**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES,<br>United States Capitol<br>Washington, D.C.  20515, | ) ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | Case No. 14-cv-01967 |
| SYLVIA MATHEWS BURWELL,<br>in her official capacity as Secretary of the United States<br>Department of Health and Human Services,<br>200 Independence Avenue, S.W.<br>Washington, D.C.  20201, | ) ) ) ) ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, D.C.  20201, | ) ) ) ) ) | |
| JACOB J. LEW,<br>in his official capacity as Secretary of the United States<br>Department of the Treasury,<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20220, and | ) ) ) ) ) ) | |
| UNITED STATES DEPARTMENT OF<br>THE TREASURY,<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20220, | ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

_____)

## COMPLAINT

### PRELIMINARY STATEMENT

This case arises out of unconstitutional and unlawful actions taken by the Administration

of President Barack Obama (the "Administration") in respect of the Patient Protection and

Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) ("ACA").  In challenging these

actions, this case addresses fundamental issues regarding the limits of Executive power under our constitutional form of government, and the continued viability of the separation of powers doctrine upon which "the whole American fabric has been erected."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803).  This lawsuit thus raises issues of exceptional importance, not only to plaintiff United States House of Representatives, but also to the entire nation.

One fundamental tenet of our divided-power system of government is that all *legislative* power is vested in Congress, and Congress alone.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.").  This legislative power may be exercised only through the "single, finely wrought, and exhaustively considered process," *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998), that is familiar to us all, namely, the passage of identical bills by the House of Representatives and the Senate (bicameralism), followed by delivery to the President for his signature or veto (presentment).  U.S. Const. art. I, § 7, cl. 2 ("Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States . . . .").  Beyond the President's role in the presentment process, the Constitution does not permit the Executive Branch to enact laws, or to amend or repeal duly enacted laws, including by adopting rules or taking other unilateral actions that have such an effect.

Equally fundamental is the constitutional ban on the expenditure of any public funds by any branch of the federal government, including the Executive Branch, absent enactment of a law appropriating such funds:  "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7.  Congress thus has a necessary role – indeed, *the defining role* – in our system over any expenditure of public

funds by virtue of the fact that it first must pass identical appropriations bills in the House of Representatives and the Senate – and such bills then must become law – before any public funds may be expended, and then only expended as directed in such duly enacted appropriations laws. The Executive Branch has no authority to expend public funds that have not been thus appropriated.

The Administration has made no secret of its willingness, notwithstanding Article I of the Constitution, to act without Congress when Congress declines to enact laws that the Administration desires.  Not only is there no license for the Administration to "go it alone" in our system, but such unilateral action is directly barred by Article I.  Despite such fundamental constitutional limitations, the Administration repeatedly has abused its power by using executive action as a substitute for legislation.  This suit challenges two such abuses:

A.  Defendants Sylvia Mathews Burwell, Secretary of the United States Department of Health and Human Services, Jacob J. Lew, Secretary of the United States Department of the Treasury, and the respective Executive Branch departments they head, have violated, and are continuing to violate, the Constitution by directing, paying, and continuing to pay, public funds to certain insurance companies to implement a program authorized by the ACA, but for which *no funds* have been appropriated.  Such unconstitutional payments are estimated to exceed $3 billion in Fiscal Year 2014, and total approximately $175 billion over the ten succeeding Fiscal Years. Defendants' expenditure of taxpayer funds, absent a congressional appropriation, plainly is unconstitutional as it violates Article I of the Constitution; it also violates statutory law, in particular, 31 U.S.C. § 1324, the ACA, and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*.

B.  Defendants Lew and the United States Department of the Treasury also have violated the Constitution by issuing a regulation that effectively amends ACA provisions that impose mandates on certain employers and establish a deadline by which such employers must comply with those mandates.  These unconstitutional actions are estimated to cost federal taxpayers at least $12 billion.

The House now brings this civil action for declaratory and injunctive relief to halt these unconstitutional and unlawful actions which usurp the House's Article I legislative powers.

## PARTIES

1.      Plaintiff United States House of Representatives ("House") is the legislative body constituted by Article I, section 2 of the United States Constitution.

2.      Defendant Sylvia Mathews Burwell is, and has been since June 9, 2014, the Secretary of the United States Department of Health and Human Services.  As Secretary, defendant Burwell is responsible for all actions taken by the department she heads.

3.      Defendant United States Department of Health and Human Services ("HHS") is an agency in the Executive Branch of the federal government.

4.      Defendant Jacob J. Lew is, and has been since February 28, 2013, the Secretary of the United States Department of the Treasury.  As Secretary, defendant Lew is responsible for all actions taken by the department he heads.

5.      Defendant United States Department of the Treasury ("Treasury Department") is an agency in the Executive Branch of the federal government.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.  This case arises under the Constitution and the laws of the United States, and is brought by the United

States, i.e., the United States House of Representatives, which is a component of the United States government.

7.     On July 30, 2014, the United States House of Representatives adopted, by a vote of 225-201, H. Res. 676, which provides that

> the Speaker is authorized to initiate or intervene in one or more civil actions on behalf of the House of Representatives in a Federal court of competent jurisdiction to seek any appropriate relief regarding the failure of the President, the head of any department or agency, or any other officer or employee of the executive branch, to act in a manner consistent with that official's duties under the Constitution and laws of the United States with respect to implementation of any provision of the Patient Protection and Affordable Care Act, title I or subtitle B of title II of the Health Care and Education Reconciliation Act of 2010, including any amendment made by such provision, or any other related provision of law, including a failure to implement any such provision.

8.     Section 3(a) of H. Res. 676 provides that "[t]he Office of the General Counsel of the House of Representatives, at the direction of the Speaker, shall represent the House in any civil action initiated, or in which the House intervenes, pursuant to this resolution, and may employ the services of outside counsel and other experts for this purpose."

9.     This Court has authority to issue a declaratory judgment, and to order injunctive and other relief that is just and proper, pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e), and 5 U.S.C. § 703.

## ALLEGATIONS

**The Constitution Vests the Congress, Not the Executive, with the Authority to Legislate, Including the Authority to Legislate to Appropriate Public Funds**

11.     Article I, section 1 of the Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

12.     Article I, section 7, clause 2 of the Constitution provides that "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it . . . ."

13.     Article I, section 9, clause 7 of the Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

**Authorizing Legislation Is Distinct from Appropriations Legislation**

14.     "Authorization" legislation establishes, continues, or modifies an agency, program, or government function.  Authorization laws alone, however, do not provide the legal authority required by Article I, section 9, clause 7 of the Constitution to expend public funds.  Only an "appropriations" law can do that.

15.     An "appropriations" law – and only an appropriations law – permits the expenditure of public funds.  That is, appropriations legislation is the sole mechanism by which Congress empowers federal agencies to expend public funds in compliance with Article I, section 9, clause 7 of the Constitution.

16.     In keeping with its broad, constitutional authority, Congress may choose not to appropriate funds for an authorized program, or Congress may appropriate a different amount of

money than the amount (if any) provided for in an authorization.  Congress also may limit the

purposes for which appropriated funds may be used.  Only a validly enacted appropriations law –

not an underlying authorization – permits a federal agency to expend public funds.  Although

Congress may combine an authorization and an appropriation in a single bill, it may (and most

often does) enact them separately.

17.     Appropriations laws generally take one of two forms:  (a) temporary

appropriations, which typically are enacted on an annual basis,[1] and (b) permanent

appropriations, which are few in number and which (i) remain in effect until Congress repeals or

modifies them, and (ii) permit federal agencies to expend public funds without the need for

passage of a temporary appropriations bill in the current Congress.  For an appropriation to be

considered permanent, the law must clearly and expressly so provide.[2]

18.     By providing funding to the Executive Branch through temporary (typically

annual) appropriations, Congress ensures Executive Branch accountability by forcing the

Executive Branch to return to Congress each year to seek continued funding for authorized

agencies, programs, and government functions.  This process provides Congress the opportunity

---

[1]  *See, e.g.*, Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, § 5, 128 Stat. 5, 7 (2014) ("The
following sums in this Act are appropriated, out of any money in the Treasury not otherwise appropriated,
for the fiscal year ending September 30, 2014."); *id.* div. B, tit. II ("For expenses necessary for the
administration of the Department of Justice, $110,000,000 . . . .").

[2]  Examples of permanent appropriations laws are 31 U.S.C. § 1304(a) (payment of certain judgments:
"Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and
interest and costs . . . when [certain specified conditions are met]"); 31 U.S.C. § 1305(2) (payment of
interest on national debt:  "Necessary amounts are appropriated . . . to pay interest on the public debt
under laws authorizing payment."); 31 U.S.C.  § 1324 (payments for refunds due under Internal Revenue
Code:  "Necessary amounts are appropriated to the Secretary of the Treasury for refunding internal
revenue collections as provided by law . . . ."); 42 U.S.C. § 401(a) (payments to Social Security
recipients:  "There is hereby appropriated to the Federal Old-Age and Survivors Insurance Trust Fund for
the fiscal year ending June 30, 1941, and for each fiscal year thereafter, [certain specified tax
revenues]."); and 42 U.S.C. § 1395i(a) (payments for Medicare benefits:  "There are hereby appropriated
to the [Federal Hospital Insurance] Trust Fund for the fiscal year ending June 30, 1966, and for each fiscal
year thereafter, [certain specified tax revenues].").

to determine a suitable amount of funding after careful consideration of, among other things, needs and effectiveness.

19.     Temporary appropriations also reinforce and further Congress' constitutional responsibility to oversee the Executive Branch, and thereby act as a check upon the Executive Branch, as the Framers intended.

20.     Without an explicit appropriation of funds by Congress, legal requirements imposed on Administration officials are merely unfunded authorizations.  In such cases, the Administration is constitutionally barred from expending public funds on the agency, program, or government function which has been authorized.

21.     The Administration is constitutionally barred from converting an authorization that requires a temporary appropriation into a permanent appropriation.  Indeed, such conversion effectively would negate the defining "power of the purse" given to Congress by the Framers.

**The Patient Protection and Affordable Care Act – the ACA – Becomes Law**

22.     On December 24, 2009, H.R. 3560, 111th Cong. (2009), as amended and retitled "Patient Protection and Affordable Care Act," passed the Senate by a vote of 60-39.

23.     On March 21, 2010, the House of Representatives agreed to the Senate amendments by a vote of 219-212.

24.     On March 23, 2010, H.R. 3560, as agreed to by both the Senate and the House of Representatives, was signed into law by President Obama.  *See* ACA, Pub. L. No. 111-148, 124 Stat. 119 (2010).

**The Administration Expends Public Funds That Congress Has Not Appropriated**

25.     Section 1402(a)(2) of the ACA requires all health insurance issuers that offer a qualified health plan through the ACA ("Insurers") to provide reduced deductibles, co-pays, and

co-insurance levels to qualified policyholders enrolled in such plans ("Beneficiaries").  These

reductions are referred to in the ACA as "Cost-Sharing Reductions."

26.     ACA Cost-Sharing Reductions are required by law and are not contingent upon

the receipt by Insurers of any offsetting payments from the government.  Rather, Insurers – who

benefit enormously by participating in the ACA – are statutorily required to provide Cost-

Sharing Reductions to Beneficiaries as a condition of being permitted to offer insurance policies

through an ACA health insurance marketplace exchange.

27.     The ACA also establishes a program by which the government is authorized to

make direct payments to Insurers to offset costs that Insurers incur in providing Cost-Sharing

Reductions to Beneficiaries (referred to herein as the "Section 1402 Offset Program").[3]

28.     Congress has not, and never has, appropriated any funds (whether through

temporary appropriations or permanent appropriations) to make any Section 1402 Offset

Program payments to Insurers.

29.     In contrast, Congress has appropriated funds for section 1401 of the ACA.  That

provision authorizes refundable tax credits to be paid for qualified individuals to reduce the cost

of their health insurance premiums (referred to herein as the "Section 1401 Refundable Tax

Credit Program") through the standing permanent appropriation for refunds due under the

Internal Revenue Code ("IRC"), 31 U.S.C. § 1324.  The Section 1402 Offset Program, on the

other hand, is not funded through this or any other appropriation.[4]

---

[3]  Section 1412(c)(3) of the ACA establishes the mechanism by which any Section 1402 Offset Program payments would be made.

[4]  *Compare* ACA §§ 1401(a), 1401(d)(1), 1412(c)(2) (payment of tax credits under Section 1401 Refundable Tax Credit Program to be made through IRC), *with* ACA §§ 1402, 1412(c)(3) (providing no authority for Section 1402 Offset Program payments to Insurers to be funded through IRC).

30.    The Congressional Budget Office ("CBO") estimates that the Administration's Section 1402 Offset Program payments to Insurers would total approximately $178 billion for fiscal years 2014 through 2024.[5]

31.    The Administration repeatedly has acknowledged that it requires temporary appropriations to fund Section 1402 Offset Program payments to Insurers.  For example, in its Fiscal Year 2014 budget submission to Congress – and in particular, in the section of its Fiscal Year 2014 budget submission dealing with the Centers for Medicare and Medicaid Services ("CMS"), an agency within defendant HHS – the Administration specifically requested, "[f]or carrying out . . . sections 1402 and 1412 of the [ACA], such sums as necessary," and, "[f]or carrying out . . . such sections in the first quarter of fiscal year 2015[,] . . . $1,420,000,000."[6]

32.    Similarly, defendant HHS, in its underlying budget justification for Fiscal Year 2014, expressly recognized that it required an annual (temporary) appropriation for CMS' "five annually-appropriated accounts," including, in particular, a new, "annually-appropriated" account for the 1402 Offset Program payments beginning in FY 2014, the "Reduced Cost Sharing for Individuals Enrolled in Qualified Health Plans (Cost Sharing Reductions)" account.[7] CMS said it needed an "annual" appropriation for Section 1402 Offset Program payments in the amount of "$4.0 billion in the first year of [ACA Exchange] operations . . . [and] a $1.4 billion advance appropriation for the first quarter of FY 2015 . . . to permit CMS to reimburse [certain

---

[5]  *See* CBO, Insurance Coverage Provisions of the Affordable Care Act – CBO's April 2014 Baseline at Table 3 (Apr. 14, 2014), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/43900-2014-04-ACAtables2.pdf.

[6]  Office of Mgmt. & Budget ("OMB"), Fiscal Year 2014 Budget of the U.S. Government, App. at 448 (Apr. 10, 2013), *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2014/assets/appendix.pdf.

[7]  *See* HHS, Fiscal Year 2014, CMS, Justification of Estimates for Appropriations Committees ("FY 2014 CMS Justification"), at 2, 4, 7, 183-84, *available at* http://www.cms.gov/about-cms/agency-information/performancebudget/downloads/fy2014-cj-final.pdf.

insurance] issuers."[8]  As defendant HHS explained:  "CMS requests an appropriation in order to ensure adequate funding to make payments to issuers to cover reduced cost-sharing in FY 2014."[9]

33.     In other words, at the time of its Fiscal Year 2014 budget submission to Congress, the Administration correctly recognized that Section 1402 Offset Program payments to Insurers could not be made unless and until Congress specifically appropriated funds for that purpose.

34.     Congress has not appropriated any funds for Section 1402 Offset Program payments to Insurers for Fiscal Years 2014 or 2015.

35.     Notwithstanding the lack of any congressional appropriation for Section 1402 Offset Program payments, defendants Lew and the Treasury Department, at the direction of defendants Burwell and HHS, began making Section 1402 Offset Program payments to Insurers in January 2014, and, upon information and belief, continues to make such payments.[10]  The Office of Management and Budget ("OMB") has reported that Section 1402 Offset Program payments to Insurers for Fiscal Year 2014 were estimated to be $3.978 billion.[11]

---

[8]  FY 2014 CMS Justification, at 2, 7.

[9]  FY 2014 CMS Justification, at 183-84.

[10]  *See* CMS, March Marketplace Payment Processing Cycle:  Enrollment & Payment Data Reporting and Restatement at 9 (Feb. 12, 2014) ("Payments for the January payment month . . . were sent to issuers in January."), *available at* https://www.regtap.info/uploads/library/FM_MPP_Slides_021214_5CR_021214.pdf; *see also* CMS, Marketplace Payment Processing:  Restatement and Payment Reporting at 7, 11 (Jan. 13, 2014) (stating that payments would begin in January 2014), *available at* https://www.regtap.info/uploads/library/FM_MPP_RestatementPayRprtSlides_011314_5CR_011514.pdf.

[11]  *See* OMB, OMB Sequestration Preview Report to the President and Congress for Fiscal Year 2014 and OMB Report to the Congress on the Joint Committee Reductions for Fiscal Year 2014, Corrected Version, p. 23 (May 20, 2013) ("OMB Report FY 2014"), *available at* http://www.whitehouse.gov/sites/default/files/omb/assets/legislative_reports/fy14_preview_and_joint_committee_reductions_reports_05202013.pdf.  The House does not know the actual amount that defendants have expended on Section 1402 Offset Program payments because, as discussed below, the Administration has disguised those figures. *See infra* note 14.

36.     In its Fiscal Year 2015 budget submission, submitted to Congress in March 2014, the Administration dramatically and conspicuously changed course.  The Administration's request for a temporary appropriation to CMS to enable it to make Section 1402 Offset Program payments to Insurers disappeared, and was replaced with a single line item in the Internal Revenue Service ("IRS") section of the budget, lumping together Section 1401 Refundable Tax Credit Program payments – funding for which is permanently appropriated through the IRC – with Section 1402 Offset Program payments which are not funded through the IRC.[12]

37.     The only explanation the Administration has offered for its unilateral decision to make Section 1402 Offset Program payments to Insurers, notwithstanding the lack of *any* congressional appropriation for such payments, came from defendant Burwell in May 2014, when she was serving as Director of OMB, in the context of Senate hearings on her nomination to be Secretary of HHS.

38.     Specifically, defendant Burwell then stated, in a letter to Senators Ted Cruz and Michael Lee, that no payments would be made from a Treasury account established for the purpose of making Section 1402 Offset Program payments to Insurers (account no. 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).  (Presumably this was so because there was no money in that account since Congress had not appropriated *any* funds for Section 1402 Offset Program payments.)  Instead, defendant Burwell said, Section 1402 Offset Program payments "will be paid out of the same account

---

[12]  *See* OMB, Fiscal Year 2015 Budget of the U.S. Government, App. at 1087 (Mar. 4, 2014), *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/appendix.pdf.

[account no. 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] from which the [Section 1401 Refundable Tax Credit Program payments] are paid," an explanation that she justified on grounds of "efficiency."[13]

39.     Defendant Burwell's explanation – translated – means that defendants are using the permanent appropriation meant to pay for tax refunds due under the IRC (31 U.S.C. § 1324) to fund not only Section 1401 Refundable Tax Credit Program payments, but also Section 1402 Offset Program payments, even though (a) the ACA does not permit that permanent appropriation to be used to fund Section 1402 Offset Program payments, and (b) 31 U.S.C. § 1324 expressly states that "[d]isbursements may be made from the appropriation made by this section only for (1) refunds to the limit of liability of an individual tax account, and (2) refunds due from credit provisions of the [IRC]," 31 U.S.C. § 1324(b); defendants' direct payments to Insurers under the Section 1402 Offset Program are neither.

40.     The Constitution does not permit such a sleight of hand.  Absent enactment of a law appropriating funds for the Section 1402 Offset Program – *and no such law exists* –

---

[13]  Letter from Sylvia M. Burwell, Dir., OMB, to Senators Ted Cruz and Michael S. Lee, at Responses p. 4 (May 21, 2014), *available at* http://www.cruz.senate.gov/files/documents/Letters/20140521_Burwell_Response.pdf.  The Burwell letter responded to a letter from Senators Cruz and Lee which inquired why the Administration had flip-flopped on the question of whether Section 1402 Offset Program payments would be subject to mandatory sequestration rules.  *See* Letter from Senators Ted Cruz and Michael S. Lee, to Sylvia M. Burwell, Dir., OMB, at 2 (May 16, 2014), *available at* http://www.cruz.senate.gov/files/documents/Letters/Burwell%20Letter.pdf.

The Senators' May 16, 2014 letter, in turn, resulted from a significant discrepancy between OMB's sequestration reports to Congress for Fiscal Years 2014 and 2015.  In particular, OMB reported for FY 2014 that Section 1402 Offset Program payments to Insurers for FY 2014 were predicted to be $3.978 billion, and that such payments were subject to mandatory sequestration in the amount of $286 million.  *See* OMB Report FY 2014 at App., p. 23 (referencing Treasury account no. 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 under "Centers for Medicare and Medicaid Services").  Ten months later, Treasury account no. 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 disappeared from the OMB report, with no explanation provided.  *See* OMB, OMB Sequestration Preview Report to the President and Congress for Fiscal Year 2015, at App., p. 6 (Mar. 10, 2014), *available at* http://www.whitehouse.gov/sites/default/files/omb/assets/legislative_reports/sequestration/sequestration_preview_report_march2014.pdf.

defendants may not legally or constitutionally make Section 1402 Offset Program payments to Insurers.[14]

41.     Defendants' actions injure the House by, among other things, usurping its Article I legislative authority.

**The Administration Unilaterally Amends Employer Mandate Provisions of the ACA**

42.     Section 1513 of the ACA amends the IRC by adding to Chapter 43 a new section 4980H.  New section 4980H imposes on "applicable large employer[s]" who fail to offer to all of their full-time employees (and their dependents) affordable health insurance coverage, as defined in the statute, one or both of two tax penalties set forth in section 4980H(a)-(b).[15]  The tax penalties are sometimes referred to as "employer shared responsibility payments."

43.     Section 1513(d) of the ACA states expressly that "[t]he amendments made by this section *shall apply* to months beginning after December 31, 2013."  ACA § 1513(d) (emphasis added).

44.     Given its obvious importance to the budgetary impact of the ACA and the balance of burdens between private and governmental sources, the selection of the December 31, 2013

---

[14]  Defendant Treasury Department is making Section 1402 Offset Program payments to Insurers from an account entitled "Refundable Premium Assistance Tax Credit," which refers to the account for the Section 1401 Refundable Tax Credit Program.  *See* OMB, SF 133 Reports on Budget Execution and Budgetary Resources, at p. 12,085 (Department of the Treasury) (Oct. 29, 2014), *available at* https://max.omb.gov/maxportal/document/SF133/Budget/attachments/703038966/705527982.pdf. Because defendant Treasury Department is making, from one account, payments to Insurers under the Section 1402 Offset Program *and* Section 1401 Refundable Tax Credit Program payments, *see id.* at p. 12,087, Line No. 4190, and because defendant Treasury Department has not separated out the amounts for these two types of payments, the House and the American people do not know the actual amounts that defendants unconstitutionally and unlawfully have expended on Section 1402 Offset Program payments to Insurers.

[15]  Section 4980H(c)(4) defines "full-time employee" ("FTE") as, "an employee who is employed on average at least 30 hours of service per week."

date was a matter of intense debate in Congress during its consideration of the bills that became the ACA.

45.    Defendants Lew and the Treasury Department effectively and unilaterally have amended section 1513(d) of the ACA by altering the date by which penalties will be assessed:

    i.    Notwithstanding the clear direction in section 1513(d) of the ACA, defendant Treasury Department announced on July 2, 2013, that it was "extending . . . transition relief to the employer shared responsibility payments.  These payments will not apply for 2014.  Any employer shared responsibility payments will not apply until 2015."[16]

    ii.    Notwithstanding the clear direction in section 1513(d) of the ACA, the IRS, a bureau of defendant Treasury Department, announced on July 9, 2013, that "no employer shared responsibility payments will be assessed for 2014."[17]

    iii.    Notwithstanding the clear direction in section 1513(d) of the ACA, defendant Treasury Department, in February 2014, promulgated a regulation, the Preamble to which states that "no assessable payment under section 4980H(a) or (b) will apply for any calendar month during 2015 or any calendar month during the portion of the 2015 plan year that falls in 2016" for employers who employ "on

---

[16]  Mark J. Mazur, Continuing to Implement the ACA in a Careful, Thoughtful Manner, Treasury Notes (July 2, 2013), *available at* http://www.treasury.gov/connect/blog/pages/continuing-to-implement-the-aca-in-a-careful-thoughtful-manner-.aspx.

[17]  IRS Notice 2013-45, 2013-31 I.R.B. 116, at 3 (July 9, 2013), *available at* http://www.irs.gov/pub/irs-drop/n-13-45.pdf.

average at least 50 full-time employees (including FTEs) but fewer than 100 full-time employees (including FTEs) on business days during 2014."[18]

46.     Defendants Lew and the Treasury Department also effectively and unilaterally have amended section 4980H of the IRC by altering the percentage of FTEs who must be offered insurance by certain employers:

    i.    Notwithstanding the requirement in section 4980H of the IRC that applicable large employers offer affordable coverage to all of their FTEs to avoid the tax penalty imposed by section 4980H(a), the Preamble to the Treasury Rule states that "for each calendar month during 2015 and any calendar months during the portion of the 2015 plan year that falls in 2016, an applicable large employer member that offers coverage to at least 70 percent (or that fails to offer to no more than 30 percent) of its full-time employees . . . will not be subject to an assessable payment under section 4980H(a)."  Treasury Rule, pmbl. § XV.D.7.a, 79 Fed. Reg. at 8575.

    ii.    Notwithstanding the requirement in section 4980H of the IRC that applicable large employers offer affordable coverage to all of their FTEs to avoid the tax penalties imposed by section 4980H(a)-(b), the Treasury Rule provides that applicable large employers must offer affordable coverage to only 95% of their FTEs in 2016 and beyond to avoid the tax penalties imposed by section 4980H(a)-

---

[18]  Shared Responsibility for Employers Regarding Health Coverage, pmbl. § XV.D.6.a.(1), 79 Fed. Reg. 8544, 8574 (Feb. 12, 2014) (to be codified at 26 C.F.R. pts. 1, 54 & 301) ("Treasury Rule").  The Treasury Rule purports to provide similar transition relief to large employers for 2014 by referencing and incorporating IRS Notice 2013-45.  *See* Treasury Rule, pmbl. § XV.B, 79 Fed. Reg. at 8569 ("Notice 2013-45, issued on July 9, 2013, provides as transition relief that no assessable payments under section 4980H will apply for 2014.").

(b).  Treasury Rule, pt. 54, §§ 54.4980H-4(a), 54.4980H-5(a), 79 Fed. Reg. at 8597-99.

47.     No legislation has been enacted to alter (i) the deadline established by section 1513(d) of the ACA, or (ii) the ACA's mandate in section 4980H of the IRC that applicable large employers offer affordable coverage to all of their FTEs to avoid the tax penalties imposed by section 4980H(a)-(b) of the IRC.

48.     The ACA does not delegate to defendant Lew, to defendant Treasury Department, or to anyone else or any other Executive Branch entity the authority to legislate such changes to the ACA.

49.     Defendants Lew's and the Treasury Department's alterations to the employer mandate provisions of the ACA are estimated to cost federal taxpayers approximately $12 billion.[19]

50.     The actions of defendants Lew and the Treasury Department injure the House by, among other things, usurping its Article I legislative authority.

## CLAIMS FOR RELIEF

### COUNT I
### (Section 1402 Offset Program Payments to Insurers
### Violate Article I, Section 9, Clause 7 of the Constitution)

51.     The House incorporates and re-alleges paragraphs 1 through 50, above, as if set forth fully herein.

---

[19]  *See* Letter from Douglas W. Elmendorf, Dir., CBO, to Hon. Paul Ryan at 3 & attached tbl. (July 30, 2013), *available at* https://www.cbo.gov/sites/default/files/44465-ACA.pdf.  CBO's $12 billion estimate is likely low inasmuch as it was calculated prior to the promulgation of the Treasury Rule that further delayed the mandate an additional year for employers with 50-99 FTEs.  *See* Treasury Rule, pmbl. § XV.D.6.a(1), 79 Fed. Reg. at 8574.

52.     Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

53.     No law appropriating funds for Section 1402 Offset Program payments to Insurers has been enacted.

54.     The Section 1402 Offset Program payments that defendants have made to Insurers, and are continuing to make to Insurers, violate Article I, section 9, clause 7 of the Constitution.

55.      The House has been injured, and will continue to be injured, by defendants' unconstitutional actions which, among other things, usurp the House's legislative authority.

56.     WHEREFORE, the House prays that the Court (i) declare that defendants' Section 1402 Offset Program payments to Insurers violate Article I, section 9, clause 7 of the Constitution, and (ii) enjoin defendants Lew and the Treasury Department from making any additional Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted in accordance with Article I of the Constitution.

## COUNT II
### (Section 1402 Offset Program Payments to Insurers
### Violate Article I, Section 1 and Article I, Section 7, Clause 2 of the Constitution)

57.     The House incorporates and re-alleges paragraphs 1 through 56, above, as if set forth fully herein.

58.     Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

59.     No law appropriating funds for Section 1402 Offset Program payments to Insurers has been enacted.

60.     Defendants' actions in making, and continuing to make, Section 1402 Offset Program payments to Insurers violate Article I, section 1 and Article I, section 7, clause 2 of the Constitution.

61.     The House has been injured, and will continue to be injured, by defendants' unconstitutional actions which, among other things, usurp the House's legislative authority.

62.     WHEREFORE, the House prays that the Court (i) declare that defendants' Section 1402 Offset Program payments to Insurers violate Article I, section 1 and Article I, section 7, clause 2 of the Constitution, and (ii) enjoin defendants Lew and the Treasury Department from making any additional Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted in accordance with Article I of the Constitution.

## COUNT III
## (Section 1402 Offset Program Payments to Insurers Violate 31 U.S.C. § 1324)

63.     The House incorporates and re-alleges paragraphs 1 through 62, above, as if set forth fully herein.

64.     Section 1324(a) of title 31 provides that "[n]ecessary amounts are appropriated to the Secretary of the Treasury for refunding internal revenue collections as provided by law."

65.     Section 1324(b) of title 31 provides that "[d]isbursements may be made from the appropriation made by this section [i.e., section 1324] only for – (1) refunds to the limit of liability of an individual tax account; and (2) refunds due from credit provisions of the [IRC] . . . ."

66.     Defendants are using the permanent appropriation for refunds due under the IRC, provided by section 1324 of title 31, to fund Section 1402 Offset Program payments.

67.     Defendants' direct payments to Insurers under the Section 1402 Offset Program are neither "(1) refunds to the limit of liability of an individual tax account; [nor] (2) refunds due from credit provisions of the [IRC]."

68.     The Section 1402 Offset Program payments by defendants to Insurers violate section 1324 of title 31.

69.     The House has been injured, and will continue to be injured, by defendants' unlawful actions which, among other things, usurp the House's legislative authority.

70.     WHEREFORE, the House prays that the Court (i) declare that defendants' Section 1402 Offset Program payments to Insurers violate section 1324 of title 31, and (ii) enjoin defendants Lew and the Treasury Department from making any additional Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted in accordance with Article I of the Constitution.

COUNT IV
**(Section 1402 Offset Program Payments to Insurers Violate the ACA)**

71.     The House incorporates and re-alleges paragraphs 1 through 70, above, as if set forth fully herein.

72.     In crafting legislation, Congress chooses whether particular programs will be authorized without appropriation, authorized and funded with temporary appropriations, or authorized and funded with permanent appropriations.

73.     The budgetary impact of programs was a prominent element running through the debate over the ACA, and Congress selected different forms of authorization or appropriations for different programs.

74.     For example, Congress selected different appropriation schemes for ACA sections 1401 and 1402.

75.     In section 1401 of the ACA, Congress established a new program – the Section 1401 Refundable Tax Credit Program – and, elsewhere in the ACA, appropriated funds for that program by expressly linking the program to the permanent appropriation for refunds due under the IRC (31 U.S.C. § 1324).  *See* ACA, §§ 1401(a), 1401(d)(1), 1412(c)(2).

76.     In section 1402 of the ACA, Congress established another new program – the Section 1402 Offset Program.  However, in stark contrast to the Section 1401 Refundable Tax Credit Program, Congress did not provide any appropriation for the Section 1402 Offset Program, either by linking that program to the permanent appropriation for refunds due under the IRC (31 U.S.C. § 1324) or otherwise.

77.     Congress thereby manifested its intent that the Section 1402 Offset Program be funded by temporary appropriations, if at all, and that no Section 1402 Offset Program payments be made absent such a temporary appropriation.

78.     Congress has not enacted any temporary appropriation for the Section 1402 Offset Program, and defendants cannot imply from mere authorizing language in ACA § 1402 the authority to expend funds.  Moreover, defendants cannot convert ACA § 1402 into a permanent appropriation by executive fiat or unilateral action.

79.     In light of the entire statutory scheme, the Section 1402 Offset Program payments that defendants have made to Insurers, and are continuing to make to Insurers, violate the ACA.

80.     The House has been injured, and will continue to be injured, by defendants' unlawful actions which, among other things, usurp the House's legislative authority.

81.     WHEREFORE, the House prays that the Court (i) declare that defendants' Section 1402 Offset Program payments to Insurers violate the ACA, and (ii) enjoin defendants Lew and the Treasury Department from making any additional Section 1402 Offset Program

payments to Insurers unless and until a law appropriating funds for such payments is enacted in accordance with Article I.

## COUNT V
**(Section 1402 Offset Program Payments to Insurers Violate the Administrative Procedure Act)**

82.     The House incorporates and re-alleges paragraphs 1 through 81, above, as if set forth fully herein.

83.     Defendants' direct payments to Insurers under the Section 1402 Offset Program constitute "agency action" and/or "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*. ("APA").

84.     Defendants' direct payments to Insurers under the Section 1402 Offset Program are "not in accordance with law" within the meaning of the APA § 706(2)(A).

85.     Defendants' direct payments to Insurers under the Section 1402 Offset Program are "contrary to constitutional right, power, privilege, or immunity" within the meaning of the APA § 706(2)(B).

86.     Defendants' direct payments to Insurers under the Section 1402 Offset Program are "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right" within the meaning of the APA § 706(2)(C).

87.     Accordingly, the Section 1402 Offset Program payments defendants have made to Insurers, and are continuing to make to Insurers, violate the APA, in particular, APA § 706(2)(A), (B), and (C).

88.     The House has been injured, and will continue to be injured, by defendants' unlawful actions which, among other things, usurp the House's legislative authority.

89.     The House has no adequate or available administrative remedy, and/or any effort to obtain an administrative remedy would be futile.

90.     WHEREFORE, the House prays that the Court (i) declare that defendants' Section 1402 Offset Program payments to Insurers violate the APA, and (ii) enjoin defendants Lew and the Treasury Department from making any additional Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted in accordance with Article I of the Constitution.

## COUNT VI
### (Treasury Rule, pmbl. § XV.D.6.a(1) Violates Article I, Section 1 and Article I, Section 7, Clause 2 of the Constitution)

91.     The House incorporates and re-alleges paragraphs 1 through 90, above, as if set forth fully herein.

92.     Defendants Lew and the Treasury Department may not amend or repeal any provisions of the ACA.

93.     By virtue of Treasury Rule, pmbl. § XV.D.6.a(1), defendants Lew and the Treasury Department effectively have amended section 1513(d) of the ACA, which provides that "[t]he amendments made by this section *shall apply to months beginning after December 31, 2013.*" *Id.* (emphasis added).

94.     By thus effectively amending section 1513(d) of the ACA, defendants Lew and the Treasury Department have violated the Constitution, in particular, Article I, section 1, which vests in the Congress "[a]ll legislative Powers," and Article I, section 7, clause 2, requiring passage by both the House and Senate, and then presentment to the President.

95.     The House has been injured, and will continue to be injured, by the unconstitutional actions of defendants Lew and the Treasury Department which, among other things, usurp the House's legislative authority.

96.     WHEREFORE, the House prays that the Court declare that Treasury Rule, pmbl. § XV.D.6.a(1) violates Article I, section 1 and Article I, section 7, clause 2 of the Constitution.[20]

## COUNT VII
### (Treasury Rule, pmbl. § XV.D.7.a Violates Article I, Section 1 and Article I, Section 7, Clause 2 of the Constitution)

97.     The House incorporates and re-alleges paragraphs 1 through 96, above, as if set forth fully herein.

98.     Defendants Lew and the Treasury Department may not amend or repeal any provisions of the ACA, including amendments to the IRC effectuated by the ACA.

99.     By virtue of Treasury Rule, pmbl. § XV.D.7.a, defendants Lew and the Treasury Department effectively have amended section 4980H of the IRC, which mandates that applicable large employers offer affordable coverage to *all of their FTEs* in order to avoid the tax penalty imposed by section 4980H(a).

100.    By effectively amending section 4980H of the IRC, defendants Lew and the Treasury Department have violated the Constitution, in particular, Article I, section 1, which vests in the Congress "[a]ll legislative Powers," and Article I, section 7, clause 2, requiring passage by both the House and Senate, and then presentment to the President.

---

[20]  The House does not seek relief with respect to IRS Notice 2013-45 which, as noted above in paragraph 45(ii), effectively altered the deadline established by section 1513(d) of the ACA from "months beginning after December 31, 2013" to "months beginning after December 31, 2014" for all large employers, for the sole reason that IRS Notice 2013-45 will cease to have any effect as of January 1, 2015.

101.    The House has been injured, and will continue to be injured, by the unconstitutional actions of defendants Lew and the Treasury Department which, among other things, usurp the House's legislative authority.

102.    WHEREFORE, the House prays that the Court declare that Treasury Rule, pmbl. § XV.D.7.a violates Article I, section 1 and Article I, section 7, clause 2 of the Constitution.

**COUNT VIII**
**(Treasury Rule, pt. 54, §§ 54.4980H-4(a), 54.4980H-5(a) Violate Article I, Section 1 and Article I, Section 7, Clause 2 of the Constitution)**

103.    The House incorporates and re-alleges paragraphs 1 through 102, above, as if set forth fully herein.

104.    Defendants Lew and the Treasury Department may not amend or repeal any provisions of the ACA, including amendments to the IRC effectuated by the ACA.

105.    By virtue of Treasury Rule, pt. 54, §§ 54.4980H-4(a), 54.4980H-5(a), defendants Lew and the Treasury Department effectively have amended section 4980H of the IRC, which mandates that applicable large employers offer affordable coverage to *all of their FTEs* to avoid the tax penalties imposed by section 4980H(a)-(b).

106.    By effectively amending section 4980H of the IRC, defendants Lew and the Treasury Department have violated the Constitution, in particular, Article I, section 1, which vests in the Congress "[a]ll legislative Powers," and Article I, section 7, clause 2, requiring passage by both the House and Senate, and then presentment to the President.

107.    The House has been injured, and will continue to be injured, by the unconstitutional actions of defendants Lew and the Treasury Department which, among other things, usurp the House's legislative authority.

108.    WHEREFORE, the House prays that the Court declare that Treasury Rule, pt. 54, §§ 54.4980H-4(a), 54.4980H-5(a) violate Article I, section 1 and Article I, section 7, clause 2 of the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the House respectfully prays that this Court:

A.    Enter declaratory relief as follows:

    (i)    With respect to Count I, declare that defendants' Section 1402 Offset Program payments to Insurers violate Article I, section 9, clause 7 of the Constitution;

    (ii)    With respect to Count II, declare that defendants' Section 1402 Offset Program payments to Insurers violate Article I, section 1 and Article I, section 7, clause 2 of the Constitution;

    (iii)    With respect to Count III, declare that defendants' Section 1402 Offset Program payments to Insurers violate 31 U.S.C. § 1324;

    (iv)    With respect to Count IV, declare that defendants' Section 1402 Offset Program payments to Insurers violate the ACA;

    (v)    With respect to Count V, declare that defendants' Section 1402 Offset Program payments to Insurers violate the APA;

    (vi)    With respect to Count VI, declare that Treasury Rule, pmbl. § XV.D.6.a(1) violates Article I, section 1 and Article I, section 7, clause 2 of the Constitution;

(vii)    With respect to Count VII, declare that Treasury Rule, pmbl. § XV.D.7.a violates Article I, section 1 and Article I, section 7, clause 2 of the Constitution; and

(viii)    With respect to Count VIII, declare that Treasury Rule, pt. 54, §§ 54.4980H-4(a), 54.4980H-5(a) violate Article I, section 1 and Article I, section 7, clause 2 of the Constitution.

B.    Enter injunctive relief as follows:

(i)    With respect to Counts I, II, III, IV, and V, enjoin defendants Lew and the Treasury Department from making any further Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted in accordance with Article I of the Constitution.

C.    Grant the House such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Jonathan Turley*
JONATHAN TURLEY
DC Bar No. 417674

2000 H Street, N.W.
Washington, D.C.  20052
(202) 285-8163
jturley@law.gwu.edu

Of Counsel:

KERRY W. KIRCHER, General Counsel
DC Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
DC Bar No. 482949
TODD B. TATELMAN, Assistant Counsel
VA Bar No. 66008
ELENI M. ROUMEL, Assistant Counsel
SC Bar No. 75763
ISAAC B. ROSENBERG, Assistant Counsel
DC Bar No. 998900
KIMBERLY HAMM, Assistant Counsel
DC Bar No. 1020989

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700

*Counsel for Plaintiff United States House of Representatives*

November 21, 2014