**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-01967-RMC |
| | ) | |
| SYLVIA MATHEWS BURWELL, | ) | |
| in her official capacity as Secretary of the United States | ) | |
| Department of Health and Human Services, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**UNITED STATES HOUSE OF REPRESENTATIVES'
RESPONSE TO DEFENDANTS' SUPPLEMENTAL MEMORANDUM**

JONATHAN TURLEY, D.C. Bar No. 417674
2000 H Street, N.W.
Washington, D.C.  20052
(202) 285-8163
jturley@law.gwu.edu

KERRY W. KIRCHER, General Counsel
    D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
    D.C. Bar No. 482949
TODD B. TATELMAN, Senior Assistant Counsel
ELENI M. ROUMEL, Assistant Counsel
ISAAC B. ROSENBERG, Assistant Counsel
    D.C. Bar No. 998900
KIMBERLY HAMM, Assistant Counsel
    D.C. Bar No. 1020989

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)

*Counsel for Plaintiff United States House of Representatives*

July 17, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.       Defendants' Merits Contentions Are Wrong. ................................................... 3

         1.       The "Congressional Understanding" Defendants Allege Lacks Any Record
                  Support and Confuses Authorizations and Appropriations ..................... 5

         2.       The Absence of an Appropriation Does Not Imply an Appropriation .................... 6

         3.       Defendants Misconstrue § 1001 ........................................................ 7

II.      Defendants' Other Arguments Also Are Wrong. ............................................... 8

CONCLUSION ........................................................................................................... 8

CERTIFICATE OF SERVICE

EXHIBITS

      A – C. Stephen Redhead, Cong. Research Serv., R42051, *Budget Control Act: Potential Impact of Sequestration on Health Reform Spending* (2013)

      B – 42 U.S.C. § 18023

      C – *Hr'g on Dep'ts of Labor, Health & Human Servs., & Educ., & Related Agencies Appropriations for Fiscal Year* 2014, *Before the S. Comm. on Appropriations*, 113th Cong. (2013)

      D – Continuing Appropriations Act, 2014, Pub. L. No. 113-46, 127 Stat. 558 (2013)

# TABLE OF AUTHORITIES

<u>**Cases**</u>

\* *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
No. 13-1314, 2015 WL 2473452 (U.S. June 29, 2015) .......................................................1

\* *Comm. on the Judiciary v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008) ....................................................................................8

\* *Comm. on Oversight & Gov't Reform v. Holder*,
979 F. Supp. 2d 1 (D.D.C. 2013) .....................................................................................8

*Freytag v. Comm'r*,
501 U.S. 868 (1991)..........................................................................................................2

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977) ......................................................................................2, 3

*King v. Burwell*,
No. 14-114, 2015 WL 2473448 (U.S. June 25, 2015) ......................................................5

\* *OPM v. Richmond*,
496 U.S. 414 (1990)..........................................................................................................6

\* *U.S. v. AT&T*,
551 F.2d 384 (D.C. Cir. 1976) ..........................................................................................8

\* *U.S. v. AT&T*,
567 F.2d 121 (D.C. Cir. 1977) ..........................................................................................8

\* *U.S. v. MacCollom*,
426 U.S. 317 (1976)..........................................................................................................7

*U.S. v. Windsor*,
133 S. Ct. 2675 (2013) ......................................................................................................8

\* *Zivotofsky v. Kerry*,
135 S. Ct. 2076 (June 8, 2015)..........................................................................................2

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 7.................................................................................1, 6

## Statutes & Federal Rules

31 U.S.C. § 1324.........................................................................................3, 4, 5, 6, 7

42 U.S.C. § 18023.................................................................................................6

ACA § 1401 (codified at 26 U.S.C. § 36B) .............................................................5, 6

ACA § 1402 (codified at 42 U.S.C. § 18071)...........................................................5, 6

Continuing Appropriations Act, 2014, Pub. L. No. 113-46, 127 Stat. 558 (2013).................4, 7, 8

## Legislative Authorities

159 Cong. Rec. H5517 (daily ed. Sept. 12, 2013) ...........................................................4

*Dep't of Labor, Health & Human Servs., & Educ., & Related Agencies
    Appropriations for Fiscal Year 2014, Hr'g Before the S. Comm. on Appropriations,*
    113th Cong (2013) ............................................................................................6

*Obamacare Implementation & the Dep't of Health & Human Services FY16 Budget Request,*
    *Hr'g before the House Comm. on Ways & Means*, 114th Cong. (June 10, 2015)...............4

## Other Authorities

C. Stephen Redhead, Cong. Research Serv., R42051, *Budget Control Act: Potential
    Impact of Sequestration on Health Reform Spending* (2013) ..............................................5

Letter from Hon. Kathleen Sebelius to the Hon. Joseph R. Biden, Jr. (Jan. 1, 2014)
    (Ex. 9 to Joint Submission).................................................................................7

U.S. Gov't Accountability Office, *Principles of Federal Appropriations Law*, 3d ed., vol. I ....5, 7

Tr. of Oral Arg. (May 28, 2015) (ECF No. 31) (Ex. N to Joint Submission)...........................1, 4

Defendants' latest pleading argues principally that defendants are right and the House is wrong on the merits. *See* Defs.' Suppl. Mem. . . . (July 1, 2015) (ECF No. 34) ("Defendants' Supplemental Memorandum"). While the House is eager for the Court to reach the merits of its claims, the question now before the Court is whether the House has standing. And, on that question – as we pointed out earlier and as defendants have acknowledged – the Court must assume that the House is right on the merits.[1]

As to the issue actually before the Court, the House contends it is injured for Article III purposes because its exclusive constitutional power to appropriate is negated and usurped by defendants' giveaway of billions of taxpayer dollars to insurers under an ACA program for which *Congress never has appropriated any funds*.[2] Defendants do not contest that (i) if the Court accepts, for purposes of its standing analysis, that Congress never appropriated any funds for the Section 1402 Offset Program, then (ii) the House is injured. Indeed, in light of the explicit mandate of the Appropriations Clause – "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7 – they could not plausibly contend otherwise. *See also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, No. 13-1314, 2015 WL 2473452, at *8-10 (U.S. June 29, 2015) (state legislature had standing where it alleged that its constitutional powers had been stripped away).[3]

---

[1]  *See* Opp'n of the [House] to Defs.' Mot. to Dismiss . . . at 20-21 (Feb. 27, 2015) (ECF No. 22) ("House Opposition"); [House's] Suppl. Mem. . . . at 1, n.2 & 10. (July 1, 2015) (ECF No. 33) ("House Supplemental Memorandum"); Tr. of Oral Arg. at 11 (May 28, 2015) (ECF No. 31) ("Transcript") (MR. McELVAIN:  Court must "assume that [the House] is right [on the merits]"); *see also id.* at 27, 48.

[2]  *See* Compl. ¶¶ 25-26, 28, 31-35 (Nov. 21, 2014) (ECF No. 1); House Opp'n at 11-17, 21-31; Joint Submission in Resp. to This Court's June 1, 2015 Minute Order at 4-9 (June 15, 2015) (ECF. No. 30) (Joint Submission"); House Suppl. Mem. at 2-7, 7-11.

[3]  Despite *Arizona State Legislature's* affirmative recognition of legislative standing, defendants suggest that that case stands for the proposition that separation of powers considerations bar all suits by the Legislative Branch against the Executive. *See* Defs.' Suppl. Mem. at 12. It does not. *See* Pl.'s Notice of New Authority at 2-3 (June 30, 2015) (ECF No. 32). Here, separation of powers considerations counsel

(*Continued. . .* )

1

Defendants' response on the standing issue reduces to nothing more than this: because *they can conceive* of the possibility that the ACA might somehow be construed to provide funding for the Section 1402 Offset Program, this case automatically becomes a "challenge [to] the Executive Branch's interpretation and implementation of federal law," Defs.' Suppl. Mem. at 2, and the House therefore automatically lacks standing.

If accepted, this argument would render the Appropriations Clause merely advisory; neuter Congress by effectively transferring the appropriations power to the Executive; and curtail the judiciary's ability to check Executive Branch overreach. Defendants' standing argument, in other words, is wholly inconsistent with our system of separated powers and checks and balances. *See* House Opp'n at 3-10; House Suppl. Mem. at 12; *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2096 (June 8, 2015) ("improper" for one branch to "'aggrandiz[e] its power at the expense of another branch'" (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991))). If it is improper to aggrandize power at the expense of one branch, then most assuredly it is improper to aggrandize power at the expense of both the other branches, as defendants attempt to do here.

As we now explain, defendants' position on standing is wrong, not only because it is contrary to the black-letter law of this circuit, *see* House Opp'n at 20-21; House Suppl. Mem. at 1, n.2 & 10, but also because its underlying premise – that the ACA might somehow be construed to provide funding for the Section 1402 Offset Program – rests on a series of contentions about the merits that are manifestly incorrect.[4]

---

very heavily in favor of the House's standing. *See* House Opp'n at 1-10, 21-22; House Suppl. Mem. at 12.

[4] Defendants' argument rests principally on *Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977), which is inapposite here because Representative Harrington did not contend – as the House does here – that there was no appropriation. *See id.* at 196 (plaintiff "does not question the constitutional sufficiency of the funding . . . provisions of the CIA Act"). In any event, the House does not concede that it lacks standing if it merely disputes the Executive's interpretation of an appropriations law; that is an open question.

*(Continued. . . )*

## I.      Defendants' Merits Contentions Are Wrong.

We have explained in detail that (i) the ACA itself did not appropriate funds for the Section 1402 Offset Program, and (ii) Congress thereafter did not appropriate funds for that program – in either FY 2014 or 2015.  *See* House Suppl. Mem. at 2-4, 4-7.  Defendants do not dispute that Congress did not appropriate funds in FY 2014 and 2015 and, in particular, do not dispute that, with respect to FY 2014, Congress declined to enact an *annual* appropriation that the Administration specifically requested (and did not withdraw).  *See id.* at 4-7 & 6 n.6. However, defendants' position on whether the ACA itself appropriated any funds from which defendants *legally* could pay billions to insurers has changed dramatically over time.

*In April 2013*, the Administration acknowledged that no permanent appropriation was available to make Section 1402 Offset Program payments, and that it required an annual appropriation to make such payments.  *See id.* at 4-5; Joint Submission at 5-7.

*In May 2013*, OMB (then headed by defendant Burwell) acknowledged that 31 U.S.C. § 1324 was *not* available to make Section 1402 Offset Program payments to insurers.  *See* House Suppl. Mem. at 5 n.4; Joint Submission at 6 n.2.

*In January 2014*, after Congress rejected their request for an annual appropriation, defendants began making Section 1402 Offset Program payments to insurers, without informing, or providing any justification to, the Congress.  *See* Joint Submission at 8; *infra* n.9.

*In May 2014*, after those payments already had begun, defendant Burwell justified the payments, to Congress, on grounds of "efficiency."  *See* Joint Submission at 9.

---

While *Harrington* suggests that might be the case as to an individual congressional plaintiff, *Harrington* did not resolve that issue as to institutional plaintiffs.  *See* House Opp'n at 38 n.21.

*In May 2015*, defendants disavowed Burwell's "efficiency" rationale.  *See* Tr. at 10.

They then said unidentified "Principles of Appropriations Law," *id.* at 8, entitled them to tap the

appropriation made by 31 U.S.C. § 1324 – a permanent appropriation *expressly* limited to "(1)

refunds to the limit of liability of an individual tax account; and (2) refunds due from [specified]

credit provisions of the Internal Revenue Code ['IRC']," 31 U.S.C. § 1324(b).

*In June 2015*, defendant Burwell told the House Committee on Ways and Means that the

Section 1402 Offset Program was actually a "tax credit."[5]

*Now, in July 2015*, defendants, by not mentioning it, tacitly have disavowed the "tax

credit" idea.  *See* Defs.' Suppl. Mem.  Still unable to identify any actual appropriations language,

they now rest their argument that they can tap 31 U.S.C. § 1324 on three bald assertions:  (i)

"Congress enacted a provision in the ACA [not identified] that was *premised on the*

*understanding* that cost-sharing reductions did not require yearly appropriations," *id.* at 4

(emphasis added); (ii) Congress, in subsequent enactments, never restricted the use of any

federal funds for Section 1402 Offset program payments, *see id.* at 4-7, 9; and (iii) certain

programmatic language in § 1001 of the Continuing Appropriations Act, 2014, Pub. L. No. 113-

46, 127 Stat. 558, 566 (2013), evinces "a shared understanding that [Section 1402 Offset

Program] payments could be made," *id.* at 7.[6]  All three predicate contentions are badly flawed.

---

[5] *Obamacare Implementation & the Dep't of Health & Human Services FY16 Budget Request*, *Hr'g before the House Comm. on Ways & Means*, 114th Cong. (June 10, 2015) (testimony of Sec'y Burwell at 58:08:00 – 1:01:23), *available at* http://www.c-span.org/video/?326494-1/health-human-services-secretary-testimony-affordable-care-act-implementation.

[6] Defendants refer to § 1001 as the "No Subsidies Without Verification Act."  That is incorrect.  While that was the name of H.R. 2775 when the House passed that bill in September 2013, *see* 159 Cong. Rec. H5517, H5528-29 (daily ed. Sept. 12, 2013), the Senate changed the bill's name to "Continuing Appropriations Act, 2014," and passed the bill as amended in that and other regards on October 16, 2013.  *See* Joint Submission at 7.  The same day, the House passed the bill as amended by the Senate, *id.*, and the President signed the Continuing Appropriations Act, 2014 into law the following day, *id.*

1. The "Congressional Understanding" Defendants Allege Lacks Any Record Support and Confuses Authorizations and Appropriations. Defendants' first contention has no record support, and rests only on the undisputed fact that Congress created the Section 1402 Offset Program and *authorized* payments to be made to insurers under the program. But, as we already have explained, authorizations and appropriations are not the same. Authorization language creates programs, prescribes functions, and/or provides legal authority for an agency to conduct a program or activity. But authorization language – even language that says "shall pay" – does not provide any funds to be spent on programs, functions, or activities; only appropriations language can do that. *See* House Opp'n at 8-10 (citing authorities).[7]

ACA sections 1401 and 1402 are classic examples of this distinction. While both create programs and *authorize* payments to be made under those programs, *only* the Section 1401 Premium Tax Credit program actually is funded – by virtue of ACA § 1401(d)(1) which amends 31 U.S.C. § 1324(b). *See* House Suppl. Mem. at 2-3. *There is no language in the ACA that appropriates funds for the Section 1402 Offset Program* (either by amending § 1324 or otherwise), and tossing around words like "mandatory," "unified administration," and "[Congress'] understanding," Defs.' Suppl. Mem. at 3-4, cannot and does not change that fact.[8]

---

[7] *See also* U.S. Gov't Accountability Office, *Principles of Federal Appropriations Law*, 3d ed., vol. I at 2-40 ("GAO Red Book") (even an "authorization of appropriations does not constitute an appropriation of public funds, but contemplates subsequent legislation by Congress actually appropriating the funds" (citing 35 Comp. Gen. 306 (1955) & 27 Comp. Dec. 923 (1921))).

[8] While defendants cite *King v. Burwell*, No. 14-114, 2015 WL 2473448 (U.S. June 25, 2015), that decision is not apposite because (i) it does not address any appropriations issues; (ii) it says nothing about the House's standing where, as here, the House asserts (and the factual record supports) that the Administration is spending billions in the absence of any appropriations enactment; and (iii) if the House prevails on the merits, eligible beneficiaries will continue to receive ACA cost-sharing reductions for which they qualify, even though insurers will not receive reimbursements (unless and until Congress appropriates funds for that purpose). *See* C. Stephen Redhead, Cong. Research Serv., R42051, *Budget Control Act: Potential Impact of Sequestration on Health Reform Spending* 15, n.42 (2013), attached as Ex. A.

*(Continued. . . )*

2. <u>The Absence of an Appropriation Does Not Imply an Appropriation</u>.  Defendants'
contention that they may tap 31 U.S.C. § 1324 to make Section 1402 Offset Program payments
because Congress "enacted no . . . restriction as to cost-sharing payments" in FY 2014/2015,
Defs.' Suppl. Mem. at 9, is twice flawed.  *First*, this contention is statutorily precluded by § 1324
itself.  Section 1324(b) *expressly* restricts the use of that appropriation to "only . . . (1) refunds to
the limit of liability of an individual tax account; and (2) refunds due from [specified] credit
provisions of the [IRC]. . . ."  *Defendants nowhere contend, because they cannot, that Section
1402 Offset program payments are either "refunds" due on an "individual tax account," or
"refunds" due from any IRC credit provision enumerated in § 1324(b)(2).*

*Second*, the contention presumes that defendants may pass out taxpayer dollars unless
and until Congress specifically prohibits such giveaways.  But the Constitution says exactly the
opposite:  "No Money shall be drawn from the Treasury but in Consequence of Appropriations
made by Law."  U.S. Const. art. I, § 9, cl. 7.  Not surprisingly, the courts have sided with the
Constitution.  "Our cases underscore the straightforward and explicit command of the
Appropriations Clause.  It means simply that no money can be paid out of the Treasury unless it
has been appropriated by an act of Congress."  *OPM v. Richmond*, 496 U.S. 414, 424 (1990)

Defendants also cite 42 U.S.C. § 18023(b)(2)(A).  But this provision, attached as Ex. B, only addresses
restrictions on insurers' use of ACA payments they receive.  It says nothing about the appropriation of
any funds to make those payments in the first place.

Finally, defendants cite a single snippet of a Senator's statement which does not reference the Section
1402 Offset Program; is self-evidently incorrect insofar as it suggests that the entire ACA is permanently
funded; and cannot reasonably be construed to mean that Congress gave defendants carte blanche to tap
31 U.S.C. § 1324 to make the Section 1402 Offset Program payments.  *Cf. Dep'ts of Labor, Health &
Human Servs., & Educ., & Related Agencies Appropriations for Fiscal Year* 2014, *Hr'g Before the S.
Comm. on Appropriations*, 113th Cong. 141 (2013) (statement of Sen. Patty Murray, Chairwoman, S.
Comm. on Budget) ("Unlike [§ 1401] premium assistance subsidies, [§ 1402] cost-sharing subsidies are
not provided to individual taxpayers, but paid directly to insurers.  As such they appear to be subject to
sequestration."), attached as Ex. C.  Because payments properly made under 31 U.S.C. § 1324 are exempt
from sequestration, *see* House Suppl. Mem. at 5 n.4; Ex. A at 15, 22, Senator Murray's statement evinces
her understanding that § 1324 *cannot* be the funding source for Section 1402 Offset Program payments.

(quotations omitted); *see also* House Opp'n at 4-8; GAO Red Book at 1-2 to 1-5.  Under defendants' logic, the absence of a reference to a program in an appropriations act can be treated as an affirmative appropriation.  If adopted, such interpretative alchemy would turn the Constitution on its head and wholly negate Congress' power of the purse.  *See U.S. v. MacCollom*, 426 U.S. 317, 321 (1976) (rejecting this logic as "novel approach," and reversing lower court ruling that funds could be expended unless prohibited by Congress).

3. <u>Defendants Misconstrue § 1001</u>.  Finally, the notion that § 1001, attached as Ex. D, evinced some sort of "shared understanding that [Section 1402 Offset Program payments] could be made," Defs.' Suppl. Mem. at 7, is difficult to take seriously.  *First,* § 1001, which says nothing about appropriations, is a simple anti-fraud provision, designed only to ensure that individuals who apply for tax credits and cost-sharing reductions actually are eligible to receive them.[9]  *Second*, the structure of the Act belies defendants' contention:  Division A contains various appropriations, while Division B (containing §1001) deals with "Other Matters" and contains no appropriations or amendments to any laws governing any appropriations.  *Third*, when § 1001 was enacted (October 2013), the Administration's position – insofar as Congress was aware – was that an *annual* appropriation from Congress was required to make Section 1402 Offset Program payments.  *See supra* at 3; House Suppl. Mem. at 6 & n.6 (FY 2014 request for annual appropriation not withdrawn).

---

[9]  Section 1001 does this by requiring the "Secretary [to] submit a report to the Congress that details the procedures employed by . . . Exchanges to verify eligibility for credits and cost-sharing reductions . . . .," Pub. L. No. 113-46, § 1001(b), which the Secretary did.  *See* Letter from Hon. Kathleen Sebelius to the Hon. Joseph R. Biden, Jr. (Jan. 1, 2014) ("Sebelius Letter") (Ex. 9 to Joint Submission).  However, defendants' claim that this letter "provided further confirmation to Congress that advance payments of cost-sharing reductions would be made in the coming year . . . ," Defs.' Suppl. Mem. at 5, is irrelevant and wrong.  It is wrong because the letter states only that the certification is being provided "before the first advance payments of the premium tax credit are made [in mid-January]."  Sebelius Letter at 1.  It does not (i) mention Section 1402 Offset Program payments; (ii) disclose that defendants intended to tap 31 U.S.C. § 1324 to make such payments; or (iii) advise Congress when such payments would begin.

Nothing in § 1001 or its legislative history suggests that Congress was rendering any judgment on funding for the Section 1402 Offset Program, and defendants cite no law to support the extraordinary conclusions they would have the Court draw from § 1001's enactment. The idea that Congress "affirmatively ratified" those payments, Defs.' Suppl. Mem. at 11, in October 2013 – months before the first payments even were made – is over the top.

## II.     Defendants' Other Arguments Also Are Wrong.

Defendants' remaining arguments merit only the briefest of responses.

1. Defendants say this suit is "unprecedented." Defs.' Suppl. Mem. at 1; *see also id.* at 12 ("first time in this Nation's history"). It is not.[10] What *is* unprecedented here is not the appearance of the House in court, but defendants' willingness to hand out billions of taxpayer dollars with no appropriation from the Congress.

2. Defendants say the House cannot sue here because the Constitution does not say it can. *See* Defs.' Suppl. Mem. at 10 n.7. The Courts already have rejected this extreme notion. *See* House Opp'n at 21-23 (citing cases).

3. Defendants' contention that the House lacks standing because "it retains many other legislative tools," Defs.' Suppl. Memo. at 8, also is wrong, as other courts already have held.[11]

### CONCLUSION

For all the reasons presented above and earlier, the motion to dismiss should be denied.

---

[10]   *See, e.g.*, House Opp'n at 21-23 (identifying other cases in which political branches have litigated directly against each other, including *U.S. v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977), and *U.S. v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976), in which Executive was plaintiff); *see also U.S. v. Windsor*, 133 S. Ct. 2675 (2013) (Executive, acting functionally as plaintiff, affirmatively attacked constitutionality of duly enacted federal statute; House, through its leadership, was intervenor-defendant).

[11]   *See, e.g.*, *AT&T*, 567 F.2d 121 (reaching merits without requiring other remedies to be exhausted); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013) (same); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008) (same); *see also* House Opp'n at 34-36.

Respectfully submitted,

*/s/ Jonathan Turley*
JONATHAN TURLEY
D.C. Bar No. 417674

2000 H Street, N.W.
Washington, D.C.  20052
(202) 285-8163
 jturley@law.gwu.edu

KERRY W. KIRCHER, General Counsel
    D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
    D.C. Bar No. 482949
TODD B. TATELMAN, Senior Assistant Counsel
ELENI M. ROUMEL, Assistant Counsel
ISAAC B. ROSENBERG, Assistant Counsel
    D.C. Bar No. 998900
KIMBERLY HAMM, Assistant Counsel
    D.C. Bar No. 1020989

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700

*Counsel for Plaintiff U.S. House of Representatives*

July 17, 2015

**CERTIFICATE OF SERVICE**

I certify that on July 17, 2015, I filed the foregoing United States House of

Representatives' Response to Defendants' Supplemental Memorandum via the CM/ECF system

for the United States District Court for the District of Columbia which, I understand, caused

service on all registered parties.


_/s/ Sarah Clouse_____
Sarah Clouse