**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SYLVIA MATTHEWS BURWELL in her official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, | ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No.  14-1967 (RMC)

_____

**MEMORANDUM OPINION**

Article I of the United States Constitution established the Congress, which comprises a House of Representatives and a Senate.  U.S. Const. art. I, § 1.  Only these two bodies, acting together, can pass laws—including the laws necessary to spend public money.  In this respect, Article I is very clear: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7.

Through this lawsuit, the House of Representatives complains that Sylvia Burwell, the Secretary of Health and Human Services, Jacob Lew, the Secretary of the Treasury, and their respective departments (collectively the Secretaries) have spent billions of unappropriated dollars to support the Patient Protection and Affordable Care Act.  The House further alleges that Secretary Lew and Treasury have, under the guise of implementing regulations, effectively amended the Affordable Care Act's employer mandate by delaying its effect and narrowing its scope.

1

The Secretaries move to dismiss, arguing that the House lacks standing to sue. They argue that only the Executive has authority to implement the laws, and urge this Court to stay out of a quintessentially political fight in which the House is already well armed. The House opposes, adamant that it has been injured in several concrete ways, none of which can be ameliorated through the usual political processes.

The only issue before the Court is whether the House can sue the Secretaries; the merits of this lawsuit await another day. Although no precedent dictates the outcome, the case implicates the constitutionality of another Branch's actions and thus merits an "especially rigorous" standing analysis. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 n.12 (2015). The House sues, as an institutional plaintiff, to preserve its power of the purse and to maintain constitutional equilibrium between the Executive and the Legislature. If its non-appropriation claims have merit, which the Secretaries deny, the House has been injured in a concrete and particular way that is traceable to the Secretaries and remediable in court. The Court concludes that the House has standing to pursue those constitutional claims.

In contrast, the House's claims that Secretary Lew improperly amended the Affordable Care Act concern only the implementation of a statute, not adherence to any specific constitutional requirement. The House does not have standing to pursue those claims. The Secretaries' motion to dismiss will be denied as to the former and granted as to the latter.

## I. FACTS

Some background is necessary on the appropriations process under our Constitution, the workings of the statute at issue, and how this case came about. The facts alleged in the House's complaint must be taken as true in this procedural posture. *Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015).

2

## A. Constitutional Overview

Congress passes all federal laws in this country.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]").  That includes both laws that authorize the expenditure of public monies and laws that ultimately appropriate those monies.  Authorization and appropriation by Congress are nonnegotiable prerequisites to government spending: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7; *see also United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").   The distinction between authorizing legislation and appropriating legislation is relevant here and bears some discussion.

Authorizing legislation establishes or continues the operation of a federal program or agency, either indefinitely or for a specific period.  GAO *Glossary* at 15.[1]  Such an authorization may be part of an agency or program's organic legislation, or it may be entirely separate.  *Id.*  No money can be appropriated until an agency or program is authorized, although authorization may sometimes be inferred from an appropriation itself.  *Id.*

---

[1] The Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, § 801(a), 88 Stat. 297, 327 (1974) gives the Government Accountability Office (GAO) specific duties in the budgetary arena.  *See generally* 31 U.S.C. § 1112(c).  One of those duties is to help "establish, maintain, and publish standard terms and classifications for fiscal, budget, and program information of the Government, including information on fiscal policy, receipts, expenditures, programs, projects, activities, and functions."  *Id.* § 1112(c)(1).  The most recent publication in fulfilment of that duty is GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (2005) (GAO *Glossary*).   "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

Appropriation legislation "provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." *Id.* at 13. Appropriations legislation has "the limited and specific purpose of providing funds for authorized programs." *Andrus v. Sierra Club*, 442 U.S. 347, 361 (1979) (quoting *TVA v. Hill*, 437 U.S. 153, 190 (1978)).  An appropriation must be expressly stated; it cannot be inferred or implied.  31 U.S.C. § 1301(d).  It is well understood that the "a direction to pay without a designation of the source of funds is not an appropriation."  U.S. Government Accounting Office, GAO-04-261SP, *Principles of Federal Appropriations Law (Vol. I)* 2-17 (3d ed. 2004) (GAO *Principles*).  The inverse is also true: the designation of a source, without a specific direction to pay, is not an appropriation.  *Id.*  Both are required.  *See Nevada*, 400 F.3d at 13-14. An appropriation act, "like any other statute, [must be] passed by both Houses of Congress and either signed by the President or enacted over a presidential veto."  GAO *Principles* at 2-45 (citing *Friends of the Earth v. Armstrong*, 485 F.2d 1, 9 (10th Cir. 1973); *Envirocare of Utah Inc. v. United States*, 44 Fed. Cl. 474, 482 (1999)).

Appropriations come in many forms.  A "permanent" or "continuing" appropriation, once enacted, makes funds available indefinitely for their specified purpose; no further action is needed from Congress.  *Nevada*, 400 F.3d at 13; GAO *Principles* at 2-14.[2]  A "current appropriation," by contrast, allows an agency to obligate funds only in the year or years for which they are appropriated.  GAO *Principles* at 2-14.  Current appropriations often give a particular agency, program or function its spending cap and thus constrain what that agency, program, or function may do in the relevant year(s).  Most current appropriations are adopted on

---

[2] Examples of permanent appropriations include the Judgment Fund (31 U.S.C. § 1304(a)) and the payment of interest on the national debt (31 U.S.C. § 1305(2)).

an annual basis and must be re-authorized in each fiscal year.  Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse string.

### B.  Statutory Overview

The 111th Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA), "to increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012); *see also King v. Burwell*, 135 S. Ct. 2480, 2485 (2015) ("The [ACA] adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market.").  No party disputes here whether the ACA was validly adopted by both houses of Congress and signed into law by the President.[3]

### 1.  Subsidies under Sections 1401 and 1402 of the Affordable Care Act

The ACA provides monetary subsidies in several forms; two are relevant here. First, in order to assist certain individuals with the cost of insurance on the newly-established exchanges, Congress enacted a "premium tax credit" under the Internal Revenue Code for coverage of statutory beneficiaries with household incomes from 100% to 400% of the federal poverty level.  *See* 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082; *King*, 135 S. Ct. at 2487. These premium tax credits were enacted in Section 1401 of the ACA, and the Court will therefore refer to this subsidy as the "Section 1401 Premium Tax Credit."

Second, Section 1402 of the ACA requires insurers to reduce the cost of insurance

---

[3] The bill, H.R. 3590, 111th Cong. (2d Sess. 2009) (H.R. 3590), was amended and retitled after consideration and debate in the Senate.  It passed the Senate by a vote of 60-39 on December 24, 2009.  On March 21, 2010, the House agreed to the Senate amendments by a vote of 219-212. On March 23, 2010, President Obama signed H.R. 3590 into law.

to certain, eligible statutory beneficiaries.  *See* 42 U.S.C. § 18071(a)(2).  Specifically, these "cost-sharing" provisions require insurance companies that offer qualified health plans through the ACA to reduce the out-of-pocket cost of insurance coverage for policyholders who qualify.  *See generally id.* § 18071.[4]  The federal government then offsets the added costs to insurance companies by reimbursing them with funds from the Treasury.  *See* 42 U.S.C. § 18071(c)(3) ("An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions.").  The Court will refer to this subsidy as the "Section 1402 Cost-Sharing Offset."

Eligibility determinations for either subsidy can be made in advance, as can payments.  *See* 42 U.S.C. § 18082(a)(1) (requiring the Secretaries of Health and Human Services (HHS) and Treasury to consult and establish a program to make advance determinations "with respect to the income eligibility of individuals . . . for the premium tax credit allowable under section 36B of title 26 and the cost-sharing reductions under section 18071").  The Section 1401 Premium Tax Credits are paid directly to insurance companies, who then "reduce the premium charged the insured for any period by the amount of the advance payment."  *Id.* § 18082(c)(2)(B)(i).  Treasury pays Section 1402 Cost-Sharing Offsets to the insurers "at such time and in such amount as the Secretary [of HHS] specifies."  *Id.* § 18082(c)(3).

The House alleges that there is a marked, and constitutionally significant,

---

[4] "Reduced cost-sharing for individuals enrolling in qualified health plans" is described in some detail in the statute.  *See generally* 42 U.S.C. § 18071.  Basically, the ACA mandates lower co-pay expenses for beneficiaries.  Once the Secretary of HHS notifies the insurer that an enrolled beneficiary is eligible for reduced cost-sharing, the insurer "shall reduce the cost-sharing under the plan" on a sliding scale dependent on the individual's household income.  42 U.S.C. §§ 18071(a)(2), 18071(c).

difference in the way these two subsidies are funded.  *See* Compl. ¶ 29 (citing 31 U.S.C. § 1324).

Essentially, the House contends that Section 1401 Premium Tax Credits are funded by a

permanent appropriation in the Internal Revenue Code, whereas Section 1402 Cost-Sharing

Offsets must be funded and re-funded by annual, current appropriations.  *Id.*  The House alleges

further that "Congress has not, and never has, appropriated any funds (whether through

temporary appropriations or permanent appropriations) to make any Section 1402 Offset

Program payments to Insurers."  *Id.* ¶ 28.

### 2.  The Affordable Care Act's Employer Mandate

Apart from its monetary subsidies, the ACA provides incentives for employers to

offer health insurance coverage to their employees.  Under the title "Shared Responsibility for

Employers Regarding Health Coverage," Section 1513 of the ACA adds a new chapter to the

Internal Revenue Code that subjects every non-conforming employer to an "assessable

payment," *i.e.*, a tax.  *See* 26 U.S.C. § 4980H(a).  *Cf. id.* § 4980H(d)(7) ("For denial of deduction

for the *tax* imposed by this section . . . .") (emphasis added); *Independent Business*, 132 S. Ct. at

2580, 2601 (concluding that the "[s]hared responsibility payment" in the ACA's individual

mandate, 26 U.S.C. § 5000A(b)(1), could "reasonably be read as a tax").  The substance of

Section 1513 is only relevant here insofar as it requires any "applicable large employer" to "offer

its full-time employees (and their dependents) the opportunity to enroll in minimum essential

coverage under an eligible employer-sponsored plan" or else to pay the tax.  26 U.S.C. §

4980H(a)-(b).  Section 1513 concludes: "The amendments made by this section shall apply to

months beginning after December 31, 2013."  *Id.* § 4980H(d).

### C.  Budgetary Requests and Appropriation Acts

The House alleges that the "Administration repeatedly has acknowledged that it

requires temporary appropriations to fund Section 1402," namely through the budget request

process since the ACA's enactment.  Compl. ¶ 31.  After the May 28, 2015 hearing on the

pending motion, the Court ordered supplemental briefing on these budget requests.  *See* 6/1/2015

Minute Order.  The parties filed a joint stipulation of facts in response, *see* Dkt. 30 (Stipulation).[5]

The stipulated facts are clear, even if the parties dispute their relevance.  *See* Stipulation at 1-2.[6]

On April 10, 2013, the Office of Management and Budget submitted its *Fiscal

Year 2014 Budget of the U.S. Government*.  Budget [Dkt. 30-1].  The Appendix to that budget

contained "more detailed financial information on individual programs and appropriation

accounts than any of the other budget documents."  App. to Budget [Dkt. 30-2] at 3.  The

Appendix included, among other things, "explanations of the work to be performed and the funds

needed."  *Id.*  In the April 2013 Appendix, the Administration requested the following:

> For carrying out, except as otherwise provided, sections 1402
> [Reduced Cost-Sharing] and 1412 of the Patient Protection and
> Affordable Care Act (Public Law 111-148), such sums as
> necessary.  For carrying out, except as otherwise provided, such
> sections in the first quarter of fiscal year 2015 (including upward
> adjustments to prior year payments), $1,420,000,000.

*Id.* at 453.

On the same day, HHS separately submitted to the relevant appropriations

committees a *Justification of Estimates for Appropriations Committees*.  Justification [Dkt. 30-

---

[5] The Court also ordered supplemental briefing on those facts.  *See* Pl.'s Supplemental Mem.
[Dkt. 33] (Pl. Supp. Mem.); Defs.' Supplemental Mem. [Dkt. 34] (Defs. Supp. Mem.); Pl.'s
Supplemental Reply [Dkt. 35] (Pl. Supp. Reply); Defs.' Supplemental Reply [Dkt. 37] (Defs.'
Supp. Reply).

[6] The dispute over relevance caused the parties to submit separate compilations of documents in
support of their 'joint' stipulation.  While the House selectively excerpted the relevant pages, the
Secretaries filed and delivered a four-volume compendium of the documents in their entirety.
*Compare* Dkts. 30-1 to 30-14 *with* Dkts. 30-15 to 30-28.  Because neither party disputes the
authenticity of the other's exhibits, the Court will freely cite to both.

3].  In that document, HHS explained:

> The FY 2014 request for Reduced Cost Sharing for Individuals
> Enrolled in Qualified Health Plans is $4.0 billion in the first year
> of operations for Health Insurance Marketplaces, also known as
> Exchanges.  CMS also requests a $1.4 billion advance
> appropriation for the first quarter of FY 2015 in this budget to
> permit CMS to reimburse issuers who provided reduced cost-
> sharing [under Section 1402] in excess of the monthly advanced
> payments received in FY 2014 through the cost-sharing reduction
> reconciliation process.

*Id.* at 14.  In its conclusion, HHS referred to the "Cost-Sharing Reductions" as one of "five

annually-appropriated accounts."  *Id.*  In a later graphic entitled "Reduced Cost Sharing," HHS

listed "--" under "Budget Authority" for "FY 2013 Current Law," *id.* at 193.  That fact indicates

that no prior appropriation applied to Section 1402.  HHS compared the Section 1402 program to

"other appropriated entitlements such as Medicaid."  *Id.*

On May 17, 2013, the Administration submitted a number of amendments to its

budget request.  Amendments [Dkt. 30-4].  The House contends that these amendments are

relevant because as they "did not withdraw or otherwise alter in any respect the Administration's

FY 2014 request for an annual appropriation for the Section 1402 Offset Program," Pl. Supp.

Mem. at 7 n.6.[7]

On May 20, 2013, OMB issued its *Sequestration Preview Report* for Fiscal Year

2014, which listed "Reduced Cost Sharing" as subject to sequestration in the amount of $286

---

[7] At the hearing on the instant motion, the Secretaries erroneously stated that the FY2014 request
for Section 1402 funding had been withdrawn.  *See* 5/28/15 Tr. at 23 (Counsel for the
Secretaries) ("There was initially a request and that request was later withdrawn because the
administration took a second look and realized that there were principles of appropriations law
that made the request unnecessary.").  Counsel for the House questioned whether that was
correct.  *Id.* at 38.  The Secretaries have since notified the court that "[t]he reference of a
withdrawal [was] to OMB's submission of the Fiscal Year 2015 Budget, which did not request a
similar line item.  Defendants' counsel did not intend to suggest that there was a formal
withdrawal document, and apologizes for being unclear on that point."  Stipulation at 3 n.1.

million, or 7.2% of the requested appropriation.  Report [Dkt. 30-18] at 4.  The House believes

that because "payments properly made under [Section 1401 of the ACA] are exempt from

sequestration," OMB's inclusion of Section 1402 Cost-Sharing Offsets on a list of sequestration-

required programs was "an acknowledgement that the permanent appropriation codified at 31

U.S.C. § 1324 cannot be the funding source for such payments."  Stipulation at 7 n.2.

On July 13, 2013, the Senate Appropriations Committee adopted S. 1284, a bill

appropriating monies to HHS and other agencies.  An accompanying report stated that "[t]he

Committee recommendation does not include a mandatory appropriation, requested by the

administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412

of the ACA."  S. Rep. No. 113-71, 113th Cong., at 123 (2013).  No subsequent consideration of

funding for Section 1402 appears in the record.

On October 17, 2013, the President signed into law the first of two continuing

resolutions to keep the government running pending a consolidated appropriations act.  *See*

Continuing Appropriations Act for 2014, Pub. L. 113-46, 127 Stat. 558 (2013); Joint Resolution,

Pub. L. 113-73, 128 Stat. 3 (2014).  Neither resolution included an appropriation for the Section

1402 Cost-Sharing Offset program.

Finally on January 17, 2014, the President signed the Consolidated

Appropriations Act for 2014, Pub. L. 113-76, 128 Stat. 5 (2014).  That law similarly did not

appropriate monies for the Section 1402 Cost-Sharing Offset program.[8]  Indeed, the Secretaries

have conceded that "[t]here was no 2014 statute appropriating new money" for the Section 1402

---

[8] The Secretaries do assert that the Act "imposed dozens of explicit restrictions on particular uses
of appropriated funds," but "did not restrict the use of any federal funds for the advance payment
of cost-sharing reductions under the ACA."  Defs. Supp. Mem. at 5.  The absence of a
restriction, however, is not an appropriation.  *See MacCollom*, 426 U.S. at 321.

Cost-Sharing Offset program.  5/28/15 Tr. at 27.

### D.  Background of this Case

The House alleges that the Secretaries, despite Congress's refusal to fund the

Section 1402 Cost-Sharing Offsets through a current appropriation, nonetheless drew and spent

public monies on that program beginning in January 2014.  Compl. ¶ 35.  The House also alleges

that Secretary Lew has effectively "legislate[d] changes" to Section 1513, both by delaying the

employer mandate beyond December 31, 2013 and by altering the percentage of employees that

must be offered coverage.  *Id.* ¶¶ 45, 46.  These changes to the mandate are said by the House to

have "usurp[ed] its Article I legislative authority."  *Id.* ¶ 50.

To right these perceived wrongs, the House took legal action.  On July 30, 2014,

it adopted House Resolution 676, which authorized the Speaker of the House to file suit in

federal court against the head of an Executive department or agency for "failure . . . to act in a

manner consistent with that official's duties under the Constitution and laws of the United States

with respect to implementation of any provision of the Patient Protection and Affordable Care

Act."  H.R. Res. 676, 113th Cong. (2014).  Section 3(a) of the same Resolution authorized the

House's Office of General Counsel, assisted by outside counsel, to represent the House in court.

*Id.*  After this suit commenced, the 113th Congress ended and the 114th Congress began.  The

new House adopted House Resolution 5 on January 6, 2015, which provided in part that the

114th House of Representatives could succeed the 113th House of Representatives as plaintiff in

this lawsuit.  H.R. Res. 5, § 3(f)(2)(A), 114th Cong. (2015).

The Secretaries moved to dismiss the case on January 26, 2015.  *See* Mot. to

Dismiss [Dkt. 20] (Mot.); Mem. in Support [Dkt. 20-1] (Mem.).  The House opposes.  Mem. in

Opp'n [Dkt. 22] (Opp'n).  The Secretaries have filed a reply.  Reply to Opp'n to Mot. [Dkt. 26]

(Reply).  Oral argument was held on May 28, 2015.  The motion is thus ripe for resolution.[9]

## II.  LEGAL STANDARDS

The Court will analyze the pending motion under the following legal standards.

### A.  Motion to Dismiss

The Secretaries move to dismiss the complaint under the Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

#### 1.  Rule 12(b)(1)

Pursuant to Rule 12(b)(1), a defendant can move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction in federal court.  Fed. R. Civ. P. 12(b)(1).  No action by the parties can confer subject matter jurisdiction on a federal court, because subject matter jurisdiction is both a statutory requirement and an Article III requirement.  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts have limited jurisdiction and that "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).  When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must construe the complaint liberally, giving the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the

---

[9] The States of West Virginia, Oklahoma, Arizona, Louisiana, South Carolina, and Texas also sought leave to file an Amicus Curiae Brief.  Motion [Dkt. 24].  The Court will grant the motion by separate order.

court need not accept factual inferences drawn by plaintiffs if those inferences are not supported

by facts alleged in the complaint, nor must the Court accept plaintiffs' legal

conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

A court may consider materials outside the pleadings to determine its jurisdiction.

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground

Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).  That includes materials necessary to

determine whether the plaintiff has standing.  *See Natural Resources Defense Council v. Pena*,

147 F.3d 1012, 1024 (D.C. Cir. 1998).  A court has "broad discretion to consider relevant and

competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion.  *Finca Santa

Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B

Charles Wright & Arthur Miller, *Federal Practice & Procedure, Civil* § 1350 (3d ed. 2004)); *see

also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003)

(in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may

examine testimony and affidavits).  In such instances, consideration of documents outside the

pleadings does not convert the motion to dismiss into one for summary judgment.  *Al-Owhali v.

Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

### 2.  Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6)

challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).  A complaint must

be sufficient "to give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations

omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation

to provide the grounds of his entitlement to relief "requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Id*.  A court must

treat the complaint's factual allegations as true, "even if doubtful in fact," *id.*, but a court need

not accept as true legal conclusions set forth in a complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at

570.  A complaint must allege sufficient facts that would allow the court "to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

      In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged

in the complaint, documents attached to the complaint as exhibits or incorporated by reference,

and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508

F.3d 1052, 1059 (D.C. Cir. 2007).

### B.  Standing and Subject Matter Jurisdiction

      Standing is part and parcel of Article III's limitation on the judicial power of the

United States, which extends only to cases or controversies.  U.S. Const. art. III, § 2; *Arizona*,

135 S. Ct. at 2663.  The strictures of Article III standing are by now "familiar." *United States v.

Windsor*, 133 S. Ct. 2675, 2685 (2013).  Standing requires (1) the plaintiff to have suffered an

injury in fact that is both (a) concrete and particularized and (b) actual or imminent, as opposed

to conjectural or hypothetical; (2) the injury to be traceable to the defendant's actions; and (3) the

injury to be redressable by a favorable decision of the court. *See id.* at 2685-86 (citing *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992)).

      A federal court must assure itself of both constitutional and statutory subject

matter jurisdiction.  The former obtains if the case is one "arising under the Constitution, the

Laws of the United States, and Treaties made, or which shall be made, under their Authority."

U.S. Const. art. III, § 2.  The relevant statute, 28 U.S.C. § 1331, likewise confers jurisdiction upon lower courts to hear "all civil actions arising under the Constitution, laws, or treaties of the United States."  As the Supreme Court held in *Powell v. McCormack*, federal courts have constitutional and statutory "arising under" jurisdiction whenever a plaintiff's claim "will be sustained if the Constitution is given one construction and will be defeated if it is given another." 395 U.S. 486, 514-16 (1969) (citing *Bell v. Hood*, 327 U.S. 678, 685 (1946); *King Cnty. v. Seattle Sch. Dist. No. 1*, 263 U.S. 361, 363-64 (1923)) (internal alterations omitted).

### C.  Justiciability

"[T]here is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'"  *Powell*, 395 U.S. 486 at 512 (citing *Baker v. Carr*, 369 U.S. 186, 198 (1962)).  Jurisdiction governs a court's authority to hear a case; justiciability pertains to the advisability of hearing the case.  *Windsor*, 133 S. Ct. at 2685.

Justiciability counsels the avoidance of political cases or controversies.  "The term 'political' has been used to distinguish questions which are essentially for decision by the political branches from those which are essentially for adjudication by the judicial branch." *Powell v. McCormack*, 395 F.2d 577, 591 (D.C. Cir. 1968), *rev'd in part*, *Powell*, 395 U.S. 486. Hence the "political question" doctrine.  That self-imposed limitation "bars our jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it.'"  *Hourani v. Mirtchev*, Nos. 13-7088, 13-7089, 2015 WL 4590324, at *5 (D.C. Cir. July 31, 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993); *Baker*, 396 U.S. at 217).

The Court must be cautious not to "elide[] the distinction" between the "jurisdictional requirements of Article III and the prudential limits on its exercise." *Windsor*, 133 S. Ct. at 3685.  In the middle of their arguments concerning why the House has no "actionable injury," and thus no standing to sue, the Secretaries inject a separation-of-powers argument.  Mem. at 16-18.  That confuses jurisdiction with justiciability, however, which are separate principles.  The first is a legal question, while the second assumes the legal answer yet cautions prudence.  *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004).  The Court will not consider separation of powers in the standing analysis.  *See Powell*, 395 U.S. 486, 512 ("[T]he doctrine of separation of powers is more properly considered in determining whether the case is 'justiciable.'").[10]

## III. ANALYSIS

Under these long-established principles of law, and accepting the facts as alleged in the Complaint, the Court must decide whether it *can* hear this case (jurisdiction) and whether it *should* hear this case (justiciability).

### A. Standing

There is no authority that answers the questions posed by the Secretaries' motion.  A survey of the precedent relied on by the parties is a worthwhile starting point, however, as it provides the guiding principles to be applied.

---

[10] The Supreme Court has opined that "the law of Art. III standing is built on a single idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984).  But *Allen*'s reference to "separation of powers" concerned the role prescribed for the Judiciary in Article III, *i.e.*, to hear only cases or controversies.  *Allen* did not address the separation between the Executive and Legislature Branches, which is at the heart of the argument advanced by the Secretaries.  *See* Mem. at 16 ("The House seeks to upset this finely wrought balance by attempting to control the implementation of federal law, outside the Article I procedures for the enactment of legislation by bringing a suit premised on its disagreement with the Executive Branch's interpretation of that law.").

### 1. **Precedent**

The House draws heavily from *Coleman v. Miller*, in which the Kansas legislature had considered a proposed amendment to the U.S. Constitution known as the Child Labor Amendment. 307 U.S. 433, 435 (1939). When the resolution came to a vote, 20 state senators voted for it and 20 voted against it. *Id.* at 436. The Lieutenant Governor of Kansas, presiding over the Kansas Senate, cast the deciding vote in favor of the amendment. *Id.* The 20 opposing senators sought a writ of mandamus to prohibit ratification of the amendment, on the ground that the Lieutenant Governor had no right to cast the deciding vote. *Id.* After the writ was denied by the Kansas Supreme Court, an appeal was taken to the U.S. Supreme Court.[11]

*Coleman* recognized that the 20 senator-plaintiffs had "a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* at 438. That interest was "to have their votes given effect." *Id.* Because their votes "would have been sufficient to defeat ratification," but ratification nevertheless passed, the senators' votes had "been overridden and virtually held for naught." *Id.*

Importantly, the Kansas senator-plaintiffs were *not* complaining about the State Executive's adherence to a law that had been properly passed. Instead, the Executive (in the person of the Lieutenant Governor) was said to have interfered with the legislative process so that the senator-plaintiffs' legislative acts were frustrated. The senator-plaintiffs, despite their equal vote with senator-proponents, were unable to prevent the amendment's ratification. They were not complaining about the manner of implementation or interpretation of any law by the Governor. The same is true of the corollary principle recognized in *Coleman*: that the senator-

---

[11] The federal question implicated was Article V's requirements for amending the Constitution. *Id.* at 437-38 (citing U.S. Const. art. V).

plaintiffs would have suffered an equally grave injury had a bill they voted for with the requisite

votes not been enacted.  That injury, too, resides in the disruption of the legislative process and

not in the implementation or interpretation of a law that has passed.

        The Secretaries rely chiefly on *Raines v. Byrd*, in which Senator Robert C. Byrd

and other Members of Congress challenged the Line-Item Veto Act, against which they had

voted but which was passed by majority vote and signed by former President Clinton.  521 U.S.

811 (1997).  *See* Pub. L. 104-130, 110 Stat. 1200 (1996) (Line-Item Veto Act).  Under the Line-

Item Veto Act, the President could "cancel" certain spending and tax benefit measures "after he

[had] signed them into law."  *Raines*, 521 U.S. at 814.  The President's "cancellation" of a

funding provision of an appropriation law could only be overridden by "disapproval bills" passed

by the House and Senate.  *Id.* at 815 (citing Line-Item Veto Act § 1025).  Without such dual

votes, the Executive could refuse to spend monies as directed by Congress.  The Act specifically

provided that any Member of Congress could assert a constitutional violation and sue for

declaratory or injunctive relief.  *Raines*, 521 U.S. at 815-16.  Senator Byrd and his co-plaintiffs

did just that, arguing that the Line Item Veto Act "'(a) alter[ed] the legal and practical effect of

all votes they may cast  . . . [on appropriations bills]; (b) divest[ed] [them] of their constitutional

role in the repeal of legislation, and (c) alter[ed] the constitutional balance of powers . . . .'"  *Id.*

at 816.

        The Supreme Court held that the *Raines* plaintiffs failed to establish that "their

claimed injury is personal, particularized, concrete, and otherwise judicially cognizable."  *Id.* at

820.  In other words, the plaintiffs had statutory authority to sue but did not have Article III

standing.  *Id.* at 815-19.  The Court read *Coleman* narrowly: "[O]ur holding in *Coleman* stands

(at most[]) for the proposition that legislators whose votes would have been sufficient to defeat

(or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 823. The Court distinguished the *Raines* plaintiffs on the grounds that they had "alleged no injury to themselves as individuals," and because "the constitutional injury they allege[d] is wholly abstract and widely dispersed." *Id.* at 829. The Court added that "their attempt to litigate this dispute at this time and in this form is contrary to historical experience." *Id.*

The Secretaries perceive a straight line between *Raines* and this suit: they argue that the House has alleged only an "abstract dilution of institutional legislative power." Mem. at 1 (quoting *Raines*, 521 U.S. at 826). But the plaintiff here is the House of Representatives, duly authorized to sue as an institution, not individual members as in *Raines*. In fact, *Raines* "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id.* at 829. That important fact clearly distinguishes this case. As discussed below, the injury here is sufficiently concrete and particularized as to the *whole* House.

Our Court of Appeals has considered congressional standing in other contexts. In *United States v. AT&T*, the D.C. Circuit considered whether Congress (or its committees) had standing to sue in an official capacity to demand information from the Executive in furtherance of Congress's oversight role. 551 F.2d 384 (D.C. Cir. 1976).[12] The case presented a "portentous clash between the executive and legislative branches" over congressional subpoenas to AT&T for information related to warrantless wiretaps that the Executive Branch had refused to release on grounds of national security. *Id.* at 384. The D.C. Circuit found federal subject matter

---

[12] Although styled as a lawsuit between the United States and AT&T, the latter's only interest was "to determine its legal duty" vis-à-vis a congressional subpoena that the Executive had ordered it to ignore. *Id.* at 388-89.

jurisdiction, *id.* at 388-89, and also found it "clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." *Id.* at 391.

*AT&T* was based on solid precedent.  Earlier cases had "establish[ed], at a minimum, that the mere fact that there is a conflict between the legislative and executive branches . . . does not preclude judicial resolution of the conflict." *Id.* at 390 (citing *S. Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (1974)).  *AT&T* also relied on *United States v. Nixon*, 418 U.S. 683 (1974), which resolved an "analogous conflict between the executive and judicial branches and stands for the justiciability of such a case." *AT&T*, 551 F.2d at 390.

More recent decisions from this Court have followed *AT&T*'s lead.  *See Comm. on Oversight and Gov. Reform v. Holder*, 979 F. Supp. 2d 1, 4 (D.D.C. 2013) ("[T]he Court finds that neither the Constitution nor prudential considerations require judges to stand on the sidelines. There is federal subject matter jurisdiction over this complaint, and it alleges a cause of action that plaintiff has standing to bring."); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 68 (D.D.C. 2008) ("The Committee and several supporting amici are correct that *AT&T*[] is on point and establishes that the Committee has standing to enforce its duly issued subpoena through a civil suit."); *House of Representatives v. Dep't of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998) ("[T]he court finds that [the House of Representatives] has properly alleged a judicially cognizable injury through its right to receive information by statute and through the institutional interest in its lawful composition . . . .").  It is thus well established in this Circuit that the House and its committees have, at least in some circumstances, standing to sue.[13]

---

[13] *See also In re Grand Jury Investigation of Ven-Fuel*, 441 F. Supp. 1299, 1307 (M.D. Fla. 1977).

Notably, the above-cited decisions all found that *AT&T*'s precedential force was not diminished by *Raines*. *See Miers*, 558 F. Supp. 2d at 68 ("*Raines* and subsequent cases have not undercut either the precedential value of *AT&T*[] or the force of its reasoning."); *House of Representatives*, 11 F. Supp. 2d at 89 ("The finding of an injury in this matter neither conflicts with *Raines v. Byrd* nor gives rise to a doctrine of legislative standing."); *see also Holder*, 979 F. Supp. 2d at 14 ("[*Raines*] does not stand for the proposition that Congress can never assert its institutional interests in court.  Instead, it expressly leaves that possibility open[.]  So the *Raines* decision does not compel the dismissal of this case, brought by a duly authorized House Committee.").  This Court agrees that *AT&T* survives *Raines*.

The most recent opinion on legislative standing is *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015).[14]  In that case, the Arizona Legislature filed suit challenging Proposition 106, a statewide citizen's initiative that had committed redistricting authority to an independent commission.  *Id.* at 2661.  The Arizona Legislature argued that it had "primary responsibility," *id.* at 2663, for redistricting under the Elections Clause, U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . .").  The Supreme Court agreed that Proposition 106 "strip[ped] the Legislature of its alleged prerogative to initiate redistricting," and that the Legislature, therefore, had alleged an adequate injury in fact.  *Arizona*, 135 S. Ct. at 2663.[15]

---

[14] The House submitted this case as new authority on June 30, 2015.  Notice [Dkt. 32].  The Secretaries lodged a response to that filing, Dkt. 36, which the House has since moved to strike, Dkt. 38.  The Secretaries oppose the motion to strike, Dkt. 39, and the House has filed a reply in support thereof, Dkt. 40.  The Court denies the motion to strike.

[15] On the merits, a divided Court sustained Proposition 106.  *Id.* at 2671-77.

*Arizona* carefully distinguished *Raines*, emphasizing its narrow holding "that six *individual Members* of Congress lacked standing to challenge the Line Item Veto Act." *Id.* at 2664 (emphasis in original). The *Arizona* Court reiterated that there was "some importance to the fact that [the *Raines* plaintiffs] not been authorized to represent their respective Houses of Congress." *Id.* In contrast, the Arizona Legislature was "an institutional plaintiff asserting an institutional injury." *Id.*

To be sure, the *Arizona* Court went out of its way *not* to decide the question presented in this case: "The case before us does not touch or concern the question whether Congress has standing to bring a suit against the President. There is no federal analogue to Arizona's initiative power, and a suit between Congress and the President would raise separation-of-powers concerns absent here." *Id.* at 2665 n.12. That *obiter dictum* raises cautions only as to justiciability, not jurisdiction.

In sum, no case has decided whether this institutional plaintiff has standing on facts such as these. Without the benefit of fully-applicable precedent, the Court proceeds to address the merits of the Secretaries' motion.

### 2. Plaintiff's Standing In This Case

The instant Complaint presents two theories of legal harm. First, the House alleges that the Executive has spent billions of dollars without a valid appropriation, in direct contravention of Article I, § 9, cl. 7. *See* Compl. ¶¶ 25-41, 51-90 (Counts I-V) (the Non-Appropriation Theory). Counts I and II allege constitutional violations. Count III alleges a violation of 31 U.S.C. § 1324 (the appropriation for Section 1401 Premium Tax Credits) and Count IV alleges a violation of "the entire statutory scheme [of] the ACA." Count V asserts a cause of action under the APA, alleging that the Secretaries' expenditures violate both the

Constitution and federal statutory law.

Second, the House alleges that Secretary Lew has not abided by the employer mandate as it was enacted in the ACA, thereby 'nullifying' the law. *See* Compl. ¶¶ 42-50, 98-108 (Counts VI-VIII) (the Employer-Mandate Theory).[16]  All three counts are couched as constitutional violations, citing only Article I, § 1 (vesting legislative power in Congress) and Article I, § 7, cl. 2 (prescribing the lawmaking process).  The gist of this theory is that Secretary Lew stepped into congressional shoes by effectively amending a congressionally-adopted law through regulation.  But as discussed below, the heart of the alleged violation remains statutory, not constitutional: the House alleges not that Secretary Lew has disobeyed the Constitution, but that he disobeyed the ACA as enacted.

Distilled to their essences, the Non-Appropriation Theory alleges that the Executive was unfaithful to the Constitution, while the Employer-Mandate Theory alleges that the Executive was unfaithful to a statute, the ACA.  That is a critical distinction, inasmuch as the Court finds that the House has standing to assert the first but not the second.

### a.  The Non-Appropriation Theory (Counts I-V)

The Secretaries argue that the House lacks standing to sue and stop expenditures for which no annual appropriation was enacted.  The House rejoins that it has standing to sue on several grounds, not least of which is that it has been "divested utterly and completely of its most defining constitutional function."  Opp'n at 25.  The Court agrees: the constitutional trespass alleged in this case would inflict a concrete, particular harm upon the House for which it has standing to seek redress in this Court.

---

[16] Although the House refers to these as the "Nullification Counts," Opp'n at 2, the Court will avoid that terminology so as not to confuse the theory with whether vote nullification is a cognizable injury under the Non-Appropriation Theory.

### i.  Nature of the Theory

The persistent refrain in the Secretaries' memorandum is that the House has no standing to "maintain an action against the Executive Branch concerning its *implementation* of a statute."  Mem. at 1 (emphasis added).  The Secretaries use the word "implement," or a derivative thereof, no fewer than forty times in their twenty-six page memorandum.  *See generally id.*  They also cast this case as "concerning the proper *interpretation* of federal law," *id.* at 2 (emphasis added), and about "the *execution* of federal law," *id.* at 3 (emphasis added).

Properly understood, however, the Non-Appropriation Theory is not about the implementation, interpretation, or execution of any federal statute.  It is a complaint that the Executive has drawn funds from the Treasury without a congressional appropriation—not in violation of any statute, but in violation of Article I, § 9, cl. 7 of the Constitution.[17]  The Non-Appropriation Theory, in other words, is not about how Section 1402 is being applied, but rather how it is funded.

This clarification renders most of the Secretaries' precedent inapposite.  They argue, for example, that our "Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts," Mem. at 12 (quoting *Bowsher v. Synar*, 478 U.S. 714, 722 (1986)), and that Congress does not "have standing anytime a President allegedly acts in excess of statutory authority," Mem. at 14-15 (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)).  But again, the Non-Appropriation Theory is not about executing congressionally-enacted laws or staying within their bounds.  Nor

---

[17] The nature of this particular constitutional violation is that it will almost always violate an appropriations statute as well.  In this case, it would conceivably violate the appropriations legislation by which Congress funded the Section 1401 Premium Tax Credits and not, the House argues, the Section 1402 Cost-Sharing Offsets.  But it is only the allegedly *unconstitutional* nature of the Executive's actions that causes a particular enough harm to convey standing.

is it "a generalized grievance about the conduct of government."  Mem. at 25 n.12 (quoting *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1382 (D.C. Cir. 1984)).  It alleges a specific, constitutional violation that is wholly irrespective of the ACA's implementation.

### ii.  Injury in Fact

Once the nature of the Non-Appropriation Theory is appreciated, it becomes clear that the House has suffered a concrete, particularized injury that gives it standing to sue.[18]  The Congress (of which the House and Senate are equal) is the only body empowered by the Constitution to adopt laws directing monies to be spent from the U.S. Treasury.  *See Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("Congress's control over federal expenditures is 'absolute.'") (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)); *Nevada v. Dep't of Energy*, 400 F.3d at 13 ("[T]he Appropriations Clause of the U.S. Constitution 'vests Congress with exclusive power over the federal purse'") (quoting *Rochester*, 960 F.2d at 185); *Hart's Adm'r v. United States*, 16 Ct. Cl. 459, 484 (1880) ("[A]bsolute control of the moneys of the United States is in Congress, and Congress is responsible for its exercise of this great power only to the people."), *aff'd sub nom. Hart v. United States*, 118 U.S. 62 (1886).  Yet this constitutional structure would collapse, and the role of the House would be meaningless, if the Executive could circumvent the appropriations process and spend funds however it pleases.  If such actions are taken, in contravention of the specific proscription in Article I, § 9, cl. 7, the House as an institution has standing to sue.  None of the Secretaries' four arguments, Mem. at 9-23, persuades the Court otherwise.[19]

---

[18] The Secretaries have mounted no argument as to the traceability or redressability of that injury, and thus concede that those elements of standing are satisfied.  *See generally* Mem.

[19] The Secretaries stake a fifth argument, that "[t]he separation of powers forecloses the House's

### (a)  Vindication of the rule of law generally

The Secretaries first argue that "vindication of the rule of law" is too generalized a grievance to be entertained by an Article III court.  Mem. at 9-11.  Their argument depends on, and cites almost exclusively, *Raines v. Byrd*.  But this is not a case about "abstract dilution of institutional legislative power" as addressed in *Raines*, 521 U.S. at 826.  The institutional injury was "diluted" in that case because only six of the 535 members of Congress sued as plaintiffs.[20] The critical distinction here is that the House of Representatives as an institution is the plaintiff. *See Arizona*, 135 S. Ct. at 2664 ("The 'institutional injury' at issue [in *Raines*], we reasoned, scarcely zeroed in on any individual Member. . . .  The Arizona Legislature, in contrast, is an institutional plaintiff asserting an institutional injury.").[21]

The difference between institutional and individual plaintiffs also explains (and renders irrelevant) the *Raines* dichotomy between the "loss of political power" and the "loss of a[] private right."  521 U.S. at 821.  In *Raines*, the Supreme Court reasoned that the plaintiffs'

_____

claim of standing," Mem. at 16-19, which the Court will not consider in its standing analysis.  As described above, separation-of-powers concerns are properly accounted for in a justiciability analysis, not a jurisdictional analysis.

[20] The Court takes judicial notice that the 105th Congress comprised 435 Representatives and 100 Senators.  *See* http://history.house.gov/Congressional-Overview/Profiles/105th/ (last visited on Sep. 8, 2015).

[21] It is of course true that the House is but one chamber of Congress, and the Senate is not a plaintiff in this suit.  That distinguishes the case from *Arizona*, where the entire state legislature sued.  135 S. Ct. at 2658-59.  Yet the House remains an institution claiming an institutional injury.  The only question is whether that injury "zeroe[s] in on" the House, or is too "widely disbursed" between it and the Senate.  *Id.* at 2665.  In *Raines*, six of 535 congressional members was not enough.  *Id.*  In *Arizona*, the entire legislature was enough.  *Id.*  In this case, one of two separate appropriating institutions—half of Congress—is the plaintiff.  The Court finds that the injury, although arguably suffered by the House and Senate alike, is sufficiently concentrated on the House to give it independent standing to sue.  An injury in fact must be inflicted particularly, but not exclusively, on the plaintiff.

injury was not "concrete" in part because none of them had a personal stake at issue.  *See Kucinich v. Bush*, 236 F. Supp. 2d 1, 7 (D.D.C. 2002) ("*Raines* teaches us that generalized injuries that affect all members of Congress in the same broad and undifferentiated manner are not sufficiently 'personal' or 'particularized,' but rather are *institutional*, and too widely dispersed to confer standing.") (emphasis in original).  But when the institution itself files suit, it can obtain a remedy for the "institutional" injury that the *Raines* Court found "too widely dispersed" when asserted by only a few members.  *Id.*; *cf. Arizona*, 135 S. Ct. at 2664.  As this Court has held, *Raines* "does not stand for the proposition that Congress can never assert its institutional interests in court," but instead "expressly leaves that possibility open."  *Holder*, 979 F. Supp. 2d at 14.

The Secretaries also cite *Nevada Commission on Ethics v. Carrigan*, 131 S. Ct. 1343, 2350 (2011) ("The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it.").  *See* Mem. at 11.  But the Secretaries' ensuing sentence does not follow: "A legislative plaintiff, then, does not hold any legally protected interest in the proper application of the law that would be distinct from the interest held by every member of the public at large."  *Id.*  An individual legislator holds political power in trust for the people; she may gain and lose that power at their whim.  The legislature's role is not so fleeting; the House remains the House, and *it* can sue to vindicate certain institutional interests, such as its distinct role in the appropriations process.

It is similarly misleading to say that the House's interest is "not as a prerogative of personal power," Mem. at 11 (quoting *Raines*, 521 U.S. at 821), or that "legislative power thus committed is not personal to the legislator but belongs to the people," Mem. at 11 (quoting *Nevada Comm'n*, 131 S. Ct. at 2350).  The cases quoted are readily distinguishable, because the

plaintiffs were individual legislators.  *See Raines*, 521 U.S. at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action.").  The 'person' in this case is the House; to deem its prerogatives 'personal' *to the institution* does not contravene either *Raines* or *Nevada Commission*.  And it is entirely consistent with *Arizona*.

The Secretaries also urge that "[o]nce a bill becomes a law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public."  Mem. at 11 (quoting *Daughtrey v. Carter*, 584 F.2d 1050, 1057 (D.C. Cir. 1978)).  That much may be conceded, but it does not resolve the question of standing for the House of Representatives in this case.  Instead, it illustrates precisely why the nature of the Non-Appropriation Theory is so important to grasp: the House is not suing to police implementation of the ACA, but rather to redress an alleged violation of the Constitution.  And because the House occupies a unique role in the appropriations process prescribed by the Constitution, not held by the ordinary citizen, perversion of that process inflicts on the House a particular injury quite distinguishable from any suffered by the public generally.[22]

### (b)  Interest in the implementation of federal law

The Secretaries argue that Congress has no "legally cognizable interest in the manner in which federal law is implemented."  Mem. at 12-16.  This has been addressed.  The Non-Appropriation Theory does not turn on the implementation, interpretation, or execution of the ACA.  The question presented is instead constitutional.  It is therefore unavailing, even if true, that "Congress plays no direct role in the execution of federal law and has no continuing or

---

[22] This also puts aside the obvious distinguishing feature of *Daughtrey*, which considered "*a Congressman's* interest" in enforcing federal law.  584 F.2d at 1057 (emphasis added). *Cf. Raines*, 521 U.S. at 829; *Arizona*, 135 S. Ct. at 2664.

distinct interest or stake in a bill once it becomes a law." *Id.* at 13.  The House *does* have a

continuing and distinct interest in the appropriation process, for that is its role in our

constitutional system and the source of virtually all of the House's political power.

### (c)  Non-judicial countermeasures

The Secretaries further argue that the House is not injured by the lack of an

appropriation because it can remedy or prevent that injury through means outside this lawsuit.

*Id.* at 19-20.  Chief among those means, they contend, is "the elimination of funding."  *Id.*  As

the House points out, the Secretaries are "apparently oblivious to the irony" of their argument.

Opp'n at 35.  Eliminating funding for Section 1402 *is exactly* what the House tried to do.  But as

the House argues, Congress cannot fulfill its constitutional role if it specifically denies funding

and the Executive simply finds money elsewhere without consequence.  Indeed, the harm alleged

in this case is particularly insidious *because*, if proved, it would eliminate Congress's role via-a-

vis the Executive.  The political tug of war anticipated by the Constitution depends upon Article

I, § 9, cl. 7 having some force; otherwise the purse strings would be cut.

The Court finds equally unpersuasive the argument that Congress "could repeal or

amend the terms of the regulatory or appropriations authority that it has vested in the Executive

Branch." Mem. at 19.[23]  But the authority trespassed upon under the Non-Appropriation Theory

is not statutory; it is constitutional.  It was not vested in the Executive by Congress; it was vested

in Congress by sovereign people through constitutional ratification.  Neither Congress nor the

Executive has the authority to repeal or amend the terms of Article I, § 9, cl. 7.

---

[23] The parties are obviously at odds over the meaning of the "appropriations authority" currently
in place.  The House believes that no appropriation has been made for Section 1402 Cost-Sharing
Offsets, while the Secretaries maintain that such payments "are being made as part of a
mandatory payment program that Congress has fully appropriated."  Mem. at 6.  That is a dispute
to be resolved at the merits, which the parties have not yet briefed.

### (d)  The 'nullification' theory of standing.

In an obvious effort to preempt the House's invocation of *Coleman v. Miller*, the Secretaries argue that 'vote nullification' is not a cognizable injury.  Mem. at 20-23.  The House responds that this case "presents the same type of nullification injury the Supreme Court recognized in *Coleman*."  Opp'n at 27.  The Court need not reach this question, however, because it finds that the House suffers a sufficiently concrete and particularized injury by its displacement from the appropriations process.  Whether its votes were 'nullified' within the meaning of *Coleman* need not be addressed at this juncture.

### iii.  Specific Rulings

The House of Representatives as an institution would suffer a concrete, particularized injury if the Executive were able to draw funds from the Treasury without a valid appropriation.  The House therefore has standing to sue on its Non-Appropriation Theory, to the extent that it seeks to remedy constitutional violations.  That conclusion does not end the analysis, however.

Some of the counts under the Non-Appropriation Theory do not seek redress for *constitutional* violations.  Count III alleges a violation of 31 U.S.C. § 1324, which appropriates funds for Section 1401 Premium Tax Credits but not, allegedly, the Section 1402 Cost-Sharing Offsets.  Because that question is statutory and not constitutional, it falls within the sphere of cases to which the Secretaries' precedent *does* apply: those that concern the implementation, interpretation, or execution of federal statutory law.[24]  The Court will therefore grant the Secretaries' motion as to Count III and dismiss it.  The Court will also dismiss Count IV, which

---

[24] As noted above, the merits of the constitutional claim will inevitably involve some statutory analysis.  The Secretaries' primary defense will be that an appropriation *has* been made, which will require reading the statute.  But that is an antecedent determination to a constitutional claim.

similarly alleges a violation of the ACA's "statutory scheme."  Compl. ¶ 79.

Count V alleges violations of three prongs of the Administrative Procedure Act. The House has standing under one of them: to redress agency action that is "contrary to constitutional right, power, privilege, or immunity," Compl. ¶ 85 (citing 5 U.S.C. § 706(2)(B)). The House may not proceed under the APA, however, to the extent that it challenges agency action as "in excess of statutory jurisdiction, authority, or limitation," Compl. ¶ 86 (citing 5 U.S.C. § 706(2)(C)) or agency action that is "not in accordance with law," Compl. ¶ 84 (citing 5 U.S.C. § 706(2)(A)).  Such violations would cause the House no *particular* harm, for the reasons set forth above.  Count V will not be dismissed, therefore, but merely limited in scope.

Although Counts I and II both cite constitutional provisions, only Count I will survive the Secretaries' motion.  Count I alleges a violation of the specific, constitutional prohibition in Article I, § 9, cl. 7 that is meant to safeguard the House's role in the appropriations process and keep the political branches of government in equipoise.  Count II is far more general: it cites only Article I, § 1 (vesting legislative power in Congress) and Article I, § 7, cl. 2 (prescribing the lawmaking process).  Put simply, the allegation in Count II is that the House is part of Congress, and the Secretaries are not.

That is insufficient to allege a particularized harm to the House.  If the invocation of Article I's general grant of legislative authority to Congress were enough to turn every instance of the Executive's statutory non-compliance into a constitutional violation, there would not be decades of precedent for the proposition that Congress lacks standing to affect the implementation of federal law.  *See Bowsher*, 478 U.S. at 722 ("The Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts."); *Daughtrey*, 584 F.2d at 1057 ("Once a bill becomes law, a

Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public."); *see also Russell v. DeJongh*, 491 F.3d 130, 134-35 (3d Cir. 2007) ("[T]he authorities appear to hold uniformly that an official's mere disobedience or flawed execution of a law for which a legislator voted … is not an injury in fact for standing purposes."). Where the dispute is over true implementation, Congress retains its traditional checks and balances—most prominently its purse strings. But when the appropriations process is itself circumvented, Congress finds itself deprived of its constitutional role and injured in a more particular and concrete way. For these reasons, the Court will dismiss Count II.

The House has standing to pursue this lawsuit under its Non-Appropriation Theory as alleged in Count I, and in Count V to the extent that it is predicated on a constitutional violation. The Secretaries' motion will be granted as to Counts II, III, IV, and V, in part.

### b. The Employer-Mandate Theory (Counts VI-VIII)

The Employer-Mandate Theory stands on very different footing than the Non-Appropriation Theory. The House alleges that Secretary Lew and Treasury have disregarded the congressionally-adopted employer mandate in two ways. First, Secretary Lew delayed the effective date of the mandate beyond the statutory prescription of January 1, 2014. Compl. ¶ 45. Second, he reduced the percentage of employees or full-time equivalents (FTEs) who must be offered insurance, thereby decreasing the burden on employers. *Id.* ¶ 46. Both of these regulatory actions are said to "injure the House by, among other things, usurping its Article I legislative authority." *Id.* ¶ 50. Specifically, the House assails two parts of a Treasury Rule preamble (Counts VI and VII) and another part of the substantive Rule (Count VIII).

Despite its formulation as a constitutional claim, the Employer-Mandate Theory is fundamentally a statutory argument. The House cites only Article I, § 1 and Article I, § 7, cl. 2 in its Complaint. *See* Compl. ¶¶ 91-108 (Counts VI-VIII). Those provisions, taken together,

establish that Congress has sole legislative authority and that laws cannot be adopted without its approval. The House extrapolates from this that any member of the Executive who exceeds his statutory authority is unconstitutionally legislating.

The argument proves too much. If it were accepted, every instance of an extra-statutory action by an Executive officer might constitute a cognizable constitutional violation, redressable by Congress through a lawsuit. Such a conclusion would contradict decades of administrative law and precedent, in which courts have guarded against "the specter of 'general legislative standing' based upon claims that the Executive Branch is misinterpreting a statute or the Constitution." *House of Representatives*, 11 F. Supp. at 89-90; *cf. Windsor*, 133 S. Ct. at 2689 ("The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise.").[25]  In sum, Article I is not a talisman; citing its most general provisions does not transform a statutory violation into a constitutional case or controversy.

The generalized nature of the injury alleged in the Employer-Mandate Theory is also relevant because other litigants can sue under the Administrative Procedure Act to invalidate Treasury regulations. *Cf. Blackfeet Nat'l Bank v. Rubin*, 890 F. Supp. 48, 54 (D.D.C.), *aff'd* 67 F.3d 972 (D.C. Cir. 1995).  Indeed, litigation over implementing regulations has been ubiquitous since the ACA's inception. *E.g.*, *King v. Burwell*, 135 S. Ct. at 2488.  A private plaintiff who is aggrieved by Treasury's actions is free to sue and convince a court that such regulations are contrary to the ACA or otherwise improper.

The redressability element of the standing analysis also distinguishes the two theories. If successful on the merits, which are not addressed here, the Non-Appropriation

---

[25] As described below, today's decision raises no such specter.

theory might result in an injunction against further Section 1402 Cost-Sharing Offsets until an appropriation is made.  That would cure the constitutional injury.  But under the Employer-Mandate Theory, the House merely asks the Court to declare unconstitutional several subsections of the preamble to a Treasury Rule.  *Id.*  Quite conspicuously, and in contrast to the Non-Appropriation Theory, the House does *not* seek injunctive relief with regard to the employer mandate.  Compl. at 26-27 (Prayer for Relief).  But if the alleged injury resides in the delayed enforcement of the employer mandate, declaratory relief alone would not help.  Striking down Treasury's preamble to would not require Secretary Lew to start assessing payments.  He might instead continue delaying the employer mandate without memorializing such delay in a regulation.[26]  Thus, a ruling for the House may offer nothing but the "psychic satisfaction" of knowing "that the Nation's laws are faithfully enforced," which is "not an acceptable Article III remedy because it does not redress a cognizable Article III injury."  *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 107 (1998).

The Employer-Mandate Theory concerns the Executive's alleged infidelity to the ACA.  To the extent the theory is expressed as a constitutional violation—on the ground that the

---

[26] The "assessable payment[s]" under the employer mandate are only "assessable."  Because they are only due "upon notice and demand by the Secretary," 26 U.S.C. § 4980H(d)(1), the Secretary might stay assessments within his discretion and refuse to demand payment.  *Cf. Oil, Chemical and Atomic Workers Int'l Union v. Occupational Safety & Health Review Comm'n*, 671 F.2d 643, 649-50 (D.C. Cir. 1982) ("[The Secretary of Labor] is the exclusive prosecutor of OSHA violations.  Necessarily included within the prosecutorial power is the discretion to withdraw or settle a citation issued to an employer, and to compromise, mitigate or settle any penalty assessed under the Act.") (citations omitted); *id.* at 650 ("We endorse so broad a reading of prosecutorial discretion under the statute because we believe that such discretion comports with the Congressional intent that the Secretary be charged with the basic responsibilities for administering the Act.").  *See also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1032-33 (D.C. Cir. 2007).

Secretary of the Treasury is not Congress—the theory is too general to state a concrete, particularized harm to the House.  Because the House lacks standing to pursue these claims, the Secretaries' motion will be granted as to Counts VI-VIII.

### 3.  The House has Standing

The Court concludes that the House of Representatives has alleged an injury in fact under its Non-Appropriation Theory—that is, an invasion of a legally protected interest that is concrete and particularized.  Article I could not be more clear: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7.  Neither the President nor his officers can authorize appropriations; the assent of the House of Representatives is required before *any* public monies are spent.  Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive.  *See U.S. Dep't of the Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (2012) ("[If not for the Appropriations Clause,] the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.") (quoting 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)).  The genius of our Framers was to limit the Executive's power "by a valid reservation of congressional control over funds in the Treasury."  *OPM v. Richmond*, 496 U.S. 414, 425 (1990).  Disregard for that reservation works a grievous harm on the House, which is deprived of its rightful and necessary place under our Constitution.  The House has standing to redress that injury in federal court.

### B.  Subject Matter Jurisdiction

Although the Secretaries do not seek dismissal for want of subject matter jurisdiction, federal courts have "an independent obligation to determine whether subject matter jurisdiction exists, even when no party challenges it."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94

(2010); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

This case "arises under" the Constitution in both a constitutional and statutory sense.  The allegations here turn on a straightforward constitutional analysis: did the Secretaries violate Article I, § 9, cl. 7?  "It has long been held that a suit arises under the Constitution if a petitioner's claim will be sustained if the Constitution is given one construction and will be defeated if it is given another."  *Powell*, 395 U.S. at 514 (citing *Bell*, 327 U.S. at 685; *King County*, 263 U.S. at 363-364) (alterations and quotation marks omitted).  The relevant statute, 28 U.S.C. § 1331, similarly confers jurisdiction when the "case depends directly on construction of the Constitution."  *Powell*, 395 U.S. at 516.  The Court concludes that it has subject matter jurisdiction over this case.

### C.  Cause of Action

The Secretaries argue that the House has no cause of action even if it has standing to sue.  The House rejoins that it has causes of action under the Declaratory Judgment Act; under the Administrative Procedure Act (as to Count V only); and impliedly under the Constitution.  As to each Count for which the House has standing—Count I and part of Count V—it also has alleged a proper cause of action.[27]

### 1.  Declaratory Judgment Act, 28 U.S.C. § 2201

The parties agree that the Declaratory Judgment Act does not itself create a cause of action, but instead requires that there be an independent "case of actual controversy."  *See* 28 U.S.C. § 2201(a).  *Compare* Mem. at 23-24 *with* Opp'n at 38-40.  In other words, "the availability of [declaratory] relief presupposes the existence of a judicially remediable right."  *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).

---

[27] The Court will not address Counts II-IV or VI-VIII.

So, while the Secretaries make separate arguments about the House's lack of standing and its lack of a cause of action under the Declaratory Judgment Act, the two inevitably collapse into one inquiry: does the House have standing?  Not surprisingly, therefore, the parties merely incorporate their standing arguments into their cause-of-action arguments.  *See* Mem. at 24 ("[A]s explained above, the House has no direct constitutional role in the implementation of law."); Opp'n at 39 ("[T]he House need only demonstrate [] 'a case of actual controversy,' i.e., that it has standing, which it does, *see supra* Argument, Part I . . . .").

It logically follows that the Court has already decided the question.  The House has standing under the Non-Appropriation Theory (as to Count I and Count V, in part) but not under the Employer-Mandate Theory.  The House accordingly may pursue a remedy under the Declaratory Judgment Act coextensive with its standing under the Non-Appropriation Theory.  Apart from finding an actual controversy, the Court need only assure itself that the case is "within its jurisdiction" and that the House has filed "an appropriate pleading."  28 U.S.C. § 2201(a).  Both elements are satisfied here, and the Secretaries do not contest either one.  The Court concludes that the House can seek relief under the Declaratory Judgment Act for those claims that it has standing to bring, *i.e.*, Counts I and V, in part.

## 2.  **Administrative Procedure Act, 5 U.S.C. § 701** *et seq.*

The House argues that Count V can proceed under § 706(2)(A) of the Administrative Procedure Act (APA), which provides that a reviewing court shall "hold unlawful and set aside agency action" found to be "not in accordance with law."  Alternatively, the House invokes § 706(2)(B) of the APA, which requires the same result when agency action is "contrary to constitutional right, power, privilege, or immunity."  The Secretaries' only response is to challenge the House's qualification as "[a] person suffering legal wrong because of agency

action."  Reply at 17 (citing 5 U.S.C. § 702).  They argue that "[t]he House does not, and could

not, contend that it has suffered 'legal wrong' within the meaning of the APA."  Reply at 17.

Once again, the analysis collapses back into standing.  For the reasons stated above, the Court

finds that the House has standing because it *has* alleged a legal wrong that is traceable and

remediable.  The Secretaries' APA defense therefore fails.

The Secretaries also argue that the House cannot be a "person aggrieved" because

that term does not apply to "a governmental entity."  Reply at 18 (citing *Director, Office of

Workers' Compensation Programs v. Newport News Shipbuilding*, 514 U.S. 122, 130 (1995)).

But *Newport News* does not say "governmental entity"; it says "an *agency* acting in its

governmental capacity" is not a person aggrieved under the APA.  514 U.S. at 130 (emphasis

added).  That analysis does not control this case, therefore, and the Secretaries offer no precedent

for the proposition that the House cannot be a "person aggrieved."  Because there *is* precedent

for the House filing suit to vindicate its rights in other contexts, *see AT&T*, 551 F.2d at 390-91;

*Miers*, 558 F. Supp. 2d at 69; *Holder*, 979 F. Supp. 2d at 3; *House of Representatives*, 11 F.

Supp. 2d at 86, the Court will deny the Secretaries' motion to dismiss Count V for want of a

cause of action under the APA.

### 3.  The U.S. Constitution

Finally, the Court finds that the House has an implied cause of action under the

Constitution itself.  The Secretaries' argument on this score revolves mostly around "private

rights of action to enforce federal law."  Reply at 18 (quoting *Alexander v. Sandoval*, 532 U.S.

275, 286 (2001)).  But this is not a case about private citizens deputizing themselves in an effort

to enforce federal law.  Such putative plaintiffs must demonstrate an expressly-conferred cause

of action precisely because they suffer no injury in their own right.  It is quite another matter

when the House—which bears the brunt of the constitutional injury alleged—is the institutional

plaintiff.  *Cf. Ariz. Legislature*, 135 S. Ct. at 2664 (contrasting the individual plaintiffs in *Raines*

to "an institutional plaintiff asserting an institutional injury").

The distinction makes *Armstrong v. Exceptional Child Center* similarly

unavailing to the Secretaries.  *See* Reply at 18-19 (citing 135 S. Ct. 1378 (2015)).  In that case,

the Supreme Court refused to find an implied cause of action in the Supremacy Clause, which "is

silent regarding who may enforce federal laws in court, and in what circumstances they may do

so."  *Armstrong*, 135 S. Ct. at 1383.  The Supreme Court reasoned that if there were such an

implied cause of action, it would significantly curtail Congress's "ability to guide the

implementation of federal law" by deciding at the outset who can enforce it.  *Id.* 1384.  In other

words, an army of private enforcers would be inconsistent with Congress's "broad discretion

with regard to the enactment of laws."  *Id.* at 1383.  But *Armstrong* is of no concern here,

because the House and Senate are the only two possible plaintiffs under the Non-Appropriation

Theory as recognized by this Court.  Nor is it inconsistent with "the context of the Constitution

as a whole," *id.*, for the Framers to forbid the Executive from spending un-appropriated money

and then allow the appropriators to enforce that right in court.  After all, "we presume that

justiciable constitutional rights are to be enforced through the courts."  *Davis v. Passman*, 442

U.S. 228, 242 (1979).  The House in this case has "no effective means other than the judiciary"

to seek redress for its injury and "must be able to invoke the existing jurisdiction of the courts for

the protection of [its] justiciable constitutional rights."  *Id.*  The Court recognizes an implied

cause of action for the House as an institution under a specific constitutional prohibition whose

violation, if proved, would particularly harm Congress.

### D.  Justiciability

That the Court has jurisdiction over this case does not end the inquiry.  It must also consider whether there is any reason it should not hear the case, *i.e.*, whether the case is justiciable.  That, in turn, presents two questions: (1) whether the claim presented and the relief sought are of the type which admit of judicial resolution; and (2) whether the structure of the federal government renders the issue presented a "political question," that is, not justiciable because of the separation of powers among the Legislative, Executive and Judicial Branches established by the Constitution.  *Powell*, 395 U.S. at 516-17.[28]

The first question is easily answered: the claims for which the House has standing involve pure questions of constitutional interpretation, amenable to resolution by this Court.  "It would be difficult to say that there are no 'manageable standards' for adjudicating the issues raised.  Familiar judicial techniques are available to construe the meaning" of the Constitution. *Powell*, 395 F.2d at 594; *see also Powell*, 395 U.S. at 548-49 ("[A] determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution.  Such a determination falls within the traditional role accorded to courts to interpret the law, and does not involve a 'lack of respect due [a] coordinate [branch] of government,' nor does it involve 'an initial policy determination of a kind clearly for nonjudicial discretion.'") (quoting *Baker*, 369 U.S. at 217).  In short, centuries of precedent demonstrate the Judiciary's ability to adjudicate the Secretaries' compliance with the Constitution.  *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

---

[28] In addition to their justiciability argument rooted in separation of powers, the Secretaries argue unpersuasively that the Court should exercise its discretion under the Declaratory Judgment Act and dismiss this case because the House "has a variety of legislative means available to counter the Executive Branch."  Mem. at 26.  As discussed above, the constitutional violation of which the House complains has the collateral effect of disarming the most potent of those legislative means.

The Secretaries pin their hopes on the second question, arguing that to allow this suit to proceed would "upset the finely wrought balance" among the branches and that the case presents issues not "suitable for resolution by an Article III court." Mem. at 16, 18.[29] The argument is not persuasive. Whatever the merits of the parties' interpretations of the differing appropriation legislation—an issue not to be addressed at this stage of litigation—the Complaint makes clear that this is not a dispute over statutory semantics. To the contrary, the constitutional violation alleged is that, despite an intentional refusal by Congress to appropriate funds for Section 1402, the Secretaries freely ignored Article I, § 9, cl. 7 of the Constitution and sought other sources of public money. The Complaint's Non-Appropriation Theory presents a question of constitutional interpretation for the Judiciary, which provides "the primary means through which [constitutional] rights may be enforced." *Davis*, 442 U.S. at 241.

The Secretaries' separation-of-powers argument, properly addressed here, is unavailing. It consists of two principal parts: (1) the history of non-litigiousness between the political branches, recounted in *Raines*, and (2) a page-long series of quotes from Justice Scalia's dissent in *Windsor*. *See* Mem. at 16-18. The first part is unconvincing: the refusal by several presidents to sue Congress over the Tenure of Office Act hardly answers the question presented by the pending motion. *See* 521 U.S. at 826. The refrain by either branch from exercising one of its options does not mean that the option was unavailable; there will never be a history of litigation until the first lawsuit is filed. The second part is not precedential: for all of its

---

[29] The Secretaries also cite the 19th-century history of non-litigiousness between the political Branches, which was surveyed in *Raines*, 521 U.S. at 826-27. The Court has carefully considered all of *Raines* and finds it distinguishable. While there is no precedent for this specific lawsuit, the rights of the House as an institution to litigate to protect its constitutional role has been recognized in other contexts in the 20th century and its institutional standing was most specifically foreseen, if not decided, in *Raines*, 521 U.S. at 829-30 and *Arizona Legislature*, 135 S. Ct. at 2664-65.

eloquence, Justice Scalia's opinion remains a dissent joined by only two other Justices.  It does not convince the Court to dismiss this case.

The Court concludes that prudential considerations do not counsel avoidance of this dispute.  The Court is familiar with the standards for constitutional review of Executive actions, and the mere fact that the House of Representatives is the plaintiff does not turn this suit into a non-justiciable "political" dispute.  *See Powell*, 395 U.S. at 549 ("Our system of government requires that federal courts on occasion interpret the Constitution at variance with the construction given the document by another branch.  The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.") (collecting cases).  Despite its potential political ramifications, this suit remains a plain dispute over a constitutional command, of which the Judiciary has long been the ultimate interpreter. *See Marbury*, 5 U.S. (1 Cranch) 137.

The Court is also assured that this decision will open no floodgates, as it is inherently limited by the extraordinary facts of which it was born.  The Secretaries note that this case is a "novel tactic" by the House and "entirely without precedent."  Mem. at 2, 25.  The House agrees that this "case is the result of an historic vote by plaintiff House of Representatives."  Opp'n at 1.  The rarity of these circumstances itself militates against dismissing the case as non-justiciable.  *See Windsor*, 133 S. Ct. at 2689 ("The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise.  But this case is not routine.").

## IV. CONCLUSION

The House of Representatives has standing to pursue its allegations that the Secretaries of Health and Human Services and of the Treasury violated Article I, § 9, cl. 7 of the

Constitution when they spent public monies that were not appropriated by the Congress.  The

Secretaries hotly dispute that any violation has occurred, maintaining that the Section 1402 "cost

sharing reduction payments are being made as part of a mandatory payment program that

Congress has fully appropriated."  Mem. at 6 (citing 42 U.S.C. § 18082).  The Court stresses that

the merits have not been briefed or decided; only the question of standing has been determined.

> The Secretaries' motion to dismiss, Dkt. 20, will be granted in part and denied in

part.  The following Counts of the Complaint will be dismissed: II, III, IV, V, in part, VI, VII,

and VIII.  Count I remains, as does Count V (to the extent predicated on a constitutional

violation).  Furthermore, the House's motion to strike, Dkt. 38, will be denied.  The parties will

be directed to meet, confer, and file a proposed schedule for briefing dispositive motions.

> A memorializing Order accompanies this Opinion.

Date: September 9, 2015

> _____/s/_____
> ROSEMARY M. COLLYER
> United States District Judge