**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES HOUSE OF REPRESENTATIVES**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:14-cv-01967-RMC |
| | ) |
| **SYLVIA MATHEWS BURWELL**, in her official | ) |
| capacity as Secretary of Health and Human Services, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' MOTION FOR CERTIFICATION OF THIS COURT'S
ORDER OF SEPTEMBER 9, 2015, FOR INTERLOCUTORY APPEAL**

The defendants hereby request that this Court certify its September 9, 2015 Order (ECF No. 42) for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).   For the first time in our Nation's history, one House of Congress has been permitted to invoke the jurisdiction of the federal courts to resolve a disagreement between the political Branches arising out of the Executive Branch's administration of a federal program.   Allowing such a suit to proceed is a momentous step, and we respectfully urge that it is irreconcilable with the "restricted role for Article III courts" in our constitutional structure and history.   *Raines v. Byrd*, 521 U.S. 811, 828 (1997).   The Supreme Court and D.C. Circuit have made clear that separation-of-powers principles lie at the heart of the Article III standing doctrine.   Rigorous adherence to these principles ensures that the Judiciary is not "improperly and unnecessarily plung[ed]" into "political battle[s] being waged between the President and Congress." *Id.* at 827.   Once a federal court asserts the power to decide which Branch should prevail in such a political dispute,

1

the damage to the separation of powers can never be fully undone—even if a reviewing court later determines that the suit should have been dismissed as inconsistent with Article III. Moreover, for reasons discussed below, the logic of the Court's ruling cannot be cabined as this Court suggested and would invite litigation over numerous other disputes between the political Branches. "In the light of this overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," we respectfully submit that this Court should "put aside the natural urge to proceed directly to the merits of this important dispute and to 'settle' it for the sake of convenience and efficiency." *Id.* at 820. Before this unprecedented suit proceeds further, we submit that the most responsible course is to afford the D.C. Circuit the opportunity to determine whether this suit is consistent with the limitations imposed by Article III and the underlying separation-of-powers principles.

An immediate appeal under 28 U.S.C. § 1292(b) is warranted because, as demonstrated below, this Court's Order involves a controlling question of law as to which there are substantial grounds for difference of opinion. That question is:

> Whether the House of Representatives may, consistent with Article III and separation-of-powers principles, bring a suit to vindicate its contention that the Executive Branch is spending money without a valid appropriation by making payments mandated by the Affordable Care Act.

An immediate appeal will materially advance the termination of this litigation. The defendants intend to move for an expedited appellate briefing schedule under which their opening brief will be due 21 days after the D.C. Circuit acts on the Section 1292(b) petition. If the D.C. Circuit hears the appeal and adopts the defendants' position, this litigation will cease.

The Supreme Court has emphasized that "[t]he preconditions for § 1292(b) review—'a controlling question of law,' the prompt resolution of which 'may materially advance the ultimate termination of the litigation'—are most likely to be satisfied" when the district court's ruling "involves a new legal question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases."   *Mohawk Industries, Inc. v. Carpenter,* 558 U.S. 100, 110-11 (2009).   This is plainly such a case.   This Court has already concluded that "no precedent dictates the outcome," Memorandum Opinion (ECF No. 41) ("Mem. Op.") 2, and the Court's ruling would have profound consequences for the separation of powers.   The Order should be certified for interlocutory appeal.[1]

### Background

1.   As the Court is aware, the 111th Congress enacted the Patient Protection and Affordable Care Act ("Affordable Care Act," or "ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), "to increase the number of Americans covered by health insurance and decrease the cost of health care."   *Nat'l Fed'n of Indep. Business v. Sebelius*, 132 S. Ct. 2566, 2580 (2012).   The 111th Congress sought to accomplish those goals by "adopt[ing] a series of interlocking reforms designed to expand coverage in the individual health insurance market."   *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).   Two components of the Act are the subject of this litigation.

*First*, Congress created an integrated system of subsidies to help people buy health insurance through newly created insurance Exchanges.   The Act provides premium tax credits to eligible individuals who purchase coverage on the Exchanges and who have household

---

[1]   Pursuant to Local Civil Rule 7(m), the undersigned counsel has consulted with counsel for the plaintiff, who indicates that the plaintiff opposes this motion.

incomes between 100% and 400% of the federal poverty level.   26 U.S.C. § 36B.   The Act also provides payments to insurers to reduce out-of-pocket expenses, such as co-payments and deductibles, that would otherwise be borne by recipients of the premium tax credits whose household income is between 100% and 250% of the federal poverty level.   42 U.S.C. § 18071(c)(2).   The Act provides that the insurance issuer of a plan covering an eligible individual "shall reduce the cost-sharing under the plan" according to a formula specified by the statute.   42 U.S.C. § 18071(a)(2).   The Act then gives the insurance issuer the legal right to a payment from the government equal to the amount of those cost-sharing reductions, directing that "the Secretary [of Health and Human Services] shall make periodic and timely payments to the issuer equal to the value of the reductions."   42 U.S.C. § 18071(c)(3)(A).   The Act further directs that the Department of the Treasury "shall" make advance payments of premium tax credits and cost-sharing reductions to the relevant insurers.   42 U.S.C. § 18082(c)(2)(A), (c)(3).

The Act instructs the defendants to "establish a program" for the unified administration of advance payments.   42 U.S.C. § 18082(a).   Under that program, the Secretary of the Treasury must "make[] advance payments" of both forms of the subsidy "in order to reduce the premiums payable by individuals eligible for such credit."   42 U.S.C. § 18082(a)(3).   Advance payments of the premium tax credits and cost-sharing reductions are thus made at the same time, by the same Department, to the same recipients, for the same purpose, and pursuant to the same statutory provision.   The Secretary of the Treasury is making the mandatory advance payments of premium tax credits and cost-sharing reductions from the permanent appropriation in 31 U.S.C. § 1324.   Compl. ¶ 39 (ECF No. 1).

*Second*, the ACA provides for a tax to be imposed on an applicable large employer if that employer fails to offer its full-time employees and their dependents health coverage that meets certain standards for affordable, minimum value coverage.   26 U.S.C. § 4980H.   The Department of the Treasury announced transitional relief providing that the Section 4980H tax would not be imposed on any large employer for the 2014 tax year, *see* 79 Fed. Reg. 8544, 8569-70 (Feb. 12, 2014), and that certain large employers would not be subject to the Section 4980H tax for the 2015 tax year, *id*. at 8574-75.

2.   The House of Representatives in the 113th Congress filed a complaint in this Court on November 21, 2014, alleging that the Executive Branch had exceeded its authority under the Affordable Care Act and the Constitution in two respects.   ECF No. 1.   First, the House alleged that neither the permanent appropriation in 31 U.S.C. § 1324 nor any other appropriations law allows the Executive Branch to make the advance payments of cost-sharing reductions mandated by the Act.   Second, the House alleged that the Executive Branch had exceeded its authority by providing for transitional relief from the large-employer tax.

The defendants moved to dismiss the complaint, urging that the House lacked Article III standing, that no source of law accorded the House a cause of action for its claims, and that in all events the Court should exercise its equitable discretion to decline to hear the action.   ECF No. 20, ECF No. 20-1.   This Court granted the motion to dismiss in part and denied it in part in its September 9, 2015 Order.   ECF No. 42.   In its accompanying Memorandum Opinion, the Court stated that "no precedent dictates the outcome" of the defendants' motion, Mem. Op. 2, and that the House's complaint in this action is "the first lawsuit" of its kind in the history of the United States, *id.* at 41.   This Court nevertheless ruled that the House may proceed with some

of its claims concerning the expenditure of funds to the extent its allegations present "constitutional claims" under the Appropriations Clause.   Mem. Op. 2.   In contrast, this Court dismissed for lack of standing the House's claims with respect to allegations that the Executive Branch's actions did not comport with appropriations *statutes* and all of its claims regarding the large-employer tax, reasoning that those claims "concern[ed] only the implementation of a statute."   *Id.*

### Discussion

As this Court and the parties have recognized, this is an "extraordinary" case.   Mem. Op. 42.   This Court's Order would, for the first time in our Nation's history, allow one House of Congress to invoke the jurisdiction of an Article III court to resolve a disagreement over the Executive Branch's administration of a federal program.   We respectfully submit that before this Court takes that momentous step, the D.C Circuit should be afforded an opportunity to consider the threshold questions raised by this suit.   An immediate appeal is warranted because this Court's Order satisfies the three requirements of Section 1292(b):   (1) the Order involves "controlling question[s] of law"; (2) there is a "substantial ground for difference of opinion" on those questions; and (3) an immediate appeal will "materially advance the ultimate termination of the litigation."   28 U.S.C. § 1292(b); *see, e.g.*, *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 95 (D.D.C. 2003).

## I.      This Court's Order Involves Controlling Questions of Law

"Under section 1292(b), a question of law is controlling if it would require reversal if decided incorrectly."   *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 840 F. Supp. 2d 52, 55 (D.D.C. 2012) (internal quotation omitted).

6

"Controlling questions of law include issues that would terminate an action if the district court's order were reversed." *APCC Servs.*, 297 F. Supp. 2d at 96. Here, the defendants moved to dismiss the complaint because, *inter alia*, the House's suit does not present an Article III case or controversy, and because the House lacks a cause of action. A ruling in the defendants' favor on either issue would terminate this suit. Accordingly, this Court's Order involves controlling questions of law.

## II.      There Are Substantial Grounds for Difference of Opinion with This Court's Ruling

Certification under Section 1292(b) is appropriate if there is a "substantial ground for difference of opinion" on the questions at issue. That standard does not require this Court to conclude that its underlying decision was incorrect. Instead, an interlocutory appeal is appropriate where a court concludes that "the arguments in support of the opposite conclusion are not insubstantial," *In re Vitamins Antitrust Litig.*, No. 99–197 TFH, 2000 WL 33142129, at *2 (D.D.C. Nov. 22, 2000), or where "fair-minded jurists might reach contradictory conclusions," *Reese v. BP Exploration Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). Certification is particularly appropriate where, as here, a case involves "novel legal issues" subject to reasonable disagreement. *Id.*; *see Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55 (D.D.C. 2009). In this case, certification is warranted because, at a minimum, fair-minded jurists could disagree with this Court's conclusions.

### A.      There Are Substantial Grounds for Disagreement with This Court's Conclusion that the House's Suit Is Consistent with Article III

This Court correctly recognized that "there is no precedent for this specific lawsuit." Mem. Op. 41 n.29. The Court suggested, however, that "the rights of the House as an

institution to litigate to protect its constitutional role … and its institutional standing" find support in the Supreme Court's decisions in *Raines v. Byrd*, 521 U.S. 811 (1997), and *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015) ("*AIRC*").   Mem. Op. 41 n.29; *see id.* at 22-32.   There are substantial grounds for drawing contrary lessons from those cases and the governing precedent of the D.C. Circuit.

> 1.    *Separation-of-powers principles are at the core of the Article III standing issue*

This Court's holding that the House's suit presents a case or controversy properly resolved by the federal courts under Article III appears to rest in substantial part on the Court's conclusion that it should not "consider separation of powers in the standing analysis."   Mem. Op. 16; *see id.* at 26 n.19.   But as both the Supreme Court and the D.C. Circuit have stressed, separation-of-powers principles lie at the heart of the proper Article III standing analysis.

In *Raines*, the Supreme Court explained that "the law of Art. III standing is built on a single basic idea—the idea of separation of powers," which the Court described as reflecting an "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere."   521 U.S. at 820.   The Court also emphasized that its "standing inquiry has been especially rigorous when reaching the merits of the dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."   *Id.* at 819-20.

The D.C. Circuit has also repeatedly underscored "the separation-of-powers problems inherent in legislative standing."   *Campbell v. Clinton*, 203 F.3d 19, 21 (D.C. Cir. 2000); *see Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999).   Before *Raines*, the D.C. Circuit had

concluded that it should "[k]eep[] distinct [its] analysis of standing and [its] consideration of the separation of powers issues raised when a legislator brings a lawsuit concerning a legislative or executive act." *Chenoweth*, 181 F.3d at 114. But the D.C. Circuit recognized that this feature of its prior legislative standing cases was "untenable in the light of *Raines*." *Id.* at 115. Instead, the D.C. Circuit explained, *Raines* "require[d] [it] to merge [its] separation of powers and standing analyses." *Id.* at 116; *see id.* at 115 ("The [Supreme] Court … emphasized that standing requirements are 'especially rigorous' when reaching the merits of a case would raise questions about the proper scope of judicial authority.") (internal quotation omitted).

More recently, the Supreme Court in *AIRC* reinforced the D.C. Circuit's post-*Raines* understanding. The Supreme Court emphasized that its decision to allow the Arizona Legislature's suit to go forward in that case did not "touch or concern the question whether Congress has standing to bring a suit against the President," and that "a suit between Congress and the President would raise separation-of-powers concerns" under the United States Constitution that are "absent" in a suit between state governmental bodies. 135 S. Ct. at 2665 n.12. Courts thus must consider separation-of-powers principles in the Article III standing analysis.

Those principles confirm that the House's dispute with the Executive Branch does not qualify as an Article III case or controversy. In *Raines*, the Supreme Court emphasized the serious separation-of-powers concerns that would arise if federal courts were to adjudicate disputes between the political Branches. 521 U.S. at 826-29. The Court explained that by entertaining such actions, the Judiciary could be "improperly and unnecessarily plunged" into political battles between Congress and the President. *Id*. at 827. Although "[t]here would be

nothing irrational about a system that granted standing in these cases," the Supreme Court emphasized that "it is obviously not the regime that has obtained under our Constitution to date." *Id*. at 828.   To the contrary, the Court declared:   "Our regime contemplates a more restricted role for Article III courts," in which the power of judicial review is afforded to protect "'the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action.'"   *Id*. at 828-29 (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring)).   "'It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.'"   *Id*. at 829 (quoting *Richardson*, 418 U.S. at 192 (Powell, J., concurring)).

This suit by the House poses precisely the dangers that the Supreme Court identified in *Raines*.   It would plunge the Judiciary directly into an ongoing dispute between the House and the Executive Branch on an issue that is politically charged.   And it would engage the courts in the very sort of "general supervision of the operations of government" that *Raines* rejected, by resolving a disagreement solely between the government's political Branches, in the absence of any private party who has judicially cognizable "rights and liberties" at stake.   521 U.S. at 828. This suit thus is contrary to our constitutional structure not only because the House is exceeding its own constitutional role by resorting to litigation rather than legislation (*see* pp. 11-12, *infra*), but also because the House seeks to enmesh the Judicial Branch in precisely the type of dispute between the political Branches that has never been understood to be within the "Cases" and "Controversies" amenable to resolution by an Article III court.   *See Steel Co.* v. *Citizens for a*

10

*Better Env't*, 523 U.S. 83, 102 (1998) ("We have always taken this to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.").

In *Raines*, the Supreme Court catalogued "several episodes in our history" involving "confrontations between one or both Houses of Congress and the Executive Branch" and deemed it significant that in every one of those confrontations, "no suit was brought on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826. The D.C. Circuit has made clear that disputes of this nature must be resolved through "political self-help," and not judicial resolution. *Campbell*, 203 F.3d at 24. And as discussed below, the House has constitutionally prescribed powers to resolve this dispute.

      2.    *The House retains its constitutionally prescribed legislative mechanisms for resolving this dispute*

This Court mistakenly suggested that the House lacks means outside this lawsuit for resolving its disagreement with the Executive Branch. The Court reasoned that "the elimination of funding" is not an available course because "[e]liminating funding for Section 1402 is *exactly* what the House tried to do." Mem. Op. 29. But as the Court elsewhere recognized, the very question whether Congress has permanently appropriated funds for the advance payment of cost-sharing reductions is the central statutory issue in this dispute. Mem. Op. 30 n.24 (acknowledging that the House's constitutional claim "inevitably involve[s]" statutory interpretation); *see also id*. at 24 n.17. This Court could not resolve the House's Appropriations Clause claim without addressing the antecedent statutory question whether the Section 1324 permanent appropriation is available for the ACA's advance payments of cost-sharing reductions.

11

Congress has the constitutional means at its disposal to resolve the House's disagreement with the Executive Branch with respect to the meaning of the ACA and Section 1324. Congress could clarify the terms of the relevant statutes.   Or, if Congress as a whole agreed with the position taken by the House, Congress could pass a law prohibiting the expenditure of funds for the advance payment of cost-sharing reductions.   Restrictions of this kind are a familiar means by which Congress controls federal spending, and the Affordable Care Act itself includes such measures.   *See*, *e.g.*, 42 U.S.C. § 18023(b) (prohibiting the use of federal funds for specified purposes).   And, of course, Congress could repeal the provisions requiring the advance payment of cost-sharing reductions.   If Congress had used any of these measures, those payments would cease.   But Congress has *never* sought to prohibit advance payments of cost-sharing reductions using these available legislative tools.   To the contrary, Congress enacted legislation that presupposed the validity of these cost-sharing payments by conditioning them on a certification by HHS that a program is in place to verify that applicants are eligible for the Affordable Care Act's subsidies.   Continuing Appropriations Act, 2014, Pub. L. No. 113-46, Div. B, § 1001(a), 127 Stat. 558, 566 (2013).   The defendants promptly met that statute's condition, and advance payments of cost-sharing reductions have proceeded on the terms that the full Congress envisioned.

Under D.C. Circuit precedent, the availability of these established legislative means to prohibit the expenditure of funds forecloses Article III standing for the House's constitutional claim.   Because "Congress has a broad range of legislative authority it can use to stop" the spending to which the House objects, *Campbell*, 203 F.3d at 203, the House cannot assert "standing in federal court to challenge the lawfulness of actions of the executive."   *Id*. at 20.

3.      *The logic of this Court's ruling would invite lawsuits over other disputes between the political Branches*

This Court correctly recognized that any theory of standing that would allow Congress or one of its Houses to challenge "every instance of an extra-statutory action by an Executive officer" would be repugnant to our constitutional structure and tradition.   Mem. Op. 33.   The Court thus sought to limit its holding to claims that the Executive has violated the Appropriations Clause, and it dismissed the House's "statutory" challenges to the advance payment of cost-sharing reductions.   Mem. Op. 32-33.   We respectfully submit that the Court erred in distinguishing between the House's statutory and constitutional claims.   *All* of the House's challenges to the Executive's advance payment of cost-sharing reductions—those that the Court dismissed and those that it allowed to move forward—boil down to an argument that the Executive misinterpreted the relevant provisions of the ACA and Section 1324.   The only way the Court could find a violation of the Appropriations Clause is by finding that the Executive is misinterpreting those statutes.   In practical terms, therefore, the House's Appropriations Clause claim would inevitably require the court to referee a disagreement between the House and the Executive over the meaning of federal statutes—the very sort of dispute that this Court recognized the House lacks standing to bring.

In any event, even taken on its own terms, this Court's holding with respect to the Appropriations Clause would invite litigation over countless disputes between the political Branches, fundamentally altering the role of the Judiciary under the Constitution.   Disputes over Executive Branch spending are not unusual.   Moreover, the logic of the Court's Order cannot be limited to the Appropriations Clause, but rather would extend to numerous other

constitutional provisions that, like the Appropriations Clause, condition action by the Executive or others outside the Legislative Branch on action by Congress or one of its Houses.

a.  Disagreements often arise between Congress (or one of its Houses) and an Executive Branch agency over whether an expenditure is authorized by law.  As noted above, Congress routinely includes in appropriations statutes measures specifying the circumstances under which an appropriation may be used.  *See*, *e.g.*, Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. H, tit. V, §§ 501-520, 128 Stat. 5, 408-12 (2014) (restrictions on HHS funds). Under this Court's reasoning, it appears that either House of Congress would have standing to assert a claim that the Executive Branch has run afoul of any of the myriad restrictions and conditions contained in annual or permanent appropriations laws—disputes that always have been resolved through the political process.[2]

Nor is the logic of this Court's opinion confined to disputes over the interpretation of the appropriations statutes themselves.  Where, as is often the case, an appropriation is tied to a particular statute or program, any claim that an Executive Branch agency has erroneously interpreted the governing substantive statute could easily be recast as a violation of the Appropriations Clause, on the theory that the applicable appropriations law did not permit the

---

[2] Precedent makes clear that Article III's limitations on congressional standing apply with full force to claims implicating Congress's spending power.  *Raines* itself involved a dispute over the President's authority to cancel spending authorized by Congress.  *See* 521 U.S. at 813-15.  In *Chenoweth*, the D.C. Circuit dismissed for lack of standing a claim that an administrative program was unlawful because, among other things, it "violate[d] the Anti-Deficiency Act, 31 U.S.C. § 1301 *et seq.*" and the "Spending Clause[] of … the Constitution" by spending federal funds without an appropriation.  181 F.3d at 113; *see also Harrington* v. *Bush*, 553 F.2d 190, 213 (D.C. Cir. 1977) (agency's alleged misuse of funding "does not invade the lawmaking power of Congress or [one of its Members]").

expenditure of funds for an assertedly unlawful purpose.   *See OPM v. Richmond*, 496 U.S. 414, 424 (1990) (holding that "the straightforward and explicit command of the Appropriations Clause" barred payment of a claim for federal benefits not authorized by the relevant substantive statute).   The claim in *King v. Burwell*, for example, was that the Treasury Department's expenditures for premium tax credits in States with Exchanges operated by the federal government were contrary to the unambiguous text of 26 U.S.C. § 36B.   *See* 135 S. Ct. at 2488-89.   That claim could have been characterized as a claim that the Treasury Department's payment of those credits violated the Appropriations Clause because Congress had not appropriated funds for the payment of credits except as authorized in Section 36B.   Indeed, Members of Congress argued as *amici* in *King* that Treasury was usurping Congress's appropriations power.[3]   Yet it is inconceivable that the House or Senate, or Congress as a whole, could have brought its own suit to press the claim urged by the individual plaintiffs in *King*.   That conclusion, however, follows from this Court's holding that either House of Congress has standing to assert any claim that the Executive has "draw[n] funds from the Treasury without a valid appropriation."   Mem. Op. 30.

The Framers quite deliberately established a system of checks and balances that requires the political Branches to engage in a democratic process of give-and-take to resolve political disputes.   If resort to the Judiciary were available following a majority vote by a single House of Congress, that path would be an ever-tempting—but extra-constitutional—shortcut that bypasses the process the Constitution prescribes for resolving such disputes.   *Cf.* Jake Sherman,

---

[3]   *See* Brief of *Amici Curiae* Senators John Cornyn *et al.* in Support of Petitioners at 23-24, *King v. Burwell*, 135 S. Ct. 2480 (2015) (No. 14-114), 2014 WL 7474064, at *23-24.

*Boehner:   I Might Sue Obama Over Iran Deal*, Politico (Sept. 10, 2015), http://www.politico. com/story/2015/09/john-boehner-barack-obama-sue-iran-nuclear-deal-213496.

b.   What is more, it is difficult to see how the logic of this Court's ruling could be cabined in a principled manner to cover only alleged violations of the Appropriations Clause. The Court sought to distinguish Appropriations Clause claims from others on the rationale that an unauthorized expenditure inflicts an Article III injury because it "divest[s]" the House of its "constitutional function" to appropriate funds.   Mem. Op. 23 (citation omitted).   But nothing the Executive Branch has done here could "divest" the House of its constitutional role in passing new laws to make or restrict appropriations.   The Executive Branch has simply interpreted a law Congress has *already* passed in a way that the House now disagrees with.[4]   Such disagreements over existing law are by no means unique to appropriations.

To be sure, the Appropriations Clause does provide that specified action by Congress—an "Appropriation made by Law"—is a precondition for an expenditure of funds. But numerous constitutional provisions make specified action by one or both Houses of Congress a precondition to particular actions by the Executive or by others.   For example, the House, Senate, or Congress could rely on this Court's reasoning to ask the Judiciary to adjudicate

---

[4]  It is for that same reason that this case is fundamentally different from *AIRC*.   There, the challenged amendment to the Arizona Constitution entirely divested the Arizona Legislature of its legislative *power* to enact a redistricting law, and as a result would have "completely nullif[ied] any vote by the Legislature, now or in the future, purporting to adopt a redistricting plan."   135 S. Ct. at 2665 (citations and internal quotation marks omitted).   The House's asserted injury is of an entirely different kind:   there is no sense in which the Executive's challenged actions have divested *Congress* of its *power* under Article I of the Constitution to enact a law making or restricting an appropriation.

- a claim that the President has appointed a judge or other federal officer without the advice and consent of the Senate, in violation of Article II, Section 2, Clause 2, *cf. NLRB v. Noel Canning*, 134 S. Ct. 2550, 2563-64 (2014) (describing disputes between the Senate and the President regarding the scope of the appointments power);

- a claim that the President has made a treaty without the "Advice and Consent of the Senate" required under Article II, Section 2, Clause 2;

- a claim that the President has usurped Congress's authority to declare war under Article I, Section 8, Clause 11 (or any of Congress's other Article I authorities), *cf. Campbell*, 203 F.3d at 19 (rejecting a claim that individual legislators had standing to assert "that the President violated … the War Powers Clause of the Constitution");

- a claim that one House of Congress had adjourned for more than three days without the consent of the other, in violation of Article I, Section 5, Clause 4;

- a claim that a federal officer had accepted a "present, Emolument, Office, or Title" from a foreign power without the consent of Congress in violation of Article I, Section 9, Clause 8;

- a claim that a State had imposed a duty on imports or exports without the consent of Congress, in violation of Article I, Section 10, Clause 2; or

- a claim that a State had entered into a compact with another State without the consent of Congress, in violation of Article I, Section 10, Clause 3.

Yet disputes under these provisions of the Constitution have never been resolved in suits by Congress or one of its Houses.

c.    Indeed, the logic of this Court's opinion would appear to extend to *any* claim that the Executive has violated the law.   As this Court observed, "Congress passes *all* federal laws in this country," Mem. Op. 3 (emphasis added), not just those laws that concern spending or implement the specific powers identified above.   The House "occupies a unique role in the [legislative] process prescribed by the Constitution, not held by the ordinary citizen," Mem. Op. 28, with respect to *all* legislation.   And, as the House emphasized in its complaint, *all* of Congress's legislative powers derive from Article I, Section 8 of the Constitution.   Thus, any

17

claim that Executive action is contrary to law could be repackaged as a claimed usurpation of Congress's constitutional authority—or as a violation of the President's constitutional obligation to "take Care that the Laws be faithfully executed."   U.S. Const. art. II, § 3.   The logic of this Court's opinion thus could be cited to support any Congressional lawsuit alleging that the Executive is violating the law.   But as this Court recognized, any theory that leads to the conclusion that Congress or one of its Houses may routinely sue the Executive over its interpretation of federal appropriations or other statutes must be rejected as contrary to "decades of precedent for the proposition that Congress lacks standing to affect the implementation of federal law."   Mem. Op. 31.[5]

\*       \*       \*

There are, in sum, substantial grounds for disagreeing with this Court's reliance on a rationale that would open the federal courts to numerous suits by Congress against the Executive, and for concluding instead that this case should be disposed of on the basis of the Supreme Court's straightforward holding more than 40 years ago that "the power to seek judicial relief … is authority that cannot possibly be regarded as merely in aid of the legislative function of

---

[5]  Relying on cases in which one House of Congress (or one of its committees) sued to "demand information from the Executive in furtherance of Congress's oversight role," this Court reasoned that there are "some circumstances" in which the House and its committees have been found to have standing to sue the Executive.   Mem. Op. 19-20.   We do not believe such a suit could properly go forward, and the D.C. Circuit stayed such an order because it recognized that such a suit "is of potentially great significance for the balance of power between the Legislative and Executive Branches."   *Committee on Judiciary, U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008).   In any event, no court has found standing in the circumstance of this case—where one House has challenged the Executive's administration of a federal program as inconsistent with constitutional or statutory restrictions.   *See* Mem. Op. 22 ("no case has decided whether this institutional plaintiff has standing on facts such as these").

Congress.   A lawsuit is the ultimate remedy for breach of a law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"   *Buckley v. Valeo*, 424 U.S. 1, 138 (1976).   That holding, we submit, applies with full force when the law in question concerns appropriations, or when the "breach of the law" is an alleged violation of the Constitution.

> **B.     There Are Substantial Grounds for Disagreement with This Court's Conclusion that the House Has a Cause of Action**

Even if a suit by Congress against the Executive Branch could in some circumstance be reconciled with the limitations imposed by the structure of the Constitution and Article III, the profound separation-of-powers concerns at issue would counsel against recognizing standing and allowing such a suit to proceed in the absence of an Act of Congress purporting to confer a cause of action on the House.   No such law exists here.   We respectfully submit that fair-minded jurists could disagree with the Court's conclusion that this unprecedented suit may nonetheless go forward.

First, although this Court initially recognized that "the Declaratory Judgment Act does not itself create a cause of action," Mem. Op. 36, it then concluded that the Act accorded the House a cause of action that is "coextensive with its standing," *id.* 37.   The D.C. Circuit, however, has held that a party that has not "alleged a cognizable cause of action" under some other source of law has "no basis upon which to seek declaratory relief" under the Declaratory Judgment Act.   *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).   And the suggestion that Article III standing and the existence of a cause of action "collapse into one inquiry," Mem. Op. 37, is inconsistent with D.C. Circuit precedent holding that "[i]n addition to constitutional

standing, a plaintiff must have a valid cause of action for the court to proceed to the merits of its claim." *Gunpowder Riverkeeper v. FERC*, --- F.3d ---, 2015 WL 4450952, at *3 (D.C. Cir. July 21, 2015).

Second, this Court held that the House qualifies as a "person adversely affected or aggrieved" who can sue under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Mem. Op. 37-38.   This Court recognized that the Supreme Court has held that the term of art "person adversely affected or aggrieved" does not include "an agency acting in its governmental capacity." *Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 130 (1995).   For the same reasons, the House does not qualify as a "person adversely affected or aggrieved" within the meaning of the APA.   In reaching a contrary conclusion, this Court relied on "precedent for the House filing suit to vindicate its rights in other contexts."   Mem. Op. 38.   But none of those cases involved a suit by Congress under the APA challenging "agency action" taken by the Executive Branch in administering a federal program.

Finally, this Court held that "the House has an implied cause of action under the Constitution itself."   Mem. Op. 38.   We respectfully disagree.   The weighty considerations against inferring *private* rights of action to enforce the Constitution and federal statutes apply here with even greater force.   And this Court's conclusion that the Framers intended to allow Congress "to enforce [the Appropriations Clause] through the courts," Mem. Op. 39, is contrary to fundamental separation-of-powers principles, *see Buckley*, 424 U.S. at 138, and to the history of the Nation since the Founding.

### III.    Certification Will Materially Advance the Disposition of the Litigation

An immediate appeal will materially advance this litigation.   The defendants intend to move for an expedited appellate briefing schedule under which their opening brief will be due 21 days after the D.C. Circuit acts on the Section 1292(b) petition.    If the D.C. Circuit agrees that the House's lawsuit cannot proceed past the threshold stage, this litigation will come to an end. And where—as here—"there are substantial grounds for difference of opinion as to a court's subject matter jurisdiction, courts regularly hold that immediate appeal may materially advance the ultimate termination of the litigation."   *Al Maqaleh*, 620 F. Supp. 2d at 55 (collecting cases) (internal quotations omitted); *see also Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1270 (D.C. Cir. 1994) (accepting certification of order addressing plaintiff's standing).

Immediate appellate review is particularly appropriate here because of the dangers and structural constitutional concerns triggered by the House's suit.   *Cf. Miers*, 542 F.3d at 911 (staying district court order pending Court of Appeals resolution of threshold jurisdictional questions, because "[t]he present dispute is of potentially great significance for the balance of power between the Legislative and Executive Branches").   The Supreme Court has emphasized that "[t]he preconditions for § 1292(b) review—'a controlling question of law,' the prompt resolution of which 'may materially advance the ultimate termination of the litigation'—are most likely to be satisfied when a … ruling involves a new legal question or is of special consequence, and district courts should not hesitate to certify an interlocutory appeal in such cases."   *Mohawk*

*Industries, Inc. v. Carpenter,* 558 U.S. 100, 110-11 (2009).[6]

Article III's case-or-controversy requirement "is founded in concern about the proper—and properly limited—role of the courts in a democratic society."   *Warth v. Seldin*, 422 U.S. 490, 498 (1975).   Our Nation has a long history of "confrontations between one or both Houses of Congress and the Executive Branch."   *Raines*, 521 U.S. at 826.   The unbroken practice of resolving those confrontations through the give-and-take of the democratic process rather than by resort to the Judiciary reflects a constitutional structure and tradition that contemplate a "restricted role for Article III courts."   *Id.* at 828.   It is precisely the limited role of the Judicial Branch "that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests."   *Id.* at 829 (citation omitted).

If this Court were to proceed to the merits, it would be "improperly and unnecessarily plunged into [a] bitter political battle being waged between the President and [the House]," *Raines*, 521 U.S. at 827, with inevitable consequences for the courts and for the political process—no matter which side were to prevail.   An opinion from this Court captioned as the resolution of a dispute between components of the two political Branches would inevitably be perceived as an Article III court's endorsement of one side over the other in a political dispute

---

[6]   *Mohawk Industries* addressed the circumstances in which interlocutory appeal would be warranted with respect to a district court's privilege ruling.   558 U.S. at 110-11.   The considerations that the Supreme Court identified apply with even greater force here, where this Court's ruling addressed a new legal question that is of great importance for the balance of powers between the political Branches.

between them.   A ruling by this Court on the merits would deprive the D.C. Circuit of the

opportunity to decide the fundamental Article III questions raised by this case before the

Judiciary becomes enmeshed in that dispute.   A later appellate decision ordering dismissal for

lack of Article III jurisdiction could not and would not eliminate the public perception that a

court had acted as a referee between the House and the Executive.   Moreover, as discussed

above, this Court's opinion could prompt the House to bring new lawsuits against the Executive

Branch.   This Court should accordingly refrain from proceeding further until the D.C. Circuit

has had the opportunity to decide whether doing so would be consistent with the limited role of

the courts under Article III.   *See Jacobson v. Comcast Corp.*, No. 1:09-cv-562, 2010 WL

5463084, at *2 (D. Md. Dec. 29, 2010) ("[U]nder § 1292(b) it ultimately falls within the

discretion of the Court of Appeals to decide whether to permit an interlocutory appeal, and I

have concluded that the Fourth Circuit should be afforded the opportunity to determine whether

an interlocutory appeal in this case is appropriate.").[7]

## Conclusion

Section 1292(b) certification serves to identify orders that warrant immediate review

because they are "pivotal and debatable."   *Swint v. Chambers County Comm'n*, 514 U.S. 35, 46

---

[7]   We anticipate that the House may argue that certification would not advance the ultimate termination of the litigation because an appeal would delay this Court's consideration of the merits.   The same could be said, however, in any circumstance in which a district court certifies its jurisdictional ruling for immediate review, yet, as we have noted above, courts regularly do so.   And, as also demonstrated above, an immediate appeal is warranted precisely because proceeding to the merits would injure the separation of powers and further enmesh the courts in a political dispute.   As the D.C. Circuit has recognized, "[t]he Separation of Powers often impairs efficiency, in terms of dispatch and the immediate functioning of government," in order to safeguard "the long-term staying power of government."   *United States v. AT&T Co.*, 567 F.2d 131, 133 (D.C. Cir. 1977).

(1995).   For the preceding reasons, this case meets that test.   Accordingly, this Court should certify its September 9, 2015 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and stay all proceedings pending the D.C. Circuit's ultimate disposition of the appeal.

Dated: September 21, 2015                    Respectfully submitted,

                                             BENJAMIN C. MIZER
                                             Principal Deputy Assistant Attorney General

                                             VINCENT H. COHEN, JR.
                                             Acting United States Attorney

                                             JENNIFER D. RICKETTS
                                             Director

                                             SHEILA LIEBER
                                             Deputy Branch Director


                                                 /s/ Joel McElvain
                                             JOEL McELVAIN
                                             Assistant Branch Director
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Avenue, NW
                                             Washington, D.C. 20530
                                             (202) 514-2988
                                             Joel.McElvain@usdoj.gov

                                             *Counsel for the Defendants*