**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES HOUSE OF REPRESENTATIVES**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01967-RMC |
| | ) | |
| **SYLVIA MATHEWS BURWELL**, in her official | ) | |
| capacity as Secretary of Health and Human Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................ 4

   I.    Statutory Background ................................................................................................ 4

   II.   The House's Challenge to Advance Payment of Cost-Sharing Reductions ............... 10

ARGUMENT ..................................................................................................................... 11

   I.    The Department of the Treasury's Compliance with the ACA's Mandate to Make
       Advance Payments of Both Premium Tax Credits and Cost-Sharing Reductions Is
       Fully Consistent with the Appropriations Clause ....................................................... 12

      A.   The Text of the Relevant Statutory Provisions Demonstrates that the Section 1324
           Appropriation Is Available for Advance Payments of the Cost-Sharing Reductions .. 12

      B.   The Affordable Care Act's Structure and Design Further Demonstrate that Congress
           Fully Funded All Components of the Act's Integrated System of Health Insurance
           Subsidies ................................................................................................................ 16

      C.   The Affordable Care Act's Legislative Record Confirms that Cost-Sharing Reduction
           Payments Do Not Require Annual Appropriations .................................................... 23

      D.   At a Minimum, the Executive Branch's Interpretation of the Scope of the Section 1324
           Appropriation Is Entitled to Deference .................................................................... 25

   II.   The House's Contrary Arguments Lack Merit .......................................................... 26

      A.   The Section 1324 Appropriation Is Not Limited to Payments Made under the
           Provisions Listed in that Statute ............................................................................. 26

      B.   The Administration's Fiscal Year 2014 Budget Request and Congress's Failure to
           Enact Annual Appropriations for Cost-Sharing Reductions Do Not Undermine the
           Availability of the Section 1324 Appropriation ....................................................... 29

   III.  Under This Court's Prior Decision, the House Lacks Standing at the Summary
       Judgment Stage ...................................................................................................... 33

CONCLUSION ................................................................................................................... 34

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Am. Trucking Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*,
   387 U.S. 397 (1967) ................................................................................................ 30

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ................................................................................................ 31

*Chevron, USA v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................................ 25

*Cummings v. Dep't of the Navy*,
   279 F.3d 1051 (D.C. Cir. 2002) .............................................................................. 32

*Dominguez v. UAL Corp.*,
   666 F.3d 1359 (D.C. Cir. 2012) .............................................................................. 33

*Fund for Animals Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ................................................................................. 30

*Heckler v. Turner*,
   470 U.S. 184 (1985) ................................................................................................ 24

*Kimberlin v. U.S. Dep't of Justice*,
   318 F.3d 228 (D.C. Cir. 2003) ................................................................................ 25

*\*King v. Burwell*,
   135 S. Ct. 2480 (2015) ..................................................................................... *passim*

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
   734 F.3d 1115 (D.C. Cir. 2013) .............................................................................. 12

*\*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012) ........................................................................................ 4, 15

*Nat'l Org. for Women v. Scheidler*,
   510 U.S. 249 (1994) ................................................................................................ 33

*Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*,
   839 F. Supp. 2d 40 (D.D.C. 2012) .......................................................................... 33

iii

*Salazar v. Ramah Navajo Chapter*,
132 S. Ct. 2181 (2012) ................................................................................... 20

*Sherley v. Sebelius*,
644 F.3d 388 (D.C Cir. 2011) ......................................................................... 25

*Taylor v. United States*,
495 U.S. 575 (1990) ........................................................................................ 32

*United States v. Mitchell*,
463 U.S. 206 (1983) ........................................................................................ 20

**STATUTES**

2 U.S.C. § 631 .................................................................................................. 23
2 U.S.C. § 900 .................................................................................................. 21
26 U.S.C. § 35 .................................................................................................. 27
*26 U.S.C. § 36B .................................................................................... *passim*
26 U.S.C. § 6431 .............................................................................................. 28
26 U.S.C. § 7527 .............................................................................................. 27
28 U.S.C. § 1491 .............................................................................................. 20
31 U.S.C. 1304 ................................................................................................. 20
*31 U.S.C. § 1324 .................................................................................. *passim*
42 U.S.C. § 300gg-18 ........................................................................................ 6
42 U.S.C. § 1396-1 ........................................................................................... 22
42 U.S.C. § 18021 .............................................................................................. 6
42 U.S.C. § 18022 .......................................................................................... 5, 6
42 U.S.C. § 18023 ............................................................................................ 14
42 U.S.C. § 18031 ......................................................................................... 9, 23
42 U.S.C. § 18032 .............................................................................................. 5
*42 U.S.C. § 18071 ................................................................................ *passim*
*42 U.S.C. § 18082 ................................................................................ *passim*
*Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) ............... 1, 9, 15, 25
Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997) .................................. 21
Continuing Appropriations Act of 2014, Pub. L. No. 113-46, 127 Stat. 558 (2013) ........ 9, 15, 16
Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, 128 Stat. 5 (2014) .............. 13, 31
Consolidated and Further Appropriations Act of 2015,
Pub. L. No. 113-235, 128 Stat. 2130 (2014) ......................................................... 23
Health Care and Education Reconciliation Act of 2010,
Pub. L. No. 111-152, 124 Stat. 1029 (2010) ........................................................... 1
Trade Act of 2002, Pub. L. No. 107-210, 116 Stat. 933 (2002) ................................... 27
Cal. Ins. Code § 10181.6 ................................................................................. 5

iv

**RULES AND REGULATIONS**

45 C.F.R. § 156.80 ........................................................................................................ 17

45 C.F.R. § 156.430 ...................................................................................................... 26

78 Fed. Reg. 15,541 (Mar. 11, 2013) ........................................................................... 26

**LEGISLATIVE HISTORY**

155 Cong. Rec. S12565 (Dec. 7, 2009) ........................................................................ 24

155 Cong. Rec. S12664 (Dec. 8, 2009) ........................................................................ 14

156 Cong. Rec. H2449 (Mar. 25, 2010) ....................................................................... 14

156 Cong. Rec. H1891 (Mar. 21, 2010) ............................................................. 14, 24, 25

156 Cong. Rec. S2069 (Mar. 25, 2010) ........................................................................ 24

H.R. Conf. Rep. 105-217 (1997) ................................................................................... 21

## PRELIMINARY STATEMENT

A principal goal of the Affordable Care Act (ACA)[1] is to make health "insurance more affordable" for low- and moderate-income Americans.   *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).   To achieve that goal, the Act establishes an integrated system of federal subsidies that lowers insurance premiums and reduces out-of-pocket costs for millions of eligible individuals. That system consists of two inter-related subsidies:   (1) premium tax credits that subsidize monthly insurance premiums for eligible individuals, and (2) cost-sharing reduction payments that compensate insurers for selling policies with reduced or no co-payments, co-insurance, or deductibles to certain recipients of the premium tax credits.   Section 1412 of the ACA directs the Secretary of the Treasury to "make[] advance payments" to insurers reflecting both the premium tax credits and the cost-sharing reductions.   42 U.S.C. § 18082(a)(3).

Although both portions of the integrated advance payment program are central to Congress's "legislative plan," *King*, 135 S. Ct. at 2496, the House of Representatives insists that Congress funded only the portion attributable to premium tax credits.   In the House's view, Congress provided no appropriation for the portion attributable to the cost-sharing reductions—even though the ACA mandates those payments, even though the payments are inextricably intertwined with the premium tax credits as a matter of both law and economics, and even though the availability of the payments is essential to the rational operation of the Act's carefully calibrated system of subsidies.   The ACA itself refutes the House's cramped reading, which should be rejected.

---

[1]   Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

The ACA's text, structure, design, and history demonstrate that Congress provided a permanent appropriation under 31 U.S.C. § 1324 for both components of the advance payment program, including the advance cost-sharing reduction payments that the House challenges here. Section 1324 provides a permanent appropriation of "[n]ecessary amounts … for refunding internal revenue collections as provided by law," including "refunds due from" a list of provisions that the ACA amended to include 26 U.S.C. § 36B.   Both components of the ACA's unified advance-payment program are "refunds due from" Section 36B because they are compensatory payments made available through the application of Section 36B.   That section sets forth conditions necessary to qualify for the premium tax credits and, in turn, for the mandatory cost-sharing reductions.   The Act specifies that an individual is eligible for the mandatory cost-sharing reductions, and thus that the insurer has a right to obtain cost-sharing reduction payments with respect to that individual, only if "a credit is allowed … under section 36B" for that individual.   42 U.S.C. § 18071(f)(2).   Eligibility for a premium tax credit is thus a statutory precondition for receipt of the cost-sharing reductions.

Furthermore, advance payments of the cost-sharing reductions are legally intertwined with the accompanying advance payments of the premium tax credits.   Both components of the advance payments are made by the same payer (the Department of the Treasury), to the same recipient (the insurer), on behalf of the same person (the eligible insured), and for the same statutory purpose—"to reduce the premiums payable by individuals eligible for such credit." 42 U.S.C. § 18082(a).

Congress had good reason to unify advance payments of premium tax credits and cost-sharing reductions into a single program.   As an economic matter, the underlying payments—insurance premiums and cost-sharing requirements—operate like a seesaw.   For

2

any given plan, when one goes down, the other goes up.   Accordingly, if insurers were not reimbursed by the government for complying with the Act's requirement that they reduce cost sharing for eligible individuals, they would raise premiums by a corresponding amount to compensate for that deficit.   And because of the structure of the Act's subsidies, Treasury would then be required to pay considerably *more* from the federal fisc because the amount of premium tax credits for *all* individuals is statutorily tied to premiums in the particular subset of plans (known as "silver" plans) that are subject to cost-sharing reductions.   The increased silver plan premiums would drive up the premium tax credits even for individuals not eligible for cost-sharing reductions, resulting in greater overall expenditures on subsidies.   Significantly, those greater expenditures would come from the very same appropriation—31 U.S.C. § 1324—that the House alleges Congress chose not to provide for the cost-sharing reduction payments.   It is simply implausible that the Congress that enacted the ACA established a system that would yield these bizarre consequences.   The ACA did not, for appropriations purposes, split apart the two subsidies that it integrated, legally and economically, for purposes of eligibility and payment.

Additional evidence from the ACA's structure and history confirms that the House's contrary reading is incompatible with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."   *King*, 135 S. Ct. at 2492 (internal quotation omitted).   For example, the ACA imposes a permanent funding restriction, modeled on the "Hyde Amendment" included in annual appropriations bills, that explicitly bars the use of funding attributable to cost-sharing reduction payments to pay for certain abortion services.   That provision is predicated on the understanding that cost-sharing reductions are permanently appropriated in the Act itself, and

therefore not subject to annual appropriations, which are already subject to the Hyde Amendment restriction.   Post-ACA appropriations legislation that requires the Executive to verify eligibility for advance payments of the cost-sharing reductions also presumed that those advance payments would be made.   And during deliberations on the ACA, the Congressional Budget Office (CBO) repeatedly advised Congress that cost-sharing reductions were treated as unconditional direct spending, which further demonstrates that the cost-sharing reductions were fully and permanently appropriated.   The CBO's understanding of the Act was confirmed by the contemporaneous statements of numerous Members of Congress.

In short, the House's acontextual and illogical reading of the ACA, advanced for the first time years after the statute was passed and in a transparent attempt to thwart its operation, is "'untenable in light of the statute as a whole.'"   *King*, 135 S. Ct. at 2495 (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 343 (1994); internal alteration omitted).   The Court should therefore grant summary judgment in favor of the defendants.   Indeed, because the House can no longer support, at the summary judgment stage, its allegation that the Executive is circumventing the appropriations process, the Court should dismiss the remaining counts of the complaint under the reasoning of its prior opinion.

## BACKGROUND

### I.    Statutory Background

Congress enacted the Affordable Care Act "to increase the number of Americans covered by health insurance and decrease the cost of health care."   *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012) (*NFIB*).   The Act achieves the first goal in part by requiring insurers to sell health insurance without regard to an individual's medical history and by requiring individuals to maintain health coverage or else pay a tax penalty.   *See King*, 135 S.

4

Ct. at 2485.   It achieves the second in part by subsidizing the cost of health insurance for low- and moderate-income individuals.   *Id.* at 2487.

**A.**   For insured individuals and families, the cost of health care covered by a plan consists of a combination of payments to insurers and payments to health care providers.   The payments to insurers take the form of monthly premiums that the insurers charge in return for providing coverage.   *See* 42 U.S.C. § 18032(b).   The payments to health care providers, known as "cost-sharing" payments, reflect the fact that insurance plans typically do not pay for all covered health care costs.   *See* 42 U.S.C. § 18022(c)(3)(A)(ii).   Rather, plans typically require the insured to pay an amount either as a "co-payment" or "co-insurance" for visits to health care providers.   Further, some plans require an individual to pay a certain amount out of pocket, known as a deductible, before certain benefits are fully covered by the insurer.

For both economic and legal reasons, premiums and cost sharing are inversely correlated: assuming coverage of the same set of health care services, premiums are higher when cost sharing is lower, and vice versa.   Less cost sharing means that the insurer is paying a greater share of covered individuals' medical expenses, which increases the price of insurance as reflected in the premiums.   *See, e.g.*, Statement of Douglas W. Elmendorf, Director, Cong. Budget Office, *Expanding Health Insurance Coverage and Controlling Costs for Health Care* at 13-14, S. Comm. on Budget, 111th Cong., 1st Sess. (2009), reprinted in Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 298-99 (Dec. 2010) (Exh. 1). In addition, health insurers are required by state laws to calculate their rates in an "actuarially sound" manner, meaning that they must set premiums at a rate that is calculated to ensure that expected health care costs will be covered.   *E.g.*, Cal. Ins. Code § 10181.6.   And the Affordable Care Act requires insurers to provide rebates if their medical loss ratios—*i.e.*, the

percentage of premium revenues spent on clinical services and activities that improve health care quality, as opposed to profits or administrative costs—are below specified levels (80% in the individual market).   *See* 42 U.S.C. § 300gg-18(b).

**B.**   The Affordable Care Act reduces the cost of health coverage by requiring the federal government to make payments to health insurers on behalf of eligible individuals who purchase insurance through new Exchanges established in each State.   *King*, 135 S. Ct. at 2487.   Section 1412 of the Act specifies that "in order to reduce the premiums payable by" such individuals, the government must establish a single program of "advance payments" that are made directly to health insurers by the Secretary of the Treasury.   42 U.S.C. § 18082(a)(3).

One portion of these advance payments is attributable to the premium tax credits that Section 1401 of the Act (26 U.S.C. § 36B) provides for qualified individuals with household income between 100% and 400% of the federal poverty level.   42 U.S.C. § 18082(c)(2); *see* 26 U.S.C. § 36B(a), (c)(1).   Those direct payments to insurers reduce the amount of the monthly premium that the insured is required to pay by an amount that is statutorily tied to the premiums charged for certain plans offered on the relevant Exchange, which are known as "silver" plans.[2] The vast majority of individuals who buy insurance on an Exchange rely on advance payments of tax credits.   *See King*, 135 S. Ct. at 2493 (noting that, in 2014, about 87 percent of people

---

[2]   The ACA classifies plans offered on the Exchanges into one of four "metal" levels based on their cost-sharing requirements.   42 U.S.C. § 18022(d).   A "silver" plan is a plan structured so that the insurer pays 70% of the average enrollee's health care costs, leaving the enrollee responsible for the other 30% through cost sharing.   *Id.*   In a "gold" or "platinum" plan, by contrast, the insurer will bear a greater portion of health care costs, while the insurer will be responsible for a lower portion of those costs in a "bronze" plan.   *Id.*   An insurer who offers coverage on an Exchange is required by statute to offer at least one plan at both the "silver" and "gold" levels of coverage.   42 U.S.C. § 18021(a)(1)(C)(ii).

6

who bought insurance on one of the 34 Exchanges operated by the federal government did so with advance payments of tax credits).

The other portion of Section 1412's advance payments to insurers is attributable to the "cost-sharing reductions" that Section 1402 of the Act (42 U.S.C. § 18071) provides, based on household income, for a subset of individuals who are eligible for premium tax credits. 42 U.S.C. § 18082(c)(3). The relevant individuals are ones as to whom "a credit is allowed … under Section 36B"—the provision governing premium tax credits—and whose household income is below 250% of the federal poverty level. 42 U.S.C. § 18071(f)(2); *see* 42 U.S.C. § 18071(c)(2).[3] Eligibility for premium tax credits under Section 36B is a precondition for entitlement to cost-sharing reductions based on household income. 42 U.S.C. § 18071(f)(2). For those individuals who are eligible for cost-sharing reductions and who enroll in "silver" plans offered on an Exchange (the same plans upon which the amount of the premium tax credit is based), the Act requires insurers to reduce cost sharing (by an amount depending on the insured's household income) while giving insurers a corresponding legal right to payments from the government "equal to the value of the [cost-sharing] reductions." 42 U.S.C. § 18071(c)(2), (3)(A). In effect, therefore, the cost-sharing-reduction payments constitute payment by the government of health care costs that would otherwise be the responsibility of the eligible individuals.

---

[3] The ACA also specifies criteria for cost-sharing reductions to be provided for Indians. Specifically, it requires that any enrollee who is an "Indian whose household income is not more than 300 percent of the poverty line … shall be treated as an eligible insured" and have his or her cost sharing "eliminate[d]" entirely, 42 U.S.C. § 18071(d)(1); eliminates cost sharing altogether for any enrolled Indian who is "furnished an item or service directly by the Indian Health Service, an Indian Tribe, Tribal Organization, or Urban Indian Organization or through referral under contract health services," 42 U.S.C. § 18071(d)(2); and requires that insurers will be compensated for complying with these requirements, 42 U.S.C. § 18071(d)(3).

Under the structure of the ACA, Treasury's payments of cost-sharing reductions decrease the amounts that Treasury otherwise would pay out of the federal fisc as premium tax credits. As discussed above, premiums and cost-sharing are inversely related.  If insurers were not reimbursed by the government for complying with the ACA's directive to reduce the cost-sharing requirements imposed on eligible individuals enrolled in silver plans, they would raise silver plan premiums to cover the additional health care costs the insurers themselves would incur as a result.  Such premium increases, in turn, would increase the amount that Treasury would be required to pay in tax credits.   As the Congressional Budget Office explained while the Act was under consideration, if premiums for silver plans in a particular market go up, federal payments for tax credits "have to rise" as well.   Cong. Budget Office, *An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act* 20 (Nov. 30, 2009), reprinted in Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 213 (Dec. 2010) (Exh. 2).   The amount of the tax credit is designed to ensure that eligible enrollees are not required to pay more than a set percentage of their household income out of pocket in order to purchase the second-lowest-cost silver plan available in their rating area.   26 U.S.C. § 36B(b).   As a result, an increase in the amount of the premiums for those plans would trigger a dollar-for-dollar increase in the amount of the tax credit available.   And that increase would apply to *all* individuals who are eligible for premium tax credits—not just the subset that receives cost-sharing reductions.

Section 1412 of the ACA requires the Secretary of the Treasury to make periodic payments of both components of the advance payments—those attributable to premium tax credits and those attributable to cost-sharing reductions—directly to insurers.   42 U.S.C. § 18082(a)(3).

8

**C.**   To fund subsidies for insurance coverage, the Act amended the pre-existing appropriation in 31 U.S.C. § 1324.   Section 1324 provides a permanent appropriation of "[n]ecessary amounts … for refunding internal revenue collections as provided by law," including "refunds due from" specified provisions of the tax code.   31 U.S.C. § 1324(a), (b)(2). Section 1401 of the ACA amended the list of funded provisions to include "refunds due from" Section 36B.   Pub. L. No. 111-148, § 1401(d)(1), 124 Stat. 119, 220 (2010).

The ACA's system of health insurance Exchanges and subsidies became effective on January 1, 2014.   *See* 42 U.S.C. § 18031(b)(1); Pub. L. No. 111-148, § 1401(e), 124 Stat. 119, 220 (2010).   In April 2013, the Office of Management and Budget (OMB) submitted to Congress a budget request for fiscal year 2014 that, *inter alia*, sought a line item designating funds for the payment of cost-sharing reductions by HHS.   *See* Fiscal Year 2014 Budget of the United States Government, App'x, at 448 (Apr. 2013) (ECF No. 30-2).   Congress did not enact that specific line item appropriation, and the legislative record is silent as to why.   But in October 2013, in the first piece of appropriations legislation it enacted for fiscal year 2014, Congress included a provision directing HHS to certify that a program was in place to verify that applicants are in fact eligible for both premium tax credits and "reductions in cost-sharing" before "making such credits and reductions available."   Continuing Appropriations Act, 2014, Pub. L. No. 113-46, Div. B, § 1001(a), 127 Stat. 558, 566 (Oct. 17, 2013).   In accordance with that provision, HHS certified to Congress that the Exchanges "verify that applicants for advance payments of the premium tax credit and cost-sharing reductions are eligible for such payments and reductions."   Letter from Kathleen Sebelius, Secretary, U.S. Dep't of Health & Human Servs., to the Hon. Joseph R. Biden, Jr. at 1 (Jan. 1, 2014) (ECF No. 30-10).

Since January 2014, Treasury has been making advance payments of premium tax credits and cost-sharing reductions to issuers of qualified health plans as required by Section 1412 of the ACA.   42 U.S.C. § 18082(a)(3), (c); *see also, e.g.*, Centers for Medicare & Medicaid Servs., Payment Policy and Financial Management Group, *Marketplace Payment Processing*, at 6-7 (Dec. 6, 2013) (Exh. 3) (discussing plans "to make estimated payments to issuers beginning in January 2014 based on data provided by the December deadline").   These payments have been based on the Executive Branch's determination that the permanent appropriation in 31 U.S.C. § 1324, as amended by the Affordable Care Act, is available to fund all components of the Act's integrated system of subsidies for the purchase of health insurance, including both the premium tax credit and cost-sharing portions of the advance payments required by the Act.   Congress has not enacted any legislation restricting the use of the Section 1324 appropriation for that purpose or directing the Executive Branch to cease these ongoing advance payments.

## II.     The House's Challenge to Advance Payment of Cost-Sharing Reductions

In July 2014, the House adopted, by a 225-201 vote, a resolution authorizing the Speaker to bring suit regarding any alleged failure of the President or other Executive official to act in a manner consistent with the official's duties with respect to the implementation of any provision of the Affordable Care Act.   Compl. ¶ 7 (ECF No. 1).   In November 2014, the House filed this suit.

As relevant here, the House recognized that the Affordable Care Act mandates that insurers reduce cost sharing for eligible individuals.   Compl. ¶¶ 25-26.   It acknowledged that "Section 1412(c)(3) of the Act"—the provision governing advance payments—"establishes the mechanism by which" insurers are to be reimbursed for those mandatory reductions.   Compl. ¶ 27 & n.3.   And the House does not dispute that the Act permanently appropriates funds for the

portion of advance payments attributable to premium tax credits.    However, the House contends that the permanent appropriation in 31 U.S.C. § 1324 is not available to fund the portion of advance payments attributable to cost-sharing reductions.    Compl. ¶¶ 28-29.

This Court granted in part and denied in part defendants' motion to dismiss.    ECF No. 42.    The Court indicated that the House may proceed on its constitutional claims under the Appropriations Clause and the Administrative Procedure Act, but the Court dismissed claims that it viewed as concerning only the implementation of a statute.    ECF No. 41 at 2.

## ARGUMENT

The Affordable Care Act's amendment to 31 U.S.C. § 1324 provides a permanent appropriation for the Act's advance payments of cost-sharing reductions.    The text of the complete Act and subsequent appropriations legislation demonstrate that both portions of the advance payments—the cost-sharing reductions, as well as the premium tax credits—are part of an integrated system of subsidies that is fully funded under Section 1324.    Furthermore, because the premium tax credits and cost sharing reductions must necessarily work in lockstep, the structure and design of the Act confirms that any other reading would lead to bizarre consequences, including higher insurance premiums, *increased* federal spending, and costly litigation under the Tucker Act.    And the history of the Act, including authoritative budgetary scoring by the Congressional Budget Office, shows that Congress understood that the ACA fully funded the entire system of subsidies for the purchase of health insurance, including the advance payments at issue here, when it passed the landmark legislation.    The House, by contrast, can arrive at its contrary conclusion only by reading certain provisions of the ACA in isolation. Just five months ago, the Supreme Court rejected an analogous effort to distort the ACA's legislative plan by misreading in a vacuum a few words in the same provision of the ACA at

issue in this case.   *See King*, 135 S. Ct. at 2489.   The Court recognized that a court's "duty, after all, is 'to construe statutes, not isolated provisions.'"   *Id.* (quoting *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)).   This Court should do the same.

## I.   The Department of the Treasury's Compliance with the ACA's Mandate to Make Advance Payments of Both Premium Tax Credits and Cost-Sharing Reductions Is Fully Consistent with the Appropriations Clause

### A.   The Text of the Relevant Statutory Provisions Demonstrates that the Section 1324 Appropriation Is Available for Advance Payments of the Cost-Sharing Reductions

**1.**   Section 1324 of title 31 creates a permanent appropriation of "necessary amounts … for refunding internal revenue collections as provided by law," including "refunds due from" certain listed provisions.   When Congress amended Section 1324 to include "refunds due from" Section 36B, it thereby appropriated funds for *both* components of the ACA's integrated advance-payment program—not only advance payments of the premium tax credits, but also the advance payments of the cost-sharing-reduction reimbursements.   All of those payments are properly regarded as "refunds due from" Section 36B because all of them are compensatory payments made to subsidize an individual's insurance coverage based on that individual's satisfaction of the eligibility requirements in Section 36B.   *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1125 (D.C. Cir. 2013) (dictionary definitions of "from" include "'a function word to indicate the source or original or moving force of something,'" so that its meaning depends on context) (quoting *Webster's Third New International Dictionary* 913 (1981)).   The only individuals eligible for the Act's mandatory cost-sharing reductions based on household income, and the only such individuals as to whom an insurer obtains a right to cost-sharing reduction payments, are a subset of individuals to whom "a credit is allowed …

under Section 36B." 42 U.S.C. § 18071(f)(2). Eligibility for a premium tax credit under Section 36B is thus a statutory precondition for receipt of the cost-sharing reductions.

Advance payments of the cost-sharing reductions are, moreover, legally (and, as discussed below, economically) inextricable from the accompanying advance payments of the premium tax credits. Under Section 1412 of the ACA:

- Both components of the advance payments serve a single statutory purpose—"to reduce the premiums payable by individuals eligible for such credit," 42 U.S.C. § 18082(a);

- The same "eligible" individual is the beneficiary of both portions of the payments, *id.*;

- Both portions of the advance payments are made to the same entity—the "issuer[]of the qualified health plan[]," *id.*; and

- The same federal official—the "Secretary of the Treasury"—makes the advance payments of the cost-sharing reductions and the premium tax credits, *id.*[4]

The text of the ACA thus treats both the cost-sharing reductions and the premium tax credits as part of a unified "program" of advance payments, 42 U.S.C. § 18082(a).

**2.** Another significant provision of the ACA, which was critical to the Act's passage, confirms that the Act's amendment to Section 1324 established a permanent appropriation of funds for both cost-sharing reduction payments and premium tax credits. Since 1976, annual appropriations measures for various federal agencies have always included the "Hyde Amendment," a restriction on the use of federal funds for abortions. *See, e.g.*, Consolidated

---

[4]  Because as a background rule Treasury is always the payer in fact of any funds drawn from the federal fisc, and under the ACA the Secretary of Health and Human Services—not Treasury—holds the information necessary to determine eligibility for advance payments of premium tax credits and cost-sharing reductions, the ACA's explicit direction that the Secretary of the Treasury make the 42 U.S.C. § 18082 advance payment provides still more evidence that Congress understood all components of the advance payment to be made from the same fund—namely, Section 1324, which is a permanent appropriation administered by Treasury.

Appropriations Act, 2014, Div. H, §§ 506-07, 128 Stat. 5, 409 (2014).   In the legislative debate surrounding passage of the ACA, Members of Congress expressed concern that, precisely because the ACA permanently appropriated funds for its system of subsidies for the purchase of health insurance, those subsidies would not be subject to annual appropriations and thus would not be restricted by the annual Hyde Amendment.   *See* 156 Cong. Rec. H2449, H2550 (Mar. 25, 2010) (Rep. Gohmert) ("[T]his bill appropriated money.   That money was appropriated, therefore, outside the Labor and HHS appropriations bill.   Therefore, the Hyde amendment did not apply to it."); 155 Cong. Rec. S12664, S12678 (Dec. 8, 2009) (Sen. Hatch) ("Federal premium subsidies authorized and appropriated in H.R. 3590 are not subject to annual appropriations and they are, therefore, not subject to the Hyde language.").

To address that concern, Congress included in the ACA a provision explicitly prohibiting the use of funding attributable to either premium tax credits or any "cost-sharing reduction" to pay for the abortion services subject to the Hyde Amendment.   42 U.S.C. § 18023(b)(2)(A)(ii). Supporters of this provision explained that it applied the Hyde Amendment restrictions "to the programs that are both *authorized and appropriated* in this bill."   156 Cong. Rec. H1891, H1910 (Mar. 21, 2010) (Rep. Smith) (emphasis added).   And the express inclusion of the cost-sharing reduction payments in that provision would have been effectively superfluous if, as the House maintains, the Act had not already permanently appropriated funds to make those payments and instead had left them to the annual appropriations bills that are subject to the Hyde Amendment as a matter of course.

**3.**   In addition to the language present in the Act, language that is conspicuously absent demonstrates that the Act's amendment to Section 1324 permanently appropriated funds for the advance payments of the cost-sharing reductions.   The House itself recognizes (ECF No. 22 at

14

8) that when Congress intends payments to be subject to annual appropriations, it routinely enacts an "authorization of appropriations" provision, as it did in dozens of other provisions in the ACA.  *See, e.g.*, Pub. L. No. 111-148, § 2705(f), 124 Stat. 119, 325 (2010) ("There are authorized to be appropriated such sums as are necessary to carry out this section.").[5]   The use of this language would indicate that Congress did not appropriate funding at the time of the law's enactment and instead expected that funding would be provided through future annual appropriations.   There is no such "authorization of appropriations" language for cost-sharing reduction payments because Congress understood that the ACA itself provided a permanent appropriation.   *See NFIB*, 132 S. Ct. at 2583 ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.").

    **4.**   Finally, legislation enacted after the ACA, but directly related to it, further confirms that advance payments of cost-sharing reductions were fully appropriated.   The Act's integrated system of premium tax credits and cost-sharing reductions, including advance payments to insurers, went into effect on January 1, 2014.   *See King*, 135 S. Ct. at 2487.   In October 2013, Congress enacted a continuing appropriations act providing funding for the federal government. *See* Continuing Appropriations Act, 2014, Pub. L. No. 113-46, 127 Stat. 558 (Oct. 17, 2013). That legislation required HHS to certify that a program is in place to verify that applicants for the subsidies are in fact eligible for "premium tax credits … *and reductions in cost-sharing*" before

---

[5]   *See also, e.g.*, *id.*, §§ 1002, 2706(e), 3013(c), 2015, 2501, 3504(b), 3505(a), 3505(b), 3506, 3509(a)(1), 3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b).

"making such credits and reductions available," *Id.*, Div. B, § 1001(a), 127 Stat. 566 (emphasis added). The inclusion of cost-sharing reduction payments in that certification requirement is inconsistent with the House's position that Congress had precluded those payments from being made by failing to appropriate any funds to make them.

### B.     The Affordable Care Act's Structure and Design Further Demonstrate that Congress Fully Funded All Components of the Act's Integrated System of Health Insurance Subsidies

As the Supreme Court has recognized, the ACA's system of subsidies for the purchase of insurance is "closely intertwined" with the Act's market reforms. *King*, 135 S. Ct. at 2487. And the components of that system of subsidies—premium tax credits, cost-sharing reductions, and the advance payment of both—are just as closely linked. In fact, the Affordable Care Act's structure and design intertwine advance premium tax credits and cost-sharing reduction payments not only legally but also economically. This integration further demonstrates that advance cost sharing reduction payments are "for refunds due from" Section 36B and so are fully funded by the ACA.

It would have been bizarre and self-defeating for Congress to de-couple the cost-sharing reductions from the premium tax credits for purposes of appropriations, having inextricably linked them for purposes of payment. The House recognizes that the ACA mandates that insurers reduce cost-sharing for eligible individuals who enroll in "silver" plans. Compl. ¶¶ 25-26. The Act couples this requirement for insurers with a requirement that the Executive Branch reimburse insurers for the value of those cost-sharing reductions. 42 U.S.C. §§ 18071(c)(3), 18082(c)(3). But if the Act did not allow the government to comply with the statutory directive to reimburse those insurers for the cost-sharing reductions, the result would be

a cascading series of nonsensical and undesirable results that would unsettle insurance markets and scramble the Act's carefully crafted system of subsidies.

**1.** Most obviously, insurers unable to obtain reimbursement for cost-sharing reductions would increase premiums in "silver" plans to cover the cost of providing those reductions and to be able to maintain actuarially justified rates. *See* 45 C.F.R. § 156.80(d)(2)(i) (permitting plan-level premium adjustments based on "[t]he actuarial value and cost-sharing design of the plan"). Given the current mix of enrollees in silver plans, HHS has estimated that silver-plan premiums would have to increase, in the first instance, by more than 20 percent in order to make up for a loss of cost-sharing reduction payments. Dep't of Health & Human Servs., Office of the Ass't Sec'y for Planning and Evaluation, *ASPE Issue Brief: Potential Fiscal Consequences of Not Providing CSR Reimbursements* at 2 (Dec. 2015) (Exh. 4).

That premium increase would make silver plans more expensive than gold plans, even though gold plans cover a greater share of health care costs for all individuals except for those low-income individuals who are eligible for the ACA's most generous cost-sharing reductions. *Id.* at 2-3. Most of the remaining individuals who formerly purchased silver plans would likely buy gold plans instead, given that a gold plan would provide more comprehensive coverage for a lower premium. And that shifting mix of enrollees would drive up silver-plan premiums still further. With silver-plan enrollees predominantly limited to individuals eligible for the most generous cost-sharing reductions, silver-plan premiums would likely have to cover 90 percent or more of the total costs of covered services in order for insurers to maintain actuarially sound rates. As a result, premiums for silver plans would likely increase by an estimated 30 percent over current rates. *Id.* at 3.

17

As a direct consequence, Treasury would be required to pay more for premium tax credits, which are calculated on the basis of silver-plan premiums.   26 U.S.C. § 36B(b)(2)(B). As explained above, *see* p. 8, *supra*, the tax credit provisions of the ACA are structured to protect enrollees from rising premiums; if premiums rise, federal payments for tax credits "would have to rise to make up the difference."   Cong. Budget Office, *An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act* 20 (Nov. 30, 2009), reprinted in Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 213 (Dec. 2010) (Exh. 2).

As a result, eligible individuals who purchase silver plans would remain entitled to cost-sharing reductions, and would pay no more for them.   Treasury would simply subsidize that coverage through premium tax credits rather than through a combination of premium tax credits and cost-sharing reduction payments.   In doing so, the federal government would still wind up paying for cost-sharing reductions through the Section 1324 appropriation—it would just do so through increased premium tax credit outlays, rather than through cost-sharing reimbursements, as the Act expressly requires.   *See* 42 U.S.C. §§ 18071(c)(3), 18082(c)(3).

Furthermore, because silver-plan premiums are the benchmark for *all* of the ACA's premium tax credits, the increases in those premiums would also drive up the premium tax credits available to individuals who are not eligible for cost-sharing reductions, resulting in increased federal expenditures for premium tax credits for this group.[6]   Given the size of the

---

[6]   Several variables may affect the precise amount by which the public fisc's burden would in fact be increased, such as the calculation of how many un-subsidized insureds would enroll in silver plans even after insurers increased the premiums for those plans.   *See ASPE Issue Brief* at 1, 3.   The "core conclusion … that failing to provide CSR reimbursements would increase the federal deficit" would remain valid under any scenario, however.   *Id.* at 3 n.6.

population eligible for premium tax credits but not cost-sharing reductions, HHS has estimated that the total increase in the amount paid in premium tax credits would be significantly *greater* than the amount of the forgone cost-sharing reduction payments, amounting to billions of dollars in net additional expenditures annually.   *ASPE Issue Brief* at 4.   Those greater expenditures would come out of the very same appropriation that is at issue in this case—Section 1324.

In addition to resulting in greater expenditures from the Section 1324 appropriation, the House's interpretation would also distort the ACA's graduated system of subsidies.   Congress indexed the ACA's premium tax credits to silver-plan premiums because it wanted to ensure that a plan providing silver-level coverage—that is, covering 70% of the total expected cost of care—would not cost eligible individuals more than a specified percentage of their income in premiums.   26 U.S.C. § 36B(b).   Congress then enacted cost-sharing reductions to subsidize more generous coverage by requiring that silver plans sold to certain individuals cover 73%, 87%, or 94% of the total expected cost of care, even though a silver plan nominally covers only 70% of the cost of care.   42 U.S.C. § 18071(c)(2).   Those more generous subsidies are available only to individuals with incomes below 250% of the federal poverty level.   *Id.* Under the House's interpretation, however, the Act would subsidize better-than-silver-level coverage for *all* recipients of the credits:   silver-plan premiums would spike, rising to exceed the premiums for gold plans.   Tax credits would increase accordingly, and recipients of the credits who are not eligible for cost-sharing reductions would use them to buy gold plans—that is, plans covering 80% of the total cost of care.   *ASPE Issue Brief* at 3.   The House's interpretation, in other words, would effectively require the federal fisc to subsidize reduced cost-sharing for *all* recipients of the ACA's premium tax credits, but to do so indirectly, through increased tax credits rather than targeted cost-sharing reduction payments.

19

In sum, if it is accepted, the House's assertion that the Section 1324 appropriation is not available to make cost-sharing reduction payments will predictably lead to substantially *greater* net expenditures from the very same appropriation—but in a vastly more cumbersome and less efficient manner, and with significant costs to the efficient operation of insurance markets. "It is implausible that Congress meant the Act to operate in this manner." *King*, 135 S. Ct. at 2494.

**2.** The House's interpretation could yield still further anomalies. The Act requires the government to pay cost-sharing reductions to issuers. *See* 42 U.S.C. § 18071(c)(3) ("An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions."); 42 U.S.C. § 18082(c)(3) (Secretary of Treasury "shall make" advance payments of cost-sharing reductions). The absence of an appropriation would not prevent the insurers from seeking to enforce that statutory right through litigation.

Under the Tucker Act, a plaintiff may bring suit against the United States in the Court of Federal Claims to obtain monetary payments based on statutes that impose certain types of payment obligations on the government. *See* 28 U.S.C. § 1491(a)(1); *United States v. Mitchell*, 463 U.S. 206, 216 (1983). If the plaintiff is successful, it can receive the amount to which it is entitled from the permanent appropriation Congress has made in the Judgment Fund, 31 U.S.C. § 1304(a). The mere absence of a more specific appropriation is not necessarily a defense to recovery from that Fund. *See, e.g.*, *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2191-92 (2012).

If insurers were successful in bringing such suits, they could in effect receive a windfall from the government, recovering once in the form of increased premium tax credits and a second time from the Judgment Fund. The House has explained neither how that result could be

20

avoided if its interpretation were adopted nor why Congress would have created such a perverse scheme.

**3.**    The House cannot escape the bizarre and implausible consequences of its position by asserting that Congress intended to rely, in enacting the Affordable Care Act, on its successors to make annual appropriations for the cost-sharing reduction payments each year.   The House can point to no reason that Congress would have done so.   As discussed above, the text of the statute and the history of its enactment demonstrate that Congress intended to fund fully the ACA's integrated system of subsidies for the purchase of insurance, and in fact did so.

Furthermore, although Congress in the past has created "appropriated entitlements" that depend for their funding on annual appropriations, in 1997 Congress enacted a statute that changed congressional budget-scoring rules, so as to discourage the practice of "backdoor spending" through entitlements that depend for their funding on annual appropriations.   *See* Balanced Budget Act of 1997, Pub. L. 105-33, § 10101, 111 Stat. 251, 678 (Aug. 5, 1997) (amending 2 U.S.C. § 622 to define "entitlement authority"); *id.* § 10116 (amending 2 U.S.C. § 651 to provide that bills creating new entitlement authority be referred to appropriations committees under certain conditions); H.R. Conf. Rep. 105-217, at 983 (1997) ("this title discontinues the practice of providing an allocation of new entitlement authority separate from other forms of mandatory spending"); *id.* at 995 ("The important provisions of section 401 of the Budget Act are to provide controls on backdoor spending and to provide a definition of 'entitlement authority.'").   It also codified a list of "appropriated entitlements" in the Balanced Budget and Emergency Deficit Control Act of 1985, as amended, 2 U.S.C. § 900(c)(17).   No new statute has been recognized as containing such an appropriated entitlement since that list

was enacted; if Congress had intended to enact a new appropriated entitlement, it would have said so directly.

Even before 1997, when it enacted an appropriated entitlement, Congress generally signaled—through enactment of "authorization of appropriations" language—that the statute creating the entitlement did not itself provide an appropriation. *E.g.* 42 U.S.C. § 1396-1 (for making Medicaid payments to states, "there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter"). Such language is conspicuously absent here. Indeed, the House Budget Committee recognizes that the ACA's cost-sharing reduction payments do not fall within its list of "appropriated entitlements and mandatories" to be treated as direct spending for budget purposes even though they are technically dependent upon annual appropriations. *See* H. Comm. on Budget, 114th Cong., *A Compendium of Laws and Rules of the Congressional Budget Process*, 611, 618, 625-28 (Comm. Print Aug. 2015) (Exh. 5) (providing list of "Appropriated Entitlements" that does not include cost-sharing reductions).

Congress is particularly unlikely to have *sub silentio* resurrected the dormant appropriated entitlement construct for the ACA's cost-sharing reductions because those payments could not serve their function if they were dependent on the annual appropriations process. Most obviously, as demonstrated above, Congress would not have allowed for the possibility of a lapse in appropriations for cost-sharing reductions because, given the structure of the ACA, such a lapse would have resulted in bizarre consequences and *greater* federal expenditures for premium tax credits. *See* pp. 17-20, *supra.* In addition, reliance on the annual appropriation process would itself lead to an increase in premiums because of the uncertainty of whether Congress would actually appropriate funds in any given year. The

22

government's fiscal year begins on October 1, and appropriations bills are often enacted just before (or even after) that deadline.   2 U.S.C. § 631; *see, e.g.,* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130 (Dec. 16, 2014). But plans sold on the Affordable Care Act's Exchanges are required to set their premiums for the following year well in advance of that date.   *See* 42 U.S.C. § 18031(c)(6)(B) (providing for "annual open enrollment periods" in advance of "calendar years" for plans on the Exchanges); 42 U.S.C. § 18031(e)(2) (providing for review of premiums for certification of Exchange plans). Accordingly, if cost-sharing reduction payments were dependent on annual appropriations, insurers would be forced to set their premiums for the upcoming year in the face of uncertainty about the existence and amount of payments they would receive.   That uncertainty would be inefficient and destabilizing.   It would also inevitably lead to increased premiums—and correspondingly greater federal expenditures for premium tax credits—even if Congress ultimately appropriated funds to make cost-sharing reduction payments for a given year.   *See* p.21, *supra.*

### C.    The Affordable Care Act's Legislative Record Confirms that Cost-Sharing Reduction Payments Do Not Require Annual Appropriations

During deliberations on the ACA, the CBO repeatedly provided Members of Congress with budget scoring that treated cost-sharing reductions as unconditional "direct spending." *See, e.g.*, Letter of Douglas W. Elmendorf, Director, CBO to the Hon. Nancy Pelosi, tbl. 2 (Mar. 20, 2010) (listing "Premium and Cost Sharing Subsidies" as "direct spending"), reprinted in Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 20 (Dec. 2010) (Exh. 6).   *See also id.* at tbl. 4 (including "Exchange Subsidies & related spending" in estimating effect of ACA on the federal deficit).   In budget terminology, that treatment meant

23

that the ACA itself provided the budget authority for cost-sharing reductions, *i.e.*, that cost-sharing reductions were fully and permanently appropriated by the law itself.[7]   In contrast, CBO specifically refrained from scoring any discretionary spending items, that is, potential expenditures that "would be subject to future appropriation action."   *Id*. at 12.   As a result, the CBO "expressly called Congress' attention" to the fact that the advance payment of cost-sharing reductions would not be subject to annual appropriations, and this Court must "assume that Congress enacted the" ACA "in full awareness" of this budgetary treatment.   *Heckler v. Turner*, 470 U.S. 184, 206-07 (1985).

Indeed, multiple members of Congress described the ACA's subsidy provisions as costing "500 billion dollars," a reference to the CBO's cost estimates that were based on the combined cost of premium tax credits and cost-sharing reduction payments through 2019.[8]   *See* 156 Cong. Rec. S2069, S2081 (Mar. 25, 2010) (Sen. Durbin) ("$500 billion of tax cuts and cost-sharing"); 155 Cong. Rec. S12565, S12576 (Dec. 7, 2009) (Sen. Enzi) ("this bill will commit the Federal Treasury to paying for these new subsidies for the uninsured forever"); 156 Cong. Rec. H1891, H1898 (Mar. 21, 2010) (Rep. Paulsen) ("$500 billion … [in] new entitlement

---

[7]   *See* Cong. Budget Office, *Glossary* at 12 (Jan. 2012) (Exh. 7) ("Synonymous with direct spending, mandatory spending is the budget authority provided by laws other than appropriation acts and the outlays that result from that budget authority").   While this category can include not only provisions that have already been fully appropriated but also provisions that create appropriated entitlements, as discussed above, Congress did not include language indicating that it intended to make cost-sharing reductions an appropriated entitlement, and it is not plausible that Congress intended to do so.

[8]   *See* Letter of Douglas W. Elmendorf, Director, CBO to the Hon. Nancy Pelosi, tbl. 4 (Mar. 20, 2010), reprinted in Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 24 (Dec. 2010) (Exh. 6) (estimating that ACA's "Exchange Subsidies & Related Spending" coupled with small employer tax credits would cost $504 billion).

spending"); 156 Cong. Rec. H1891, H1910 (Mar. 21, 2010) (Rep. Diaz-Balart) ("half a trillion dollars … [for] a massive new entitlement program").

CBO's budget scoring is critically important to the legislative process, because that scoring determines whether and how proposed legislation fits within the spending caps Congress establishes for itself.   Congress relies closely on the CBO score in considering legislation, and drafters write legislation with the potential impact on CBO scoring in mind.   *See, e.g.*, Abbe Gluck & Lisa Bressman, *Statutory Interpretation from the Inside:   An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part II*, 66 Stan. L. Rev. 725, 763-64 (2014).   The ACA was no exception:   the Act's CBO scores were critical to its framing and passage, and were referenced in the text of the Act itself.   Pub. L. No. 111-148, § 1563(a), 124 Stat. 119, 270-71 (2010); *see* David M. Herszenhorn, *Fine-Tuning Led to Health Bill's $940 Billion Price Tag*, N.Y. Times, Mar. 19, 2010, at A16 (Exh. 8).   The CBO's understanding of the Act—corroborated by the contemporaneous statements of numerous Members of Congress—thus confirms that cost-sharing reductions do not require annual appropriations.

### D.    At a Minimum, the Executive Branch's Interpretation of the Scope of the Section 1324 Appropriation Is Entitled to Deference

The deference accorded to federal agencies under background principles of administrative law provides an additional reason for concluding that funds are available for the advance payments of the cost-sharing reimbursements.   *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (court must defer to agency's interpretation of statute it is entrusted to administer); *Sherley v. Sebelius*, 644 F.3d 388, 393-94 (D.C. Cir. 2011) (deferring to agency construction of appropriations statute that it administers); *Kimberlin v. U.S. Dep't of Justice*, 318 F.3d 228, 231-32 (D.C. Cir. 2003) (same).   Longstanding principles of

appropriations law confirm that agency deference is applicable in the appropriations context. *See* 1 U.S. General Accounting Office, *Principles of Federal Appropriations Law* at 4-23 (3d ed. 2004) (Exh. 9) ("considerable deference" is owed to federal agencies under the "necessary expense" doctrine).   Here, the Executive Branch is implementing the ACA consistent with its understanding that the Act has instructed it to pay insurers for the value of cost-sharing reductions directly, rather than inefficiently after the fact, through increased premium tax credits. *See* 45 C.F.R. § 156.430(b) (advance payments of cost-sharing reductions are required); 78 Fed. Reg. 15,541, 15,542 (Mar. 11, 2013) (the ACA "directs" that payment of cost-sharing reductions be made).   Under traditional principles of deference, the Executive Branch's reasonable construction of Section 1324 and the ACA should be upheld.

## II.     The House's Contrary Arguments Lack Merit

The complaint does not attempt to reconcile the House's position with the textual, structural, and contextual points discussed above, which demonstrate that Congress intended that advance payments of tax credits and cost-sharing reductions be made from the same permanent appropriation, Section 1324.   Instead, the House insists that payment of cost-sharing reductions is precluded by a blinkered reading of Section 1324's text.   It additionally insists that the Executive's April 2013 request for an annual appropriation for cost-sharing reduction payments conclusively demonstrates that the Section 1324 appropriation is not available for this purpose. Neither argument has merit.

### A.      The Section 1324 Appropriation Is Not Limited to Payments Made under the Provisions Listed in that Statute

Echoing the type of argument that the Supreme Court rejected in *King*, the House insists that the text of Section 1324, as amended by the ACA, must be read narrowly so as to preclude

the advance payment of the cost-sharing reductions because Section 1324 lists only Section 36B and does not list the provisions governing cost-sharing reductions and advance payments.   But it was settled well before the ACA that Section 1324's appropriation for payments of "refunds due from" the listed provisions is broad enough to encompass payments made under other statutes that are integrally related to the listed provisions.   And that is true even if, as here, the payments are made to a third party rather than directly to the taxpayer who ultimately benefits.

In 2002, Congress enacted 26 U.S.C. § 35, which provided tax credits to subsidize the purchase of health insurance by certain narrow categories of individuals.   *See* Pub. L. No. 107-210, Div. A, § 201, 116 Stat. 933, 954 (Aug. 6, 2002).   Section 35 itself provided a credit in an "amount equal to 72.5 percent" of the insurance premiums paid by an eligible taxpayer, which an individual would receive at the end of a tax year.   26 U.S.C. § 35(a).   But Congress also enacted, as part of the same program, a separate provision requiring the Secretary of the Treasury to make "advance payments" directly to insurers "on behalf of" individuals eligible for the Section 35 credit.   26 U.S.C. § 7527(a).   The advance payments available under Section 7527 allowed individuals who would be eligible for the Section 35 credit to purchase insurance during the tax year without waiting to claim the credit on their year-end returns.   26 U.S.C. § 7527(c), (d).   Congress permanently appropriated funds for the Section 35 credit program by amending the list of funded provisions in Section 1324(b) to include "[Section] 35."   Pub. L. No. 107-210, Div. A, § 201(c)(1), 116 Stat. 933, 960 (Aug. 6, 2002).   Congress did not include Section 7527 in the list of provisions funded under Section 1324, and Section 7527 payments are made "to providers of qualified health insurance" rather than directly to individuals eligible for Section 35 credits.   Yet it has never been doubted that the Section 1324 appropriation is

available to fund all aspects of the integrated Section 35 subsidy program, including the separate advance payments made under Section 7527.[9]

Accordingly, it was established before the ACA was enacted that the Section 1324 appropriation is available to make payments that are closely integrated with the credit provisions listed in Section 1324, even if those payments are made under other statutory provisions or to third parties rather than directly to the taxpayers who ultimately benefit.   Congress unquestionably relied on that understanding of Section 1324 in the ACA.   Even the House does not dispute that Treasury is properly making advance payment of premium tax credits from the Section 1324 appropriation.   But those advance payments are made under Section 1412 of the Act, which is not listed in Section 1324 and which is codified outside the tax code.   *See* 42 U.S.C. § 18082(a)(3), (c)(2).   Those advance payments are also made directly to insurers rather than to individual taxpayers.   *Id*.   And Section 36B itself makes clear that the credits and advance payments are legally distinct, separately referring to the "credit allowed under this section" and "advance payment[s] of such credit under section 1412."   26 U.S.C. § 36B(f). Yet it is common ground that the Section 1324 appropriation is available to fund the advance payments of the tax credits paid to insurers under Section 1412.

For essentially the same reasons, the Section 1324 appropriation is also available to fund the other component of the advance payments required under Section 1412, the portion

---

[9]   Similarly, in 2009, Congress enacted 26 U.S.C. § 6431, which provides a tax credit for issuers of certain municipal bonds and provides that the credit is payable either "to the issuer of such bond" or "to any person who makes … interest payments on behalf of the issuer."   26 U.S.C. § 6431(b).   Congress appropriated funds for the payment of credits under Section 6431 by adding that provision to the list of funded provisions in Section 1324(b), which further confirms that the Section 1324(b) appropriation is available to make payments to third parties, not just to taxpayers.

28

attributable to cost-sharing reductions.   Like the advance payment of premium tax credits, advance payments of cost-sharing reductions are made directly to insurers for the benefit of eligible individuals.   42 U.S.C. § 18082(a)(3), (c)(3).   Like eligibility for the advance payment of the tax credits, an individual's eligibility for the cost-sharing reductions flows from, and depends on, criteria set forth in Section 36B.   42 U.S.C. §§ 18071(f)(2), 18082(a).   And like advance payment of the tax credits, advance payments of cost-sharing reductions "reduce the premiums payable by individuals eligible for such credit."   42 U.S.C. § 18082(a). Accordingly, when Congress amended Section 1324 to provide for "refunds due from" Section 36B, Congress appropriated funds for both components of the ACA's integrated advance-payment program.

> **B.**   **The Administration's Fiscal Year 2014 Budget Request and Congress's Failure to Enact Annual Appropriations for Cost-Sharing Reductions Do Not Undermine the Availability of the Section 1324 Appropriation**

In April 2013, OMB submitted a budget request for fiscal year 2014 to Congress that, *inter alia*, sought a line item designating funds for the payment of cost-sharing reductions by HHS.   *See* Fiscal Year 2014 Budget of the United States Government, App'x, at 448 (Apr. 2013) (ECF No. 30-2).   Congress did not enact such a line item in its appropriation legislation for that fiscal year.   The House insists that that the absence of such an annual appropriation establishes that there is no funding available for cost-sharing reduction payments from any appropriations statute.   But that conclusion does not follow.   The failure of Congress to provide an annual appropriation to HHS does not alter the scope of the permanent appropriation to Treasury in Section 1324.   And for the reasons discussed above, the ACA's amendment to Section 1324 encompasses both the premium tax credit and the cost-sharing reduction components of Treasury's advance payments from that fund.

29

**1.** The Executive Branch did initially seek a line-item appropriation that would have designated funds for HHS for cost-sharing reduction payments.   But "[b]udget requests … do[] not implement, interpret, or prescribe any law or policy."   *Fund for Animals, Inc.* v. *U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (internal quotations omitted)).   And the particular request at issue here did not purport to analyze the ACA or consider the availability of the permanent appropriation in 31 U.S.C. § 1324.   It is well settled that the "[t]he advocacy of legislation by an administrative agency—and even the assertion of the need for it to accomplish a desired result—is an unsure and unreliable, and not a highly desirable, guide to statutory construction."   *Am. Trucking Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 418 (1967) (also admonishing that "[t]he possibility of its use to prove more than it means … should not[] deter administrative agencies from seeking helpful clarification of authority or a fresh and specific congressional mandate"); *accord*, 2B Norman J. Singer & J.D. Shambie Singer, *Sutherland on Statutes and Statutory Construction* § 49:9 at 124 (7th ed. 2012) ("the legislative failure to enact an agency's proposals defining its own power doesn't affect the scope of the agency's power under existing enabling legislation").   The same principle applies with equal force in the appropriations context.   As the Comptroller General and the Office of Legal Counsel have long recognized, Congress's failure to provide a specific appropriation requested by an agency sheds no light on the question whether other appropriations are available to make the same expenditure.   *See, e.g.*, B-145648, 40 Comp. Gen. 694, 696-97 (June 14, 1961) (Exh. 10); 14 OLC Op. 68, 70-71 (Mar. 29, 1990) (Exh. 11); *cf.* 37 OLC Op. 1, 4 (Feb. 4, 2013) (Exh. 12) (expenditure was permissible despite Congress's failure to provide requested reauthorization).

**2.**   The House's reliance on Congress's 2014 appropriations legislation is particularly unsound because it seeks to draw meaning from congressional silence.   Congress did not enact a line-item appropriation for cost-sharing reductions.   But neither did it enact any legislation indicating that it believed that such a line-item appropriation was required.   And it also did not impose any affirmative restriction on the use of appropriated funds to make the mandated payments, even as it imposed dozens of other such restrictions.   *See, e.g.*, Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. H, §§ 501-520, 128 Stat. 5, 408-412 (Jan. 17, 2014).   From that silence, the House infers that Congress determined (1) that an annual appropriation was required in order for the Executive to make the cost-sharing reduction payments required by the ACA, and (2) that no such appropriation should be provided.

The House's effort to draw those inferences reflects a basic error of statutory construction.   "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."   *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (internal quotation omitted).   Here, Congress's failure to enact a line item for cost-sharing reduction payments is equally consistent with the conclusion that the full Congress determined such a line item to be unnecessary in light of the pre-existing permanent appropriation in Section 1324.   Indeed, that inference is far more plausible than the one the House would draw:   the legislative history of the 2014 laws is completely silent on the reasons for Congress's failure to provide a line-item appropriation. That silence is fully consistent with Congress's understanding, discussed above, that cost-sharing reductions had been fully funded, and that no new appropriation was needed.   If, in contrast, Congress had meant to deny funding for the cost-sharing reduction payments that are required by

31

the ACA and to trigger the strange consequences for insurance markets that would follow, then "surely this would have been mentioned somewhere in the legislative history." *Taylor v. United States*, 495 U.S. 575, 601 (1990).[10]

**3.**   In any event, "[c]ongressional enactments are better evidence of legislative intent than is congressional silence." *Cummings v. Dep't of the Navy*, 279 F.3d 1051, 1055 (D.C. Cir. 2002).   Since enacting the ACA, Congress has enacted only one appropriations provision that addresses cost-sharing reduction payments:   the October 2013 Continuing Appropriations Act, which *conditioned* those payments on a certification from HHS that verification of eligibility for *both* premium tax credits and cost sharing reductions would take place.   As demonstrated above, the necessary premise of that legislation was that once the certification condition had been satisfied—as it promptly was—the Executive would begin making the mandatory payments in January 2014.   *See* pp. 15-16, *supra.*   Congress's only relevant legislative enactment is thus entirely consistent with—indeed, predicated on—an understanding that the Affordable Care Act's mandatory advance payments of cost-sharing reductions are not contingent on annual appropriations.

---

[10]   The House purports to fill the gap in the legislative history by reference to a Senate committee report.   That committee stated that it did not propose a specific line item for cost-sharing reduction payments, but it did not offer any explanation as to why it chose not to do so.   S. Rep. No. 113-71, at 123 (2013) (ECF No. 30-6).   It is not tenable to suggest that this committee intended to thwart the operation of one of the ACA's central programs, much less that it did so without explanation or notice.   To the contrary, its chairman contemporaneously noted the importance of "the subsidies that reduce out of pocket exposure for families below 250% of the poverty line," and that "without these cost-sharing subsidies, coverage would be unaffordable for many."   S. Comm. on Budget, 113th Cong., *Concurrent Resolution on the Budget FY 2014: Committee Print to Accompany S. Con. Res. 8* at 250, 251 (Comm. Print Mar. 2013) (Exh. 13) (reprinting letter of Sen. Harkin).

**III.     Under This Court's Prior Decision, the House Lacks Standing at the Summary Judgment Stage**

The defendants recognize that this Court determined at the motion to dismiss stage that the House has standing to bring some of its claims.    But "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation."   *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994).    And "in the context of a motion for summary judgment on the issue of standing, [a] [p]laintiff faces a higher burden in meeting the elements of standing than when faced with a motion to dismiss."   *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 839 F. Supp. 2d 40, 46 (D.D.C. 2012) (internal quotation omitted); *see Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012).   Under this Court's prior decision denying in part the defendants' motion to dismiss, the House cannot satisfy that burden here, and so the remaining counts of its complaint should now be dismissed for lack of standing.

In denying the motion to dismiss, this Court held that the House had standing to pursue its allegation that the Executive had drawn "funds from the Treasury without a valid appropriation."    Memorandum Opinion ("Mem. Op.") 30, ECF No. 41.    In so ruling, the Court distinguished between disputes about "the implementation, interpretation, or execution of federal statutory law," which the Court suggested that the House would not have standing to bring, and a claim that "the appropriations process is itself circumvented," which the Court held that the House would have standing to bring, *id*. at 30, 32.    And the Court later reasoned that "[w]hatever the merits of the parties' interpretations of the differing appropriation legislation—an issue not to be addressed at this stage of litigation—the Complaint makes clear this is not a dispute over statutory semantics."    Mem. Op. 41.    "To the contrary," the Court continued, "the constitutional violation alleged is that, despite an intentional refusal by Congress

Case 1:14-cv-01967-RMC   Document 55-1   Filed 12/02/15   Page 39 of 40

to appropriate funds for Section 1402, the Secretaries freely ignored Article I, § 9, cl. 7 of the Constitution and sought other sources of public money." *Id.*

Now that the Court has before it the defendants' merits arguments at the summary judgment stage, it should be evident that the complaint's allegations do not accurately capture the true nature of this dispute. As should be apparent from the foregoing discussion, this case indeed involves solely a dispute over the meaning of federal statutes. Accordingly, applying this Court's prior ruling, this action should now be dismissed for lack of jurisdiction at the summary judgment stage.

## CONCLUSION

For the foregoing reasons, summary judgment should be awarded to the defendants on all of the claims remaining in the complaint.

Dated:    December 2, 2015                  Respectfully submitted,

                                            BENJAMIN C. MIZER
                                            Principal Deputy Assistant Attorney General

                                            CHANNING D. PHILLIPS
                                            United States Attorney

                                            JENNIFER D. RICKETTS
                                            Director

                                            SHEILA LIEBER
                                            Deputy Branch Director


                                            _____/s/ Joel McElvain_____
                                            JOEL McELVAIN
                                            Assistant Branch Director
                                            MATTHEW J.B. LAWRENCE
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue, NW
                                            Washington, D.C. 20530
                                            (202) 514-2988
                                            Joel.McElvain@usdoj.gov

                                            *Counsel for the Defendants*