## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**UNITED STATES HOUSE OF**              )
**REPRESENTATIVES,**                    )
                                        )
     **Plaintiff,**              )
                                        )
     **v.**                      )     **Civil Action No.  14-1967 (RMC)**
                                        )
**SYLVIA MATTHEWS BURWELL in her**      )
**official capacity as Secretary of the United States** )
**Department of Health and Human Services,** *et al.* )
                                        )
     **Defendants.**             )
_____ )

## OPINION

     This Court previously held that the U.S. House of Representatives "has standing to pursue its allegations that the Secretaries of Health and Human Services and of the Treasury violated Article I, § 9, cl. 7 of the Constitution when they spent public monies that were not appropriated by the Congress."  *U.S. House of Reps. v. Burwell*, 130 F. Supp. 3d 53, 81 (D.D.C. 2015).  The merits of that claim are now before the Court.

     This case involves two sections of the Affordable Care Act: 1401 and 1402. Section 1401 provides tax credits to make insurance premiums more affordable, while Section 1402 reduces deductibles, co-pays, and other means of "cost sharing" by insurers.  Section 1401 was funded by adding it to a preexisting list of permanently-appropriated tax credits and refunds. Section 1402 was not added to that list.  The question is whether Section 1402 can nonetheless be funded through the same, permanent appropriation.  It cannot.

     "If the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).  Although the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," *id.*, the statutory

provisions in this case are clear in isolation and in context.  The Affordable Care Act unambiguously appropriates money for Section 1401 premium tax credits but not for Section 1402 reimbursements to insurers.  Such an appropriation cannot be inferred.  None of Secretaries' extra-textual arguments—whether based on economics, "unintended" results, or legislative history—is persuasive.  The Court will enter judgment in favor of the House of Representatives and enjoin the use of unappropriated monies to fund reimbursements due to insurers under Section 1402.  The Court will stay its injunction, however, pending appeal by either or both parties.

## I.  FACTS

The merits are fully briefed and ripe for resolution.[1]  The following facts are undisputed.

### A.  Constitutional Background

Congress passes all federal laws in this country.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]").  Those "Powers" includes sole authority to adopt laws that authorize the expenditure of public monies and laws that appropriate those monies.  Authorization and appropriation by Congress are nonnegotiable prerequisites to government spending: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  *Id.* art. I, § 9, cl. 7; *see also United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").  The distinction between authorizing

---

[1] *See* Pl. Mot. Summ. J. [Dkt. 53] (House Mot.); Defs. Opp'n [Dkt. 65] (Sec'y Opp'n); Pl. Reply [Dkt. 69] (House Reply); *see also* Defs. Mot. Summ. J. [Dkt. 55] (Sec'y Mot.); Pl. Opp'n [Dkt. 66] (House Opp'n); Defs. Reply [Dkt. 70] (Sec'y Reply).

legislation and appropriating legislation is relevant here and bears some discussion.

Authorizing legislation establishes or continues the operation of a federal program or agency, either indefinitely or for a specific period.  GAO *Glossary* at 15.[2]  Such an authorization may be part of an agency or program's organic legislation, or it may be entirely separate.  *Id.*  No money can be appropriated until an agency or program is authorized, although authorization may sometimes be inferred from an appropriation itself.  *Id.*

Appropriation legislation "provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes."  *Id.* at 13.  Appropriations legislation has "the limited and specific purpose of providing funds for authorized programs."  *Andrus v. Sierra Club*, 442 U.S. 347, 361 (1979) (quoting *TVA v. Hill*, 437 U.S. 153, 190 (1978)).  An appropriation must be expressly stated; it cannot be inferred or implied.  31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made.").  It is well established that "a direction to pay without a designation of the source of funds is not an appropriation."  U.S. Government Accounting Office, GAO-04-261SP, *Principles of Federal Appropriations Law (Vol. I)* 2-17 (3d ed. 2004) (GAO *Principles*).  The inverse is also true: the

---

[2] The Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, § 801(a), 88 Stat. 297, 327 (1974), gives the Government Accountability Office (GAO) specific duties in the budgetary arena.  *See generally* 31 U.S.C. § 1112(c).  One of those duties is to help "establish, maintain, and publish standard terms and classifications for fiscal, budget, and program information of the Government, including information on fiscal policy, receipts, expenditures, programs, projects, activities, and functions."  *Id.* § 1112(c)(1).  The most recent publication in fulfilment of that duty is GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (2005) (GAO *Glossary*).  "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

designation of a source, without a specific direction to pay, is not an appropriation. *Id.* Both are required. *See Nevada*, 400 F.3d at 13-14. An appropriation act, "like any other statute, [must be] passed by both Houses of Congress and either signed by the President or enacted over a presidential veto." GAO *Principles* at 2-45 (citing *Friends of the Earth v. Armstrong*, 485 F.2d 1, 9 (10th Cir. 1973); *Envirocare of Utah, Inc. v. United States*, 44 Fed. Cl. 474, 482 (1999)).

Appropriations come in many forms. A "permanent" or "continuing" appropriation, once enacted, makes funds available indefinitely for their specified purpose; no further action by Congress is needed. *Nevada*, 400 F.3d at 13; GAO *Principles* at 2-14.[3] A "current appropriation," by contrast, allows an agency to obligate funds only in the year or years for which they are appropriated. GAO *Principles* at 2-14. Current appropriations often give a particular agency, program, or function its spending cap and thus constrain what that agency, program, or function may do in the relevant year(s). Most current appropriations are adopted on an annual basis and must be re-authorized for each fiscal year. Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse strings.

**B.  Statutory Background**

On December 24, 2009, H.R. 3590 (111th Cong. 2009), as amended and retitled "Patient Protection and Affordable Care Act," passed the Senate by a vote of 60-39. On March 21, 2010, the House agreed to the Senate amendments by a vote of 219-212. On March 23, 2010, H.R. 3590, as agreed to by both the Senate and the House, was signed into law by the

---

[3] Examples of permanent appropriations include the Judgment Fund (31 U.S.C. § 1304(a)) and payment of interest on the national debt (31 U.S.C. § 1305(2)).

President.  *See* Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA).[4]  The ACA enacted a host of

reforms and programs; two are relevant here.

### 1. Section 1401 ("Refundable Tax Credit Providing Premium Assistance for Coverage under a Qualified Health Plan")

The thrust of Section 1401 was to add a new section to the Internal Revenue

Code: 26 U.S.C. § 36B.  *See* ACA § 1401(a).  Section 36B provides in principal part that "there

shall be allowed as a credit against the [income] tax imposed by this subtitle for any taxable year

an amount equal to the premium assistance credit amount of the taxpayer for the taxable year."

26 U.S.C. § 36B(a).  Those taxpayers "whose household income for the taxable year equals or

exceeds 100 percent but does not exceed 400 percent of an amount equal to the poverty line for a

family of the size involved" are entitled to tax credits to cover their health insurance premiums.

26 U.S.C. § 36B(c).  Section 1401 is codified in the Internal Revenue Code, not in Title 42.[5]

The appropriation for Section 1401 premium tax credits was made in Title 31 of

the U.S. Code, "Money and Finance," which also sets out basic rules of federal appropriations.

At 31 U.S.C. § 1301(d), the statute specifies that "[a] law may be construed to make an

appropriation out of the Treasury . . . only if the law specifically states that an appropriation is

made."  At 31 U.S.C. § 1324, the law provides for "Refund of internal revenue collections."

---

[4] Because so much is made of the ACA's structure and the interrelation of its provisions, the Court generally will refer to the ACA sections and not the U.S. Code sections where they are codified.  *See* ACA § 1401 (codified at 26 U.S.C. §§ 36B, 280C); ACA § 1402 (codified at 42 U.S.C. § 18071); ACA § 1412 (codified at 42 U.S.C. § 18082).

[5] Section 1401 also disallows deductions for the amount of the tax credits, *see* ACA § 1401(b), directs the Comptroller General to study the affordability of health insurance, *see id.* § 1401(c), amends 31 U.S.C. § 1324(b), *see* ACA § 1401(d), and sets an effective date of December 31, 2013, *see id.* § 1401(e).

Specifically, it appropriates to the Secretary of the Treasury "[n]ecessary amounts . . . for refunding internal revenue collections as provided by law." *Id.*

The parties agree that 31 U.S.C. § 1324 constitutes a permanent appropriation for Section 1401 premium tax credits.  Specifically, the ACA amended § 1324(b) so that it reads:

> Disbursements may be made from the appropriation made by this section only for—
>
> (1) refunds to the limit of liability of an individual tax account; and
>
> (2) refunds due from credit provisions of the Internal Revenue Code of 1986 (26 U.S.C. 1 *et seq.*) enacted before January 1, 1978, or enacted by the Taxpayer Relief Act of 1997, or from section 25A, 35, 36, 36A, ***36B***, 168(k)(4)(F), 53(e), 54B(h), or 6431 of such Code, or due under section 3081(b)(2) of the Housing Assistance Tax Act of 2008.

31 U.S.C. 1324(b) (emphasis on term added by ACA § 1401(d)).  Put simply, ACA tax credits to subsidize health insurance for eligible taxpayers are permanently funded via the reference to "36B" in 31 U.S.C. § 1324(b)(2).

### 2. Section 1402 ("Reduced Cost-Sharing for Individuals Enrolling in Qualified Health Plans")

Section 1402 of the ACA provides that "[i]n the case of an eligible insured enrolled in a qualified health plan—(1) the Secretary shall notify the issuer of the plan of such eligibility; and (2) the issuer shall reduce the cost-sharing under the plan at the level and in the manner specified in subsection (c)."  ACA § 1402(a).  Cost sharing includes "deductibles, coinsurance, copayments, or similar charges."  ACA § 1302(c)(3)(A)(i).  Section 1402 thus requires insurers offering qualified health plans through ACA Exchanges to reduce deductibles, coinsurance, copayments, and similar charges for eligible insured individuals enrolled in their plans.  These reductions are referred to in the ACA as "cost-sharing reductions." *See, e.g.*, ACA §§ 1331(d)(3)(A)(i), 1402(c)(3)(B), 1412(c)(3).

The insurers are supposed to get their money back.  *See* ACA § 1402(c)(3)(A) ("An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary [of HHS] of such reductions and the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions.").  Nothing in Section 1402 prescribes a "periodic and timely payment[]" process, however.  Nor does Section 1402 condition the insurers' obligations to reduce cost sharing on the receipt of offsetting payments.[6]

To qualify for reduced cost sharing, an individual must enroll in a qualified health plan and have a household income that "exceeds 100 percent but does not exceed 400 percent of the poverty line for a family of the size involved."  42 U.S.C. § 18071(b)(2).[7]  Individuals with income between 100 and 250 percent of the poverty line qualify for an "additional reduction." *Id.* § 18071(c)(2).[8]  Eligibility for premium tax credits under Section 1401 is also a prerequisite to receiving cost-sharing reductions under Section 1402.  *See* ACA § 1402(f)(2) ("No cost-sharing reduction shall be allowed under this section . . . unless . . . a credit is allowed to the insured . . .  under section 36B of [the Internal Revenue] Code.").

---

[6] The Court will refer to these offsetting payments as "Section 1402 reimbursements."

[7] Eligibility proceeds in two steps under Section 1402.  To be an "eligible insured" generally under Section 1402, the individual can have an income up to 400 percent of the federal poverty level.  *See* 42 U.S.C. § 18071(b)(2).  The individual must also enroll in a "qualified health plan in the silver level." *Id.* § 18071(b)(1).  But to qualify for "additional reduction for lower income insureds," the income cannot exceed 250 percent. *Id.* § 18071(c)(2).

[8] The ACA as passed on March 23, 2010 provided additional reductions only up to 200 percent of the federal poverty line.  *See* Pub. L. 111-148, §§ 1401(c)(2)(A)-(B).  A new subsection, (c)(2)(C), was added by the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, § 1001(b)(2)(C), 124 Stat. 1029, 1032 (Mar. 30, 2010).  The new subsection raised the maximum income to 250 percent of the federal poverty line.

Section 1402 is codified not in the Internal Revenue Code, but in Title 42, which includes federal laws concerning "Public Health and Welfare."  Title 42 includes such programs as Social Security, Medicare, Medicaid, and most of the ACA.

### 3.  Section 1412 ("Advance Determination and Payment of Premium Tax Credits and Cost-Sharing Reductions")

Section 1412 of the ACA requires the Secretaries to consult and establish a program under which eligibility determinations are made in advance "for the premium tax credit allowable under section 36B of the Internal Revenue Code of 1986 and the cost-sharing reductions under section 1402."  ACA § 1412(a)(1).  After the Secretary of HHS tells the Secretary of the Treasury and the pertinent Exchange who is eligible for either benefit, Treasury "makes advance payments of such credit or reductions to the issuers of the qualified health plans [on such Exchange] in order to reduce the premiums payable by individuals eligible for such credit."  *Id.* § 1412(a)(3).

### C.  Other Relevant Background

During deliberations over the ACA, the Congressional Budget Office (CBO) scored Section 1402's cost-sharing reductions as "direct spending."  *See, e.g.*, Sec'y Mot., Ex. 6, Letter of Douglas W. Elmendorf, Director, CBO to the Hon. Nancy Pelosi, (Mar. 20, 2010) [Dkt. 55-8] (CBO Ltr.) at tbl. 2 (listing "Premium and Cost Sharing Subsidies" as "direct spending"), *reprinted in* Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 20 (Dec. 2010)); CBO Ltr. at tbl. 4 (including "Exchange Subsidies & related spending" in estimating effect of ACA on the federal deficit).

During the same deliberations, several members of Congress described Sections 1401 and 1402 as costing "500 billion dollars," an estimate that almost certainly combined the costs of Section 1401's premium tax credits and Section 1402's cost-sharing reimbursements.

*See* 156 Cong. Rec. S2069, S2081 (Mar. 25, 2010) (Sen. Durbin) ("$500 billion of tax cuts and

cost-sharing"); 155 Cong. Rec. S12565, S12576 (Dec. 7, 2009) (Sen. Enzi) ("this bill will

commit the Federal Treasury to paying for these new subsidies for the uninsured forever"); 156

Cong. Rec. H1891, H1898 (Mar. 21, 2010) (Rep. Paulsen) ("$500 billion … [in] new

entitlement spending"); 156 Cong. Rec. H1891, H1910 (Mar. 21, 2010) (Rep. Diaz-Balart)

("half a trillion  dollars . . . [for] a massive new entitlement program").

On April 10, 2013, the Office of Management and Budget (OMB) submitted the

President's *Fiscal Year 2014 Budget of the U.S. Government*.  Budget [Dkt. 30-1].[9]  The

Appendix to the FY 2014 Budget Request contained "more detailed financial information on

individual programs and appropriation accounts than any of the other budget documents."  App.

to Budget [Dkt. 30-2] at 3.  The Appendix included, among other things, "explanations of the

work to be performed and the funds needed."  *Id.*  In the FY 2014 Budget Appendix, the

Administration requested the following:

> For carrying out, except as otherwise provided, sections 1402
> [Reduced Cost-Sharing] and 1412 [Advanced Payments] of the
> Patient Protection and Affordable Care Act (Public Law 111-148),
> such sums as necessary.  For carrying out, except as otherwise
> provided, such sections in the first quarter of fiscal year 2015
> (including upward adjustments to prior year payments),
> $1,420,000,000.

*Id.* at 448.

On the same day, HHS separately submitted to the relevant appropriations

committees in the House and Senate a *Justification of Estimates for Appropriations Committees*.

Justification [Dkt. 30-3].  In that document, the Centers for Medicare and Medicaid Services

---

[9] The federal budget is for fiscal years (FY) that start on October 1.  Thus, the FY 2014 Budget
Request was for FY 2014, which began on October 1, 2013.

(CMS) explained:

> The FY 2014 request for Reduced Cost Sharing for Individuals
> Enrolled in Qualified Health Plans is $4.0 billion in the first year of
> operations for Health Insurance Marketplaces, also known as
> Exchanges. CMS also requests a $1.4 billion advance appropriation
> for the first quarter of FY 2015 in this budget to permit CMS to
> reimburse issuers who provided reduced cost-sharing [under Section
> 1402] in excess of the monthly advanced payments received in FY
> 2014 through the cost-sharing reduction reconciliation process.

*Id.* at 7. In its conclusion, HHS referred to "Cost-Sharing Reductions" as one of "five annually-

appropriated accounts." *Id.* In a later graphic entitled "Reduced Cost Sharing," HHS listed "--"

under "Budget Authority" for "FY 2013 Current Law," *id.* at 184. The chart reflects a view by

HHS and OMB that no prior appropriation funded Section 1402 reduced cost sharing.[10] HHS

compared the Section 1402 program to "other appropriated entitlements such as Medicaid." *Id.*

      On May 17, 2013, the Administration submitted a number of amendments to the

FY 2014 Budget Request. *See* Amendments [Dkt. 30-4]. The Secretaries acknowledge that

neither these amendments, nor any other post-budget submission, withdrew the request for an

annual appropriation for Section 1402 reimbursements. *See* Joint Stipulation [Dkt. 30] at 3 n.1.

      On May 20, 2013, OMB issued its *Sequestration Preview Report* for FY 2014,

which listed "Reduced Cost Sharing" as subject to sequestration in the amount of $286 million,

or 7.2% of the requested appropriation. Report [Dkt. 30-18] at 23. Because permanently-

appropriated programs (such as Section 1401) are exempt from sequestration, OMB's including

Section 1402 on a list of sequestration-bound programs appears to acknowledge that no

permanent appropriation was available for Section 1402 reimbursements.

---

[10] Interestingly, both Secretaries in this case are former OMB Directors. Secretary Burwell was
nominated one week before the FY 2014 Budget was submitted to Congress and confirmed on
April 24, 2013.

On July 13, 2013, the Senate Appropriations Committee adopted S. 1284, a bill appropriating monies to HHS and other agencies for FY 2014.  An accompanying report stated that "[t]he Committee recommendation does not include a mandatory appropriation, requested by the administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412 of the ACA."  S. Rep. No. 113-71, 113th Cong., at 123 (2013).  No subsequent consideration of funding for Section 1402 appears in the record, for FY 2014 or since.

On October 17, 2013, the President signed into law the first of two continuing resolutions to keep the government running pending a consolidated appropriations act.  *See* Continuing Appropriations Act for 2014, Pub. L. 113-46, 127 Stat. 558 (2013); Joint Resolution, Pub. L. 113-73, 128 Stat. 3 (Jan. 15, 2014).  Neither resolution included an appropriation for Section 1402 reimbursements.  The October 2013 legislation did, however, require HHS to certify that a program was in place to verify that applicants were eligible for "premium tax credits . . . and reductions in cost-sharing" before "making such credits and reductions available," Pub. L. 113-46, Div. B, § 1001(a), 127 Stat. 566.

On January 17, 2014, the President signed the Consolidated Appropriations Act for 2014, Pub. L. 113-76, 128 Stat. 5 (2014).  That law similarly did not appropriate monies for Section 1402 reimbursements to insurers.  Indeed, the Secretaries have conceded that "[t]here was no 2014 statute appropriating new money" for reimbursements under Section 1402.  5/28/15 Hr'g Tr. at 27:9-10.

Since January 2014, Treasury has been making advance payments of premium tax credits  and cost-sharing reimbursements to issuers of qualified health plans to eligible individuals.  Sec'y Mot. at 10 & Ex. 3, CMS Payment Policy and Financial Management Group, *Marketplace Payment Processing* (Dec. 6, 2013) [Dkt. 55-5] at 6-7  (discussing plans

11

"to make estimated payments to issuers beginning in January 2014 based on data provided by the December deadline"). These payments have been based on the Secretaries' determination that "the permanent appropriation in 31 U.S.C. § 1324, as amended by the Affordable Care Act, is available to fund all components of the Act's integrated system of subsidies for the purchase of health insurance, including both the premium tax credit and cost-sharing portions of the advance payments required by the Act." Sec'y Mot. at 10.

## II.  LEGAL STANDARD

"Summary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Pursuant to the cross-motions for summary judgment, there is no genuine dispute of material fact; at hand are only questions of law, which include statutory construction." *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 235 (5th Cir. 2012) (citing Fed. R. Civ. P. 56(a)) (citation omitted). What remains is to determine which party is entitled to judgment as a matter of law.

## III.  ANALYSIS

The question is whether Congress appropriated the billions of dollars that the Secretaries have spent since January 2014 on Section 1402 reimbursements. The Secretaries rely on 31 U.S.C. § 1324, which expressly appropriates money for Section 1401 premium tax credits. In order to explain their paying Section 1402 reimbursements out of a permanent appropriation for IRS refunds, the Secretaries posit that Sections 1401 and 1402 are economically and programmatically integrated. A contrary reading of the amended appropriations statute, they contend, would yield absurd economic, fiscal, and healthcare-policy results.

The only result of the ACA, however, is that the Section 1402 reimbursements must be funded annually. Far from absurd, that is a perfectly valid means of appropriation. The

results predicted by the Secretaries flow not from the ACA, but from Congress' subsequent refusal to appropriate money. Such an appropriation cannot be inferred, no matter how programmatically aligned the Secretaries may view Sections 1401 and 1402. *See* 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made"). "This principle is even more important in the case of a permanent appropriation." *Remission to Guam & Virgin Islands of Estimates of Moneys to be Collected*, B-114808, 1979 WL 12213, at *3 (Comp. Gen. Aug. 7, 1979).

Paying out Section 1402 reimbursements without an appropriation thus violates the Constitution. Congress authorized reduced cost sharing but did not appropriate monies for it, in the FY 2014 budget or since. Congress is the only source for such an appropriation, and no public money can be spent without one. *See* U.S. Constitution, Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."). The Secretaries' textual and contextual arguments fail.

### A. The Secretaries' Textual Arguments

The Secretaries argue that the text of 31 U.S.C. § 1324 and other "relevant statutory provisions" of the ACA (and other statutes) authorize their expenditures for cost-sharing reimbursements. Sec'y Mot. at 12. It is a most curious and convoluted argument whose mother was undoubtedly necessity.

### 1. The relevant appropriation statute

The Secretaries contend that 31 U.S.C. § 1324 appropriates monies for Section 1402 reimbursements. The text of § 1324 is worth reviewing in full:

> Disbursements may be made from the appropriation made by this
> section only for—

(1) refunds to the limit of liability of an individual tax account; and

(2) refunds due from credit provisions of the Internal Revenue Code of 1986 (26 U.S.C. 1 *et seq.*) enacted before January 1, 1978, or enacted by the Taxpayer Relief Act of 1997, or from section 25A, 35, 36, 36A, *36B*, 168(k)(4)(F), 53(e), 54B(h), or 6431 of such Code, or due under section 3081(b)(2) of the Housing Assistance Tax Act of 2008.

31 U.S.C. 1324(b) (emphasis on portion added by the ACA).  The reference to 26 U.S.C. § 36B, part of the Internal Revenue Code, was inserted by Section 1401(d)(1) of the ACA.  There is nothing in Section 1402 (cost-sharing reductions) or Section 1412 (advance payments) that amends Title 31, amends the Internal Revenue Code, or purports to appropriate anything.  The Secretaries must therefore squeeze the elephant of Section 1402 reimbursements into the mousehole of Section 1401(d)(1).  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not . . . hide elephants in mouseholes.").

The Secretaries can only prevail if Section 1402 payments are properly considered "refunds due . . . from section . . . 36B." 31 U.S.C. § 1324(b)(2).  The Secretaries first argue that the meaning of "from" depends on context.  Sec'y Mot. at 12 (citing *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115 (D.C. Cir. 2013)).  The proposition they borrow from *Clean Water Agencies*, that "from" is "a function word to indicate the source or original or moving force of something," is accurate but not pertinent.  734 F.3d at 1125.  A refund "due from [26 U.S.C. §] 36B" means a refund due from that section.  No amount of context can make it "due from 42 U.S.C. § 18071."

If "from" depends on context, moreover, then so must "refunds."  In this case, the word "refunds" is shorthand for "refunds due from credit provisions of the Internal Revenue Code." 31 U.S.C. § 1324(b)(2).  To provide a refund or credit under the Internal Revenue Code means to reduce the tax liability of a taxpayer.  That is precisely what Section 1401 does.  *See*

14

ACA § 1401(a) ("In General.—In the case of an applicable taxpayer, there shall be allowed as a

credit against the tax imposed by this subtitle for any taxable year . . . .") (codified at 26 U.S.C.

§ 36B(a)).  As such, the credits authorized by Section 1401 are quite naturally appropriated

through 31 U.S.C. § 1324.  The cost-sharing reductions mandated by Section 1402, by contrast,

do not reduce anyone's tax liability.  Nor do the reimbursements made to the insurers.  Neither is

intended to do so.  Rather, Section 1402 reimbursements are made to compensate insurers for the

costs that they bear instead of share.  These reimbursements simply are not "refunds" as that

term is used in 31 U.S.C. § 1324(b).

 The Secretaries insist that payments under both Sections 1401 and 1402 are

"refunds due . . . from section . . . 36B" because they are both "compensatory payments made to

subsidize an individual's insurance coverage based on that individual's satisfaction of the

eligibility requirements in Section 36B."  Sec'y Mot. at 12.  The argument relies on ACA

Section 1402(f)(2), which provides:  "No cost-sharing reduction shall be allowed under this

section [1402] . . . unless . . . a credit is allowed to the insured . . . under section 36B of [the

Internal Revenue] Code."  In other words, insurers may not reduce cost sharing for anyone who

does not qualify for a premium tax credit.

 The Secretaries exaggerate the significance of Section 1402(f)(2).  Although it is

true that "[e]ligibility for a premium tax credit under Section 36B is[] a statutory precondition for

receipt of the cost-sharing reductions," Sec'y Mot. at 13, the sections do have separate eligibility

provisions.  *Compare* ACA § 1401(a), codified at 26 U.S.C. § 36B(c)(1)(A) (making eligible for

premium tax credits any policyholder who earns between 100 and 400 percent of the federal

poverty level) *with* ACA § 1402(c)(2), codified as amended at 42 U.S.C. § 18071(c)(2) (making

eligible for additional cost-sharing reductions any policyholder who earns between 100 and 250

percent of the federal poverty line and who enrolls in a "silver" plan on an exchange).  From these distinct eligibility criteria, it is clear that many policyholders who qualify for Section 1402's additional cost-sharing reductions will also qualify for Section 1401's tax credits.  But that is due to an independent criterion: income.  The terms of the ACA do not automatically link eligibility for additional cost sharing reduction to eligibility for premium tax credits.

Section 1402(f)(2) does automatically link *ineligibility*.  It dictates that if an insured individual becomes ineligible for tax credits, he will automatically become ineligible for reduced cost sharing.  Taxpayers can lose eligibility for the credits for reasons other than income.  Under Section 1401, for example, married couples must file a joint return or else they cannot qualify as an "applicable taxpayer," *i.e.*, they cannot qualify for the premium tax credits.  26 U.S.C. § 36B(c)(1)(C).  Failure to file a joint return would not, however, disqualify a policyholder for additional cost-sharing reduction.  *See generally* 42 U.S.C. §§ 18071(b), (c)(2).  Section 1402(f)(2) was likely meant to tie up this and other loose ends.  That does not turn a reimbursement due from 42 U.S.C. § 18071 into a tax credit due from 26 U.S.C. § 36B.

The Secretaries argue that "36B" should be read broadly because its adjacent terms frequently are.  *See* Sec'y Mot. at 26 ("The Section 1324 appropriation is not limited to payments made under the provisions listed in that statute.").[11]  The Secretaries offer 26 U.S.C. § 35 as an example.[12]  That section is listed among the others permanently appropriated by 31 U.S.C. § 1324(b).  By separate enactment, Congress created a new provision in the Code which

---

[11] To be clear, the text actually *does* limit payments to the provisions listed in the statute.  *See* 31 U.S.C. § 1324 ("Disbursements may be made from the appropriation made by this section *only for . . . .*") (emphasis added).

[12] Section 35 provides premium tax credits for individuals receiving a "trade readjustment allowance" under the Trade Act of 1974 and for individuals receiving a pension from the Pension Benefit Guaranty Corporation.  *See generally* 26 U.S.C. § 35(c).

requires Treasury to make "advance payments" directly to insurers "on behalf of" individuals

eligible for a Section 35 tax credit.  *See* 26 U.S.C. § 7527(a).  Section 7527 is not among the

sections listed in 31 U.S.C. 1324(b), and yet "it has never been doubted that the Section 1324

appropriation is available to fund all aspects of the integrated Section 35 subsidy program."

Sec'y Mot. at 27-28.  The Secretaries argue by analogy that "36B" can include all advanced

payments under 42 U.S.C. § 18082, including Section 1402 reimbursements.

 The Secretaries' syllogism is unsound.  Section 35 tax credits remain "refunds

due . . . from section . . . 35" even if advanced payment is authorized by Section 7527.  Those

credits are not transformed into "refunds due . . . from section . . . [7527]" merely because

Section 7527 allows them to be paid in advance.  The same is true of the tax credits provided

under Section 36B, which ACA Section 1412 allows to be paid in advance.  The advance-

funding mechanism in the ACA, codified at 42 U.S.C. § 18082, does not turn monies paid

through that mechanism into "refunds due . . . from section . . . [42 U.S.C. § 18082]."[13]  The

source of the credit—*i.e.*, the Internal Revenue Code section "from" which the "refunds" are

"due"—remains 26 U.S.C. § 36B.

 While both ACA Sections 1401 and 1402 can be paid in advance via Section

1412, only Section 1401 (in the guise of 26 U.S.C. § 36B) was added to the list of sections

whose refunds or credits are appropriated permanently by 31 U.S.C. § 1324(b).  That Section

1402 goes unmentioned suggests no error or maladroit drafting; only Section 1401 provides a

---

[13] It bears repeating here that every other section enumerated in 31 U.S.C. § 1324 comes from
the Internal Revenue Code, Title 26.  None of them comes from Title 42 or elsewhere in the U.S.
Code.  It would be unprecedented to shoehorn Section 1402 payments—which are due, if at all,
under Title 42—into 31 U.S.C. § 1324.

refund or credit under the Internal Revenue Code. The Secretaries' attempt to read "36B" as

"[26 U.S.C. §] 36B [and 42 U.S.C. § 18071]" finds no support in the statutory text.

### 2. The advance payments program

The Secretaries argue that Sections 1401 and 1402 are "unified" by the advance-

payment program authorized by Section 1412. Sec'y Mot. at 13. However, Section 1412 itself

recognizes a separation in payment schemes:

> (a) In General.—The Secretary [of HHS], in consultation with the
> Secretary of the Treasury, shall establish a program under
> which—
>
> (1) upon request of an Exchange, advance determinations are
> made under section 1411 with respect to the income eligibility
> of individuals enrolling in a qualified health plan in the
> individual market through the Exchange for the *premium tax
> credit allowable under section 36B of the Internal Revenue Code*
> of 1986 and the *cost-sharing reductions under section 1402*.

ACA § 1412(a)(1) (emphasis added).[14]  The ACA could not have been clearer: premium tax

credits are payable under Section 36B of the Internal Revenue Code, and cost-sharing reductions

are payable under Section 1402 of the ACA. The two are textually, and thus legally, distinct.

*See SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 75 (D.C. Cir. 2015) ("[W]e have repeatedly held that

where different terms are used in a single piece of legislation, the court must presume that

Congress intended the terms to have different meanings.") (quoting *Vonage Holdings Corp. v.*

---

[14] Note that advance payments are triggered only "upon request of an Exchange." ACA
§ 1412(a)(1). Thus, strictly speaking, nothing mandates that advance payments would ever
materialize. It is therefore difficult to accept the argument that the ACA *presumes* a "unified"
program for advance payments for both Sections 1401 and 1402. *See also* Sec'y Reply at 16
(conceding that "neither the premium tax credit nor cost-sharing reduction subsidies must always
be made in advance").

*FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007) (quotation marks and alteration omitted)).  The

Secretaries' unification argument fails in light of the differentiated text.[15]

There are other important textual distinctions in Section 1412.  *See, e.g.*, ACA

§ 1412(c) ("Payment of Premium Tax Credits and Cost-Sharing Reductions").  Under "Premium

Tax Credit," that section provides:

> The Secretary of the Treasury *shall make* the advance payment
> under this section of any premium tax credit allowed *under section
> 36B of the Internal Revenue Code of 1986* to the issuer of a qualified
> health plan on a monthly basis (or such other periodic basis as the
> Secretary may provide).

ACA § 1412(c)(2)(A) (emphasis added).  But under "Cost-Sharing Reductions," it provides:

> The Secretary [of HHS] *shall also notify* the Secretary of the
> Treasury and the Exchange under paragraph (1) *if* an advance
> payment of the cost-sharing reductions *under section 1402* is to be
> made to the issuer of any qualified health plan with respect to any
> individual enrolled in the plan. The Secretary of the Treasury shall
> make such advance payment at such time and in such amount as the
> Secretary [of HHS] specifies in the notice.

*Id.* § 1412(c)(3) (emphasis added).

Two distinctions are apparent.  First, these passages reiterate the difference

between Section 1401 premium tax credits, which are paid "under section 36B of the Internal

Revenue Code," and payments for Section 1402 cost-sharing reductions, which are payable

"under section 1402."  *Compare* ACA § 1412(c)(2)(A) *with id.* § 1412(c)(3).  Second, there is a

notable difference in the statutory command to the Secretaries.  Regarding Section 1401 credits,

Treasury is directed to make advance payments.  ACA § 1412(c)(2)(A) ("The Secretary of the

Treasure shall make . . . .").  But with regard to Section 1402 reimbursements, the Secretary of

HHS is directed only to "notify the Secretary of the Treasury . . . *if* an advance payment . . . is to

---

[15] The dichotomy is repeated elsewhere in Section 1412, *e.g.* § 1412(a)(2)(B).

be made." *Id.* § 1412(c)(3) (emphasis added).  This language clearly contemplates that some advance payments might *not* be made under Section 1402, which evidences the lack of congressional intent to fuse Sections 1401 and 1402 together through a "unified" program.  In point of fact, the difference in treatment reflects the reality that Section 1402 reimbursements are subject to the annual appropriations process, making it risky to command advance payments.

Sections 1412(c)(2) and 1412(c)(3), immediately adjacent and yet using noticeably different language, belie the Secretaries' textual argument that Section 1412 was meant to unify Sections 1401 and 1402.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.") (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

### 3.  The Hyde Amendment

The Secretaries base one of their textual arguments on the so-called Hyde Amendment.  Named for former Illinois Representative Henry Hyde, the amendment bars the use of federal funds to pay for abortions except in specified circumstances.  *See Harris v. McRae*, 448 U.S. 297, 302 (1980).  It routinely has been attached to certain appropriations legislation, including for HHS, since 1976.  "The Hyde Amendment is not permanent legislation," but is often "enacted as part of the statute appropriating funds for certain Executive Departments for one fiscal year."  *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 477 (1996) (per curiam).

The ACA contains a prohibition on abortion funding that is tied to annual appropriations restrictions like the Hyde Amendment.  Section 1303(a)(2)(A)(ii) provides that an insurer offering a qualified health plan "shall not use any amount attributable to . . . [a]ny cost-

sharing reduction under section 1402 of the [ACA]" or the "amount (if any) of the advance

payment of the reduction under section 1412" to pay for "abortions for which the expenditure of

Federal funds appropriated for the Department of Health and Human Services is not permitted,

based on the law as in effect" six months prior to the plan year.  ACA § 1303(a)(1)(B)(i).  So

long as the Hyde Amendment continues to be attached to HHS appropriations laws, cost-sharing

reduction payments under Section 1402 cannot be used to fund abortion services.  That would be

create a redundancy, in the Secretaries' view, because the Hyde Amendment itself would block

such use if the Section 1402 reimbursements were appropriated annually.

The House points to the term "if any" as evidence that cost-sharing reductions

might never be paid.  But the same "if any" language is found in the preceding section on

premium tax credits.  ACA § 1303(a)(2)(A)(i).  The term refers to the *advanced* payments, the

Secretaries say, which "can be explained as merely reflecting that neither the premium tax credit

nor cost-sharing reduction subsidies must always be made in advance."  Sec'y Reply at 13.[16]

The Secretaries are right; the term "if any" appears in both subsections.

Section 1303(a)(2)(ii) does create a redundancy, but not one that trumps

unambiguous text.  "Redundancies across statutes are not unusual events in drafting, and so long

as there is no 'positive repugnancy' between two laws, a court must give effect to both."  *Conn.*

*Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*, 41 U.S. (16

Pet.) 342, 363 (1842) (citation omitted)).  In *King v. Burwell*, the Court specifically rejected the

petitioners' and the dissent's redundancy argument.  135 S. Ct. at 2492 ("[O]ur preference for

avoiding surplusage constructions is not absolute.") (quoting *Lamie v. U.S. Trustee*, 540 U.S.

---

[16] That is a notable concession, given the Secretaries' argument that Congress "inextricably
linked" the two programs through the advanced-payment system.  Sec'y Mot. at 16.  The
Secretaries have conceded that the two programs can, in fact, be extricated.

526, 536 (2004)).  The Court added that "specifically with respect to [the ACA], rigorous

application of the canon does not seem a particularly useful guide to a fair construction of the

statute."  *King*, 135 S. Ct. at 2492.[17]

There is no positive repugnancy created between ACA § 1303 and the Hyde

Amendment, nor any created within the ACA.  The *Germain* Court explained that "canons of

construction are no more than rules of thumb that help courts determine the meaning of

legislation," and that "a court should always turn first to one, cardinal canon before all others[:]

courts must presume that a legislature says in a statute what it means and means in a statute what

it says there."  503 U.S. at 253-54; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227

(2008) ("In the end, we are unpersuaded by petitioner's attempt to create ambiguity [by invoking

---

[17] The Supreme Court described in detail why such minor discrepancies might appear:

> The Affordable Care Act contains more than a few examples of
> inartful drafting.  (To cite just one, the Act creates three separate
> Section 1563s. See 124 Stat. 270, 911, 912.)  Several features of the
> Act's passage contributed to that unfortunate reality.  Congress
> wrote key parts of the Act behind closed doors, rather than through
> "the traditional legislative process."  Cannan, *A Legislative History
> of the Affordable Care Act: How Legislative Procedure Shapes
> Legislative History*, 105 L. Lib. J. 131, 163 (2013).  And Congress
> passed much of the Act using a complicated budgetary procedure
> known as "reconciliation," which limited opportunities for debate
> and amendment, and bypassed the Senate's normal 60-vote
> filibuster requirement.  *Id.* at 159-167.  As a result, the Act does not
> reflect the type of care and deliberation that one might expect of
> such significant legislation.  *Cf.* Frankfurter, *Some Reflections on
> the Reading of Statutes*, 47 Colum. L. Rev. 527, 545 (1947)
> (describing a cartoon "in which a senator tells his colleagues 'I admit
> this new bill is too complicated to understand. We'll just have to
> pass it to find out what it means.'").

*King*, 135 S. Ct. at 2492.

the rule against superfluities] where the statute's text and structure suggest none.").  Given the choice between rewriting plain text and accepting a minor redundancy, the choice is clear.

### 4.  "Conspicuously absent" text

The Secretaries also rely on the *absence* of certain text.  As it often does, Congress said in certain parts of the ACA that there "are authorized to be appropriated such sums as are necessary."[18]  But that language is not in Section 1402.  The Secretaries do not argue—nor could they—that these words are necessary to appropriate monies in the future.  Instead, they deduce that the absence of this language means that Congress felt it unneeded, ostensibly because Section 1402 was already funded permanently.

To the extent that this missing language evidences congressional intent, it cannot surmount the plain text.  According to that text, Congress authorized Section 1402 but did not appropriate for it.  That is perfectly consonant with principles of appropriations law.  So long as *programs* are authorized, Congress may appropriate funds for them, or not, as it chooses.  *See* GAO *Principles* at 2-41 ("An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter (up or down) in the subsequent appropriation act.").  The absence of the "authorized to be appropriated" language does not give the Court—or the Secretaries—license to rewrite the plain text of 31 U.S.C. § 1324(b).

### 5.  Post-ACA legislation

---

[18] *See, e.g.*, ACA § 2705(f), 124 Stat. 325.  *See also* Sec'y Mot. at 15 n.5 (citing ACA §§ 1002, 2706(e), 3013(c), 2015, 2501, 3504(b), 3505(a), 3505(b), 3506, 3509(a)(1), 3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b)).

The Secretaries urge the Court to consider post-ACA legislation to inform the meaning of the ACA's text.  Specifically, they draw significance from the October 2013 Continuing Appropriations Act, which required HHS to certify eligibility for "premium tax credits . . . and reductions in cost-sharing" before "making such credits and reductions available."  Pub. L. No. 113-46, § 1001(a), 127 Stat. 566.  The Secretaries posit that a fundamental inconsistency would arise if the same Congress that "had precluded those payments from being made by failing to appropriate any funds" also required certification of eligibility for payment of cost-sharing reimbursements.  Sec'y Mot. at 16.

The significance of the October 2013 appropriations act is too ephemeral to support the Secretaries' deduction.  With FY 2014 funding still unsettled, Section 1402 reimbursements might yet have been funded for that year.  In addition, Congress could always have appropriated monies to fund Section 1402 in the future; nothing about its prior refusal bound it or a future Congress.  And with these ACA provisions set to become effective in mere months, the temporary appropriations act allowed Congress to require certification of eligibility prior to monies being distributed under either Section 1401 or 1402.  Congress did not give a reason for its requiring certification in the continuing appropriations act, but the Secretaries' deduction would create an appropriation for Section 1402 out of thin air.  Whatever the explanation, the October 2013 Continuing Appropriations Act does not alter the meaning of "refunds due . . . from section . . . 36B."  31 U.S.C. § 1324(b).

## B.  The Secretaries' Contextual Arguments

The thrust of the Secretaries' argument relies on the ACA's "structure and design."  *See* Sec'y Mot. at 16-23.  "Reliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes

creation and attempted interpretation of legislation becomes legislation itself.'" *King*, 135 S. Ct. at 2495-96 (quoting *Palmer* v. *Massachusetts*, 308 U.S. 79, 83 (1939)).  The relevant text is, once again, "refunds due . . . from section . . . 36B."  31 U.S.C. § 1324(b)(2).  As discussed above, none of those words is ambiguous standing alone.[19]  The Secretaries rely heavily on *King* to argue that the full context of the ACA makes the language ambiguous and thus subject to their interpretation, provided it is reasonable.

### 1.  Structure and design

The Secretaries first posit that the ACA enacted a "closely intertwined" system of subsidies, citing *King*, 135 S. Ct. at 2487.  The "three key reforms" described in *King* were: (1) guaranteed insurance and community rating requirements, 42 U.S.C. § 300gg; (2) an individual mandate to maintain health insurance, 26 U.S.C. § 5000A; and (3) refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line, 26 U.S.C. § 36B.  *See generally King*, 135 S. Ct. at 2486-87.  The Court added, as to the third:  "Individuals who meet the Act's requirements may purchase insurance with the tax credits, which are provided in advance directly to the individual's insurer."  *Id.* at 2487.  *King* did not describe Section 1402 cost-sharing reductions as integral to any of the three key reforms.  In fact, *King* did not mention Section 1402, discuss payments for cost-sharing

---

[19] The House argues that the Secretaries "seek to flip *King* on its head" by looking outside the relevant text to determine ambiguity in the first instance.  House Opp'n at 14.  But that is, in fact, what the Court in *King* did.  After acknowledging that "established by the State" has a plain meaning *and* that it was statutorily defined to mean "each of the 50 States and the District of Columbia," the Court nonetheless looked outside of 26 U.S.C. §§ 36B(b)(2)(A), (c)(2)(A)(i), to ascertain whether the phrase was ambiguous.  *See King*, 135 S. Ct. at 2490 ("These provisions suggest that the Act may not always use the phrase 'established by the State' in its most natural sense.  Thus, the meaning of that phrase may not be as clear as it appears when read out of context.").  In other words, the Court determined that a phrase that is unambiguous in isolation may be ambiguous in greater context.  That is the Secretaries' argument here.

reductions, or cite 42 U.S.C. § 18071.  The Secretaries nevertheless urge that cost-sharing

reductions are "just as closely linked" to the reforms described in *King*.  Sec'y Mot. at 16.  For

that reason, they ask this Court to read ambiguity into otherwise plain language.

This case is fundamentally different from *King v. Burwell*.  There, the phrase

"established by the State," 26 U.S.C. §§ 36B(b)(2)(A), 36B(c)(2)(A)(i), became "not so clear"

when it was "read in context."  *King*, 135 S. Ct. at 2490 (acknowledging that the ACA had

expressly defined "State" to mean "each of the 50 States and the District of Columbia," 42

U.S.C. § 18024(d)).  This was the "problem" identified by the Court:

> If we give the phrase "the State that established the Exchange" its
> most natural meaning, there would be *no* "qualified individuals" on
> Federal Exchanges.  But the Act clearly contemplates that there will
> be qualified individuals on *every* Exchange.  As we just mentioned,
> the Act requires all Exchanges to "make available qualified health
> plans to qualified individuals"—something an Exchange could not
> do if there were no such individuals.  § 18031(d)(2)(A).  And the
> Act tells the Exchange, in deciding which health plans to offer, to
> consider "the interests of qualified individuals . . . in the State or
> States in which such Exchange operates"—again, something the
> Exchange could not do if qualified individuals did not exist.
> § 18031(e)(1)(B).  This problem arises repeatedly throughout the
> Act.

*King*, 135 S. Ct. at 2490 (emphasis in original).  Simply put, the statute could not function if

interpreted literally; it had to be saved from itself.

The problem the Secretaries have tried to solve here is very different: it is a

failure to appropriate, not a failure in drafting.  Congress's subsequent inaction, not the text of

the ACA, is what prompts the Secretaries to force the elephant into the mousehole.  There are no

inherent flaws in the ACA that keep Section 1402 payments from being paid, in advance or

otherwise.  None of the operative provisions becomes unworkable, as they did in *King*, when the

relevant passage (31 U.S.C. § 1324(b)) is read plainly.  The minor redundancy created by ACA

Section 1303(a)(2)(ii), discussed above, is nothing compared to the fundamental disconnects that

would have "arise[n] repeatedly" in *King* if "the State" were given its most natural reading.  135 S. Ct. at 2490.  It simply does not follow from a plain reading of 31 U.S.C. § 1324(b) that "the Act d[oes] not allow the government to comply with the statutory directive to reimburse those insurers for the cost-sharing reductions."  Sec'y Mot. at 16.  There is nothing in the ACA that prevents compliance.  The funds simply must be appropriated.

The result in *King* was driven by the Court's holding "that the Act may not always use the phrase 'established by the State' in its most natural sense," and thus that "the meaning of that phrase may not be as clear as it appears when read out of context."  135 S. Ct. at 2490.  The natural sense of the statutory language at issue here ("36B") does not impede the operation of the ACA.  No "problem arises repeatedly throughout the Act," *id.*, if 31 U.S.C. § 1324(b) (as amended by ACA § 1401(d)) is given its plain meaning.  *King* is inapposite.

### 2.  Unintended consequences

The Secretaries predict a "cascading series of nonsensical and undesirable results" if 31 U.S.C. § 1324(b) is given its plain meaning.  Sec'y Mot. at 17.  When interpreting a statute, "absurd results are to be avoided."  *McNeill v. United States*, 563 U.S. 816, 822 (2011) (quoting *United States v. Wilson*, 503 U.S. 329, 334 (1992)).  The Court must therefore consider whether the ACA's plain text would cause absurd results.

The Secretaries depict health insurance premiums and cost-sharing reimbursements as a financial seesaw; as one goes down, the other must go up.  Sec'y Mot. at 2. Insurers cannot escape cost-sharing reductions, which are a mandatory feature of participation in the Exchanges.  If the insurers are not reimbursed, they will charge higher premiums to cover their expenses.  Sec'y Mot. at 17 & Ex. 4, *ASPE Issue Brief: Potential Fiscal Consequences of Not Providing CSR Reimbursements* [Dkt. 55-6] (*ASPE Br.*) at 2.  When premiums rise,

27

taxpayers become entitled to greater tax credits under Section 1401.  Sec'y Mot. at 18 (citing 26 U.S.C. § 36B(b)(2)(B)).  On its face, this causes no concern because premium tax credits are permanently funded.  The seesaw would effectively solve the problem.

But the seesaw is asymmetrical.  More people qualify for premium tax credits than for cost-sharing reductions, and tax credits for all health plans are "indexed" to the cost-sharing-eligible ("silver") plans.   Sec'y Mot. at 19.  For these reasons, if federal spending decreased on the cost-sharing side, it would increase disproportionately on the tax-credit side. Congress would end up spending more through Section 1401 alone than it would through Sections 1401 and 1402 working together.

There are other potential consequences if no funds are appropriated for Section 1402 reimbursements.  Unreimbursed insurers might sue the government under the Tucker Act, 28 U.S.C. § 1491(a)(1), to receive the money owed them under ACA Section 1402(c)(3)(A) ("[T]he Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions.").[20]  Litigation would burden the U.S. Treasury if the insurers won such suits, and even unsuccessful litigation would impose costs.  The Secretaries also worry that prevailing insurers would receive a windfall: higher insurance premiums (subsidized by Section 1401 tax credits) *and* reimbursement for Section 1402 cost-sharing reductions.

The Secretaries also project that annual funding of Section 1402 would cause uncertainty in the market.  Because "plans sold on the [ACA's] Exchanges are required to set their premiums for the following year well in advance" of the government's fiscal year, "insurers

---

[20] The House disputes whether this language confers an actionable right upon the insurers.  *See* House Opp'n at 19-20.  Because the Tucker Act argument is not ultimately dispositive, the Court does not decide whether insurers could sue under the Tucker Act.

would be forced to set their premiums for the upcoming year in the face of uncertainty about the existence and amount of payments they would receive."  Sec'y Mot. at 23.[21]

Finally, the Secretaries argue that Congress has not adopted an "appropriated entitlement" since 1997 and surely would not have done so in the ACA without saying so clearly.  Sec'y Mot. at 21-22.  They cite the Balanced Budget Act of 1997, Pub. L. 1005-33, §§ 10101, 10116, 11 Stat. 251, 678 (Aug. 5, 1997) and an accompanying conference report, H.R. Conf. Rep. 105-217, at 983 (1997).  As defined by GAO, an appropriated entitlement is:

> An entitlement whose source of funding is in an annual appropriation act.  However, because the entitlement is created by operation of law, if Congress does not appropriate the money necessary to fund the payments, eligible recipients may have legal recourse.  Veterans' compensation and Medicaid are examples of such appropriated entitlements.

GAO *Glossary* at 13.

These arguments all focus on the wrong consequences.  For purposes of interpreting the ACA, the relevant question is not whether Congress intended premiums to skyrocket, deficits to explode, or enrollment to plummet—those are not consequences of the statute that Congress wrote in 2010.  The relevant question is far narrower:  Would it have been "nonsensical" or "absurd" for Congress to authorize a program permanently in 2010 but not appropriate for it permanently at the same time?

The answer is "no."  Congress once conferred, for example, "permanent authority" on Treasury "to permit prepayment . . . to territorial treasuries of estimates of moneys to be collected from certain taxes, duties, and fees."  *Remission to Guam & Virgin Islands of*

---

[21] Amici in support of the Secretaries agree with these predictions.  *See generally* Br. Amici Curie for Economic & Health Policy Scholars [Dkt. 64] at 4-5.

*Estimates of Moneys to be Collected*, B-114808, 1979 WL 12213, at *1 (Comp. Gen. Aug. 7, 1979).  Yet because no subsequent appropriation was made, no such money could be spent:

> In sum, although we think that Section[s] 1(c) and 4(c)(2) of Pub. L. No. 95-348 do establish permanent authority for future appropriations, we conclude that they do not establish permanent indefinite appropriations.  Thus, the Department of the Treasury cannot remit funds to Guam and the Virgin Islands under these sections until Congress makes appropriations for that purpose.

*Id.* at *4.  Interestingly, GAO recognized that "Congress probably did not anticipate that appropriations would be needed in order to implement the prepayment provisions."  *Id.* at *2. That did not alter GAO's analysis of the statute, however, because "the making of an appropriation is not to be inferred but must be expressly stated.  *This principle is even more important in the case of a permanent appropriation*."  *Id.* at *3 (emphasis added).

The *Remission to Guam* decision was recently cited by GAO when analyzing Section 1342(b)(1) of the ACA.  *See Dep't of HHS—Risk Corridors Program*, B-325630, 2014 WL 4825237, at *2 (Comp. Gen. Sept. 30, 2014).  GAO found that "Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1)."  *Id.*  GAO ultimately concluded that HHS could spend monies appropriated by another statute, Pub. L. 113-76, div. H, title II, 128 Stat. 5, 374 (Jan. 17, 2014), which appropriated funds for the Centers for Medicare and Medicaid Services (CMS) to carry out its responsibilities.  2014 WL 4825237, at *3.  That appropriating statute does not apply here, so GAO's final conclusion is irrelevant for these purposes.  More to the point, the *Risk Corridors* decision illustrates` that a statute (in that case, ACA § 1342) can authorize a program, mandate that payments be made, and yet fail to appropriate the necessary funds.  *Id.* at *2 ("It is not enough for a statute to simply require an agency to make a payment.").  Thus, not only is it possible for a statute to authorize and mandate payments without making an appropriation, but GAO has found a prime example in the ACA.

These decisions illustrate well-understood principles of appropriations law.  In decisions spanning 35 years, GAO has consistently emphasized that appropriations—especially permanent appropriations—must be expressly stated.  GAO has also ruled that a mere requirement to pay is not an appropriation.  "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).  This Court draws from GAO's expertise, as well.

Finally, the Secretaries' "appropriated entitlement" argument fails.  Recall that, in its April 2013 budget justification, HHS called Section 1402 an "appropriated entitlement[]" while requesting an appropriation for it.  Justification [Dkt. 30-3] at 184.  The agency now calls appropriated entitlements a "dormant . . . construct," Sec'y Mot. at 22, but apparently thought in 2013 that the construct had awoken.  Nothing prevented Congress from resurrecting this method of appropriating, least of all a 13-year old Conference Report.  In the end, this argument simply does not call into question the plain text of 31 U.S.C. § 1324(b) as amended by ACA § 1401(d).

To recapitulate, the consequence at issue here is that a permanently authorized benefit program was made dependent on non-permanent appropriations.   That approach is perfectly consonant with principles of appropriations law; most federal entities operate in the same fashion.  The Secretaries' argument, taken to its logical conclusion, is that every permanent *authorization* must also constitute a permanent *appropriation* or else an "absurd result" would obtain.  That is assuredly not the law.  Higher premiums, more federal debt, and decreased enrollment are not consequences of the ACA's text or structure.  Those results would flow—if at

all—from Congress's continuing refusal to appropriate funds for Section 1402 reimbursements. That is Congress's prerogative; the Court cannot override it by rewriting 31 U.S.C. § 1324(b).

### 3.  The Affordable Care Act's legislative history

The Secretaries make two points about the legislative history of the ACA.  First, they say that CBO consistently referred to Section 1402 reimbursements as "direct spending." CBO would not have used this term, according to the Secretaries, if the money were not already appropriated.  But when CBO scores "laws providing or creating direct spending," it is required by law to assume that "funding for entitlement authority [will] be adequate to make all payments required by those laws."  2 U.S.C. § 907(b)(1).  Thus, the Court draws nothing particularly meaningful from CBO's assumption that appropriations would have been made for Section 1402 reimbursements.

Second, the Secretaries point to statements by individual Representatives and Senators whose description of the "cost" of the ACA presumed that Section 1402 would be funded.[22]  This argument, too, fails to establish an actual appropriation.  "An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history." *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2194-95 (2012) (quoting *Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am. v. Donovan*, 746 F.2d 855, 860-61

---

[22] *See* 156 Cong. Rec. S2069, S2081 (Mar. 25, 2010) (Sen. Durbin) ("$500 billion of tax cuts and cost-sharing"); 155 Cong. Rec. S12565, S12576 (Dec. 7, 2009) (Sen. Enzi) ("this bill will commit the Federal Treasury to paying for these new subsidies for the uninsured forever"); 156 Cong. Rec. H1891, H1898 (Mar. 21, 2010) (Rep. Paulsen) ("$500 billion . . . [in] new entitlement spending"); 156 Cong. Rec. H1891, H1910 (Mar. 21, 2010) (Rep. Diaz-Balart) ("half a trillion dollars . . . [for] a massive new entitlement program").

(D.C. Cir. 1984)).  The Court finds nothing exceptional about legislators assuming that a

program under debate would be fully appropriated if enacted.[23]

### 4.  The contemporary understanding

The best evidence of the contemporary understanding of the ACA comes from the

parties' preparation for the effective date of the law.  *Cf. United States v. Kanchanalak*, 192 F.3d

1037, 1045 (D.C. Cir. 1999) ("A[] court will ordinarily give substantial deference to a

contemporaneous agency interpretation of a statute it administers.") (quoting *Sierra Pac. Power*

*v. EPA*, 647 F.2d 60, 65 (9th Cir. 1981)).  The only such actions that speak directly to the

question in this case—whether Section 1402 reimbursements were permanently appropriated

for—were taken by OMB in the FY 2014 Budget Request and by HHS when it submitted its

Justification, both of which sought an annual appropriation for Section 1402 reimbursements.

*See* Budget [Dkt. 30-1]; App. to Budget [Dkt. 30-2] at 3, 448; Justification [Dkt. 30-3] at 7, 184.

These requests "are not in dispute."  Sec'y Opp'n at 4.

The Secretaries argue that these requests are irrelevant, however, because

"[b]udget requests . . . do[] not implement, interpret, or prescribe any law or policy."  *Fund for*

*Animals, Inc.* v. *U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (internal

quotations omitted)).  They note that "the particular request at issue here [for FY 2014] did not

purport to analyze the ACA or consider the availability of the permanent appropriation in 31

U.S.C. § 1324."  Sec'y Mot. at 30; *see also* Sec'y Reply at 4 ("[T]hose documents did not fully

account for the text, structure, design, and history of the ACA.").

---

[23] The Court thanks amici Members of Congress for their brief.  *See* Br. Amici Curiae Members
of Congress [Dkt. 63].  However, their recollections as to what "everyone at the time
understood," *id.* at 22, are anecdotal and not evidentiary.

As an initial matter, it strains credulity to suggest that OMB or HHS submitted a multibillion dollar budget request without analyzing the relevant statutes.  The Secretary of HHS is aided by an Assistant Secretary for Financial Resources who manages an Office of Budget.[24]  The employees in that office "play a lead role in analyzing Congressional budget actions and appropriations legislation."[25]  Within that office's Division of Budget Policy, Execution, and Review, the Fiscal and Legal Review Branch "provides expertise in budget execution and appropriations law" and offers "technical analysis of appropriations bills and authorizing legislation with an impact on spending authority."[26]  The Office of Budget also "maintains active communication with OMB,"[27] whose Budget Review Division "monitors congressional action on appropriations and other spending legislation."[28]

The Administration's FY 2014 Budget Request and its Appendix reflected the careful analysis that one would expect from these institutions.  Each request accounted meticulously for every penny sought.  Statutory authority was cited for every program, along with tables detailing the budgetary resources available and the effect of any appropriation or outlay.  *See, e.g.*, App. to Budget [Dkt. 30-2] at 448 (detailing such information for "Reduced Cost Sharing for Individuals Enrolled in Qualified Health Plans" and the "Consumer Operated and Oriented Plan Program Contingency Fund").  CMS's accompanying Justification contained

---

[24] *See* http://www.hhs.gov/about/agencies/orgchart/index.html (last visited May 11, 2016).

[25] http://www.hhs.gov/about/agencies/asfr/budget/index.html (last visited May 11, 2016).

[26] http://www.hhs.gov/about/agencies/asfr/budget/divisions/index.html (last visited May 11, 2016).

[27] http://www.hhs.gov/about/agencies/asfr/budget/index.html (last visited May 11, 2016).

[28] https://www.whitehouse.gov/omb/organization_mission/ (last visited May 11, 2016).

*pages* of painstaking analysis of various appropriations statutes.  *See* Justification [30-3] at 11-13, 129-31, 171-72, 183, 185-86.  Clearly these agencies were analyzing appropriations statutes and were considering the availability of permanent appropriations.  Nevertheless, it is true that the FY 2014 Budget Request and its accompanying documents do not "constrain this Court" or obviate "the traditional tools of statutory analysis."  Sec'y Opp'n at 4.

The Secretaries cite two cases for the proposition that "Executive Branch statements have no bearing on questions of statutory interpretation like the one now before this Court."  Sec'y Opp'n at 5.  In *Wong Yang Sung v. McGrath*, the Supreme Court refused to agree "that a request for and failure to get in a single session of Congress clarifying legislation on a genuinely debatable point of agency procedure admits weakness in the agency's contentions." 339 U.S. 33, 47 (1950).  The Court drew "no inference in favor of either construction of the Act" merely because the agency sought, but Congress did not pass, certain legislation.  *Id.*  In *Federal Trade Commission v. Dean Foods Company*, the Court refused to "infer[,] from the fact that Congress took no action at all on the request of the [FTC] to grant it" preliminary-injunction powers under the Clayton Act, any intent by Congress "to circumscribe [the] traditional judicial remedies" provided in the All Writs Act.  384 U.S. 597, 609-10 (1966).  Relying on these cases, the Secretaries tell the Court to ignore their FY 2014 Budget Requests.

The Secretaries have asked this Court to consider statutes that were enacted years after the ACA; floor statements by individual Members of Congress; an HHS "issue brief" on potential fiscal consequences; a *New York Times* article; the Hyde Amendment; a CMS webinar from 2013; excerpts from the House Budget Committee's *Compendium of Laws and Rules of the Congressional Budget Process* (2015 ed.); CBO scoring terminology; and a House Conference Report from 1997.  It is passing strange that they find the official FY 2014 Budget Request

related documents to be irrelevant.  The Court draws no dispositive inference from the history of

the FY 2014 Budget Request concerning the question of statutory interpretation.  But the Court

does find that the budget history is probative of HHS's contemporaneous interpretation.

       The Secretaries ignore their own actions and focus instead on congressional

inaction.  Sec'y Mot. at 29 (arguing that the "failure of Congress to provide an annual

appropriation to HHS does not alter the scope of the permanent appropriation to Treasury in

Section 1324"); *id.* at 30 ("Congress's failure to provide a specific appropriation requested by an

agency sheds no light on the question whether other appropriations are available to make the

same expenditure.").  Those arguments beg the question.  No one disputes that 31 U.S.C. § 1324

is an appropriation; the question is whether that statute, as amended by ACA §1401(d)(1),

permanently appropriates money for Section 1402 reimbursements.  The Court concludes that it

does not.

### C.  Deference to the Secretaries' Interpretation

       The Secretaries argue that "at a minimum," they deserve deference to their

interpretation of 31 U.S.C. § 1324.  Sec'y Mot. at 25-26 (citing *Chevron U.S.A., Inc. v. NRDC*,

467 U.S. 837, 842, 842-43 (1984)).  The Supreme Court in *King* rejected the agency's *Chevron*

argument.  *See* 135 S. Ct. at 2488-89.  The Court had previously recognized that in

"extraordinary cases," there "may be reason to hesitate before concluding that Congress has

intended [the] implicit delegation" that underlies *Chevron* deference.  *Id.* (quoting *FDA v. Brown*

*& Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  *King* was "one of those cases"

because "tax credits are among the Act's key reforms, involving billions of dollars in spending

each year and affecting the price of health insurance for millions of people."  135 S. Ct. at 2489.

The Secretaries say the same thing about Section 1402 reimbursements.  That being the case,

"had Congress wished to assign th[e] question to an agency, it surely would have done so expressly." *Id.* There is no express delegation here.

Even if *Chevron* deference were warranted, the Secretaries would fail at step one. *See W. Minnesota Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588, 591 (D.C. Cir. 2015) ("Under step one, the court must determine 'whether Congress has directly spoken to the precise question at issue.'  If so, then the court and the agency must 'give effect to the unambiguously expressed intent of Congress.'") (quoting *Chevron*, 467 U.S. at 842, 842-43 (citation omitted)).  As described at length above, Congress spoke directly and unambiguously to the precise question at issue.  *See* 31 U.S.C. § 1324(b) (appropriating money "only for . . . refunds due . . . from section . . . 36B.").  The Secretaries insist nonetheless that the Court should interpret "36B" to include Section 1402 reimbursements.  It cannot be done.  *See* 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made"); *Remission to Guam*, B-114808, 1979 WL 12213, at *3 (Comp. Gen. Aug. 7, 1979) ("This principle is even more important in the case of a permanent appropriation.").

### D.  Standing

The Secretaries invite the Court to revisit its standing analysis.  Sec'y Mot. at 33-34.  "Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994).

The Secretaries believe that they have proven this case to be only about statutory interpretation and implementation.  Sec'y Mot. at 34 ("As should be apparent from the foregoing discussion, this case indeed involves solely a dispute over the meaning of federal statutes.").  This argument was raised in their motion to dismiss, Defs. Reply [Dkt. 26] at 10 ("In short, the

House has described two relatively straight-forward differences of opinion between the

Legislative and Executive Branches as to the interpretation of federal law."), and addressed in

the Court's prior opinion, 130 F. Supp. 3d at 74 n.24 ("The Secretaries' primary defense will be

that an appropriation *has* been made, which will require reading the statute.  But that is an

antecedent determination to a constitutional claim.") (emphasis in original).

       The Court has not changed its mind.  While it is true that the Secretaries' defense

in this case requires interpreting federal statutes, the House of Representatives' claim under the

Appropriations Clause does not.  *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn

from the Treasury, but in Consequence of Appropriations made by Law.").  Instead, the

interpretation of a federal statute only becomes necessary when a defendant raises such a statute

as a defense.  Such a defense does not turn a constitutional claim into a statutory dispute.  The

House's injury depends on the Constitution and not on the U.S. Code.  The Secretaries' standing

argument will be denied.

## IV.  CONCLUSION

       The Court will grant summary judgment to the House of Representatives and

enter judgment in its favor.  The Court will also enjoin any further reimbursements under Section

1402 until a valid appropriation is in place.  However, the Court will stay its injunction pending

any appeal by the parties.  A memorializing Order accompanies this Opinion.


Date: May 12, 2016

                              _____/s/_____
                              ROSEMARY M. COLLYER
                              United States District Judge