# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:14−cv−01967−RMC

UNITED STATES HOUSE OF REPRESENTATIVES v.
BURWELL et al
Assigned to: Judge Rosemary M. Collyer
Demand: $0
Cause: 28:1331 Fed. Question

Date Filed: 11/21/2014
Date Terminated: 05/12/2016
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**UNITED STATES HOUSE OF
REPRESENTATIVES**

represented by **Eleni Maria Roumel**
U.S. HOUSE OF REPRESENTATIVES
Office of the General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225−9700
Fax: (202) 226−1360
Email: eleni.roumel@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Isaac Benjamin Rosenberg**
U.S. HOUSE OF REPRESENTATIVES
Office of the General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225−9700
Fax: (202) 226−1360
Email: isaac.rosenberg@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Kerry William Kircher**
U.S. HOUSE OF REPRESENTATIVES
Office of the General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225−9700
Fax: (202) 226−1360
Email: kerry.kircher@mail.house.gov
*TERMINATED: 05/04/2016*

**Kimberly Ann Hamm**
U.S. HOUSE OF REPRESENTATIVES
Office of the General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225−9700
Fax: (202) 226−1360

Email: kimberly.hamm@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Todd Barry Tatelman**
U.S. HOUSE OF REPRESENTATIVES
Office of the General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225−9700
Fax: (202) 226−1360
Email: todd.tatelman@mail.house.gov
*ATTORNEY TO BE NOTICED*

**William Bullock Pittard , IV**
U.S. HOUSE OF REPRESENTATIVES
Office of the General Counsel
219 Cannon House Office Building
Washington, DC 20515
(202) 225−9700
Fax: (202) 226−1360
Email: william.pittard@mail.house.gov
*ATTORNEY TO BE NOTICED*

**Jonathan Robert Turley**
GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL
2000 H Street, NW
Washington, DC 20052
(202) 994−7001
Fax: (202) 994−9811
Email: jturley@law.gwu.edu
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SYLVIA MATHEWS BURWELL**
*in her official capacity as Secretary of the*
*United States Department of Health and*
*Human Services*

represented by **Joel L. McElvain**
U.S. DEPARTMENT OF JUSTICE
Civil Division
20 Massachusetts Avenue, NW
Room 7200
Washington, DC 20530
(202) 514−2988
Fax: (202) 616−8460
Email: joel.l.mcelvain@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J.B. Lawrence**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, DC 20044
(202) 616−8105
Fax: (202) 616−8470
Email: matthew.lawrence@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES** | represented by | **Joel L. McElvain**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew J.B. Lawrence**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **JACOB J. LEW**<br>*in his official capacity as Secretary of the United States Department of the Treasury* | represented by | **Joel L. McElvain**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew J.B. Lawrence**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF THE TREASURY** | represented by | **Joel L. McElvain**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew J.B. Lawrence**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **STATE OF WEST VIRGINIA** | represented by | **Elbert Lin**<br>OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL<br>Solicitor General<br>1900 Kanawha Boulevard East<br>State Capitol Building 1, Room 26−E<br>Charleston, WV 25305<br>304.558.2021<br>Email: elbert.lin@wvago.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

**STATE OF OKLAHOMA**                    represented by   **Patrick R. Wyrick**
ATTORNEY GENERAL OF
OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 522−4448
Email: patrick.wyrick@oag.ok.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Movant**

**STATE OF ARIZONA**


**Movant**

**STATE OF LOUISIANA**                   represented by   **James D. Caldwell**
LOUISIANA ATTORNEY GENERAL
Post Office Box 94005
Baton Rouge, LA 70804−9005
(225) 326−6705
Email: Caldwellb@ag.state.la.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Movant**

**STATE OF SOUTH CAROLINA**              represented by   **Alan McCrory Wilson**
OFFICE OF THE ATTORNEY
GENERAL, STATE OF SOUTH
CAROLINA
P.O. Box 11549
1000 Assembly Street
Columbia, SC 29211
(803) 734−3970
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Movant**

**STATE OF TEXAS**


**Amicus**

**MEMBERS OF CONGRESS**                  represented by   **Elizabeth Bonnie Wydra**
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1200 18th Street, NW
Washington, DC 20036
(202) 296−6889
Email: elizabeth@theusconstitution.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ECONOMIC AND HEALTH POLICY SCHOLARS**

represented by **Matthew E. Price**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001−4412
(202) 639−6873
Fax: (202) 661−4802
Email: mprice@jenner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/21/2014 | 1 | | COMPLAINT against All Defendants (Fee Status:Filing Fee Waived) filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Turley, Jonathan) (Entered: 11/21/2014) |
| 11/21/2014 | | | Case Assigned to Judge Rosemary M. Collyer. (kb) (Entered: 11/21/2014) |
| 11/21/2014 | 2 | | SUMMONS (4) Issued Electronically as to SYLVIA MATHEWS BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (Attachments: # 1 Consent Form, # 2 Notice of Consent)(kb) (Entered: 11/21/2014) |
| 11/21/2014 | 3 | | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 11/21/2014. Answer due for ALL FEDERAL DEFENDANTS by 1/20/2015. (Turley, Jonathan) Modified on 11/24/2014 (jf, ). (Entered: 11/21/2014) |
| 11/24/2014 | | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 3 Summons Returned Executed as to US Attorney, was entered in error and counsel was instructed to refile said pleading as to the correct defendants. Summons have not been issued to the USA or USAG. (jf, ) (Entered: 11/24/2014) |
| 11/25/2014 | 4 | | REQUEST FOR SUMMONS TO ISSUE *to U.S. Attorney General* by UNITED STATES HOUSE OF REPRESENTATIVES re 1 Complaint filed by UNITED STATES HOUSE OF REPRESENTATIVES. Related document: 1 Complaint filed by UNITED STATES HOUSE OF REPRESENTATIVES.(Turley, Jonathan) (Entered: 11/25/2014) |
| 11/25/2014 | 5 | | REQUEST FOR SUMMONS TO ISSUE *to U.S. Attorney for the District of Columbia* by UNITED STATES HOUSE OF REPRESENTATIVES re 1 Complaint filed by UNITED STATES HOUSE OF REPRESENTATIVES. Related document: 1 Complaint filed by UNITED STATES HOUSE OF REPRESENTATIVES.(Turley, Jonathan) (Entered: 11/25/2014) |
| 11/26/2014 | 6 | | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (jf, ) (Entered: 11/26/2014) |

| 11/26/2014 | 7 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 11/26/2014. Answer due for ALL FEDERAL DEFENDANTS by 1/25/2015. (Turley, Jonathan) (Entered: 11/26/2014) |
|---|---|---|---|
| 12/03/2014 | 8 | | NOTICE of Appearance by Kerry William Kircher on behalf of UNITED STATES HOUSE OF REPRESENTATIVES (Kircher, Kerry) (Entered: 12/03/2014) |
| 12/03/2014 | 9 | | NOTICE of Appearance by William Bullock Pittard, IV on behalf of UNITED STATES HOUSE OF REPRESENTATIVES (Pittard, William) (Entered: 12/03/2014) |
| 12/03/2014 | 10 | | NOTICE of Appearance by Todd Barry Tatelman on behalf of UNITED STATES HOUSE OF REPRESENTATIVES (Tatelman, Todd) (Entered: 12/03/2014) |
| 12/03/2014 | 11 | | NOTICE of Appearance by Eleni Maria Roumel on behalf of UNITED STATES HOUSE OF REPRESENTATIVES (Roumel, Eleni) (Entered: 12/03/2014) |
| 12/03/2014 | 12 | | NOTICE of Appearance by Isaac Benjamin Rosenberg on behalf of UNITED STATES HOUSE OF REPRESENTATIVES (Rosenberg, Isaac) (Entered: 12/03/2014) |
| 12/04/2014 | 13 | | NOTICE of Appearance by Kimberly Ann Hamm on behalf of UNITED STATES HOUSE OF REPRESENTATIVES (Hamm, Kimberly) (Entered: 12/04/2014) |
| 12/11/2014 | 14 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SYLVIA MATHEWS BURWELL served on 11/25/2014 (Kircher, Kerry) (Entered: 12/11/2014) |
| 12/11/2014 | 15 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES served on 11/25/2014 (Kircher, Kerry) (Entered: 12/11/2014) |
| 12/11/2014 | 16 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JACOB J. LEW served on 11/26/2014 (Kircher, Kerry) (Entered: 12/11/2014) |
| 12/11/2014 | 17 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF THE TREASURY served on 11/26/2014 (Kircher, Kerry) (Entered: 12/11/2014) |
| 12/19/2014 | 18 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 12/1/2014. (Kircher, Kerry) (Entered: 12/19/2014) |
| 01/07/2015 | 19 | | NOTICE *of Commencement of the 114th Congress* by UNITED STATES HOUSE OF REPRESENTATIVES (Turley, Jonathan) (Entered: 01/07/2015) |
| 01/26/2015 | 20 | | MOTION to Dismiss by SYLVIA MATHEWS BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(McElvain, Joel) (Entered: 01/26/2015) |

| | | | |
|---|---|---|---|
| 01/30/2015 | 21 | | MOTION for Briefing Schedule by UNITED STATES HOUSE OF REPRESENTATIVES (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit 1)(Turley, Jonathan). Added MOTION for Extension of Time on 2/2/2015 (rdj). (Entered: 01/30/2015) |
| 02/09/2015 | | | MINUTE ORDER denying 21 Plaintiff's Motion for Briefing Schedule and granting 21 Plaintiff's Unopposed Motion for Extension of Time to Respond to 20 Defendants' Motion to Dismiss. Plaintiff shall respond only to the arguments raised in Defendants' Motion to Dismiss –– that is, whether Plaintiff has standing to pursue this action and whether Plaintiff has a cause of action under the Declaratory Judgment Act –– no later than February 27, 2015. Signed by Judge Rosemary M. Collyer on February 9, 2015. (lcrmc3) (Entered: 02/09/2015) |
| 02/09/2015 | | | Set/Reset Deadlines/Hearings: Response to 20 due by 2/27/2015 (cdw) (Entered: 02/09/2015) |
| 02/27/2015 | 22 | | Memorandum in opposition to re 20 MOTION to Dismiss filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit A – CRS Memorandum, # 2 Text of Proposed Order)(Turley, Jonathan) (Entered: 02/27/2015) |
| 03/06/2015 | 23 | | MOTION for Extension of Time to File Response/Reply as to 20 MOTION to Dismiss by SYLVIA MATHEWS BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY (Attachments: # 1 Text of Proposed Order)(McElvain, Joel) (Entered: 03/06/2015) |
| 03/06/2015 | | | MINUTE ORDER directing Plaintiff to respond to 23 Defendants' Motion for Extension of Time to File Response/Reply no later than March 9, 2015. Signed by Judge Rosemary M. Collyer on March 6, 2015. (lcrmc3) (Entered: 03/06/2015) |
| 03/06/2015 | 24 | | MOTION for Leave to File *Amicus Curiae Brief* by STATE OF WEST VIRGINIA, STATE OF OKLAHOMA, STATE OF ARIZONA, STATE OF LOUISIANA, STATE OF SOUTH CAROLINA, STATE OF TEXAS (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Lin, Elbert) (Entered: 03/06/2015) |
| 03/06/2015 | | | Set/Reset Deadlines/Hearings: Response to 23 due by 3/9/2015. (cdw) (Entered: 03/09/2015) |
| 03/09/2015 | 25 | | RESPONSE re 23 MOTION for Extension of Time to File Response/Reply as to 20 MOTION to Dismiss filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Turley, Jonathan) (Entered: 03/09/2015) |
| 03/10/2015 | | | MINUTE ORDER granting 23 Defendants' Motion for Extension of Time to File Reply in Support of their Motion to Dismiss. Defendants shall file their Reply no later than March 31, 2015; there shall be no further extensions. Signed by Judge Rosemary M. Collyer on March 10, 2015. (lcrmc3) (Entered: 03/10/2015) |
| 03/10/2015 | | | Set/Reset Deadlines/Hearings: Reply to 20 due by 3/31/2015. (cdw) (Entered: 03/11/2015) |
| 03/31/2015 | 26 | | |

| | | | |
|---|---|---|---|
| | | | REPLY to opposition to motion re 20 MOTION to Dismiss filed by SYLVIA MATHEWS BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (McElvain, Joel) (Entered: 03/31/2015) |
| 04/06/2015 | 27 | | ERRATA by UNITED STATES HOUSE OF REPRESENTATIVES 22 Memorandum in Opposition filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Turley, Jonathan) (Entered: 04/06/2015) |
| 04/13/2015 | 28 | | Unopposed MOTION for Oral Argument by UNITED STATES HOUSE OF REPRESENTATIVES re 20 MOTION to Dismiss (Turley, Jonathan) Modified on 4/13/2015 (jf, ). (Entered: 04/13/2015) |
| 04/13/2015 | | | MINUTE ORDER granting 28 Plaintiff's Unopposed Request for Oral Argument. The Deputy Clerk is directed to set a date for oral argument. Signed by Judge Rosemary M. Collyer on April 13, 2015. (lcrmc3) (Entered: 04/13/2015) |
| 04/24/2015 | | | Set/Reset Deadlines/Hearings: Motion Hearing re 20 set for 5/28/2015 at 10:00 AM before Judge Rosemary M. Collyer. Courtroom # to be determined at a later date. (cdw) (Entered: 04/24/2015) |
| 05/06/2015 | 29 | | NOTICE OF SUPPLEMENTAL AUTHORITY by UNITED STATES HOUSE OF REPRESENTATIVES (Attachments: # 1 Exhibit)(Turley, Jonathan) (Entered: 05/06/2015) |
| 05/27/2015 | | | Set/Reset Deadlines/Hearings: Motion Hearing re 20 set for 5/28/2015 at 10:00 AM in Courtroom 8 before Judge Rosemary M. Collyer. (cdw) (Entered: 05/27/2015) |
| 05/28/2015 | | | Minute Entry for proceedings held before Judge Rosemary M. Collyer: Motion Hearing held on 5/28/2015 re 20 Motion to Dismiss. Motion heard and taken under advisement. (Court Reporter: Crystal Pilgrim) (cdw) (Entered: 05/28/2015) |
| 06/01/2015 | | | MINUTE ORDER. The parties are directed to meet and confer and, no later than June 15, 2015, submit a stipulated record of the request(s), consideration, and funding decisions for Sections 1401 and 1402 of the Affordable Care Act in the FY 2014 Appropriations Bills, including any action by Defendant(s) to withdraw the funding request for Section 1402, with supporting documentation. The parties shall submit a timeline with the record. If the parties wish to submit supplemental briefs with respect to the factual record and timeline, they should submit a joint proposed briefing schedule in conjunction with their submission of the record. Signed by Judge Rosemary M. Collyer on June 1, 2015. (lcrmc3) (Entered: 06/01/2015) |
| 06/01/2015 | | | Set/Reset Deadlines/Hearings: Stipulated record of request(s) due by 6/15/2015. (cdw) (Entered: 06/02/2015) |
| 06/15/2015 | 30 | | STIPULATION re Order,, *Joint Submission by Defendants and* by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit 1A, # 2 Exhibit 1B, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12A, # 14 Exhibit 12B, # 15 Exhibit A, # 16 Exhibit B, # 17 Exhibit C, # 18 Exhibit D, # 19 Exhibit E, # 20 Exhibit F, # 21 Exhibit G, # 22 |

| | | | |
|---|---|---|---|
| | | | Exhibit H, # 23 Exhibit I, # 24 Exhibit J, # 25 Exhibit K, # 26 Exhibit L, # 27 Exhibit M, # 28 Exhibit N)(Kircher, Kerry) (Entered: 06/15/2015) |
| 06/16/2015 | | | MINUTE ORDER directing that, no later than July 1, 2015, Defendants shall submit a supplemental memorandum of no more than 12 pages and Plaintiff shall also submit a supplemental memorandum of no more than 12 pages. Defendants may submit a supplemental reply, if any, of no more than 8 pages, no later than July 17, 2015, and Plaintiff may also submit a supplemental reply, if any, no later than July 17, 2015. Signed by Judge Rosemary M. Collyer on June 16, 2015. (lcrmc3) (Entered: 06/16/2015) |
| 06/26/2015 | 31 | | TRANSCRIPT OF PROCEEDINGS before Judge Rosemary M. Collyer held on 05/28/15; Page Numbers: 1−77. Date of Issuance:06/26/15. Court Reporter/Transcriber Crystal M. Pilgrim, Telephone number 202.354.3127, Court Reporter Email Address : crystalpilgrim@aol.com. For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter. **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 7/17/2015. Redacted Transcript Deadline set for 7/27/2015. Release of Transcript Restriction set for 9/24/2015.(Pilgrim, Crystal) (Entered: 06/26/2015) |
| 06/30/2015 | 32 | | NOTICE *OF NEW AUTHORITY* by UNITED STATES HOUSE OF REPRESENTATIVES (Attachments: # 1 Exhibit)(Turley, Jonathan) (Entered: 06/30/2015) |
| 07/01/2015 | 33 | | SUPPLEMENTAL MEMORANDUM to re 22 Memorandum in Opposition filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Turley, Jonathan) (Entered: 07/01/2015) |
| 07/01/2015 | 34 | | SUPPLEMENTAL MEMORANDUM to re 20 MOTION to Dismiss filed by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (McElvain, Joel) (Entered: 07/01/2015) |
| 07/17/2015 | 35 | | SUPPLEMENTAL MEMORANDUM to re 20 MOTION to Dismiss *Defendants' Supplemental Reply Memorandum in Support of Their Motion to Dismiss the Complaint* filed by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (McElvain, Joel) (Entered: 07/17/2015) |
| 07/17/2015 | 36 | | |

| | | | |
|---|---|---|---|
| | | | RESPONSE re 32 Notice (Other) filed by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (McElvain, Joel) (Entered: 07/17/2015) |
| 07/17/2015 | 37 | | RESPONSE re 34 Supplemental Memorandum filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Turley, Jonathan) (Entered: 07/17/2015) |
| 07/20/2015 | 38 | | MOTION to Strike 36 Response to Document by UNITED STATES HOUSE OF REPRESENTATIVES (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order (Alternative))(Turley, Jonathan). Added MOTION for Leave to File on 7/21/2015 (zrdj). (Entered: 07/20/2015) |
| 07/29/2015 | 39 | | Memorandum in opposition to re 38 MOTION to Strike 36 Response to Document MOTION for Leave to File filed by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (McElvain, Joel) (Entered: 07/29/2015) |
| 08/05/2015 | 40 | | REPLY to opposition to motion re 38 MOTION to Strike 36 Response to Document MOTION for Leave to File filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Turley, Jonathan) (Entered: 08/05/2015) |
| 09/09/2015 | | | MINUTE ORDER granting 24 Motion for Leave to File Brief as Amici Curiae. Signed by Judge Rosemary M. Collyer on 9/9/2015. (lcrmc3) (Entered: 09/09/2015) |
| 09/09/2015 | 41 | 57 | MEMORANDUM AND OPINION. Signed by Judge Rosemary M. Collyer on 9/9/2015. (lcrmc3) (Entered: 09/09/2015) |
| 09/09/2015 | 42 | 56 | ORDER granting in part and denying in part 20 Defendants' Motion to Dismiss. Counts II−IV and VI−VIII are dismissed. Count V is dismissed in part. Plaintiff's 38 Motion to Strike or for Leave to File is denied. The parties shall file a joint proposed briefing schedule for dispositive motions by September 23, 2015. Signed by Judge Rosemary M. Collyer on 9/9/2015. (lcrmc3) (Entered: 09/09/2015) |
| 09/09/2015 | | | Set/Reset Deadlines/Hearings: Joint Proposed Briefing Schedule due by 9/23/2015. (cdw) (Entered: 09/10/2015) |
| 09/21/2015 | 43 | | NOTICE of Plaintiff's Response to Court's September 9, 2015 Order by UNITED STATES HOUSE OF REPRESENTATIVES re 42 Order on Motion to Strike, Order on Motion for Leave to File, Order on Motion to Dismiss,,, (Attachments: # 1 Exhibit)(Turley, Jonathan) (Entered: 09/21/2015) |
| 09/21/2015 | 44 | | MOTION for Certification for interlocutory appeal by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY (Attachments: # 1 Text of Proposed Order)(McElvain, Joel) (Entered: 09/21/2015) |
| 09/21/2015 | 45 | | MOTION to Stay re 42 Order on Motion to Strike, Order on Motion for Leave to File, Order on Motion to Dismiss,,, *Defendants' Motion to Defer the Filing of a Joint Proposed Briefing Schedule* by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN |

| | | | |
|---|---|---|---|
| | | | SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY (Attachments: # 1 Text of Proposed Order)(McElvain, Joel) (Entered: 09/21/2015) |
| 09/22/2015 | 46 | | NOTICE *OF INTENT TO RESPOND* by UNITED STATES HOUSE OF REPRESENTATIVES re 45 MOTION to Stay re 42 Order on Motion to Strike, Order on Motion for Leave to File, Order on Motion to Dismiss,,, *Defendants' Motion to Defer the Filing of a Joint Proposed Briefing Schedule* (Kircher, Kerry) (Entered: 09/22/2015) |
| 09/23/2015 | 47 | | RESPONSE re 45 MOTION to Stay re 42 Order on Motion to Strike, Order on Motion for Leave to File, Order on Motion to Dismiss,,, *Defendants' Motion to Defer the Filing of a Joint Proposed Briefing Schedule* filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Turley, Jonathan) (Entered: 09/23/2015) |
| 09/23/2015 | 48 | | NOTICE *Defendants' Response to This Court's Order with Respect to the Filing of a Joint Proposed Briefing Schedule* by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY re 42 Order on Motion to Strike, Order on Motion for Leave to File, Order on Motion to Dismiss,,, (McElvain, Joel) (Entered: 09/23/2015) |
| 10/05/2015 | 49 | | RESPONSE re 44 MOTION for Certification for interlocutory appeal filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Turley, Jonathan) (Entered: 10/05/2015) |
| 10/15/2015 | 50 | | REPLY to opposition to motion re 44 MOTION for Certification for interlocutory appeal filed by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (McElvain, Joel) (Entered: 10/15/2015) |
| 10/19/2015 | 51 | | ORDER denying Defendants' 44 Motion for Certification for Interlocutory Appeal. Defendants' 45 Motion to Stay is denied as moot. Defendants shall answer the 1 Complaint by November 2, 2015. Dispositive motions are due December 2, 2015. Oppositions are due January 4, 2016. Replies are due January 18, 2016. See Order for details. Signed by Judge Rosemary M. Collyer on 10/19/2015. (lcrmc3) (Entered: 10/19/2015) |
| 10/19/2015 | | | Set/Reset Deadlines/Hearings: Answer to complaint due by 11/2/2015. The House's Summary Judgment motion due by 12/2/2015. Response to Motion for Summary Judgment due by 1/4/2016. Reply to Motion for Summary Judgment due by 1/18/2016. Defendants' Cross Motion due by 12/2/2015. Response to Cross Motion due by 1/4/2016. Reply to Cross Motion due by 1/18/2016. (cdw) (Entered: 10/19/2015) |
| 11/02/2015 | 52 | | ANSWER to Complaint by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY.(McElvain, Joel) (Entered: 11/02/2015) |
| 12/02/2015 | 53 | | MOTION for Summary Judgment , *Statement of Material Facts, Memorandum of Points and Authorities in Support* by UNITED STATES HOUSE OF |

| | | | |
|---|---|---|---|
| | | | REPRESENTATIVES (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Text of Proposed Order)(Turley, Jonathan) (Entered: 12/02/2015) |
| 12/02/2015 | 54 | | NOTICE of Appearance by Matthew J.B. Lawrence on behalf of All Defendants (Lawrence, Matthew) (Entered: 12/02/2015) |
| 12/02/2015 | 55 | | MOTION for Summary Judgment by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Text of Proposed Order)(McElvain, Joel) (Entered: 12/02/2015) |
| 12/08/2015 | 56 | | MOTION for Leave to File *Brief Amici Curiae in Support of Defendants* by Members of Congress (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support Proposed Brief Amici Curiae)(Wydra, Elizabeth) (Entered: 12/08/2015) |
| 12/08/2015 | 57 | | WITHDRAWN PURSUANT TO 61 NOTICE FILED 12/15/2015.....NOTICE FILED RESPONSE re 56 MOTION for Leave to File *Brief Amici Curiae in Support of Defendants* filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Turley, Jonathan) Modified on 12/15/2015 (zrdj). (Entered: 12/08/2015) |
| 12/08/2015 | 58 | | MOTION for Leave to File *Brief as Amici Curiae in Support of Defendants* by ECONOMIC AND HEALTH POLICY SCHOLARS (Attachments: # 1 Text of Proposed Order, # 2 Proposed Amici Curiae Brief)(Price, Matthew) (Entered: 12/08/2015) |
| 12/09/2015 | 59 | | WITHDRAWN PURSUANT TO 61 NOTICE FILED 12/15/2015.....RESPONSE re 58 MOTION for Leave to File *Brief as Amici Curiae in Support of Defendants* filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Turley, Jonathan) Modified on 12/15/2015 (zrdj). (Entered: 12/09/2015) |
| 12/14/2015 | 60 | | Joint MOTION for Extension of Time to File *Joint Motion to Modify Briefing Schedule* by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY (Attachments: # 1 Text of Proposed Order)(McElvain, Joel) (Entered: 12/14/2015) |
| 12/14/2015 | | | MINUTE ORDER granting 60 Joint Motion for Extension of Time and amending previous 51 Order. Oppositions to dispositive motions are due January 15, 2016. Replies are due February 5, 2016. Signed by Judge Rosemary M. Collyer on 12/14/2015. (lcrmc3) (Entered: 12/14/2015) |
| 12/14/2015 | | | Set/Reset Deadlines/Hearings: Responses to Dispositive Motions due by 1/15/2016. Replies to Dispositive Motions due by 2/5/2016. (cdw) (Entered: 12/15/2015) |

| 12/15/2015 | 61 | | NOTICE *OF WITHDRAWAL OF OPPOSITIONS* by UNITED STATES HOUSE OF REPRESENTATIVES re 57 Response to motion, 59 Response to motion (Turley, Jonathan) (Entered: 12/15/2015) |
|---|---|---|---|
| 12/16/2015 | | | MINUTE ORDER granting 58 Unopposed Motion for Leave to File Amicus Brief by Economic and Health Policy Scholars. Signed by Judge Rosemary M. Collyer on 12/16/2015. (lcrmc3) (Entered: 12/16/2015) |
| 12/16/2015 | 62 | | ORDER granting in part and denying in part 56 Unopposed Motion for Leave to File Amicus Brief by Members of Congress. See Order for details. Signed by Judge Rosemary M. Collyer on 12/16/2015. (lcrmc3) (Entered: 12/16/2015) |
| 12/16/2015 | 63 | | AMICUS BRIEF by MEMBERS OF CONGRESS. (zrdj) (Entered: 12/16/2015) |
| 12/16/2015 | 64 | | AMICUS BRIEF by ECONOMIC AND HEALTH POLICY SCHOLARS. (zrdj) (Entered: 12/16/2015) |
| 01/15/2016 | 65 | | Memorandum in opposition to re 53 MOTION for Summary Judgment *, Statement of Material Facts, Memorandum of Points and Authorities in Support* filed by SYLVIA M. BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (Attachments: # 1 Statement of Facts Response to Plaintiff's Statement of Material Facts, # 2 Exhibit 14, # 3 Exhibit 15, # 4 Exhibit 16, # 5 Exhibit 17, # 6 Exhibit 18, # 7 Exhibit 19, # 8 Exhibit 20, # 9 Exhibit 21, # 10 Exhibit 22, # 11 Exhibit 23, # 12 Exhibit 24, # 13 Exhibit 25)(McElvain, Joel) (Entered: 01/15/2016) |
| 01/15/2016 | 66 | | Memorandum in opposition to re 55 MOTION for Summary Judgment filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Statement of Facts Response to Defendants' Statement, # 2 Exhibit Q, # 3 Exhibit R, # 4 Exhibit S, # 5 Exhibit T, # 6 Exhibit U, # 7 Exhibit V, # 8 Exhibit W, # 9 Exhibit X, # 10 Text of Proposed Order)(Turley, Jonathan) (Entered: 01/15/2016) |
| 01/19/2016 | 67 | | ERRATA by UNITED STATES HOUSE OF REPRESENTATIVES 66 Memorandum in Opposition, filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Errata Corrected Title Page)(Turley, Jonathan) (Entered: 01/19/2016) |
| 02/04/2016 | 68 | | ERRATA by UNITED STATES HOUSE OF REPRESENTATIVES 66 Memorandum in Opposition, filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Errata Corrected Exhibit R, # 2 Errata Corrected Exhibit R−1, # 3 Errata Corrected Table of Exhibits, # 4 Errata Corrected Table of Authorities, # 5 Errata Corrected Page 6, # 6 Errata Corrected Page 10)(Turley, Jonathan) (Entered: 02/04/2016) |
| 02/05/2016 | 69 | | REPLY to opposition to motion re 53 MOTION for Summary Judgment *, Statement of Material Facts, Memorandum of Points and Authorities in Support* filed by UNITED STATES HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit Y, # 2 Exhibit Z, # 3 Exhibit AA, # 4 Exhibit BB, # 5 Exhibit CC)(Turley, Jonathan) (Entered: 02/05/2016) |
| 02/05/2016 | 70 | | REPLY to opposition to motion re 55 MOTION for Summary Judgment filed by UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT OF THE TREASURY. (Attachments: # 1 |

| | | | Request for Oral Argument, # 2 Exhibit 26, # 3 Exhibit 27)(McElvain, Joel) (Entered: 02/05/2016) |
|---|---|---|---|
| 02/16/2016 | 71 | | NOTICE *OF SUPPLEMENTAL INFORMATION* by UNITED STATES HOUSE OF REPRESENTATIVES re 53 MOTION for Summary Judgment *, Statement of Material Facts, Memorandum of Points and Authorities in Support* (Attachments: # 1 Exhibit)(Turley, Jonathan) (Entered: 02/16/2016) |
| 05/04/2016 | 72 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to UNITED STATES HOUSE OF REPRESENTATIVES. Attorney Kerry William Kircher terminated. (Kircher, Kerry) (Entered: 05/04/2016) |
| 05/12/2016 | 73 | 18 | OPINION. Signed by Judge Rosemary M. Collyer on 5/12/2016. (lcrmc3) (Entered: 05/12/2016) |
| 05/12/2016 | 74 | 17 | ORDER granting 53 Plaintiff's Motion for Summary Judgment; entering judgment in Plaintiff's favor; denying 55 Defendants' Motion for Summary Judgment; and enjoining reimbursements paid to issuers of qualified health plans for the cost−sharing reductions mandated by Section 1402 of the Affordable Car Act, Pub. L. 111−148. The injunction is STAYED pending appeal. This is a final, appealable Order. This case is closed. Signed by Judge Rosemary M. Collyer on 5/12/2016. (lcrmc3) (Entered: 05/12/2016) |
| 07/06/2016 | 75 | 15 | NOTICE OF APPEAL TO DC CIRCUIT COURT re 41 , 42 , 73 , 74 by UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, SYLVIA MATHEWS BURWELL, JACOB J. LEW, UNITED STATES DEPARTMENT OF THE TREASURY. Fee Status: No Fee Paid. Parties have been notified. (McElvain, Joel) Modified on 7/6/2016 to add linkage (zrdj). (Entered: 07/06/2016) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES HOUSE OF REPRESENTATIVES**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-01967-RMC |
| | ) | |
| **SYLVIA MATHEWS BURWELL**, in her official | ) | |
| capacity as Secretary of Health and Human Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that the defendants, Sylvia Mathews Burwell, in her official capacity as Secretary of Health and Human Services; the United States Department of Health and Human Services; Jacob J. Lew, in his official capacity as Secretary of the Treasury; and the United States Department of the Treasury, hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the final Order (ECF No. 74) and Opinion (ECF No. 73), granting summary judgment in favor of the plaintiff, denying the defendants' motion for summary judgment, enjoining reimbursements paid to issuers of qualified health plans for the cost-sharing reductions mandated by Section 1402 of the Affordable Care Act, and staying that injunction pending appeal, entered in this action on May 12, 2016, and from all previous rulings in this action, including the Memorandum and Opinion (ECF No. 41) and Order (ECF No. 42) granting in part and denying in part the defendants' motion to dismiss, entered in this action on September 9, 2015.

Dated:   July 6, 2016                              Respectfully submitted,

                                                   BENJAMIN C. MIZER
                                                   Principal Deputy Assistant Attorney General

                                                   CHANNING D. PHILLIPS
                                                   United States Attorney

                                                   JENNIFER D. RICKETTS
                                                   Director

                                                   SHEILA LIEBER
                                                   Deputy Branch Director


                                                   ___/s/ Joel McElvain_____
                                                   JOEL McELVAIN
                                                   Assistant Branch Director
                                                   MATTHEW J.B. LAWRENCE
                                                   Trial Attorney
                                                   U.S. Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Avenue, NW
                                                   Washington, D.C. 20530
                                                   (202) 514-2988
                                                   Joel.McElvain@usdoj.gov

                                                   *Counsel for the Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**UNITED STATES HOUSE OF
REPRESENTATIVES,**

   **Plaintiff,**

    **v.**            **Civil Action No. 14-1967 (RMC)**

**SYLVIA MATTHEWS BURWELL in her
official capacity as Secretary of the United States
Department of Health and Human Services, *et al.***

   **Defendants.**

---

## ORDER

For the reasons stated in the contemporaneous Opinion, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment [Dkt. 53] is

**GRANTED** and that **JUDGMENT** is entered in favor of Plaintiff; and it is

**FURTHER ORDERED** that Defendants' Motion for Summary Judgment [Dkt.

55] is **DENIED**; and it is

**FURTHER ORDERED** that reimbursements paid to issuers of qualified health

plans for the cost-sharing reductions mandated by Section 1402 of the Affordable Car Act, Pub.

L. 111-148, are **ENJOINED** pending an appropriation for such payments; and it is

**FURTHER ORDERED** that the injunction is **STAYED** pending appeal.

This is a final, appealable order. *See* Fed. R. App. P. 4. This case is closed.


Date: May 12, 2016          /s/
              ROSEMARY M. COLLYER
              United States District Judge

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>———————————————————————</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>**UNITED STATES HOUSE OF**</td><td>)</td><td></td></tr>
<tr><td>**REPRESENTATIVES,**</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>**Plaintiff,**</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>**v.**</td><td>)</td><td>**Civil Action No. 14-1967 (RMC)**</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>**SYLVIA MATTHEWS BURWELL in her**</td><td>)</td><td></td></tr>
<tr><td>**official capacity as Secretary of the United States**</td><td>)</td><td></td></tr>
<tr><td>**Department of Health and Human Services, *et al.***</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>**Defendants.**</td><td>)</td><td></td></tr>
<tr><td>———————————————————————</td><td>)</td><td></td></tr>
</table>

### OPINION

This Court previously held that the U.S. House of Representatives "has standing to pursue its allegations that the Secretaries of Health and Human Services and of the Treasury violated Article I, § 9, cl. 7 of the Constitution when they spent public monies that were not appropriated by the Congress." *U.S. House of Reps. v. Burwell*, 130 F. Supp. 3d 53, 81 (D.D.C. 2015). The merits of that claim are now before the Court.

This case involves two sections of the Affordable Care Act: 1401 and 1402. Section 1401 provides tax credits to make insurance premiums more affordable, while Section 1402 reduces deductibles, co-pays, and other means of "cost sharing" by insurers. Section 1401 was funded by adding it to a preexisting list of permanently-appropriated tax credits and refunds. Section 1402 was not added to that list. The question is whether Section 1402 can nonetheless be funded through the same, permanent appropriation. It cannot.

"If the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). Although the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," *id.*, the statutory

1

provisions in this case are clear in isolation and in context. The Affordable Care Act unambiguously appropriates money for Section 1401 premium tax credits but not for Section 1402 reimbursements to insurers. Such an appropriation cannot be inferred. None of Secretaries' extra-textual arguments—whether based on economics, "unintended" results, or legislative history—is persuasive. The Court will enter judgment in favor of the House of Representatives and enjoin the use of unappropriated monies to fund reimbursements due to insurers under Section 1402. The Court will stay its injunction, however, pending appeal by either or both parties.

## I.  FACTS

The merits are fully briefed and ripe for resolution.[1]  The following facts are undisputed.

### A.  Constitutional Background

Congress passes all federal laws in this country.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]").  Those "Powers" includes sole authority to adopt laws that authorize the expenditure of public monies and laws that appropriate those monies.  Authorization and appropriation by Congress are nonnegotiable prerequisites to government spending: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  *Id.* art. I, § 9, cl. 7; *see also United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").  The distinction between authorizing

---

[1] *See* Pl. Mot. Summ. J. [Dkt. 53] (House Mot.); Defs. Opp'n [Dkt. 65] (Sec'y Opp'n); Pl. Reply [Dkt. 69] (House Reply); *see also* Defs. Mot. Summ. J. [Dkt. 55] (Sec'y Mot.); Pl. Opp'n [Dkt. 66] (House Opp'n); Defs. Reply [Dkt. 70] (Sec'y Reply).

legislation and appropriating legislation is relevant here and bears some discussion.

Authorizing legislation establishes or continues the operation of a federal program or agency, either indefinitely or for a specific period. GAO *Glossary* at 15.[2] Such an authorization may be part of an agency or program's organic legislation, or it may be entirely separate. *Id.* No money can be appropriated until an agency or program is authorized, although authorization may sometimes be inferred from an appropriation itself. *Id.*

Appropriation legislation "provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." *Id.* at 13. Appropriations legislation has "the limited and specific purpose of providing funds for authorized programs." *Andrus v. Sierra Club*, 442 U.S. 347, 361 (1979) (quoting *TVA v. Hill*, 437 U.S. 153, 190 (1978)). An appropriation must be expressly stated; it cannot be inferred or implied. 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made."). It is well established that "a direction to pay without a designation of the source of funds is not an appropriation." U.S. Government Accounting Office, GAO-04-261SP, *Principles of Federal Appropriations Law (Vol. I)* 2-17 (3d ed. 2004) (GAO *Principles*). The inverse is also true: the

---

[2] The Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, § 801(a), 88 Stat. 297, 327 (1974), gives the Government Accountability Office (GAO) specific duties in the budgetary arena. *See generally* 31 U.S.C. § 1112(c). One of those duties is to help "establish, maintain, and publish standard terms and classifications for fiscal, budget, and program information of the Government, including information on fiscal policy, receipts, expenditures, programs, projects, activities, and functions." *Id.* § 1112(c)(1). The most recent publication in fulfilment of that duty is GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (2005) (GAO *Glossary*). "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

3

designation of a source, without a specific direction to pay, is not an appropriation. *Id.* Both are required. *See Nevada*, 400 F.3d at 13-14. An appropriation act, "like any other statute, [must be] passed by both Houses of Congress and either signed by the President or enacted over a presidential veto." GAO *Principles* at 2-45 (citing *Friends of the Earth v. Armstrong*, 485 F.2d 1, 9 (10th Cir. 1973); *Envirocare of Utah, Inc. v. United States*, 44 Fed. Cl. 474, 482 (1999)).

Appropriations come in many forms. A "permanent" or "continuing" appropriation, once enacted, makes funds available indefinitely for their specified purpose; no further action by Congress is needed. *Nevada*, 400 F.3d at 13; GAO *Principles* at 2-14.[3] A "current appropriation," by contrast, allows an agency to obligate funds only in the year or years for which they are appropriated. GAO *Principles* at 2-14. Current appropriations often give a particular agency, program, or function its spending cap and thus constrain what that agency, program, or function may do in the relevant year(s). Most current appropriations are adopted on an annual basis and must be re-authorized for each fiscal year. Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse strings.

**B. Statutory Background**

On December 24, 2009, H.R. 3590 (111th Cong. 2009), as amended and retitled "Patient Protection and Affordable Care Act," passed the Senate by a vote of 60-39. On March 21, 2010, the House agreed to the Senate amendments by a vote of 219-212. On March 23, 2010, H.R. 3590, as agreed to by both the Senate and the House, was signed into law by the

---

[3] Examples of permanent appropriations include the Judgment Fund (31 U.S.C. § 1304(a)) and payment of interest on the national debt (31 U.S.C. § 1305(2)).

4

President.  *See* Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA).[4]  The ACA enacted a host of reforms and programs; two are relevant here.

### 1.  Section 1401 ("Refundable Tax Credit Providing Premium Assistance for Coverage under a Qualified Health Plan")

The thrust of Section 1401 was to add a new section to the Internal Revenue Code: 26 U.S.C. § 36B.  *See* ACA § 1401(a).  Section 36B provides in principal part that "there shall be allowed as a credit against the [income] tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year." 26 U.S.C. § 36B(a).  Those taxpayers "whose household income for the taxable year equals or exceeds 100 percent but does not exceed 400 percent of an amount equal to the poverty line for a family of the size involved" are entitled to tax credits to cover their health insurance premiums. 26 U.S.C. § 36B(c).  Section 1401 is codified in the Internal Revenue Code, not in Title 42.[5]

The appropriation for Section 1401 premium tax credits was made in Title 31 of the U.S. Code, "Money and Finance," which also sets out basic rules of federal appropriations. At 31 U.S.C. § 1301(d), the statute specifies that "[a] law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made."  At 31 U.S.C. § 1324, the law provides for "Refund of internal revenue collections."

---

[4] Because so much is made of the ACA's structure and the interrelation of its provisions, the Court generally will refer to the ACA sections and not the U.S. Code sections where they are codified.  *See* ACA § 1401 (codified at 26 U.S.C. §§ 36B, 280C); ACA § 1402 (codified at 42 U.S.C. § 18071); ACA § 1412 (codified at 42 U.S.C. § 18082).

[5] Section 1401 also disallows deductions for the amount of the tax credits, *see* ACA § 1401(b), directs the Comptroller General to study the affordability of health insurance, *see id.* § 1401(c), amends 31 U.S.C. § 1324(b), *see* ACA § 1401(d), and sets an effective date of December 31, 2013, *see id.* § 1401(e).

Specifically, it appropriates to the Secretary of the Treasury "[n]ecessary amounts . . . for refunding internal revenue collections as provided by law." *Id.*

The parties agree that 31 U.S.C. § 1324 constitutes a permanent appropriation for Section 1401 premium tax credits. Specifically, the ACA amended § 1324(b) so that it reads:

> Disbursements may be made from the appropriation made by this section only for—
>
> (1) refunds to the limit of liability of an individual tax account; and
>
> (2) refunds due from credit provisions of the Internal Revenue Code of 1986 (26 U.S.C. 1 *et seq.*) enacted before January 1, 1978, or enacted by the Taxpayer Relief Act of 1997, or from section 25A, 35, 36, 36A, *36B*, 168(k)(4)(F), 53(e), 54B(h), or 6431 of such Code, or due under section 3081(b)(2) of the Housing Assistance Tax Act of 2008.

31 U.S.C. 1324(b) (emphasis on term added by ACA § 1401(d)). Put simply, ACA tax credits to subsidize health insurance for eligible taxpayers are permanently funded via the reference to "36B" in 31 U.S.C. § 1324(b)(2).

## 2. Section 1402 ("Reduced Cost-Sharing for Individuals Enrolling in Qualified Health Plans")

Section 1402 of the ACA provides that "[i]n the case of an eligible insured enrolled in a qualified health plan—(1) the Secretary shall notify the issuer of the plan of such eligibility; and (2) the issuer shall reduce the cost-sharing under the plan at the level and in the manner specified in subsection (c)." ACA § 1402(a). Cost sharing includes "deductibles, coinsurance, copayments, or similar charges." ACA § 1302(c)(3)(A)(i). Section 1402 thus requires insurers offering qualified health plans through ACA Exchanges to reduce deductibles, coinsurance, copayments, and similar charges for eligible insured individuals enrolled in their plans. These reductions are referred to in the ACA as "cost-sharing reductions." *See, e.g.*, ACA §§ 1331(d)(3)(A)(i), 1402(c)(3)(B), 1412(c)(3).

The insurers are supposed to get their money back. *See* ACA § 1402(c)(3)(A) ("An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary [of HHS] of such reductions and the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions."). Nothing in Section 1402 prescribes a "periodic and timely payment[]" process, however. Nor does Section 1402 condition the insurers' obligations to reduce cost sharing on the receipt of offsetting payments.[6]

To qualify for reduced cost sharing, an individual must enroll in a qualified health plan and have a household income that "exceeds 100 percent but does not exceed 400 percent of the poverty line for a family of the size involved." 42 U.S.C. § 18071(b)(2).[7] Individuals with income between 100 and 250 percent of the poverty line qualify for an "additional reduction." *Id.* § 18071(c)(2).[8] Eligibility for premium tax credits under Section 1401 is also a prerequisite to receiving cost-sharing reductions under Section 1402. *See* ACA § 1402(f)(2) ("No cost-sharing reduction shall be allowed under this section . . . unless . . . a credit is allowed to the insured . . . under section 36B of [the Internal Revenue] Code.").

---

[6] The Court will refer to these offsetting payments as "Section 1402 reimbursements."

[7] Eligibility proceeds in two steps under Section 1402. To be an "eligible insured" generally under Section 1402, the individual can have an income up to 400 percent of the federal poverty level. *See* 42 U.S.C. § 18071(b)(2). The individual must also enroll in a "qualified health plan in the silver level." *Id.* § 18071(b)(1). But to qualify for "additional reduction for lower income insureds," the income cannot exceed 250 percent. *Id.* § 18071(c)(2).

[8] The ACA as passed on March 23, 2010 provided additional reductions only up to 200 percent of the federal poverty line. *See* Pub. L. 111-148, §§ 1401(c)(2)(A)-(B). A new subsection, (c)(2)(C), was added by the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, § 1001(b)(2)(C), 124 Stat. 1029, 1032 (Mar. 30, 2010). The new subsection raised the maximum income to 250 percent of the federal poverty line.

Section 1402 is codified not in the Internal Revenue Code, but in Title 42, which includes federal laws concerning "Public Health and Welfare." Title 42 includes such programs as Social Security, Medicare, Medicaid, and most of the ACA.

### 3. Section 1412 ("Advance Determination and Payment of Premium Tax Credits and Cost-Sharing Reductions")

Section 1412 of the ACA requires the Secretaries to consult and establish a program under which eligibility determinations are made in advance "for the premium tax credit allowable under section 36B of the Internal Revenue Code of 1986 and the cost-sharing reductions under section 1402." ACA § 1412(a)(1). After the Secretary of HHS tells the Secretary of the Treasury and the pertinent Exchange who is eligible for either benefit, Treasury "makes advance payments of such credit or reductions to the issuers of the qualified health plans [on such Exchange] in order to reduce the premiums payable by individuals eligible for such credit." *Id.* § 1412(a)(3).

### C. Other Relevant Background

During deliberations over the ACA, the Congressional Budget Office (CBO) scored Section 1402's cost-sharing reductions as "direct spending." *See, e.g.*, Sec'y Mot., Ex. 6, Letter of Douglas W. Elmendorf, Director, CBO to the Hon. Nancy Pelosi, (Mar. 20, 2010) [Dkt. 55-8] (CBO Ltr.) at tbl. 2 (listing "Premium and Cost Sharing Subsidies" as "direct spending"), *reprinted in* Cong. Budget Office, *Selected CBO Publications Related to Health Care, 2009-2010* at 20 (Dec. 2010)); CBO Ltr. at tbl. 4 (including "Exchange Subsidies & related spending" in estimating effect of ACA on the federal deficit).

During the same deliberations, several members of Congress described Sections 1401 and 1402 as costing "500 billion dollars," an estimate that almost certainly combined the costs of Section 1401's premium tax credits and Section 1402's cost-sharing reimbursements.

*See* 156 Cong. Rec. S2069, S2081 (Mar. 25, 2010) (Sen. Durbin) ("$500 billion of tax cuts and cost-sharing"); 155 Cong. Rec. S12565, S12576 (Dec. 7, 2009) (Sen. Enzi) ("this bill will commit the Federal Treasury to paying for these new subsidies for the uninsured forever"); 156 Cong. Rec. H1891, H1898 (Mar. 21, 2010) (Rep. Paulsen) ("$500 billion … [in] new entitlement spending"); 156 Cong. Rec. H1891, H1910 (Mar. 21, 2010) (Rep. Diaz-Balart) ("half a trillion  dollars . . . [for] a massive new entitlement program").

On April 10, 2013, the Office of Management and Budget (OMB) submitted the President's *Fiscal Year 2014 Budget of the U.S. Government*.  Budget [Dkt. 30-1].[9]  The Appendix to the FY 2014 Budget Request contained "more detailed financial information on individual programs and appropriation accounts than any of the other budget documents."  App. to Budget [Dkt. 30-2] at 3.  The Appendix included, among other things, "explanations of the work to be performed and the funds needed."  *Id.*  In the FY 2014 Budget Appendix, the Administration requested the following:

> For carrying out, except as otherwise provided, sections 1402 [Reduced Cost-Sharing] and 1412 [Advanced Payments] of the Patient Protection and Affordable Care Act (Public Law 111-148), such sums as necessary.  For carrying out, except as otherwise provided, such sections in the first quarter of fiscal year 2015 (including upward adjustments to prior year payments), $1,420,000,000.

*Id.* at 448.

On the same day, HHS separately submitted to the relevant appropriations committees in the House and Senate a *Justification of Estimates for Appropriations Committees*.  Justification [Dkt. 30-3].  In that document, the Centers for Medicare and Medicaid Services

---

[9] The federal budget is for fiscal years (FY) that start on October 1.  Thus, the FY 2014 Budget Request was for FY 2014, which began on October 1, 2013.

(CMS) explained:

> The FY 2014 request for Reduced Cost Sharing for Individuals
> Enrolled in Qualified Health Plans is $4.0 billion in the first year of
> operations for Health Insurance Marketplaces, also known as
> Exchanges. CMS also requests a $1.4 billion advance appropriation
> for the first quarter of FY 2015 in this budget to permit CMS to
> reimburse issuers who provided reduced cost-sharing [under Section
> 1402] in excess of the monthly advanced payments received in FY
> 2014 through the cost-sharing reduction reconciliation process.

*Id.* at 7. In its conclusion, HHS referred to "Cost-Sharing Reductions" as one of "five annually-appropriated accounts." *Id.* In a later graphic entitled "Reduced Cost Sharing," HHS listed "--" under "Budget Authority" for "FY 2013 Current Law," *id.* at 184. The chart reflects a view by HHS and OMB that no prior appropriation funded Section 1402 reduced cost sharing.[10] HHS compared the Section 1402 program to "other appropriated entitlements such as Medicaid." *Id.*

On May 17, 2013, the Administration submitted a number of amendments to the FY 2014 Budget Request. *See* Amendments [Dkt. 30-4]. The Secretaries acknowledge that neither these amendments, nor any other post-budget submission, withdrew the request for an annual appropriation for Section 1402 reimbursements. *See* Joint Stipulation [Dkt. 30] at 3 n.1.

On May 20, 2013, OMB issued its *Sequestration Preview Report* for FY 2014, which listed "Reduced Cost Sharing" as subject to sequestration in the amount of $286 million, or 7.2% of the requested appropriation. Report [Dkt. 30-18] at 23. Because permanently-appropriated programs (such as Section 1401) are exempt from sequestration, OMB's including Section 1402 on a list of sequestration-bound programs appears to acknowledge that no permanent appropriation was available for Section 1402 reimbursements.

---

[10] Interestingly, both Secretaries in this case are former OMB Directors. Secretary Burwell was nominated one week before the FY 2014 Budget was submitted to Congress and confirmed on April 24, 2013.

On July 13, 2013, the Senate Appropriations Committee adopted S. 1284, a bill appropriating monies to HHS and other agencies for FY 2014. An accompanying report stated that "[t]he Committee recommendation does not include a mandatory appropriation, requested by the administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412 of the ACA." S. Rep. No. 113-71, 113th Cong., at 123 (2013). No subsequent consideration of funding for Section 1402 appears in the record, for FY 2014 or since.

On October 17, 2013, the President signed into law the first of two continuing resolutions to keep the government running pending a consolidated appropriations act. *See* Continuing Appropriations Act for 2014, Pub. L. 113-46, 127 Stat. 558 (2013); Joint Resolution, Pub. L. 113-73, 128 Stat. 3 (Jan. 15, 2014). Neither resolution included an appropriation for Section 1402 reimbursements. The October 2013 legislation did, however, require HHS to certify that a program was in place to verify that applicants were eligible for "premium tax credits . . . and reductions in cost-sharing" before "making such credits and reductions available," Pub. L. 113-46, Div. B, § 1001(a), 127 Stat. 566.

On January 17, 2014, the President signed the Consolidated Appropriations Act for 2014, Pub. L. 113-76, 128 Stat. 5 (2014). That law similarly did not appropriate monies for Section 1402 reimbursements to insurers. Indeed, the Secretaries have conceded that "[t]here was no 2014 statute appropriating new money" for reimbursements under Section 1402. 5/28/15 Hr'g Tr. at 27:9-10.

Since January 2014, Treasury has been making advance payments of premium tax credits and cost-sharing reimbursements to issuers of qualified health plans to eligible individuals. Sec'y Mot. at 10 & Ex. 3, CMS Payment Policy and Financial Management Group, *Marketplace Payment Processing* (Dec. 6, 2013) [Dkt. 55-5] at 6-7 (discussing plans

"to make estimated payments to issuers beginning in January 2014 based on data provided by the December deadline"). These payments have been based on the Secretaries' determination that "the permanent appropriation in 31 U.S.C. § 1324, as amended by the Affordable Care Act, is available to fund all components of the Act's integrated system of subsidies for the purchase of health insurance, including both the premium tax credit and cost-sharing portions of the advance payments required by the Act." Sec'y Mot. at 10.

## II. LEGAL STANDARD

"Summary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Pursuant to the cross-motions for summary judgment, there is no genuine dispute of material fact; at hand are only questions of law, which include statutory construction." *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 235 (5th Cir. 2012) (citing Fed. R. Civ. P. 56(a)) (citation omitted). What remains is to determine which party is entitled to judgment as a matter of law.

## III. ANALYSIS

The question is whether Congress appropriated the billions of dollars that the Secretaries have spent since January 2014 on Section 1402 reimbursements. The Secretaries rely on 31 U.S.C. § 1324, which expressly appropriates money for Section 1401 premium tax credits. In order to explain their paying Section 1402 reimbursements out of a permanent appropriation for IRS refunds, the Secretaries posit that Sections 1401 and 1402 are economically and programmatically integrated. A contrary reading of the amended appropriations statute, they contend, would yield absurd economic, fiscal, and healthcare-policy results.

The only result of the ACA, however, is that the Section 1402 reimbursements must be funded annually. Far from absurd, that is a perfectly valid means of appropriation. The

results predicted by the Secretaries flow not from the ACA, but from Congress' subsequent refusal to appropriate money. Such an appropriation cannot be inferred, no matter how programmatically aligned the Secretaries may view Sections 1401 and 1402. *See* 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made"). "This principle is even more important in the case of a permanent appropriation." *Remission to Guam & Virgin Islands of Estimates of Moneys to be Collected*, B-114808, 1979 WL 12213, at *3 (Comp. Gen. Aug. 7, 1979).

Paying out Section 1402 reimbursements without an appropriation thus violates the Constitution. Congress authorized reduced cost sharing but did not appropriate monies for it, in the FY 2014 budget or since. Congress is the only source for such an appropriation, and no public money can be spent without one. *See* U.S. Constitution, Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."). The Secretaries' textual and contextual arguments fail.

### A. The Secretaries' Textual Arguments

The Secretaries argue that the text of 31 U.S.C. § 1324 and other "relevant statutory provisions" of the ACA (and other statutes) authorize their expenditures for cost-sharing reimbursements. Sec'y Mot. at 12. It is a most curious and convoluted argument whose mother was undoubtedly necessity.

### 1. The relevant appropriation statute

The Secretaries contend that 31 U.S.C. § 1324 appropriates monies for Section 1402 reimbursements. The text of § 1324 is worth reviewing in full:

> Disbursements may be made from the appropriation made by this
> section only for—

13

(1) refunds to the limit of liability of an individual tax account; and

(2) refunds due from credit provisions of the Internal Revenue Code of 1986 (26 U.S.C. 1 *et seq.*) enacted before January 1, 1978, or enacted by the Taxpayer Relief Act of 1997, or from section 25A, 35, 36, 36A, *36B*, 168(k)(4)(F), 53(e), 54B(h), or 6431 of such Code, or due under section 3081(b)(2) of the Housing Assistance Tax Act of 2008.

31 U.S.C. 1324(b) (emphasis on portion added by the ACA). The reference to 26 U.S.C. § 36B, part of the Internal Revenue Code, was inserted by Section 1401(d)(1) of the ACA. There is nothing in Section 1402 (cost-sharing reductions) or Section 1412 (advance payments) that amends Title 31, amends the Internal Revenue Code, or purports to appropriate anything. The Secretaries must therefore squeeze the elephant of Section 1402 reimbursements into the mousehole of Section 1401(d)(1). *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not . . . hide elephants in mouseholes.").

The Secretaries can only prevail if Section 1402 payments are properly considered "refunds due . . . from section . . . 36B." 31 U.S.C. § 1324(b)(2). The Secretaries first argue that the meaning of "from" depends on context. Sec'y Mot. at 12 (citing *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115 (D.C. Cir. 2013)). The proposition they borrow from *Clean Water Agencies*, that "from" is "a function word to indicate the source or original or moving force of something," is accurate but not pertinent. 734 F.3d at 1125. A refund "due from [26 U.S.C. §] 36B" means a refund due from that section. No amount of context can make it "due from 42 U.S.C. § 18071."

If "from" depends on context, moreover, then so must "refunds." In this case, the word "refunds" is shorthand for "refunds due from credit provisions of the Internal Revenue Code." 31 U.S.C. § 1324(b)(2). To provide a refund or credit under the Internal Revenue Code means to reduce the tax liability of a taxpayer. That is precisely what Section 1401 does. *See*

14

ACA § 1401(a) ("In General.—In the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year . . . .") (codified at 26 U.S.C. § 36B(a)). As such, the credits authorized by Section 1401 are quite naturally appropriated through 31 U.S.C. § 1324. The cost-sharing reductions mandated by Section 1402, by contrast, do not reduce anyone's tax liability. Nor do the reimbursements made to the insurers. Neither is intended to do so. Rather, Section 1402 reimbursements are made to compensate insurers for the costs that they bear instead of share. These reimbursements simply are not "refunds" as that term is used in 31 U.S.C. § 1324(b).

The Secretaries insist that payments under both Sections 1401 and 1402 are "refunds due . . . from section . . . 36B" because they are both "compensatory payments made to subsidize an individual's insurance coverage based on that individual's satisfaction of the eligibility requirements in Section 36B." Sec'y Mot. at 12. The argument relies on ACA Section 1402(f)(2), which provides: "No cost-sharing reduction shall be allowed under this section [1402] . . . unless . . . a credit is allowed to the insured . . . under section 36B of [the Internal Revenue] Code." In other words, insurers may not reduce cost sharing for anyone who does not qualify for a premium tax credit.

The Secretaries exaggerate the significance of Section 1402(f)(2). Although it is true that "[e]ligibility for a premium tax credit under Section 36B is[] a statutory precondition for receipt of the cost-sharing reductions," Sec'y Mot. at 13, the sections do have separate eligibility provisions. *Compare* ACA § 1401(a), codified at 26 U.S.C. § 36B(c)(1)(A) (making eligible for premium tax credits any policyholder who earns between 100 and 400 percent of the federal poverty level) *with* ACA § 1402(c)(2), codified as amended at 42 U.S.C. § 18071(c)(2) (making eligible for additional cost-sharing reductions any policyholder who earns between 100 and 250

15

percent of the federal poverty line and who enrolls in a "silver" plan on an exchange). From these distinct eligibility criteria, it is clear that many policyholders who qualify for Section 1402's additional cost-sharing reductions will also qualify for Section 1401's tax credits. But that is due to an independent criterion: income. The terms of the ACA do not automatically link eligibility for additional cost sharing reduction to eligibility for premium tax credits.

Section 1402(f)(2) does automatically link *ineligibility*. It dictates that if an insured individual becomes ineligible for tax credits, he will automatically become ineligible for reduced cost sharing. Taxpayers can lose eligibility for the credits for reasons other than income. Under Section 1401, for example, married couples must file a joint return or else they cannot qualify as an "applicable taxpayer," *i.e.*, they cannot qualify for the premium tax credits. 26 U.S.C. § 36B(c)(1)(C). Failure to file a joint return would not, however, disqualify a policyholder for additional cost-sharing reduction. *See generally* 42 U.S.C. §§ 18071(b), (c)(2). Section 1402(f)(2) was likely meant to tie up this and other loose ends. That does not turn a reimbursement due from 42 U.S.C. § 18071 into a tax credit due from 26 U.S.C. § 36B.

The Secretaries argue that "36B" should be read broadly because its adjacent terms frequently are. *See* Sec'y Mot. at 26 ("The Section 1324 appropriation is not limited to payments made under the provisions listed in that statute.").[11] The Secretaries offer 26 U.S.C. § 35 as an example.[12] That section is listed among the others permanently appropriated by 31 U.S.C. § 1324(b). By separate enactment, Congress created a new provision in the Code which

---

[11] To be clear, the text actually *does* limit payments to the provisions listed in the statute. *See* 31 U.S.C. § 1324 ("Disbursements may be made from the appropriation made by this section *only for . . . .*") (emphasis added).

[12] Section 35 provides premium tax credits for individuals receiving a "trade readjustment allowance" under the Trade Act of 1974 and for individuals receiving a pension from the Pension Benefit Guaranty Corporation. *See generally* 26 U.S.C. § 35(c).

requires Treasury to make "advance payments" directly to insurers "on behalf of" individuals eligible for a Section 35 tax credit. *See* 26 U.S.C. § 7527(a). Section 7527 is not among the sections listed in 31 U.S.C. 1324(b), and yet "it has never been doubted that the Section 1324 appropriation is available to fund all aspects of the integrated Section 35 subsidy program." Sec'y Mot. at 27-28. The Secretaries argue by analogy that "36B" can include all advanced payments under 42 U.S.C. § 18082, including Section 1402 reimbursements.

The Secretaries' syllogism is unsound. Section 35 tax credits remain "refunds due . . . from section . . . 35" even if advanced payment is authorized by Section 7527. Those credits are not transformed into "refunds due . . . from section . . . [7527]" merely because Section 7527 allows them to be paid in advance. The same is true of the tax credits provided under Section 36B, which ACA Section 1412 allows to be paid in advance. The advance-funding mechanism in the ACA, codified at 42 U.S.C. § 18082, does not turn monies paid through that mechanism into "refunds due . . . from section . . . [42 U.S.C. § 18082]."[13] The source of the credit—*i.e.*, the Internal Revenue Code section "from" which the "refunds" are "due"—remains 26 U.S.C. § 36B.

While both ACA Sections 1401 and 1402 can be paid in advance via Section 1412, only Section 1401 (in the guise of 26 U.S.C. § 36B) was added to the list of sections whose refunds or credits are appropriated permanently by 31 U.S.C. § 1324(b). That Section 1402 goes unmentioned suggests no error or maladroit drafting; only Section 1401 provides a

---

[13] It bears repeating here that every other section enumerated in 31 U.S.C. § 1324 comes from the Internal Revenue Code, Title 26. None of them comes from Title 42 or elsewhere in the U.S. Code. It would be unprecedented to shoehorn Section 1402 payments—which are due, if at all, under Title 42—into 31 U.S.C. § 1324.

refund or credit under the Internal Revenue Code.  The Secretaries' attempt to read "36B" as "[26 U.S.C. §] 36B [and 42 U.S.C. § 18071]" finds no support in the statutory text.

### 2. The advance payments program

The Secretaries argue that Sections 1401 and 1402 are "unified" by the advance-payment program authorized by Section 1412.  Sec'y Mot. at 13.  However, Section 1412 itself recognizes a separation in payment schemes:

> (a) In General.—The Secretary [of HHS], in consultation with the Secretary of the Treasury, shall establish a program under which—
>
> (1) upon request of an Exchange, advance determinations are made under section 1411 with respect to the income eligibility of individuals enrolling in a qualified health plan in the individual market through the Exchange for the *premium tax credit allowable under section 36B of the Internal Revenue Code* of 1986 and the *cost-sharing reductions under section 1402*.

ACA § 1412(a)(1) (emphasis added).[14]  The ACA could not have been clearer: premium tax credits are payable under Section 36B of the Internal Revenue Code, and cost-sharing reductions are payable under Section 1402 of the ACA.  The two are textually, and thus legally, distinct. *See SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 75 (D.C. Cir. 2015) ("[W]e have repeatedly held that where different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings.") (quoting *Vonage Holdings Corp. v.*

---

[14] Note that advance payments are triggered only "upon request of an Exchange."  ACA § 1412(a)(1).  Thus, strictly speaking, nothing mandates that advance payments would ever materialize.  It is therefore difficult to accept the argument that the ACA *presumes* a "unified" program for advance payments for both Sections 1401 and 1402.  *See also* Sec'y Reply at 16 (conceding that "neither the premium tax credit nor cost-sharing reduction subsidies must always be made in advance").

18

*FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007) (quotation marks and alteration omitted)).  The

Secretaries' unification argument fails in light of the differentiated text.[15]

There are other important textual distinctions in Section 1412.  *See, e.g.*, ACA

§ 1412(c) ("Payment of Premium Tax Credits and Cost-Sharing Reductions").  Under "Premium

Tax Credit," that section provides:

> The Secretary of the Treasury *shall make* the advance payment
> under this section of any premium tax credit allowed *under section
> 36B of the Internal Revenue Code of 1986* to the issuer of a qualified
> health plan on a monthly basis (or such other periodic basis as the
> Secretary may provide).

ACA § 1412(c)(2)(A) (emphasis added).  But under "Cost-Sharing Reductions," it provides:

> The Secretary [of HHS] *shall also notify* the Secretary of the
> Treasury and the Exchange under paragraph (1) *if* an advance
> payment of the cost-sharing reductions *under section 1402* is to be
> made to the issuer of any qualified health plan with respect to any
> individual enrolled in the plan. The Secretary of the Treasury shall
> make such advance payment at such time and in such amount as the
> Secretary [of HHS] specifies in the notice.

*Id.* § 1412(c)(3) (emphasis added).

Two distinctions are apparent.  First, these passages reiterate the difference

between Section 1401 premium tax credits, which are paid "under section 36B of the Internal

Revenue Code," and payments for Section 1402 cost-sharing reductions, which are payable

"under section 1402."  *Compare* ACA § 1412(c)(2)(A) *with id.* § 1412(c)(3).  Second, there is a

notable difference in the statutory command to the Secretaries.  Regarding Section 1401 credits,

Treasury is directed to make advance payments.  ACA § 1412(c)(2)(A) ("The Secretary of the

Treasure shall make . . . .").  But with regard to Section 1402 reimbursements, the Secretary of

HHS is directed only to "notify the Secretary of the Treasury . . . *if* an advance payment . . . is to

---

[15] The dichotomy is repeated elsewhere in Section 1412, *e.g.* § 1412(a)(2)(B).

be made." *Id.* § 1412(c)(3) (emphasis added).  This language clearly contemplates that some advance payments might *not* be made under Section 1402, which evidences the lack of congressional intent to fuse Sections 1401 and 1402 together through a "unified" program.  In point of fact, the difference in treatment reflects the reality that Section 1402 reimbursements are subject to the annual appropriations process, making it risky to command advance payments.

Sections 1412(c)(2) and 1412(c)(3), immediately adjacent and yet using noticeably different language, belie the Secretaries' textual argument that Section 1412 was meant to unify Sections 1401 and 1402.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.") (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

### 3.  The Hyde Amendment

The Secretaries base one of their textual arguments on the so-called Hyde Amendment.  Named for former Illinois Representative Henry Hyde, the amendment bars the use of federal funds to pay for abortions except in specified circumstances.  *See Harris v. McRae*, 448 U.S. 297, 302 (1980).  It routinely has been attached to certain appropriations legislation, including for HHS, since 1976.  "The Hyde Amendment is not permanent legislation," but is often "enacted as part of the statute appropriating funds for certain Executive Departments for one fiscal year."  *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 477 (1996) (per curiam).

The ACA contains a prohibition on abortion funding that is tied to annual appropriations restrictions like the Hyde Amendment.  Section 1303(a)(2)(A)(ii) provides that an insurer offering a qualified health plan "shall not use any amount attributable to . . . [a]ny cost-

20

sharing reduction under section 1402 of the [ACA]" or the "amount (if any) of the advance payment of the reduction under section 1412" to pay for "abortions for which the expenditure of Federal funds appropriated for the Department of Health and Human Services is not permitted, based on the law as in effect" six months prior to the plan year. ACA § 1303(a)(1)(B)(i). So long as the Hyde Amendment continues to be attached to HHS appropriations laws, cost-sharing reduction payments under Section 1402 cannot be used to fund abortion services. That would be create a redundancy, in the Secretaries' view, because the Hyde Amendment itself would block such use if the Section 1402 reimbursements were appropriated annually.

The House points to the term "if any" as evidence that cost-sharing reductions might never be paid. But the same "if any" language is found in the preceding section on premium tax credits. ACA § 1303(a)(2)(A)(i). The term refers to the *advanced* payments, the Secretaries say, which "can be explained as merely reflecting that neither the premium tax credit nor cost-sharing reduction subsidies must always be made in advance." Sec'y Reply at 13.[16] The Secretaries are right; the term "if any" appears in both subsections.

Section 1303(a)(2)(ii) does create a redundancy, but not one that trumps unambiguous text. "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363 (1842) (citation omitted)). In *King v. Burwell*, the Court specifically rejected the petitioners' and the dissent's redundancy argument. 135 S. Ct. at 2492 ("[O]ur preference for avoiding surplusage constructions is not absolute.") (quoting *Lamie v. U.S. Trustee*, 540 U.S.

---

[16] That is a notable concession, given the Secretaries' argument that Congress "inextricably linked" the two programs through the advanced-payment system. Sec'y Mot. at 16. The Secretaries have conceded that the two programs can, in fact, be extricated.

526, 536 (2004)).  The Court added that "specifically with respect to [the ACA], rigorous application of the canon does not seem a particularly useful guide to a fair construction of the statute."  *King*, 135 S. Ct. at 2492.[17]

There is no positive repugnancy created between ACA § 1303 and the Hyde Amendment, nor any created within the ACA.  The *Germain* Court explained that "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation," and that "a court should always turn first to one, cardinal canon before all others[:] courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  503 U.S. at 253-54; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) ("In the end, we are unpersuaded by petitioner's attempt to create ambiguity [by invoking

---

[17] The Supreme Court described in detail why such minor discrepancies might appear:

> The Affordable Care Act contains more than a few examples of inartful drafting.  (To cite just one, the Act creates three separate Section 1563s. See 124 Stat. 270, 911, 912.)  Several features of the Act's passage contributed to that unfortunate reality.  Congress wrote key parts of the Act behind closed doors, rather than through "the traditional legislative process."  Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 L. Lib. J. 131, 163 (2013).  And Congress passed much of the Act using a complicated budgetary procedure known as "reconciliation," which limited opportunities for debate and amendment, and bypassed the Senate's normal 60-vote filibuster requirement.  *Id.* at 159-167.  As a result, the Act does not reflect the type of care and deliberation that one might expect of such significant legislation.  *Cf.* Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 545 (1947) (describing a cartoon "in which a senator tells his colleagues 'I admit this new bill is too complicated to understand. We'll just have to pass it to find out what it means.'").

*King*, 135 S. Ct. at 2492.

the rule against superfluities] where the statute's text and structure suggest none."). Given the choice between rewriting plain text and accepting a minor redundancy, the choice is clear.

### 4. "Conspicuously absent" text

The Secretaries also rely on the *absence* of certain text. As it often does, Congress said in certain parts of the ACA that there "are authorized to be appropriated such sums as are necessary."[18] But that language is not in Section 1402. The Secretaries do not argue—nor could they—that these words are necessary to appropriate monies in the future. Instead, they deduce that the absence of this language means that Congress felt it unneeded, ostensibly because Section 1402 was already funded permanently.

To the extent that this missing language evidences congressional intent, it cannot surmount the plain text. According to that text, Congress authorized Section 1402 but did not appropriate for it. That is perfectly consonant with principles of appropriations law. So long as *programs* are authorized, Congress may appropriate funds for them, or not, as it chooses. *See* GAO *Principles* at 2-41 ("An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter (up or down) in the subsequent appropriation act."). The absence of the "authorized to be appropriated" language does not give the Court—or the Secretaries—license to rewrite the plain text of 31 U.S.C. § 1324(b).

### 5. Post-ACA legislation

---

[18] *See, e.g.*, ACA § 2705(f), 124 Stat. 325. *See also* Sec'y Mot. at 15 n.5 (citing ACA §§ 1002, 2706(e), 3013(c), 2015, 2501, 3504(b), 3505(a), 3505(b), 3506, 3509(a)(1), 3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b)).

23

The Secretaries urge the Court to consider post-ACA legislation to inform the meaning of the ACA's text. Specifically, they draw significance from the October 2013 Continuing Appropriations Act, which required HHS to certify eligibility for "premium tax credits . . . and reductions in cost-sharing" before "making such credits and reductions available." Pub. L. No. 113-46, § 1001(a), 127 Stat. 566. The Secretaries posit that a fundamental inconsistency would arise if the same Congress that "had precluded those payments from being made by failing to appropriate any funds" also required certification of eligibility for payment of cost-sharing reimbursements. Sec'y Mot. at 16.

The significance of the October 2013 appropriations act is too ephemeral to support the Secretaries' deduction. With FY 2014 funding still unsettled, Section 1402 reimbursements might yet have been funded for that year. In addition, Congress could always have appropriated monies to fund Section 1402 in the future; nothing about its prior refusal bound it or a future Congress. And with these ACA provisions set to become effective in mere months, the temporary appropriations act allowed Congress to require certification of eligibility prior to monies being distributed under either Section 1401 or 1402. Congress did not give a reason for its requiring certification in the continuing appropriations act, but the Secretaries' deduction would create an appropriation for Section 1402 out of thin air. Whatever the explanation, the October 2013 Continuing Appropriations Act does not alter the meaning of "refunds due . . . from section . . . 36B." 31 U.S.C. § 1324(b).

## B. The Secretaries' Contextual Arguments

The thrust of the Secretaries' argument relies on the ACA's "structure and design." *See* Sec'y Mot. at 16-23. "Reliance on context and structure in statutory interpretation is a 'subtle business, calling for great wariness lest what professes to be mere rendering becomes

24

creation and attempted interpretation of legislation becomes legislation itself.'" *King*, 135 S. Ct. at 2495-96 (quoting *Palmer* v. *Massachusetts*, 308 U.S. 79, 83 (1939)).  The relevant text is, once again, "refunds due . . . from section . . . 36B."  31 U.S.C. § 1324(b)(2).  As discussed above, none of those words is ambiguous standing alone.[19]  The Secretaries rely heavily on *King* to argue that the full context of the ACA makes the language ambiguous and thus subject to their interpretation, provided it is reasonable.

### 1. Structure and design

The Secretaries first posit that the ACA enacted a "closely intertwined" system of subsidies, citing *King*, 135 S. Ct. at 2487.  The "three key reforms" described in *King* were: (1) guaranteed insurance and community rating requirements, 42 U.S.C. § 300gg; (2) an individual mandate to maintain health insurance, 26 U.S.C. § 5000A; and (3) refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line, 26 U.S.C. § 36B.  *See generally King*, 135 S. Ct. at 2486-87.  The Court added, as to the third:  "Individuals who meet the Act's requirements may purchase insurance with the tax credits, which are provided in advance directly to the individual's insurer."  *Id.* at 2487.  *King* did not describe Section 1402 cost-sharing reductions as integral to any of the three key reforms.  In fact, *King* did not mention Section 1402, discuss payments for cost-sharing

---

[19] The House argues that the Secretaries "seek to flip *King* on its head" by looking outside the relevant text to determine ambiguity in the first instance.  House Opp'n at 14.  But that is, in fact, what the Court in *King* did.  After acknowledging that "established by the State" has a plain meaning *and* that it was statutorily defined to mean "each of the 50 States and the District of Columbia," the Court nonetheless looked outside of 26 U.S.C. §§ 36B(b)(2)(A), (c)(2)(A)(i), to ascertain whether the phrase was ambiguous.  *See King*, 135 S. Ct. at 2490 ("These provisions suggest that the Act may not always use the phrase 'established by the State' in its most natural sense. Thus, the meaning of that phrase may not be as clear as it appears when read out of context.").  In other words, the Court determined that a phrase that is unambiguous in isolation may be ambiguous in greater context.  That is the Secretaries' argument here.

reductions, or cite 42 U.S.C. § 18071. The Secretaries nevertheless urge that cost-sharing

reductions are "just as closely linked" to the reforms described in *King*. Sec'y Mot. at 16. For

that reason, they ask this Court to read ambiguity into otherwise plain language.

This case is fundamentally different from *King v. Burwell*. There, the phrase

"established by the State," 26 U.S.C. §§ 36B(b)(2)(A), 36B(c)(2)(A)(i), became "not so clear"

when it was "read in context." *King*, 135 S. Ct. at 2490 (acknowledging that the ACA had

expressly defined "State" to mean "each of the 50 States and the District of Columbia," 42

U.S.C. § 18024(d)). This was the "problem" identified by the Court:

> If we give the phrase "the State that established the Exchange" its
> most natural meaning, there would be *no* "qualified individuals" on
> Federal Exchanges. But the Act clearly contemplates that there will
> be qualified individuals on *every* Exchange. As we just mentioned,
> the Act requires all Exchanges to "make available qualified health
> plans to qualified individuals"—something an Exchange could not
> do if there were no such individuals. § 18031(d)(2)(A). And the
> Act tells the Exchange, in deciding which health plans to offer, to
> consider "the interests of qualified individuals . . . in the State or
> States in which such Exchange operates"—again, something the
> Exchange could not do if qualified individuals did not exist.
> § 18031(e)(1)(B). This problem arises repeatedly throughout the
> Act.

*King*, 135 S. Ct. at 2490 (emphasis in original). Simply put, the statute could not function if

interpreted literally; it had to be saved from itself.

The problem the Secretaries have tried to solve here is very different: it is a

failure to appropriate, not a failure in drafting. Congress's subsequent inaction, not the text of

the ACA, is what prompts the Secretaries to force the elephant into the mousehole. There are no

inherent flaws in the ACA that keep Section 1402 payments from being paid, in advance or

otherwise. None of the operative provisions becomes unworkable, as they did in *King*, when the

relevant passage (31 U.S.C. § 1324(b)) is read plainly. The minor redundancy created by ACA

Section 1303(a)(2)(ii), discussed above, is nothing compared to the fundamental disconnects that

would have "arise[n] repeatedly" in *King* if "the State" were given its most natural reading. 135 S. Ct. at 2490. It simply does not follow from a plain reading of 31 U.S.C. § 1324(b) that "the Act d[oes] not allow the government to comply with the statutory directive to reimburse those insurers for the cost-sharing reductions." Sec'y Mot. at 16. There is nothing in the ACA that prevents compliance. The funds simply must be appropriated.

The result in *King* was driven by the Court's holding "that the Act may not always use the phrase 'established by the State' in its most natural sense," and thus that "the meaning of that phrase may not be as clear as it appears when read out of context." 135 S. Ct. at 2490. The natural sense of the statutory language at issue here ("36B") does not impede the operation of the ACA. No "problem arises repeatedly throughout the Act," *id.*, if 31 U.S.C. § 1324(b) (as amended by ACA § 1401(d)) is given its plain meaning. *King* is inapposite.

### 2. Unintended consequences

The Secretaries predict a "cascading series of nonsensical and undesirable results" if 31 U.S.C. § 1324(b) is given its plain meaning. Sec'y Mot. at 17. When interpreting a statute, "absurd results are to be avoided." *McNeill v. United States*, 563 U.S. 816, 822 (2011) (quoting *United States v. Wilson*, 503 U.S. 329, 334 (1992)). The Court must therefore consider whether the ACA's plain text would cause absurd results.

The Secretaries depict health insurance premiums and cost-sharing reimbursements as a financial seesaw; as one goes down, the other must go up. Sec'y Mot. at 2. Insurers cannot escape cost-sharing reductions, which are a mandatory feature of participation in the Exchanges. If the insurers are not reimbursed, they will charge higher premiums to cover their expenses. Sec'y Mot. at 17 & Ex. 4, *ASPE Issue Brief: Potential Fiscal Consequences of Not Providing CSR Reimbursements* [Dkt. 55-6] (*ASPE Br.*) at 2. When premiums rise,

27

taxpayers become entitled to greater tax credits under Section 1401. Sec'y Mot. at 18 (citing 26 U.S.C. § 36B(b)(2)(B)). On its face, this causes no concern because premium tax credits are permanently funded. The seesaw would effectively solve the problem.

But the seesaw is asymmetrical. More people qualify for premium tax credits than for cost-sharing reductions, and tax credits for all health plans are "indexed" to the cost-sharing-eligible ("silver") plans. Sec'y Mot. at 19. For these reasons, if federal spending decreased on the cost-sharing side, it would increase disproportionately on the tax-credit side. Congress would end up spending more through Section 1401 alone than it would through Sections 1401 and 1402 working together.

There are other potential consequences if no funds are appropriated for Section 1402 reimbursements. Unreimbursed insurers might sue the government under the Tucker Act, 28 U.S.C. § 1491(a)(1), to receive the money owed them under ACA Section 1402(c)(3)(A) ("[T]he Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions.").[20] Litigation would burden the U.S. Treasury if the insurers won such suits, and even unsuccessful litigation would impose costs. The Secretaries also worry that prevailing insurers would receive a windfall: higher insurance premiums (subsidized by Section 1401 tax credits) *and* reimbursement for Section 1402 cost-sharing reductions.

The Secretaries also project that annual funding of Section 1402 would cause uncertainty in the market. Because "plans sold on the [ACA's] Exchanges are required to set their premiums for the following year well in advance" of the government's fiscal year, "insurers

---

[20] The House disputes whether this language confers an actionable right upon the insurers. *See* House Opp'n at 19-20. Because the Tucker Act argument is not ultimately dispositive, the Court does not decide whether insurers could sue under the Tucker Act.

would be forced to set their premiums for the upcoming year in the face of uncertainty about the existence and amount of payments they would receive." Sec'y Mot. at 23.[21]

Finally, the Secretaries argue that Congress has not adopted an "appropriated entitlement" since 1997 and surely would not have done so in the ACA without saying so clearly. Sec'y Mot. at 21-22. They cite the Balanced Budget Act of 1997, Pub. L. 1005-33, §§ 10101, 10116, 11 Stat. 251, 678 (Aug. 5, 1997) and an accompanying conference report, H.R. Conf. Rep. 105-217, at 983 (1997). As defined by GAO, an appropriated entitlement is:

> An entitlement whose source of funding is in an annual appropriation act. However, because the entitlement is created by operation of law, if Congress does not appropriate the money necessary to fund the payments, eligible recipients may have legal recourse. Veterans' compensation and Medicaid are examples of such appropriated entitlements.

GAO *Glossary* at 13.

These arguments all focus on the wrong consequences. For purposes of interpreting the ACA, the relevant question is not whether Congress intended premiums to skyrocket, deficits to explode, or enrollment to plummet—those are not consequences of the statute that Congress wrote in 2010. The relevant question is far narrower: Would it have been "nonsensical" or "absurd" for Congress to authorize a program permanently in 2010 but not appropriate for it permanently at the same time?

The answer is "no." Congress once conferred, for example, "permanent authority" on Treasury "to permit prepayment . . . to territorial treasuries of estimates of moneys to be collected from certain taxes, duties, and fees." *Remission to Guam & Virgin Islands of*

---

[21] Amici in support of the Secretaries agree with these predictions. *See generally* Br. Amici Curiae for Economic & Health Policy Scholars [Dkt. 64] at 4-5.

*Estimates of Moneys to be Collected*, B-114808, 1979 WL 12213, at *1 (Comp. Gen. Aug. 7,

1979).  Yet because no subsequent appropriation was made, no such money could be spent:

> In sum, although we think that Section[s] 1(c) and 4(c)(2) of Pub. L.
> No. 95-348 do establish permanent authority for future
> appropriations, we conclude that they do not establish permanent
> indefinite appropriations.  Thus, the Department of the Treasury
> cannot remit funds to Guam and the Virgin Islands under these
> sections until Congress makes appropriations for that purpose.

*Id.* at *4.  Interestingly, GAO recognized that "Congress probably did not anticipate that

appropriations would be needed in order to implement the prepayment provisions."  *Id.* at *2.

That did not alter GAO's analysis of the statute, however, because "the making of an

appropriation is not to be inferred but must be expressly stated.  *This principle is even more

important in the case of a permanent appropriation*."  *Id.* at *3 (emphasis added).

The *Remission to Guam* decision was recently cited by GAO when analyzing

Section 1342(b)(1) of the ACA.  *See Dep't of HHS—Risk Corridors Program*, B-325630, 2014

WL 4825237, at *2 (Comp. Gen. Sept. 30, 2014).  GAO found that "Section 1342, by its terms,

did not enact an appropriation to make the payments specified in section 1342(b)(1)."  *Id.*  GAO

ultimately concluded that HHS could spend monies appropriated by another statute, Pub. L. 113-

76, div. H, title II, 128 Stat. 5, 374 (Jan. 17, 2014), which appropriated funds for the Centers for

Medicare and Medicaid Services (CMS) to carry out its responsibilities.  2014 WL 4825237, at

*3.  That appropriating statute does not apply here, so GAO's final conclusion is irrelevant for

these purposes.  More to the point, the *Risk Corridors* decision illustrates` that a statute (in that

case, ACA § 1342) can authorize a program, mandate that payments be made, and yet fail to

appropriate the necessary funds.  *Id.* at *2 ("It is not enough for a statute to simply require an

agency to make a payment.").  Thus, not only is it possible for a statute to authorize and mandate

payments without making an appropriation, but GAO has found a prime example in the ACA.

30

These decisions illustrate well-understood principles of appropriations law.  In

decisions spanning 35 years, GAO has consistently emphasized that appropriations—especially

permanent appropriations—must be expressly stated.  GAO has also ruled that a mere

requirement to pay is not an appropriation.  "Although GAO decisions are not binding, [courts]

'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in

the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir.

2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855,

861 (D.C. Cir. 1984)).  This Court draws from GAO's expertise, as well.

Finally, the Secretaries' "appropriated entitlement" argument fails.  Recall that, in

its April 2013 budget justification, HHS called Section 1402 an "appropriated entitlement[]"

while requesting an appropriation for it.  Justification [Dkt. 30-3] at 184.  The agency now calls

appropriated entitlements a "dormant . . . construct," Sec'y Mot. at 22, but apparently thought in

2013 that the construct had awoken.  Nothing prevented Congress from resurrecting this method

of appropriating, least of all a 13-year old Conference Report.  In the end, this argument simply

does not call into question the plain text of 31 U.S.C. § 1324(b) as amended by ACA § 1401(d).

To recapitulate, the consequence at issue here is that a permanently authorized

benefit program was made dependent on non-permanent appropriations.   That approach is

perfectly consonant with principles of appropriations law; most federal entities operate in the

same fashion.  The Secretaries' argument, taken to its logical conclusion, is that every permanent

*authorization* must also constitute a permanent *appropriation* or else an "absurd result" would

obtain.  That is assuredly not the law.  Higher premiums, more federal debt, and decreased

enrollment are not consequences of the ACA's text or structure.  Those results would flow—if at

all—from Congress's continuing refusal to appropriate funds for Section 1402 reimbursements. That is Congress's prerogative; the Court cannot override it by rewriting 31 U.S.C. § 1324(b).

### 3. The Affordable Care Act's legislative history

The Secretaries make two points about the legislative history of the ACA. First, they say that CBO consistently referred to Section 1402 reimbursements as "direct spending." CBO would not have used this term, according to the Secretaries, if the money were not already appropriated. But when CBO scores "laws providing or creating direct spending," it is required by law to assume that "funding for entitlement authority [will] be adequate to make all payments required by those laws." 2 U.S.C. § 907(b)(1). Thus, the Court draws nothing particularly meaningful from CBO's assumption that appropriations would have been made for Section 1402 reimbursements.

Second, the Secretaries point to statements by individual Representatives and Senators whose description of the "cost" of the ACA presumed that Section 1402 would be funded.[22] This argument, too, fails to establish an actual appropriation. "An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history." *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2194-95 (2012) (quoting *Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am. v. Donovan*, 746 F.2d 855, 860-61

---

[22] *See* 156 Cong. Rec. S2069, S2081 (Mar. 25, 2010) (Sen. Durbin) ("$500 billion of tax cuts and cost-sharing"); 155 Cong. Rec. S12565, S12576 (Dec. 7, 2009) (Sen. Enzi) ("this bill will commit the Federal Treasury to paying for these new subsidies for the uninsured forever"); 156 Cong. Rec. H1891, H1898 (Mar. 21, 2010) (Rep. Paulsen) ("$500 billion . . . [in] new entitlement spending"); 156 Cong. Rec. H1891, H1910 (Mar. 21, 2010) (Rep. Diaz-Balart) ("half a trillion dollars . . . [for] a massive new entitlement program").

(D.C. Cir. 1984)).  The Court finds nothing exceptional about legislators assuming that a program under debate would be fully appropriated if enacted.[23]

### 4. The contemporary understanding

The best evidence of the contemporary understanding of the ACA comes from the parties' preparation for the effective date of the law.  *Cf. United States v. Kanchanalak*, 192 F.3d 1037, 1045 (D.C. Cir. 1999) ("A[] court will ordinarily give substantial deference to a contemporaneous agency interpretation of a statute it administers.") (quoting *Sierra Pac. Power v. EPA*, 647 F.2d 60, 65 (9th Cir. 1981)).  The only such actions that speak directly to the question in this case—whether Section 1402 reimbursements were permanently appropriated for—were taken by OMB in the FY 2014 Budget Request and by HHS when it submitted its Justification, both of which sought an annual appropriation for Section 1402 reimbursements.  *See* Budget [Dkt. 30-1]; App. to Budget [Dkt. 30-2] at 3, 448; Justification [Dkt. 30-3] at 7, 184.  These requests "are not in dispute."  Sec'y Opp'n at 4.

The Secretaries argue that these requests are irrelevant, however, because "[b]udget requests . . . do[] not implement, interpret, or prescribe any law or policy."  *Fund for Animals, Inc.* v. *U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (internal quotations omitted)).  They note that "the particular request at issue here [for FY 2014] did not purport to analyze the ACA or consider the availability of the permanent appropriation in 31 U.S.C. § 1324."  Sec'y Mot. at 30; *see also* Sec'y Reply at 4 ("[T]hose documents did not fully account for the text, structure, design, and history of the ACA.").

---

[23] The Court thanks amici Members of Congress for their brief.  *See* Br. Amici Curiae Members of Congress [Dkt. 63].  However, their recollections as to what "everyone at the time understood," *id.* at 22, are anecdotal and not evidentiary.

33

As an initial matter, it strains credulity to suggest that OMB or HHS submitted a multibillion dollar budget request without analyzing the relevant statutes. The Secretary of HHS is aided by an Assistant Secretary for Financial Resources who manages an Office of Budget.[24] The employees in that office "play a lead role in analyzing Congressional budget actions and appropriations legislation."[25] Within that office's Division of Budget Policy, Execution, and Review, the Fiscal and Legal Review Branch "provides expertise in budget execution and appropriations law" and offers "technical analysis of appropriations bills and authorizing legislation with an impact on spending authority."[26] The Office of Budget also "maintains active communication with OMB,"[27] whose Budget Review Division "monitors congressional action on appropriations and other spending legislation."[28]

The Administration's FY 2014 Budget Request and its Appendix reflected the careful analysis that one would expect from these institutions. Each request accounted meticulously for every penny sought. Statutory authority was cited for every program, along with tables detailing the budgetary resources available and the effect of any appropriation or outlay. *See, e.g.*, App. to Budget [Dkt. 30-2] at 448 (detailing such information for "Reduced Cost Sharing for Individuals Enrolled in Qualified Health Plans" and the "Consumer Operated and Oriented Plan Program Contingency Fund"). CMS's accompanying Justification contained

---

[24] *See* http://www.hhs.gov/about/agencies/orgchart/index.html (last visited May 11, 2016).

[25] http://www.hhs.gov/about/agencies/asfr/budget/index.html (last visited May 11, 2016).

[26] http://www.hhs.gov/about/agencies/asfr/budget/divisions/index.html (last visited May 11, 2016).

[27] http://www.hhs.gov/about/agencies/asfr/budget/index.html (last visited May 11, 2016).

[28] https://www.whitehouse.gov/omb/organization_mission/ (last visited May 11, 2016).

34

*pages* of painstaking analysis of various appropriations statutes. *See* Justification [30-3] at 11-13, 129-31, 171-72, 183, 185-86. Clearly these agencies were analyzing appropriations statutes and were considering the availability of permanent appropriations. Nevertheless, it is true that the FY 2014 Budget Request and its accompanying documents do not "constrain this Court" or obviate "the traditional tools of statutory analysis." Sec'y Opp'n at 4.

The Secretaries cite two cases for the proposition that "Executive Branch statements have no bearing on questions of statutory interpretation like the one now before this Court." Sec'y Opp'n at 5. In *Wong Yang Sung v. McGrath*, the Supreme Court refused to agree "that a request for and failure to get in a single session of Congress clarifying legislation on a genuinely debatable point of agency procedure admits weakness in the agency's contentions." 339 U.S. 33, 47 (1950). The Court drew "no inference in favor of either construction of the Act" merely because the agency sought, but Congress did not pass, certain legislation. *Id.* In *Federal Trade Commission v. Dean Foods Company*, the Court refused to "infer[,] from the fact that Congress took no action at all on the request of the [FTC] to grant it" preliminary-injunction powers under the Clayton Act, any intent by Congress "to circumscribe [the] traditional judicial remedies" provided in the All Writs Act. 384 U.S. 597, 609-10 (1966). Relying on these cases, the Secretaries tell the Court to ignore their FY 2014 Budget Requests.

The Secretaries have asked this Court to consider statutes that were enacted years after the ACA; floor statements by individual Members of Congress; an HHS "issue brief" on potential fiscal consequences; a *New York Times* article; the Hyde Amendment; a CMS webinar from 2013; excerpts from the House Budget Committee's *Compendium of Laws and Rules of the Congressional Budget Process* (2015 ed.); CBO scoring terminology; and a House Conference Report from 1997. It is passing strange that they find the official FY 2014 Budget Request

35

related documents to be irrelevant.  The Court draws no dispositive inference from the history of the FY 2014 Budget Request concerning the question of statutory interpretation.  But the Court does find that the budget history is probative of HHS's contemporaneous interpretation.

The Secretaries ignore their own actions and focus instead on congressional inaction.  Sec'y Mot. at 29 (arguing that the "failure of Congress to provide an annual appropriation to HHS does not alter the scope of the permanent appropriation to Treasury in Section 1324"); *id.* at 30 ("Congress's failure to provide a specific appropriation requested by an agency sheds no light on the question whether other appropriations are available to make the same expenditure.").  Those arguments beg the question.  No one disputes that 31 U.S.C. § 1324 is an appropriation; the question is whether that statute, as amended by ACA §1401(d)(1), permanently appropriates money for Section 1402 reimbursements.  The Court concludes that it does not.

## C. Deference to the Secretaries' Interpretation

The Secretaries argue that "at a minimum," they deserve deference to their interpretation of 31 U.S.C. § 1324.  Sec'y Mot. at 25-26 (citing *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842, 842-43 (1984)).  The Supreme Court in *King* rejected the agency's *Chevron* argument.  *See* 135 S. Ct. at 2488-89.  The Court had previously recognized that in "extraordinary cases," there "may be reason to hesitate before concluding that Congress has intended [the] implicit delegation" that underlies *Chevron* deference.  *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  *King* was "one of those cases" because "tax credits are among the Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people."  135 S. Ct. at 2489.  The Secretaries say the same thing about Section 1402 reimbursements.  That being the case,

36

"had Congress wished to assign th[e] question to an agency, it surely would have done so expressly." *Id.* There is no express delegation here.

Even if *Chevron* deference were warranted, the Secretaries would fail at step one. *See W. Minnesota Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588, 591 (D.C. Cir. 2015) ("Under step one, the court must determine 'whether Congress has directly spoken to the precise question at issue.' If so, then the court and the agency must 'give effect to the unambiguously expressed intent of Congress.'") (quoting *Chevron*, 467 U.S. at 842, 842-43 (citation omitted)). As described at length above, Congress spoke directly and unambiguously to the precise question at issue. *See* 31 U.S.C. § 1324(b) (appropriating money "only for . . . refunds due . . . from section . . . 36B."). The Secretaries insist nonetheless that the Court should interpret "36B" to include Section 1402 reimbursements. It cannot be done. *See* 31 U.S.C. § 1301(d) ("A law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made"); *Remission to Guam*, B-114808, 1979 WL 12213, at *3 (Comp. Gen. Aug. 7, 1979) ("This principle is even more important in the case of a permanent appropriation.").

## D. Standing

The Secretaries invite the Court to revisit its standing analysis. Sec'y Mot. at 33-34. "Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994).

The Secretaries believe that they have proven this case to be only about statutory interpretation and implementation. Sec'y Mot. at 34 ("As should be apparent from the foregoing discussion, this case indeed involves solely a dispute over the meaning of federal statutes."). This argument was raised in their motion to dismiss, Defs. Reply [Dkt. 26] at 10 ("In short, the

37

House has described two relatively straight-forward differences of opinion between the Legislative and Executive Branches as to the interpretation of federal law."), and addressed in the Court's prior opinion, 130 F. Supp. 3d at 74 n.24 ("The Secretaries' primary defense will be that an appropriation *has* been made, which will require reading the statute. But that is an antecedent determination to a constitutional claim.") (emphasis in original).

        The Court has not changed its mind. While it is true that the Secretaries' defense in this case requires interpreting federal statutes, the House of Representatives' claim under the Appropriations Clause does not. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). Instead, the interpretation of a federal statute only becomes necessary when a defendant raises such a statute as a defense. Such a defense does not turn a constitutional claim into a statutory dispute. The House's injury depends on the Constitution and not on the U.S. Code. The Secretaries' standing argument will be denied.

## IV. CONCLUSION

        The Court will grant summary judgment to the House of Representatives and enter judgment in its favor. The Court will also enjoin any further reimbursements under Section 1402 until a valid appropriation is in place. However, the Court will stay its injunction pending any appeal by the parties. A memorializing Order accompanies this Opinion.


Date: May 12, 2016

                                                 _____/s/_____
                                         ROSEMARY M. COLLYER
                                         United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Action No. 14-1967 (RMC) |
| SYLVIA MATTHEWS BURWELL in her official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, | ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

### ORDER

For the reasons stated in the contemporaneous Opinion, it is hereby

**ORDERED** that Defendants' motion to dismiss [Dkt. 20] is **GRANTED IN PART** and **DENIED IN PART**. Counts II, III, IV, VI, VII and VIII of Plaintiff's Complaint [Dkt. 1] are hereby **DISMISSED**. Count V is **DISMISSED IN PART**, to the extent it is not predicated on a constitutional violation; and it is

**FURTHER ORDERED** that Plaintiff's motion to strike or for leave to file [Dkt. 38] is **DENIED**; and it is

**FURTHER ORDERED** that the parties shall meet, confer, and file by September 23, 2015 a jointly proposed briefing schedule for dispositive motions.


Date: September 9, 2015                                   _____/s/_____

ROSEMARY M. COLLYER
United States District Judge

1

)
**UNITED STATES HOUSE OF** )
**REPRESENTATIVES,** )
)
      **Plaintiff,** )
)
      **v.** )      Civil Action No.  14-1967 (RMC)
)
**SYLVIA MATTHEWS BURWELL in** )
**her official capacity as Secretary of the** )
**United States Department of Health and** )
**Human Services,** *et al.***,** )
)
      **Defendants.** )
)

## MEMORANDUM OPINION

      Article I of the United States Constitution established the Congress, which

comprises a House of Representatives and a Senate.  U.S. Const. art. I, § 1.  Only these two

bodies, acting together, can pass laws—including the laws necessary to spend public money.  In

this respect, Article I is very clear: "No Money shall be drawn from the Treasury, but in

Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7.

      Through this lawsuit, the House of Representatives complains that Sylvia

Burwell, the Secretary of Health and Human Services, Jacob Lew, the Secretary of the Treasury,

and their respective departments (collectively the Secretaries) have spent billions of

unappropriated dollars to support the Patient Protection and Affordable Care Act.  The House

further alleges that Secretary Lew and Treasury have, under the guise of implementing

regulations, effectively amended the Affordable Care Act's employer mandate by delaying its

effect and narrowing its scope.

The Secretaries move to dismiss, arguing that the House lacks standing to sue. They argue that only the Executive has authority to implement the laws, and urge this Court to stay out of a quintessentially political fight in which the House is already well armed. The House opposes, adamant that it has been injured in several concrete ways, none of which can be ameliorated through the usual political processes.

The only issue before the Court is whether the House can sue the Secretaries; the merits of this lawsuit await another day. Although no precedent dictates the outcome, the case implicates the constitutionality of another Branch's actions and thus merits an "especially rigorous" standing analysis. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 n.12 (2015). The House sues, as an institutional plaintiff, to preserve its power of the purse and to maintain constitutional equilibrium between the Executive and the Legislature. If its non-appropriation claims have merit, which the Secretaries deny, the House has been injured in a concrete and particular way that is traceable to the Secretaries and remediable in court. The Court concludes that the House has standing to pursue those constitutional claims.

In contrast, the House's claims that Secretary Lew improperly amended the Affordable Care Act concern only the implementation of a statute, not adherence to any specific constitutional requirement. The House does not have standing to pursue those claims. The Secretaries' motion to dismiss will be denied as to the former and granted as to the latter.

## I. FACTS

Some background is necessary on the appropriations process under our Constitution, the workings of the statute at issue, and how this case came about. The facts alleged in the House's complaint must be taken as true in this procedural posture. *Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015).

2

## A. Constitutional Overview

Congress passes all federal laws in this country. U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States[.]"). That includes both laws that authorize the expenditure of public monies and laws that ultimately appropriate those monies. Authorization and appropriation by Congress are nonnegotiable prerequisites to government spending: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7; *see also United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress."). The distinction between authorizing legislation and appropriating legislation is relevant here and bears some discussion.

Authorizing legislation establishes or continues the operation of a federal program or agency, either indefinitely or for a specific period. GAO *Glossary* at 15.[1] Such an authorization may be part of an agency or program's organic legislation, or it may be entirely separate. *Id.* No money can be appropriated until an agency or program is authorized, although authorization may sometimes be inferred from an appropriation itself. *Id.*

---

[1] The Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, § 801(a), 88 Stat. 297, 327 (1974) gives the Government Accountability Office (GAO) specific duties in the budgetary arena. *See generally* 31 U.S.C. § 1112(c). One of those duties is to help "establish, maintain, and publish standard terms and classifications for fiscal, budget, and program information of the Government, including information on fiscal policy, receipts, expenditures, programs, projects, activities, and functions." *Id.* § 1112(c)(1). The most recent publication in fulfilment of that duty is GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* (2005) (GAO *Glossary*). "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

Appropriation legislation "provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes." *Id.* at 13. Appropriations legislation has "the limited and specific purpose of providing funds for authorized programs." *Andrus v. Sierra Club*, 442 U.S. 347, 361 (1979) (quoting *TVA v. Hill*, 437 U.S. 153, 190 (1978)). An appropriation must be expressly stated; it cannot be inferred or implied. 31 U.S.C. § 1301(d). It is well understood that the "a direction to pay without a designation of the source of funds is not an appropriation." U.S. Government Accounting Office, GAO-04-261SP, *Principles of Federal Appropriations Law (Vol. I)* 2-17 (3d ed. 2004) (GAO *Principles*). The inverse is also true: the designation of a source, without a specific direction to pay, is not an appropriation. *Id.* Both are required. *See Nevada*, 400 F.3d at 13-14. An appropriation act, "like any other statute, [must be] passed by both Houses of Congress and either signed by the President or enacted over a presidential veto." GAO *Principles* at 2-45 (citing *Friends of the Earth v. Armstrong*, 485 F.2d 1, 9 (10th Cir. 1973); *Envirocare of Utah Inc. v. United States*, 44 Fed. Cl. 474, 482 (1999)).

Appropriations come in many forms. A "permanent" or "continuing" appropriation, once enacted, makes funds available indefinitely for their specified purpose; no further action is needed from Congress. *Nevada*, 400 F.3d at 13; GAO *Principles* at 2-14.[2] A "current appropriation," by contrast, allows an agency to obligate funds only in the year or years for which they are appropriated. GAO *Principles* at 2-14. Current appropriations often give a particular agency, program or function its spending cap and thus constrain what that agency, program, or function may do in the relevant year(s). Most current appropriations are adopted on

---

[2] Examples of permanent appropriations include the Judgment Fund (31 U.S.C. § 1304(a)) and the payment of interest on the national debt (31 U.S.C. § 1305(2)).

an annual basis and must be re-authorized in each fiscal year. Such appropriations are an integral part of our constitutional checks and balances, insofar as they tie the Executive Branch to the Legislative Branch via purse string.

## B. Statutory Overview

The 111th Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA), "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012); *see also King v. Burwell*, 135 S. Ct. 2480, 2485 (2015) ("The [ACA] adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market."). No party disputes here whether the ACA was validly adopted by both houses of Congress and signed into law by the President.[3]

### 1. Subsidies under Sections 1401 and 1402 of the Affordable Care Act

The ACA provides monetary subsidies in several forms; two are relevant here. First, in order to assist certain individuals with the cost of insurance on the newly-established exchanges, Congress enacted a "premium tax credit" under the Internal Revenue Code for coverage of statutory beneficiaries with household incomes from 100% to 400% of the federal poverty level. *See* 26 U.S.C. § 36B; 42 U.S.C. §§ 18081, 18082; *King*, 135 S. Ct. at 2487. These premium tax credits were enacted in Section 1401 of the ACA, and the Court will therefore refer to this subsidy as the "Section 1401 Premium Tax Credit."

Second, Section 1402 of the ACA requires insurers to reduce the cost of insurance

---

[3] The bill, H.R. 3590, 111th Cong. (2d Sess. 2009) (H.R. 3590), was amended and retitled after consideration and debate in the Senate. It passed the Senate by a vote of 60-39 on December 24, 2009. On March 21, 2010, the House agreed to the Senate amendments by a vote of 219-212. On March 23, 2010, President Obama signed H.R. 3590 into law.

to certain, eligible statutory beneficiaries. *See* 42 U.S.C. § 18071(a)(2). Specifically, these "cost-sharing" provisions require insurance companies that offer qualified health plans through the ACA to reduce the out-of-pocket cost of insurance coverage for policyholders who qualify. *See generally id.* § 18071.[4] The federal government then offsets the added costs to insurance companies by reimbursing them with funds from the Treasury. *See* 42 U.S.C. § 18071(c)(3) ("An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions."). The Court will refer to this subsidy as the "Section 1402 Cost-Sharing Offset."

Eligibility determinations for either subsidy can be made in advance, as can payments. *See* 42 U.S.C. § 18082(a)(1) (requiring the Secretaries of Health and Human Services (HHS) and Treasury to consult and establish a program to make advance determinations "with respect to the income eligibility of individuals . . . for the premium tax credit allowable under section 36B of title 26 and the cost-sharing reductions under section 18071"). The Section 1401 Premium Tax Credits are paid directly to insurance companies, who then "reduce the premium charged the insured for any period by the amount of the advance payment." *Id.* § 18082(c)(2)(B)(i). Treasury pays Section 1402 Cost-Sharing Offsets to the insurers "at such time and in such amount as the Secretary [of HHS] specifies." *Id.* § 18082(c)(3).

The House alleges that there is a marked, and constitutionally significant,

---

[4] "Reduced cost-sharing for individuals enrolling in qualified health plans" is described in some detail in the statute. *See generally* 42 U.S.C. § 18071. Basically, the ACA mandates lower co-pay expenses for beneficiaries. Once the Secretary of HHS notifies the insurer that an enrolled beneficiary is eligible for reduced cost-sharing, the insurer "shall reduce the cost-sharing under the plan" on a sliding scale dependent on the individual's household income. 42 U.S.C. §§ 18071(a)(2), 18071(c).

6

difference in the way these two subsidies are funded.  *See* Compl. ¶ 29 (citing 31 U.S.C. § 1324).

Essentially, the House contends that Section 1401 Premium Tax Credits are funded by a

permanent appropriation in the Internal Revenue Code, whereas Section 1402 Cost-Sharing

Offsets must be funded and re-funded by annual, current appropriations.  *Id.*  The House alleges

further that "Congress has not, and never has, appropriated any funds (whether through

temporary appropriations or permanent appropriations) to make any Section 1402 Offset

Program payments to Insurers."  *Id.* ¶ 28.

### 2.  The Affordable Care Act's Employer Mandate

Apart from its monetary subsidies, the ACA provides incentives for employers to

offer health insurance coverage to their employees.  Under the title "Shared Responsibility for

Employers Regarding Health Coverage," Section 1513 of the ACA adds a new chapter to the

Internal Revenue Code that subjects every non-conforming employer to an "assessable

payment," *i.e.*, a tax.  *See* 26 U.S.C. § 4980H(a).  *Cf. id.* § 4980H(d)(7) ("For denial of deduction

for the *tax* imposed by this section . . . .") (emphasis added); *Independent Business*, 132 S. Ct. at

2580, 2601 (concluding that the "[s]hared responsibility payment" in the ACA's individual

mandate, 26 U.S.C. § 5000A(b)(1), could "reasonably be read as a tax").  The substance of

Section 1513 is only relevant here insofar as it requires any "applicable large employer" to "offer

its full-time employees (and their dependents) the opportunity to enroll in minimum essential

coverage under an eligible employer-sponsored plan" or else to pay the tax.  26 U.S.C. §

4980H(a)-(b).  Section 1513 concludes: "The amendments made by this section shall apply to

months beginning after December 31, 2013."  *Id.* § 4980H(d).

### C.  Budgetary Requests and Appropriation Acts

The House alleges that the "Administration repeatedly has acknowledged that it

requires temporary appropriations to fund Section 1402," namely through the budget request process since the ACA's enactment. Compl. ¶ 31. After the May 28, 2015 hearing on the pending motion, the Court ordered supplemental briefing on these budget requests. *See* 6/1/2015 Minute Order. The parties filed a joint stipulation of facts in response, *see* Dkt. 30 (Stipulation).[5] The stipulated facts are clear, even if the parties dispute their relevance. *See* Stipulation at 1-2.[6]

On April 10, 2013, the Office of Management and Budget submitted its *Fiscal Year 2014 Budget of the U.S. Government*. Budget [Dkt. 30-1]. The Appendix to that budget contained "more detailed financial information on individual programs and appropriation accounts than any of the other budget documents." App. to Budget [Dkt. 30-2] at 3. The Appendix included, among other things, "explanations of the work to be performed and the funds needed." *Id.* In the April 2013 Appendix, the Administration requested the following:

> For carrying out, except as otherwise provided, sections 1402 [Reduced Cost-Sharing] and 1412 of the Patient Protection and Affordable Care Act (Public Law 111-148), such sums as necessary. For carrying out, except as otherwise provided, such sections in the first quarter of fiscal year 2015 (including upward adjustments to prior year payments), $1,420,000,000.

*Id.* at 453.

On the same day, HHS separately submitted to the relevant appropriations committees a *Justification of Estimates for Appropriations Committees*. Justification [Dkt. 30-

---

[5] The Court also ordered supplemental briefing on those facts. *See* Pl.'s Supplemental Mem. [Dkt. 33] (Pl. Supp. Mem.); Defs.' Supplemental Mem. [Dkt. 34] (Defs. Supp. Mem.); Pl.'s Supplemental Reply [Dkt. 35] (Pl. Supp. Reply); Defs.' Supplemental Reply [Dkt. 37] (Defs.' Supp. Reply).

[6] The dispute over relevance caused the parties to submit separate compilations of documents in support of their 'joint' stipulation. While the House selectively excerpted the relevant pages, the Secretaries filed and delivered a four-volume compendium of the documents in their entirety. *Compare* Dkts. 30-1 to 30-14 *with* Dkts. 30-15 to 30-28. Because neither party disputes the authenticity of the other's exhibits, the Court will freely cite to both.

8

3]. In that document, HHS explained:

> The FY 2014 request for Reduced Cost Sharing for Individuals
> Enrolled in Qualified Health Plans is $4.0 billion in the first year
> of operations for Health Insurance Marketplaces, also known as
> Exchanges. CMS also requests a $1.4 billion advance
> appropriation for the first quarter of FY 2015 in this budget to
> permit CMS to reimburse issuers who provided reduced cost-
> sharing [under Section 1402] in excess of the monthly advanced
> payments received in FY 2014 through the cost-sharing reduction
> reconciliation process.

*Id.* at 14. In its conclusion, HHS referred to the "Cost-Sharing Reductions" as one of "five annually-appropriated accounts." *Id.* In a later graphic entitled "Reduced Cost Sharing," HHS listed "--" under "Budget Authority" for "FY 2013 Current Law," *id.* at 193. That fact indicates that no prior appropriation applied to Section 1402. HHS compared the Section 1402 program to "other appropriated entitlements such as Medicaid." *Id.*

On May 17, 2013, the Administration submitted a number of amendments to its budget request. Amendments [Dkt. 30-4]. The House contends that these amendments are relevant because as they "did not withdraw or otherwise alter in any respect the Administration's FY 2014 request for an annual appropriation for the Section 1402 Offset Program," Pl. Supp. Mem. at 7 n.6.[7]

On May 20, 2013, OMB issued its *Sequestration Preview Report* for Fiscal Year 2014, which listed "Reduced Cost Sharing" as subject to sequestration in the amount of $286

---

[7] At the hearing on the instant motion, the Secretaries erroneously stated that the FY2014 request for Section 1402 funding had been withdrawn. *See* 5/28/15 Tr. at 23 (Counsel for the Secretaries) ("There was initially a request and that request was later withdrawn because the administration took a second look and realized that there were principles of appropriations law that made the request unnecessary."). Counsel for the House questioned whether that was correct. *Id.* at 38. The Secretaries have since notified the court that "[t]he reference of a withdrawal [was] to OMB's submission of the Fiscal Year 2015 Budget, which did not request a similar line item. Defendants' counsel did not intend to suggest that there was a formal withdrawal document, and apologizes for being unclear on that point." Stipulation at 3 n.1.

million, or 7.2% of the requested appropriation. Report [Dkt. 30-18] at 4. The House believes that because "payments properly made under [Section 1401 of the ACA] are exempt from sequestration," OMB's inclusion of Section 1402 Cost-Sharing Offsets on a list of sequestration-required programs was "an acknowledgement that the permanent appropriation codified at 31 U.S.C. § 1324 cannot be the funding source for such payments." Stipulation at 7 n.2.

On July 13, 2013, the Senate Appropriations Committee adopted S. 1284, a bill appropriating monies to HHS and other agencies. An accompanying report stated that "[t]he Committee recommendation does not include a mandatory appropriation, requested by the administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412 of the ACA." S. Rep. No. 113-71, 113th Cong., at 123 (2013). No subsequent consideration of funding for Section 1402 appears in the record.

On October 17, 2013, the President signed into law the first of two continuing resolutions to keep the government running pending a consolidated appropriations act. *See* Continuing Appropriations Act for 2014, Pub. L. 113-46, 127 Stat. 558 (2013); Joint Resolution, Pub. L. 113-73, 128 Stat. 3 (2014). Neither resolution included an appropriation for the Section 1402 Cost-Sharing Offset program.

Finally on January 17, 2014, the President signed the Consolidated Appropriations Act for 2014, Pub. L. 113-76, 128 Stat. 5 (2014). That law similarly did not appropriate monies for the Section 1402 Cost-Sharing Offset program.[8] Indeed, the Secretaries have conceded that "[t]here was no 2014 statute appropriating new money" for the Section 1402

---

[8] The Secretaries do assert that the Act "imposed dozens of explicit restrictions on particular uses of appropriated funds," but "did not restrict the use of any federal funds for the advance payment of cost-sharing reductions under the ACA." Defs. Supp. Mem. at 5. The absence of a restriction, however, is not an appropriation. *See MacCollom*, 426 U.S. at 321.

10

Cost-Sharing Offset program. 5/28/15 Tr. at 27.

### D. Background of this Case

The House alleges that the Secretaries, despite Congress's refusal to fund the Section 1402 Cost-Sharing Offsets through a current appropriation, nonetheless drew and spent public monies on that program beginning in January 2014. Compl. ¶ 35. The House also alleges that Secretary Lew has effectively "legislate[d] changes" to Section 1513, both by delaying the employer mandate beyond December 31, 2013 and by altering the percentage of employees that must be offered coverage. *Id.* ¶¶ 45, 46. These changes to the mandate are said by the House to have "usurp[ed] its Article I legislative authority." *Id.* ¶ 50.

To right these perceived wrongs, the House took legal action. On July 30, 2014, it adopted House Resolution 676, which authorized the Speaker of the House to file suit in federal court against the head of an Executive department or agency for "failure . . . to act in a manner consistent with that official's duties under the Constitution and laws of the United States with respect to implementation of any provision of the Patient Protection and Affordable Care Act." H.R. Res. 676, 113th Cong. (2014). Section 3(a) of the same Resolution authorized the House's Office of General Counsel, assisted by outside counsel, to represent the House in court. *Id.* After this suit commenced, the 113th Congress ended and the 114th Congress began. The new House adopted House Resolution 5 on January 6, 2015, which provided in part that the 114th House of Representatives could succeed the 113th House of Representatives as plaintiff in this lawsuit. H.R. Res. 5, § 3(f)(2)(A), 114th Cong. (2015).

The Secretaries moved to dismiss the case on January 26, 2015. *See* Mot. to Dismiss [Dkt. 20] (Mot.); Mem. in Support [Dkt. 20-1] (Mem.). The House opposes. Mem. in Opp'n [Dkt. 22] (Opp'n). The Secretaries have filed a reply. Reply to Opp'n to Mot. [Dkt. 26]

11

(Reply).  Oral argument was held on May 28, 2015.  The motion is thus ripe for resolution.[9]

## II.  LEGAL STANDARDS

The Court will analyze the pending motion under the following legal standards.

### A.    Motion to Dismiss

The Secretaries move to dismiss the complaint under the Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

#### 1.  Rule 12(b)(1)

Pursuant to Rule 12(b)(1), a defendant can move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction in federal court.  Fed. R. Civ. P. 12(b)(1).  No action by the parties can confer subject matter jurisdiction on a federal court, because subject matter jurisdiction is both a statutory requirement and an Article III requirement.  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts have limited jurisdiction and that "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).  When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must construe the complaint liberally, giving the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the

---

[9] The States of West Virginia, Oklahoma, Arizona, Louisiana, South Carolina, and Texas also sought leave to file an Amicus Curiae Brief.  Motion [Dkt. 24].  The Court will grant the motion by separate order.

court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

A court may consider materials outside the pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). That includes materials necessary to determine whether the plaintiff has standing. *See Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998). A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, *Federal Practice & Procedure, Civil* § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In such instances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

### 2. Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions,

13

and a formulaic recitation of the elements of a cause of action will not do." *Id*. A court must treat the complaint's factual allegations as true, "even if doubtful in fact," *id.*, but a court need not accept as true legal conclusions set forth in a complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. A complaint must allege sufficient facts that would allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### B. Standing and Subject Matter Jurisdiction

Standing is part and parcel of Article III's limitation on the judicial power of the United States, which extends only to cases or controversies. U.S. Const. art. III, § 2; *Arizona*, 135 S. Ct. at 2663. The strictures of Article III standing are by now "familiar." *United States v. Windsor*, 133 S. Ct. 2675, 2685 (2013). Standing requires (1) the plaintiff to have suffered an injury in fact that is both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) the injury to be traceable to the defendant's actions; and (3) the injury to be redressable by a favorable decision of the court. *See id.* at 2685-86 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992)).

A federal court must assure itself of both constitutional and statutory subject matter jurisdiction. The former obtains if the case is one "arising under the Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."

14

U.S. Const. art. III, § 2.  The relevant statute, 28 U.S.C. § 1331, likewise confers jurisdiction upon lower courts to hear "all civil actions arising under the Constitution, laws, or treaties of the United States."  As the Supreme Court held in *Powell v. McCormack*, federal courts have constitutional and statutory "arising under" jurisdiction whenever a plaintiff's claim "will be sustained if the Constitution is given one construction and will be defeated if it is given another." 395 U.S. 486, 514-16 (1969) (citing *Bell v. Hood*, 327 U.S. 678, 685 (1946); *King Cnty. v. Seattle Sch. Dist. No. 1*, 263 U.S. 361, 363-64 (1923)) (internal alterations omitted).

### C.  Justiciability

"[T]here is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'"  *Powell*, 395 U.S. 486 at 512 (citing *Baker v. Carr*, 369 U.S. 186, 198 (1962)).  Jurisdiction governs a court's authority to hear a case; justiciability pertains to the advisability of hearing the case.  *Windsor*, 133 S. Ct. at 2685.

Justiciability counsels the avoidance of political cases or controversies.  "The term 'political' has been used to distinguish questions which are essentially for decision by the political branches from those which are essentially for adjudication by the judicial branch." *Powell v. McCormack*, 395 F.2d 577, 591 (D.C. Cir. 1968), *rev'd in part*, *Powell*, 395 U.S. 486. Hence the "political question" doctrine.  That self-imposed limitation "bars our jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it.'"  *Hourani v. Mirtchev*, Nos. 13-7088, 13-7089, 2015 WL 4590324, at *5 (D.C. Cir. July 31, 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993); *Baker*, 396 U.S. at 217).

15

The Court must be cautious not to "elide[] the distinction" between the "jurisdictional requirements of Article III and the prudential limits on its exercise." *Windsor*, 133 S. Ct. at 3685. In the middle of their arguments concerning why the House has no "actionable injury," and thus no standing to sue, the Secretaries inject a separation-of-powers argument. Mem. at 16-18. That confuses jurisdiction with justiciability, however, which are separate principles. The first is a legal question, while the second assumes the legal answer yet cautions prudence. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). The Court will not consider separation of powers in the standing analysis. *See Powell*, 395 U.S. 486, 512 ("[T]he doctrine of separation of powers is more properly considered in determining whether the case is 'justiciable.'").[10]

## III. ANALYSIS

Under these long-established principles of law, and accepting the facts as alleged in the Complaint, the Court must decide whether it *can* hear this case (jurisdiction) and whether it *should* hear this case (justiciability).

### A. Standing

There is no authority that answers the questions posed by the Secretaries' motion. A survey of the precedent relied on by the parties is a worthwhile starting point, however, as it provides the guiding principles to be applied.

---

[10] The Supreme Court has opined that "the law of Art. III standing is built on a single idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984). But *Allen*'s reference to "separation of powers" concerned the role prescribed for the Judiciary in Article III, *i.e.*, to hear only cases or controversies. *Allen* did not address the separation between the Executive and Legislature Branches, which is at the heart of the argument advanced by the Secretaries. *See* Mem. at 16 ("The House seeks to upset this finely wrought balance by attempting to control the implementation of federal law, outside the Article I procedures for the enactment of legislation by bringing a suit premised on its disagreement with the Executive Branch's interpretation of that law.").

### 1. Precedent

The House draws heavily from *Coleman v. Miller*, in which the Kansas legislature had considered a proposed amendment to the U.S. Constitution known as the Child Labor Amendment. 307 U.S. 433, 435 (1939). When the resolution came to a vote, 20 state senators voted for it and 20 voted against it. *Id.* at 436. The Lieutenant Governor of Kansas, presiding over the Kansas Senate, cast the deciding vote in favor of the amendment. *Id.* The 20 opposing senators sought a writ of mandamus to prohibit ratification of the amendment, on the ground that the Lieutenant Governor had no right to cast the deciding vote. *Id.* After the writ was denied by the Kansas Supreme Court, an appeal was taken to the U.S. Supreme Court.[11]

*Coleman* recognized that the 20 senator-plaintiffs had "a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* at 438. That interest was "to have their votes given effect." *Id.* Because their votes "would have been sufficient to defeat ratification," but ratification nevertheless passed, the senators' votes had "been overridden and virtually held for naught." *Id.*

Importantly, the Kansas senator-plaintiffs were *not* complaining about the State Executive's adherence to a law that had been properly passed. Instead, the Executive (in the person of the Lieutenant Governor) was said to have interfered with the legislative process so that the senator-plaintiffs' legislative acts were frustrated. The senator-plaintiffs, despite their equal vote with senator-proponents, were unable to prevent the amendment's ratification. They were not complaining about the manner of implementation or interpretation of any law by the Governor. The same is true of the corollary principle recognized in *Coleman*: that the senator-

---

[11] The federal question implicated was Article V's requirements for amending the Constitution. *Id.* at 437-38 (citing U.S. Const. art. V).

plaintiffs would have suffered an equally grave injury had a bill they voted for with the requisite votes not been enacted. That injury, too, resides in the disruption of the legislative process and not in the implementation or interpretation of a law that has passed.

The Secretaries rely chiefly on *Raines v. Byrd*, in which Senator Robert C. Byrd and other Members of Congress challenged the Line-Item Veto Act, against which they had voted but which was passed by majority vote and signed by former President Clinton. 521 U.S. 811 (1997). *See* Pub. L. 104-130, 110 Stat. 1200 (1996) (Line-Item Veto Act). Under the Line-Item Veto Act, the President could "cancel" certain spending and tax benefit measures "after he [had] signed them into law." *Raines*, 521 U.S. at 814. The President's "cancellation" of a funding provision of an appropriation law could only be overridden by "disapproval bills" passed by the House and Senate. *Id.* at 815 (citing Line-Item Veto Act § 1025). Without such dual votes, the Executive could refuse to spend monies as directed by Congress. The Act specifically provided that any Member of Congress could assert a constitutional violation and sue for declaratory or injunctive relief. *Raines*, 521 U.S. at 815-16. Senator Byrd and his co-plaintiffs did just that, arguing that the Line Item Veto Act "'(a) alter[ed] the legal and practical effect of all votes they may cast . . . [on appropriations bills]; (b) divest[ed] [them] of their constitutional role in the repeal of legislation, and (c) alter[ed] the constitutional balance of powers . . . .'" *Id.* at 816.

The Supreme Court held that the *Raines* plaintiffs failed to establish that "their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Id.* at 820. In other words, the plaintiffs had statutory authority to sue but did not have Article III standing. *Id.* at 815-19. The Court read *Coleman* narrowly: "[O]ur holding in *Coleman* stands (at most[]) for the proposition that legislators whose votes would have been sufficient to defeat

18

(or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 823. The Court distinguished the *Raines* plaintiffs on the grounds that they had "alleged no injury to themselves as individuals," and because "the constitutional injury they allege[d] is wholly abstract and widely dispersed." *Id.* at 829. The Court added that "their attempt to litigate this dispute at this time and in this form is contrary to historical experience." *Id.*

The Secretaries perceive a straight line between *Raines* and this suit: they argue that the House has alleged only an "abstract dilution of institutional legislative power." Mem. at 1 (quoting *Raines*, 521 U.S. at 826). But the plaintiff here is the House of Representatives, duly authorized to sue as an institution, not individual members as in *Raines*. In fact, *Raines* "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id.* at 829. That important fact clearly distinguishes this case. As discussed below, the injury here is sufficiently concrete and particularized as to the *whole* House.

Our Court of Appeals has considered congressional standing in other contexts. In *United States v. AT&T*, the D.C. Circuit considered whether Congress (or its committees) had standing to sue in an official capacity to demand information from the Executive in furtherance of Congress's oversight role. 551 F.2d 384 (D.C. Cir. 1976).[12] The case presented a "portentous clash between the executive and legislative branches" over congressional subpoenas to AT&T for information related to warrantless wiretaps that the Executive Branch had refused to release on grounds of national security. *Id.* at 384. The D.C. Circuit found federal subject matter

---

[12] Although styled as a lawsuit between the United States and AT&T, the latter's only interest was "to determine its legal duty" vis-à-vis a congressional subpoena that the Executive had ordered it to ignore. *Id.* at 388-89.

jurisdiction, *id.* at 388-89, and also found it "clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." *Id.* at 391.

*AT&T* was based on solid precedent. Earlier cases had "establish[ed], at a minimum, that the mere fact that there is a conflict between the legislative and executive branches . . . does not preclude judicial resolution of the conflict." *Id.* at 390 (citing *S. Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (1974)). *AT&T* also relied on *United States v. Nixon*, 418 U.S. 683 (1974), which resolved an "analogous conflict between the executive and judicial branches and stands for the justiciability of such a case." *AT&T*, 551 F.2d at 390.

More recent decisions from this Court have followed *AT&T*'s lead. *See Comm. on Oversight and Gov. Reform v. Holder*, 979 F. Supp. 2d 1, 4 (D.D.C. 2013) ("[T]he Court finds that neither the Constitution nor prudential considerations require judges to stand on the sidelines. There is federal subject matter jurisdiction over this complaint, and it alleges a cause of action that plaintiff has standing to bring."); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 68 (D.D.C. 2008) ("The Committee and several supporting amici are correct that *AT&T*[] is on point and establishes that the Committee has standing to enforce its duly issued subpoena through a civil suit."); *House of Representatives v. Dep't of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998) ("[T]he court finds that [the House of Representatives] has properly alleged a judicially cognizable injury through its right to receive information by statute and through the institutional interest in its lawful composition . . . ."). It is thus well established in this Circuit that the House and its committees have, at least in some circumstances, standing to sue.[13]

---

[13] *See also In re Grand Jury Investigation of Ven-Fuel*, 441 F. Supp. 1299, 1307 (M.D. Fla. 1977).

Notably, the above-cited decisions all found that *AT&T*'s precedential force was not diminished by *Raines*. *See Miers*, 558 F. Supp. 2d at 68 ("*Raines* and subsequent cases have not undercut either the precedential value of *AT&T*[] or the force of its reasoning."); *House of Representatives*, 11 F. Supp. 2d at 89 ("The finding of an injury in this matter neither conflicts with *Raines v. Byrd* nor gives rise to a doctrine of legislative standing."); *see also Holder*, 979 F. Supp. 2d at 14 ("[*Raines*] does not stand for the proposition that Congress can never assert its institutional interests in court. Instead, it expressly leaves that possibility open[.] So the *Raines* decision does not compel the dismissal of this case, brought by a duly authorized House Committee."). This Court agrees that *AT&T* survives *Raines*.

The most recent opinion on legislative standing is *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015).[14] In that case, the Arizona Legislature filed suit challenging Proposition 106, a statewide citizen's initiative that had committed redistricting authority to an independent commission. *Id.* at 2661. The Arizona Legislature argued that it had "primary responsibility," *id.* at 2663, for redistricting under the Elections Clause, U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ."). The Supreme Court agreed that Proposition 106 "strip[ped] the Legislature of its alleged prerogative to initiate redistricting," and that the Legislature, therefore, had alleged an adequate injury in fact. *Arizona*, 135 S. Ct. at 2663.[15]

---

[14] The House submitted this case as new authority on June 30, 2015. Notice [Dkt. 32]. The Secretaries lodged a response to that filing, Dkt. 36, which the House has since moved to strike, Dkt. 38. The Secretaries oppose the motion to strike, Dkt. 39, and the House has filed a reply in support thereof, Dkt. 40. The Court denies the motion to strike.

[15] On the merits, a divided Court sustained Proposition 106. *Id.* at 2671-77.

21

Arizona carefully distinguished *Raines*, emphasizing its narrow holding "that six *individual Members* of Congress lacked standing to challenge the Line Item Veto Act." *Id.* at 2664 (emphasis in original). The *Arizona* Court reiterated that there was "some importance to the fact that [the *Raines* plaintiffs] not been authorized to represent their respective Houses of Congress." *Id.* In contrast, the Arizona Legislature was "an institutional plaintiff asserting an institutional injury." *Id.*

To be sure, the *Arizona* Court went out of its way *not* to decide the question presented in this case: "The case before us does not touch or concern the question whether Congress has standing to bring a suit against the President. There is no federal analogue to Arizona's initiative power, and a suit between Congress and the President would raise separation-of-powers concerns absent here." *Id.* at 2665 n.12. That *obiter dictum* raises cautions only as to justiciability, not jurisdiction.

In sum, no case has decided whether this institutional plaintiff has standing on facts such as these. Without the benefit of fully-applicable precedent, the Court proceeds to address the merits of the Secretaries' motion.

### 2. Plaintiff's Standing In This Case

The instant Complaint presents two theories of legal harm. First, the House alleges that the Executive has spent billions of dollars without a valid appropriation, in direct contravention of Article I, § 9, cl. 7. *See* Compl. ¶¶ 25-41, 51-90 (Counts I-V) (the Non-Appropriation Theory). Counts I and II allege constitutional violations. Count III alleges a violation of 31 U.S.C. § 1324 (the appropriation for Section 1401 Premium Tax Credits) and Count IV alleges a violation of "the entire statutory scheme [of] the ACA." Count V asserts a cause of action under the APA, alleging that the Secretaries' expenditures violate both the

22

Constitution and federal statutory law.

Second, the House alleges that Secretary Lew has not abided by the employer mandate as it was enacted in the ACA, thereby 'nullifying' the law. *See* Compl. ¶¶ 42-50, 98-108 (Counts VI-VIII) (the Employer-Mandate Theory).[16] All three counts are couched as constitutional violations, citing only Article I, § 1 (vesting legislative power in Congress) and Article I, § 7, cl. 2 (prescribing the lawmaking process). The gist of this theory is that Secretary Lew stepped into congressional shoes by effectively amending a congressionally-adopted law through regulation. But as discussed below, the heart of the alleged violation remains statutory, not constitutional: the House alleges not that Secretary Lew has disobeyed the Constitution, but that he disobeyed the ACA as enacted.

Distilled to their essences, the Non-Appropriation Theory alleges that the Executive was unfaithful to the Constitution, while the Employer-Mandate Theory alleges that the Executive was unfaithful to a statute, the ACA. That is a critical distinction, inasmuch as the Court finds that the House has standing to assert the first but not the second.

### a. The Non-Appropriation Theory (Counts I-V)

The Secretaries argue that the House lacks standing to sue and stop expenditures for which no annual appropriation was enacted. The House rejoins that it has standing to sue on several grounds, not least of which is that it has been "divested utterly and completely of its most defining constitutional function." Opp'n at 25. The Court agrees: the constitutional trespass alleged in this case would inflict a concrete, particular harm upon the House for which it has standing to seek redress in this Court.

---

[16] Although the House refers to these as the "Nullification Counts," Opp'n at 2, the Court will avoid that terminology so as not to confuse the theory with whether vote nullification is a cognizable injury under the Non-Appropriation Theory.

23

### i. Nature of the Theory

The persistent refrain in the Secretaries' memorandum is that the House has no standing to "maintain an action against the Executive Branch concerning its *implementation* of a statute." Mem. at 1 (emphasis added). The Secretaries use the word "implement," or a derivative thereof, no fewer than forty times in their twenty-six page memorandum. *See generally id.* They also cast this case as "concerning the proper *interpretation* of federal law," *id.* at 2 (emphasis added), and about "the *execution* of federal law," *id.* at 3 (emphasis added).

Properly understood, however, the Non-Appropriation Theory is not about the implementation, interpretation, or execution of any federal statute. It is a complaint that the Executive has drawn funds from the Treasury without a congressional appropriation—not in violation of any statute, but in violation of Article I, § 9, cl. 7 of the Constitution.[17] The Non-Appropriation Theory, in other words, is not about how Section 1402 is being applied, but rather how it is funded.

This clarification renders most of the Secretaries' precedent inapposite. They argue, for example, that our "Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts," Mem. at 12 (quoting *Bowsher v. Synar*, 478 U.S. 714, 722 (1986)), and that Congress does not "have standing anytime a President allegedly acts in excess of statutory authority," Mem. at 14-15 (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)). But again, the Non-Appropriation Theory is not about executing congressionally-enacted laws or staying within their bounds. Nor

---

[17] The nature of this particular constitutional violation is that it will almost always violate an appropriations statute as well. In this case, it would conceivably violate the appropriations legislation by which Congress funded the Section 1401 Premium Tax Credits and not, the House argues, the Section 1402 Cost-Sharing Offsets. But it is only the allegedly *unconstitutional* nature of the Executive's actions that causes a particular enough harm to convey standing.

24

is it "a generalized grievance about the conduct of government." Mem. at 25 n.12 (quoting *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1382 (D.C. Cir. 1984)). It alleges a specific, constitutional violation that is wholly irrespective of the ACA's implementation.

### ii. Injury in Fact

Once the nature of the Non-Appropriation Theory is appreciated, it becomes clear that the House has suffered a concrete, particularized injury that gives it standing to sue.[18] The Congress (of which the House and Senate are equal) is the only body empowered by the Constitution to adopt laws directing monies to be spent from the U.S. Treasury. *See Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("Congress's control over federal expenditures is 'absolute.'") (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)); *Nevada v. Dep't of Energy*, 400 F.3d at 13 ("[T]he Appropriations Clause of the U.S. Constitution 'vests Congress with exclusive power over the federal purse'") (quoting *Rochester*, 960 F.2d at 185); *Hart's Adm'r v. United States*, 16 Ct. Cl. 459, 484 (1880) ("[A]bsolute control of the moneys of the United States is in Congress, and Congress is responsible for its exercise of this great power only to the people."), *aff'd sub nom. Hart v. United States*, 118 U.S. 62 (1886). Yet this constitutional structure would collapse, and the role of the House would be meaningless, if the Executive could circumvent the appropriations process and spend funds however it pleases. If such actions are taken, in contravention of the specific proscription in Article I, § 9, cl. 7, the House as an institution has standing to sue. None of the Secretaries' four arguments, Mem. at 9-23, persuades the Court otherwise.[19]

---

[18] The Secretaries have mounted no argument as to the traceability or redressability of that injury, and thus concede that those elements of standing are satisfied. *See generally* Mem.

[19] The Secretaries stake a fifth argument, that "[t]he separation of powers forecloses the House's

25

### (a) Vindication of the rule of law generally

The Secretaries first argue that "vindication of the rule of law" is too generalized a grievance to be entertained by an Article III court. Mem. at 9-11. Their argument depends on, and cites almost exclusively, *Raines v. Byrd*. But this is not a case about "abstract dilution of institutional legislative power" as addressed in *Raines*, 521 U.S. at 826. The institutional injury was "diluted" in that case because only six of the 535 members of Congress sued as plaintiffs.[20] The critical distinction here is that the House of Representatives as an institution is the plaintiff. *See Arizona*, 135 S. Ct. at 2664 ("The 'institutional injury' at issue [in *Raines*], we reasoned, scarcely zeroed in on any individual Member. . . . The Arizona Legislature, in contrast, is an institutional plaintiff asserting an institutional injury.").[21]

The difference between institutional and individual plaintiffs also explains (and renders irrelevant) the *Raines* dichotomy between the "loss of political power" and the "loss of a[] private right." 521 U.S. at 821. In *Raines*, the Supreme Court reasoned that the plaintiffs'

---

claim of standing," Mem. at 16-19, which the Court will not consider in its standing analysis. As described above, separation-of-powers concerns are properly accounted for in a justiciability analysis, not a jurisdictional analysis.

[20] The Court takes judicial notice that the 105th Congress comprised 435 Representatives and 100 Senators. *See* http://history.house.gov/Congressional-Overview/Profiles/105th/ (last visited on Sep. 8, 2015).

[21] It is of course true that the House is but one chamber of Congress, and the Senate is not a plaintiff in this suit. That distinguishes the case from *Arizona*, where the entire state legislature sued. 135 S. Ct. at 2658-59. Yet the House remains an institution claiming an institutional injury. The only question is whether that injury "zeroe[s] in on" the House, or is too "widely disbursed" between it and the Senate. *Id.* at 2665. In *Raines*, six of 535 congressional members was not enough. *Id.* In *Arizona*, the entire legislature was enough. *Id.* In this case, one of two separate appropriating institutions—half of Congress—is the plaintiff. The Court finds that the injury, although arguably suffered by the House and Senate alike, is sufficiently concentrated on the House to give it independent standing to sue. An injury in fact must be inflicted particularly, but not exclusively, on the plaintiff.

injury was not "concrete" in part because none of them had a personal stake at issue. *See Kucinich v. Bush*, 236 F. Supp. 2d 1, 7 (D.D.C. 2002) ("*Raines* teaches us that generalized injuries that affect all members of Congress in the same broad and undifferentiated manner are not sufficiently 'personal' or 'particularized,' but rather are *institutional*, and too widely dispersed to confer standing.") (emphasis in original). But when the institution itself files suit, it can obtain a remedy for the "institutional" injury that the *Raines* Court found "too widely dispersed" when asserted by only a few members. *Id.*; *cf. Arizona*, 135 S. Ct. at 2664. As this Court has held, *Raines* "does not stand for the proposition that Congress can never assert its institutional interests in court," but instead "expressly leaves that possibility open." *Holder*, 979 F. Supp. 2d at 14.

The Secretaries also cite *Nevada Commission on Ethics v. Carrigan*, 131 S. Ct. 1343, 2350 (2011) ("The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it."). *See* Mem. at 11. But the Secretaries' ensuing sentence does not follow: "A legislative plaintiff, then, does not hold any legally protected interest in the proper application of the law that would be distinct from the interest held by every member of the public at large." *Id.* An individual legislator holds political power in trust for the people; she may gain and lose that power at their whim. The legislature's role is not so fleeting; the House remains the House, and *it* can sue to vindicate certain institutional interests, such as its distinct role in the appropriations process.

It is similarly misleading to say that the House's interest is "not as a prerogative of personal power," Mem. at 11 (quoting *Raines*, 521 U.S. at 821), or that "legislative power thus committed is not personal to the legislator but belongs to the people," Mem. at 11 (quoting *Nevada Comm'n*, 131 S. Ct. at 2350). The cases quoted are readily distinguishable, because the

27

plaintiffs were individual legislators. *See Raines*, 521 U.S. at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action."). The 'person' in this case is the House; to deem its prerogatives 'personal' *to the institution* does not contravene either *Raines* or *Nevada Commission*. And it is entirely consistent with *Arizona*.

The Secretaries also urge that "[o]nce a bill becomes a law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public." Mem. at 11 (quoting *Daughtrey v. Carter*, 584 F.2d 1050, 1057 (D.C. Cir. 1978)). That much may be conceded, but it does not resolve the question of standing for the House of Representatives in this case. Instead, it illustrates precisely why the nature of the Non-Appropriation Theory is so important to grasp: the House is not suing to police implementation of the ACA, but rather to redress an alleged violation of the Constitution. And because the House occupies a unique role in the appropriations process prescribed by the Constitution, not held by the ordinary citizen, perversion of that process inflicts on the House a particular injury quite distinguishable from any suffered by the public generally.[22]

### (b) Interest in the implementation of federal law

The Secretaries argue that Congress has no "legally cognizable interest in the manner in which federal law is implemented." Mem. at 12-16. This has been addressed. The Non-Appropriation Theory does not turn on the implementation, interpretation, or execution of the ACA. The question presented is instead constitutional. It is therefore unavailing, even if true, that "Congress plays no direct role in the execution of federal law and has no continuing or

---

[22] This also puts aside the obvious distinguishing feature of *Daughtrey*, which considered "*a Congressman's* interest" in enforcing federal law. 584 F.2d at 1057 (emphasis added). *Cf. Raines*, 521 U.S. at 829; *Arizona*, 135 S. Ct. at 2664.

28

distinct interest or stake in a bill once it becomes a law." *Id.* at 13. The House *does* have a continuing and distinct interest in the appropriation process, for that is its role in our constitutional system and the source of virtually all of the House's political power.

### (c) Non-judicial countermeasures

The Secretaries further argue that the House is not injured by the lack of an appropriation because it can remedy or prevent that injury through means outside this lawsuit. *Id.* at 19-20. Chief among those means, they contend, is "the elimination of funding." *Id.* As the House points out, the Secretaries are "apparently oblivious to the irony" of their argument. Opp'n at 35. Eliminating funding for Section 1402 is *exactly* what the House tried to do. But as the House argues, Congress cannot fulfill its constitutional role if it specifically denies funding and the Executive simply finds money elsewhere without consequence. Indeed, the harm alleged in this case is particularly insidious *because*, if proved, it would eliminate Congress's role via-a-vis the Executive. The political tug of war anticipated by the Constitution depends upon Article I, § 9, cl. 7 having some force; otherwise the purse strings would be cut.

The Court finds equally unpersuasive the argument that Congress "could repeal or amend the terms of the regulatory or appropriations authority that it has vested in the Executive Branch." Mem. at 19.[23] But the authority trespassed upon under the Non-Appropriation Theory is not statutory; it is constitutional. It was not vested in the Executive by Congress; it was vested in Congress by sovereign people through constitutional ratification. Neither Congress nor the Executive has the authority to repeal or amend the terms of Article I, § 9, cl. 7.

---

[23] The parties are obviously at odds over the meaning of the "appropriations authority" currently in place. The House believes that no appropriation has been made for Section 1402 Cost-Sharing Offsets, while the Secretaries maintain that such payments "are being made as part of a mandatory payment program that Congress has fully appropriated." Mem. at 6. That is a dispute to be resolved at the merits, which the parties have not yet briefed.

#### (d) The 'nullification' theory of standing.

In an obvious effort to preempt the House's invocation of *Coleman v. Miller*, the Secretaries argue that 'vote nullification' is not a cognizable injury. Mem. at 20-23. The House responds that this case "presents the same type of nullification injury the Supreme Court recognized in *Coleman*." Opp'n at 27. The Court need not reach this question, however, because it finds that the House suffers a sufficiently concrete and particularized injury by its displacement from the appropriations process. Whether its votes were 'nullified' within the meaning of *Coleman* need not be addressed at this juncture.

### iii. Specific Rulings

The House of Representatives as an institution would suffer a concrete, particularized injury if the Executive were able to draw funds from the Treasury without a valid appropriation. The House therefore has standing to sue on its Non-Appropriation Theory, to the extent that it seeks to remedy constitutional violations. That conclusion does not end the analysis, however.

Some of the counts under the Non-Appropriation Theory do not seek redress for *constitutional* violations. Count III alleges a violation of 31 U.S.C. § 1324, which appropriates funds for Section 1401 Premium Tax Credits but not, allegedly, the Section 1402 Cost-Sharing Offsets. Because that question is statutory and not constitutional, it falls within the sphere of cases to which the Secretaries' precedent *does* apply: those that concern the implementation, interpretation, or execution of federal statutory law.[24] The Court will therefore grant the Secretaries' motion as to Count III and dismiss it. The Court will also dismiss Count IV, which

---

[24] As noted above, the merits of the constitutional claim will inevitably involve some statutory analysis. The Secretaries' primary defense will be that an appropriation *has* been made, which will require reading the statute. But that is an antecedent determination to a constitutional claim.

similarly alleges a violation of the ACA's "statutory scheme." Compl. ¶ 79.

Count V alleges violations of three prongs of the Administrative Procedure Act. The House has standing under one of them: to redress agency action that is "contrary to constitutional right, power, privilege, or immunity," Compl. ¶ 85 (citing 5 U.S.C. § 706(2)(B)). The House may not proceed under the APA, however, to the extent that it challenges agency action as "in excess of statutory jurisdiction, authority, or limitation," Compl. ¶ 86 (citing 5 U.S.C. § 706(2)(C)) or agency action that is "not in accordance with law," Compl. ¶ 84 (citing 5 U.S.C. § 706(2)(A)). Such violations would cause the House no *particular* harm, for the reasons set forth above. Count V will not be dismissed, therefore, but merely limited in scope.

Although Counts I and II both cite constitutional provisions, only Count I will survive the Secretaries' motion. Count I alleges a violation of the specific, constitutional prohibition in Article I, § 9, cl. 7 that is meant to safeguard the House's role in the appropriations process and keep the political branches of government in equipoise. Count II is far more general: it cites only Article I, § 1 (vesting legislative power in Congress) and Article I, § 7, cl. 2 (prescribing the lawmaking process). Put simply, the allegation in Count II is that the House is part of Congress, and the Secretaries are not.

That is insufficient to allege a particularized harm to the House. If the invocation of Article I's general grant of legislative authority to Congress were enough to turn every instance of the Executive's statutory non-compliance into a constitutional violation, there would not be decades of precedent for the proposition that Congress lacks standing to affect the implementation of federal law. *See Bowsher*, 478 U.S. at 722 ("The Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts."); *Daughtrey*, 584 F.2d at 1057 ("Once a bill becomes law, a

31

Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public."); *see also Russell v. DeJongh*, 491 F.3d 130, 134-35 (3d Cir. 2007) ("[T]he authorities appear to hold uniformly that an official's mere disobedience or flawed execution of a law for which a legislator voted … is not an injury in fact for standing purposes."). Where the dispute is over true implementation, Congress retains its traditional checks and balances—most prominently its purse strings. But when the appropriations process is itself circumvented, Congress finds itself deprived of its constitutional role and injured in a more particular and concrete way. For these reasons, the Court will dismiss Count II.

The House has standing to pursue this lawsuit under its Non-Appropriation Theory as alleged in Count I, and in Count V to the extent that it is predicated on a constitutional violation. The Secretaries' motion will be granted as to Counts II, III, IV, and V, in part.

### b. The Employer-Mandate Theory (Counts VI-VIII)

The Employer-Mandate Theory stands on very different footing than the Non-Appropriation Theory. The House alleges that Secretary Lew and Treasury have disregarded the congressionally-adopted employer mandate in two ways. First, Secretary Lew delayed the effective date of the mandate beyond the statutory prescription of January 1, 2014. Compl. ¶ 45. Second, he reduced the percentage of employees or full-time equivalents (FTEs) who must be offered insurance, thereby decreasing the burden on employers. *Id.* ¶ 46. Both of these regulatory actions are said to "injure the House by, among other things, usurping its Article I legislative authority." *Id.* ¶ 50. Specifically, the House assails two parts of a Treasury Rule preamble (Counts VI and VII) and another part of the substantive Rule (Count VIII).

Despite its formulation as a constitutional claim, the Employer-Mandate Theory is fundamentally a statutory argument. The House cites only Article I, § 1 and Article I, § 7, cl. 2 in its Complaint. *See* Compl. ¶¶ 91-108 (Counts VI-VIII). Those provisions, taken together,

32

establish that Congress has sole legislative authority and that laws cannot be adopted without its approval. The House extrapolates from this that any member of the Executive who exceeds his statutory authority is unconstitutionally legislating.

The argument proves too much. If it were accepted, every instance of an extra-statutory action by an Executive officer might constitute a cognizable constitutional violation, redressable by Congress through a lawsuit. Such a conclusion would contradict decades of administrative law and precedent, in which courts have guarded against "the specter of 'general legislative standing' based upon claims that the Executive Branch is misinterpreting a statute or the Constitution." *House of Representatives*, 11 F. Supp. at 89-90; *cf. Windsor*, 133 S. Ct. at 2689 ("The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise.").[25] In sum, Article I is not a talisman; citing its most general provisions does not transform a statutory violation into a constitutional case or controversy.

The generalized nature of the injury alleged in the Employer-Mandate Theory is also relevant because other litigants can sue under the Administrative Procedure Act to invalidate Treasury regulations. *Cf. Blackfeet Nat'l Bank v. Rubin*, 890 F. Supp. 48, 54 (D.D.C.), *aff'd* 67 F.3d 972 (D.C. Cir. 1995). Indeed, litigation over implementing regulations has been ubiquitous since the ACA's inception. *E.g.*, *King v. Burwell*, 135 S. Ct. at 2488. A private plaintiff who is aggrieved by Treasury's actions is free to sue and convince a court that such regulations are contrary to the ACA or otherwise improper.

The redressability element of the standing analysis also distinguishes the two theories. If successful on the merits, which are not addressed here, the Non-Appropriation

---

[25] As described below, today's decision raises no such specter.

theory might result in an injunction against further Section 1402 Cost-Sharing Offsets until an appropriation is made. That would cure the constitutional injury. But under the Employer-Mandate Theory, the House merely asks the Court to declare unconstitutional several subsections of the preamble to a Treasury Rule. *Id.* Quite conspicuously, and in contrast to the Non-Appropriation Theory, the House does *not* seek injunctive relief with regard to the employer mandate. Compl. at 26-27 (Prayer for Relief). But if the alleged injury resides in the delayed enforcement of the employer mandate, declaratory relief alone would not help. Striking down Treasury's preamble to would not require Secretary Lew to start assessing payments. He might instead continue delaying the employer mandate without memorializing such delay in a regulation.[26] Thus, a ruling for the House may offer nothing but the "psychic satisfaction" of knowing "that the Nation's laws are faithfully enforced," which is "not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 107 (1998).

The Employer-Mandate Theory concerns the Executive's alleged infidelity to the ACA. To the extent the theory is expressed as a constitutional violation—on the ground that the

---

[26] The "assessable payment[s]" under the employer mandate are only "assessable." Because they are only due "upon notice and demand by the Secretary," 26 U.S.C. § 4980H(d)(1), the Secretary might stay assessments within his discretion and refuse to demand payment. *Cf. Oil, Chemical and Atomic Workers Int'l Union v. Occupational Safety & Health Review Comm'n*, 671 F.2d 643, 649-50 (D.C. Cir. 1982) ("[The Secretary of Labor] is the exclusive prosecutor of OSHA violations. Necessarily included within the prosecutorial power is the discretion to withdraw or settle a citation issued to an employer, and to compromise, mitigate or settle any penalty assessed under the Act.") (citations omitted); *id.* at 650 ("We endorse so broad a reading of prosecutorial discretion under the statute because we believe that such discretion comports with the Congressional intent that the Secretary be charged with the basic responsibilities for administering the Act."). *See also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1032-33 (D.C. Cir. 2007).

34

Secretary of the Treasury is not Congress—the theory is too general to state a concrete, particularized harm to the House.  Because the House lacks standing to pursue these claims, the Secretaries' motion will be granted as to Counts VI-VIII.

### 3.  The House has Standing

The Court concludes that the House of Representatives has alleged an injury in fact under its Non-Appropriation Theory—that is, an invasion of a legally protected interest that is concrete and particularized.  Article I could not be more clear: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7.  Neither the President nor his officers can authorize appropriations; the assent of the House of Representatives is required before *any* public monies are spent.  Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive.  *See U.S. Dep't of the Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (2012) ("[If not for the Appropriations Clause,] the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.") (quoting 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)).  The genius of our Framers was to limit the Executive's power "by a valid reservation of congressional control over funds in the Treasury."  *OPM v. Richmond*, 496 U.S. 414, 425 (1990).  Disregard for that reservation works a grievous harm on the House, which is deprived of its rightful and necessary place under our Constitution.  The House has standing to redress that injury in federal court.

### B.  Subject Matter Jurisdiction

Although the Secretaries do not seek dismissal for want of subject matter jurisdiction, federal courts have "an independent obligation to determine whether subject matter jurisdiction exists, even when no party challenges it."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94

35

(2010); *Arbaugh v. Y & H Corp*., 546 U.S. 500, 514 (2006).

This case "arises under" the Constitution in both a constitutional and statutory sense. The allegations here turn on a straightforward constitutional analysis: did the Secretaries violate Article I, § 9, cl. 7? "It has long been held that a suit arises under the Constitution if a petitioner's claim will be sustained if the Constitution is given one construction and will be defeated if it is given another." *Powell*, 395 U.S. at 514 (citing *Bell*, 327 U.S. at 685; *King County*, 263 U.S. at 363-364) (alterations and quotation marks omitted). The relevant statute, 28 U.S.C. § 1331, similarly confers jurisdiction when the "case depends directly on construction of the Constitution." *Powell*, 395 U.S. at 516. The Court concludes that it has subject matter jurisdiction over this case.

## C. Cause of Action

The Secretaries argue that the House has no cause of action even if it has standing to sue. The House rejoins that it has causes of action under the Declaratory Judgment Act; under the Administrative Procedure Act (as to Count V only); and impliedly under the Constitution. As to each Count for which the House has standing—Count I and part of Count V—it also has alleged a proper cause of action.[27]

### 1. Declaratory Judgment Act, 28 U.S.C. § 2201

The parties agree that the Declaratory Judgment Act does not itself create a cause of action, but instead requires that there be an independent "case of actual controversy." *See* 28 U.S.C. § 2201(a). *Compare* Mem. at 23-24 *with* Opp'n at 38-40. In other words, "the availability of [declaratory] relief presupposes the existence of a judicially remediable right." *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).

---

[27] The Court will not address Counts II-IV or VI-VIII.

So, while the Secretaries make separate arguments about the House's lack of standing and its lack of a cause of action under the Declaratory Judgment Act, the two inevitably collapse into one inquiry: does the House have standing? Not surprisingly, therefore, the parties merely incorporate their standing arguments into their cause-of-action arguments. *See* Mem. at 24 ("[A]s explained above, the House has no direct constitutional role in the implementation of law."); Opp'n at 39 ("[T]he House need only demonstrate [] 'a case of actual controversy,' i.e., that it has standing, which it does, *see supra* Argument, Part I . . . .").

It logically follows that the Court has already decided the question. The House has standing under the Non-Appropriation Theory (as to Count I and Count V, in part) but not under the Employer-Mandate Theory. The House accordingly may pursue a remedy under the Declaratory Judgment Act coextensive with its standing under the Non-Appropriation Theory. Apart from finding an actual controversy, the Court need only assure itself that the case is "within its jurisdiction" and that the House has filed "an appropriate pleading." 28 U.S.C. § 2201(a). Both elements are satisfied here, and the Secretaries do not contest either one. The Court concludes that the House can seek relief under the Declaratory Judgment Act for those claims that it has standing to bring, *i.e.*, Counts I and V, in part.

### 2. Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

The House argues that Count V can proceed under § 706(2)(A) of the Administrative Procedure Act (APA), which provides that a reviewing court shall "hold unlawful and set aside agency action" found to be "not in accordance with law." Alternatively, the House invokes § 706(2)(B) of the APA, which requires the same result when agency action is "contrary to constitutional right, power, privilege, or immunity." The Secretaries' only response is to challenge the House's qualification as "[a] person suffering legal wrong because of agency

action." Reply at 17 (citing 5 U.S.C. § 702). They argue that "[t]he House does not, and could not, contend that it has suffered 'legal wrong' within the meaning of the APA." Reply at 17. Once again, the analysis collapses back into standing. For the reasons stated above, the Court finds that the House has standing because it *has* alleged a legal wrong that is traceable and remediable. The Secretaries' APA defense therefore fails.

The Secretaries also argue that the House cannot be a "person aggrieved" because that term does not apply to "a governmental entity." Reply at 18 (citing *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding*, 514 U.S. 122, 130 (1995)). But *Newport News* does not say "governmental entity"; it says "an *agency* acting in its governmental capacity" is not a person aggrieved under the APA. 514 U.S. at 130 (emphasis added). That analysis does not control this case, therefore, and the Secretaries offer no precedent for the proposition that the House cannot be a "person aggrieved." Because there *is* precedent for the House filing suit to vindicate its rights in other contexts, *see AT&T*, 551 F.2d at 390-91; *Miers*, 558 F. Supp. 2d at 69; *Holder*, 979 F. Supp. 2d at 3; *House of Representatives*, 11 F. Supp. 2d at 86, the Court will deny the Secretaries' motion to dismiss Count V for want of a cause of action under the APA.

### 3. The U.S. Constitution

Finally, the Court finds that the House has an implied cause of action under the Constitution itself. The Secretaries' argument on this score revolves mostly around "private rights of action to enforce federal law." Reply at 18 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). But this is not a case about private citizens deputizing themselves in an effort to enforce federal law. Such putative plaintiffs must demonstrate an expressly-conferred cause of action precisely because they suffer no injury in their own right. It is quite another matter

when the House—which bears the brunt of the constitutional injury alleged—is the institutional plaintiff. *Cf. Ariz. Legislature*, 135 S. Ct. at 2664 (contrasting the individual plaintiffs in *Raines* to "an institutional plaintiff asserting an institutional injury").

The distinction makes *Armstrong v. Exceptional Child Center* similarly unavailing to the Secretaries. *See* Reply at 18-19 (citing 135 S. Ct. 1378 (2015)). In that case, the Supreme Court refused to find an implied cause of action in the Supremacy Clause, which "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong*, 135 S. Ct. at 1383. The Supreme Court reasoned that if there were such an implied cause of action, it would significantly curtail Congress's "ability to guide the implementation of federal law" by deciding at the outset who can enforce it. *Id.* 1384. In other words, an army of private enforcers would be inconsistent with Congress's "broad discretion with regard to the enactment of laws." *Id.* at 1383. But *Armstrong* is of no concern here, because the House and Senate are the only two possible plaintiffs under the Non-Appropriation Theory as recognized by this Court. Nor is it inconsistent with "the context of the Constitution as a whole," *id.*, for the Framers to forbid the Executive from spending un-appropriated money and then allow the appropriators to enforce that right in court. After all, "we presume that justiciable constitutional rights are to be enforced through the courts." *Davis v. Passman*, 442 U.S. 228, 242 (1979). The House in this case has "no effective means other than the judiciary" to seek redress for its injury and "must be able to invoke the existing jurisdiction of the courts for the protection of [its] justiciable constitutional rights." *Id.* The Court recognizes an implied cause of action for the House as an institution under a specific constitutional prohibition whose violation, if proved, would particularly harm Congress.

### D. Justiciability

39

That the Court has jurisdiction over this case does not end the inquiry. It must also consider whether there is any reason it should not hear the case, *i.e.*, whether the case is justiciable. That, in turn, presents two questions: (1) whether the claim presented and the relief sought are of the type which admit of judicial resolution; and (2) whether the structure of the federal government renders the issue presented a "political question," that is, not justiciable because of the separation of powers among the Legislative, Executive and Judicial Branches established by the Constitution. *Powell*, 395 U.S. at 516-17.[28]

The first question is easily answered: the claims for which the House has standing involve pure questions of constitutional interpretation, amenable to resolution by this Court. "It would be difficult to say that there are no 'manageable standards' for adjudicating the issues raised. Familiar judicial techniques are available to construe the meaning" of the Constitution. *Powell*, 395 F.2d at 594; *see also Powell*, 395 U.S. at 548-49 ("[A] determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded to courts to interpret the law, and does not involve a 'lack of respect due [a] coordinate [branch] of government,' nor does it involve 'an initial policy determination of a kind clearly for nonjudicial discretion.'") (quoting *Baker*, 369 U.S. at 217). In short, centuries of precedent demonstrate the Judiciary's ability to adjudicate the Secretaries' compliance with the Constitution. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

---

[28] In addition to their justiciability argument rooted in separation of powers, the Secretaries argue unpersuasively that the Court should exercise its discretion under the Declaratory Judgment Act and dismiss this case because the House "has a variety of legislative means available to counter the Executive Branch." Mem. at 26. As discussed above, the constitutional violation of which the House complains has the collateral effect of disarming the most potent of those legislative means.

The Secretaries pin their hopes on the second question, arguing that to allow this suit to proceed would "upset the finely wrought balance" among the branches and that the case presents issues not "suitable for resolution by an Article III court." Mem. at 16, 18.[29] The argument is not persuasive. Whatever the merits of the parties' interpretations of the differing appropriation legislation—an issue not to be addressed at this stage of litigation—the Complaint makes clear that this is not a dispute over statutory semantics. To the contrary, the constitutional violation alleged is that, despite an intentional refusal by Congress to appropriate funds for Section 1402, the Secretaries freely ignored Article I, § 9, cl. 7 of the Constitution and sought other sources of public money. The Complaint's Non-Appropriation Theory presents a question of constitutional interpretation for the Judiciary, which provides "the primary means through which [constitutional] rights may be enforced." *Davis*, 442 U.S. at 241.

The Secretaries' separation-of-powers argument, properly addressed here, is unavailing. It consists of two principal parts: (1) the history of non-litigiousness between the political branches, recounted in *Raines*, and (2) a page-long series of quotes from Justice Scalia's dissent in *Windsor*. *See* Mem. at 16-18. The first part is unconvincing: the refusal by several presidents to sue Congress over the Tenure of Office Act hardly answers the question presented by the pending motion. *See* 521 U.S. at 826. The refrain by either branch from exercising one of its options does not mean that the option was unavailable; there will never be a history of litigation until the first lawsuit is filed. The second part is not precedential: for all of its

---

[29] The Secretaries also cite the 19th-century history of non-litigiousness between the political Branches, which was surveyed in *Raines*, 521 U.S. at 826-27. The Court has carefully considered all of *Raines* and finds it distinguishable. While there is no precedent for this specific lawsuit, the rights of the House as an institution to litigate to protect its constitutional role has been recognized in other contexts in the 20th century and its institutional standing was most specifically foreseen, if not decided, in *Raines*, 521 U.S. at 829-30 and *Arizona Legislature*, 135 S. Ct. at 2664-65.

eloquence, Justice Scalia's opinion remains a dissent joined by only two other Justices. It does not convince the Court to dismiss this case.

The Court concludes that prudential considerations do not counsel avoidance of this dispute. The Court is familiar with the standards for constitutional review of Executive actions, and the mere fact that the House of Representatives is the plaintiff does not turn this suit into a non-justiciable "political" dispute. *See Powell*, 395 U.S. at 549 ("Our system of government requires that federal courts on occasion interpret the Constitution at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.") (collecting cases). Despite its potential political ramifications, this suit remains a plain dispute over a constitutional command, of which the Judiciary has long been the ultimate interpreter. *See Marbury*, 5 U.S. (1 Cranch) 137.

The Court is also assured that this decision will open no floodgates, as it is inherently limited by the extraordinary facts of which it was born. The Secretaries note that this case is a "novel tactic" by the House and "entirely without precedent." Mem. at 2, 25. The House agrees that this "case is the result of an historic vote by plaintiff House of Representatives." Opp'n at 1. The rarity of these circumstances itself militates against dismissing the case as non-justiciable. *See Windsor*, 133 S. Ct. at 2689 ("The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise. But this case is not routine.").

## IV. CONCLUSION

The House of Representatives has standing to pursue its allegations that the Secretaries of Health and Human Services and of the Treasury violated Article I, § 9, cl. 7 of the

Constitution when they spent public monies that were not appropriated by the Congress. The Secretaries hotly dispute that any violation has occurred, maintaining that the Section 1402 "cost sharing reduction payments are being made as part of a mandatory payment program that Congress has fully appropriated." Mem. at 6 (citing 42 U.S.C. § 18082). The Court stresses that the merits have not been briefed or decided; only the question of standing has been determined.

    The Secretaries' motion to dismiss, Dkt. 20, will be granted in part and denied in part. The following Counts of the Complaint will be dismissed: II, III, IV, V, in part, VI, VII, and VIII. Count I remains, as does Count V (to the extent predicated on a constitutional violation). Furthermore, the House's motion to strike, Dkt. 38, will be denied. The parties will be directed to meet, confer, and file a proposed schedule for briefing dispositive motions.

    A memorializing Order accompanies this Opinion.

Date: September 9, 2015

             /s/
             ROSEMARY M. COLLYER
             United States District Judge